1  **HAHN & HAHN LLP**
Dean G. Rallis Jr. (SBN 94266)
2  drallis@hahnlawyers.com
301 E. Colorado Blvd., Ninth Floor
3  Pasadena, California 91101-1977
Telephone: (626) 796-9123
4  Facsimile: (626) 449-7357

5  Attorneys for Creditor,
CENTURY CITY MALL, LLC
6

7

8

9  **UNITED STATES BANKRUPTCY COURT**

10  **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

11

12  In re                                    Case No. 2:24-bk-20065-DS

13  HEALTHY SPOT OPERATING, LLC,              Chapter 11

14        Debtor and Debtor In Possession.    **CENTURY CITY MALL, LLC'S MOTION
                                              PURSUANT TO 11 U.S.C. § 365(d)(3) TO
15                                            COMPEL THE DEBTOR TO PAY POST
                                              PETITION DATE RENT AND ALLOW
16                                            ADMINISTRATIVE CLAIM UNDER 11
                                              U.S.C. § 503(b); MEMORANDUM OF
17                                            POINTS AND AUTHORITIES;
                                              DECLARATION OF LOUIS SCHILLACE**

18                                            **Hearing Date**
                                              Date:   July 8, 2025
19                                            Time:   1:00 p.m.
                                              Place:  Courtroom 1639
20                                                    Edward R. Roybal Federal Building
                                                      and Courthouse
21                                                    255 East Temple Street
                                                      Los Angeles, CA 90012
22

23  **TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES**

24  **BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, OTHER**

25  **INTERESTED PARTIES:**

26        Century City Mall, LLC (the "Landlord"), landlord, creditor, and party in interest, hereby

27  moves the Court by this motion (the "Motion") pursuant to 11 U.S.C. §§ 365(d)(3) and 503(b) for

28  the entry of an order compelling Healthy Spot Operating, LLC, the debtor and debtor-in-

possession in the above captioned bankruptcy case (the "<u>Debtor</u>"), to pay post-petition date rent and allow administrative claim under the lease dated February 18, 2018 between the Landlord and the Debtor for certain premises described as Store No. 2580, at Westfield Century City Mall, located on Santa Monica Boulevard, Los Angeles, California.

The Motion is based on 11 U.S.C. §§ 365(d)(3), 503(b), Federal Rule of Bankruptcy Procedure 9013, and Local Bankruptcy Rule 9013-1, the attached Memorandum of Points and Authorities and the Declaration of Louis Schillace annexed hereto, the entire record of the Debtor's bankruptcy case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court.

**WHEREFORE**, the Landlord respectfully requests that this Court enter an Order:

(1)    Granting the motion in its entirety;

(2)    Compelling the Debtor to pay the post-petition accrued rent in full;

(3)    Allowing the accrued rent as an administrative expense;

(4)    Compelling the Debtor to pay the reasonable legal fees incurred by Landlord in securing the requested relief; and

(5)    Granting such other and further relief as the Court deems just and proper under the circumstances.

DATED:  June 13, 2025                        Respectfully submitted,

HAHN & HAHN LLP

By:    _/s/ *Dean G. Rallis Jr.*_____
Dean G. Rallis Jr.
Attorneys for Creditor, CENTURY CITY MALL, LLC

2

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

On December 10, 2024, the Debtor commenced the instant bankruptcy case under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Upon information and belief, the debtor remains in control of and is operating its businesses as a debtor-in-possession and no trustee or examiner has been appointed.

On February 18, 2018 the Landlord entered into a Lease with Healthy Spot 015 LLC for retail Store No. 2580 (the "Premises") at Westfield Century City Mall (the "Center"), located on Santa Monica Boulevard in Los Angeles, California.  The Lease has been amended from time to time, and assigned to an affiliate of the original tenant, Healthy Spot Gamma, LLC, which assignment was acknowledged by Landlord in a letter dated July 1, 2019. The Debtor has represented to the Landlord that the Lease was subsequently assigned to the Debtor as part of a transaction in which substantially all of Healthy Spot Gamma, LLC's assets were acquired by the Debtor. The Landlord has not been provided with any documentation to substantiate this claim and, to the extent required under the Lease, the Landlord has not yet acknowledged the validity of the purported assignment of the Lease. A true and correct copy of the Lease is attached hereto as Exhibit 1.

As set forth on Exhibit 2 attached hereto and the attached Affidavit, the Debtor has: (a) failed to pay the December 11-31, 2024 rents in the amount of $11,762.11 ("Stub Rents"); (b) underpaid rents attributable to the months of January, February, and March of 2025 (certain expense escalations that were first billed in April); and (c) failed to pay the rents for the months of April, May, and June of 2025.  As of the filing of this memorandum, the foregoing post-petition date rental arrears, including Stub Rents, totals $65,324.57. (collectively, the "Unpaid Rentals"). Monthly rents, including all charges payable under the Lease, such as common area maintenance, taxes, promotional charges, among others, totals $17,926.29 (collectively, the "Monthly Rentals").

On March 26, 2025, pursuant to 11 U.S.C. § 365(d)(4), the Court entered the Order

Granting Debtor's Motion for Order Extending Time to Assume or Reject Unexpired Nonresidential Real Property Leases (the "<u>Extension Order</u>").  As of the entry of the Extension Order, excepting only Stub Rent and small shortfalls for each of January, February and March, 2025, the Debtor was substantially current on its Monthly Rental payments. Since the entry of the Extension Order, the Debtor has not paid any Monthly Rentals to Landlord.

On June 9, 2025, the Debtor moved to reject the Lease, among certain other leases, pursuant to *Debtor's Motion for Order to Reject Unexpired Leases of Nonresidential Rela Property* [D.I. 146].

## II.

## DISCUSSION

Bankruptcy Code § 365(d)(3) provides:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) or this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (1) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

U.S.C. § 365(d)(3).

It is well settled that, pursuant to 11 U.S.C. § 365(d)(3), the Debtor is obligated to pay the Unpaid Rentals immediately. *See, e.g.*, *The Caldor Corp. v. S Plaza Assocs., L.P. (In re Caldor, Inc.-NY)*, 217 B.R. 116, 120-21 (Bankr. S.D.N.Y. 1998); *In re Montgomery Ward Holding Corp*., 268 F.3d 205, 209 (3rd Cir. 2001) (holding that Congress, in adopting section 365(d)(3), intended a debtor to perform all leasehold obligations as they came due); *cf. In re Leather Factory Inc.*, 475 B.R. 710, 714 (Bankr.C.D.Cal. 2012) ("… the rent for the days after the filing of the petition until the next lease payment is due are an administrative claim under § 365(d)(3) in a prorated amount of a full monthly lease payment …"); *Cukierman v. Uecker (in Re Cukierman)*, 265 F.3d 846, 851 (9th Cir. 2001) ("Interpreting § 365(d)(3) as a bright-line rule, encompassing all obligations contained in a bargained-for agreement, ensures prompt performance of lease

4

obligations …").

Bankruptcy Code Section 365(d)(3) was added to the Bankruptcy Code in 1984 to protect landlords from the consequences of "involuntary" creditor status. The legislative history explains the reason for enacting § 365(d)(3):

> This subtitle contains three major substantive provisions which are intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code . . . A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments under the lease. In this situation, the landlord is forced to provide current services-the use of its property, utilities, security, and other services--without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the debtor. The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance  requirement will insure that debtor-tenants pay their rent, common area,  and other charges on time pending the trustee's assumption or rejection of the lease.

130 Cong. Rec. 58887, 8895 (daily ed. June 29, 1984) (statement of Sen. Hatch) (emphasis added). Thus, section 365(d)(3) requires the Debtor to pay lease obligations as they come due, thereby balancing the Debtor's need to retain the leasehold, and the Landlord's inability to evict the Debtor during the Section 365(d)(4) period. *See El Paso Props. Corp. v. Gonzales (In re Furr's Supermarkets, Inc.)*, 283 B.R. 60, 69 (B.A.P. 10th Cir. 2002). Accordingly, the Landlord respectfully requests that this Court enter an order directing the Debtor to pay the Unpaid Rentals to the Landlord immediately.

Consistent with the foregoing and as alternative relief, the Landlord respectfully requests that this Court allow the Landlord an administrative expense claim under 11 U.S.C. § 503(b) in the amount of the Unpaid Rentals. "If the trustee fails to perform a lease obligation, the plain meaning of § 365(d)(3) serves to eliminate disputes over whether the claim arising from that nonperformance is entitled to administrative priority"). *Cukierman v. Uecker (in Re Cukierman)*, 265 F.3d at 851. Accordingly, and in the alternative, the Landlord should be allowed an administrative expense claim under 11 U.S.C. § 503(b) in the amount of the Unpaid Rentals.

Additionally, pursuant to the Lease, the Landlord has a right to payment of the attorneys' fees it has incurred (and will continue to incur) in connection with this Motion. *See, e.g.,*

DRALLIS\38907.00002\5221019.3

1  *Travelers Cas. & Su. Co. of Am. v. Pacific Gas and El. Co.*, 127 S. Ct. 1199, 1203 (2007)

2  (holding that a party is entitled to be reimbursed for its attorneys' fees when there exists an

3  "enforceable contract allocating attorneys' fees"); *In re East 44th Realty, LLC*, 2008 WL 217103

4  (S.D. N.Y. 2008) (affirming bankruptcy court's finding that a $1.7 million settlement of

5  attorneys' fees to a landlord was reasonable); *In re Beltway Medical, Inc.*, 358 B.R. 448, 453

6  (Bankr. S.D. Fla. 2006) ("Where the trustee or debtor-in-possession fails to perform the primary

7  obligation under the lease (i.e. to pay rent), and the landlord incurs legal fees seeking to obtain

8  payment, it follows that the attorney's fees, if authorized under the lease and linked to

9  enforcement of the payment obligation, are entitled to the same administrative priority as the rent

10  obligation"); *In re Entertainment, Inc.*, 223 B.R. 141, 152-154 (Bankr. E.D. Ill. 1998)

11  (determining that interest and attorneys' fees must be paid as provided for in the assumed lease);

12  *In re MS Freight Distribution, Inc.*, 172 B.R. 976, 978 (Bankr. W.D. Wash. 1994) ("[T]he

13  legislative history of [section 365(d)(3)] and the language of the section itself mandate that a

14  lessor be paid interest, late fees, and legal fees incurred in the first 60 days of the bankruptcy case

15  . . .").

16      Lease, Section 27.22, provides as follows:

17      Tenant shall also pay all costs, expenses and/or reasonable attorneys' fees that may be
        incurred or paid by Landlord, its agents or employees in successfully enforcing the terms,
18      covenant and/or conditions of this Lease.

19      Lease, Section 20.09, provides as follows:

20      If, in the context of Tenant's bankruptcy case, Landlord is compelled at any time to incur
        any expense including attorneys' fees, in enforcing or attempting to enforce the terms of
21      this Lease or to enforce any action required under the Bankruptcy Code to be taken by the
        Trustee or Tenant, as Debtor-In-Possession, then the sum so paid by Landlord shall be
22      awarded to Landlord by the Bankruptcy Court and shall be immediately due and payable
        by the Trustee or by Tenant's bankruptcy estate to Landlord in accordance with the terms
23      of the order of the Bankruptcy Court.

24

25      Reimbursement of attorneys' fees related to the Motion is appropriate here because the

26  Landlord has been required to initiate this contested matter to enforce its clear, statutorily

27  protected, contractual right to timely rent payments under the Lease.

28

DRALLIS\38907.00002\5221019.3

## III.

## CONCLUSION

Based on the foregoing, the Landlord requests the Court enter an order directing the Debtor to immediately pay the Unpaid Rentals plus reasonable attorneys' fees associated with preparing and prosecuting this Motion. Furthermore, the Landlord requests that the Court grant the Landlord and allowed administrative expense claim in the amount of the Unpaid Rentals and further grant the Landlord such other and further remedies and relief as the Court may deem appropriate under the circumstances. *See, e.g., In re Southwest Aircraft Servs., Inc.*, 831 F.2d 848, 854 (9th Cir. 1987) ("Congress intended the bankruptcy courts to have the discretion to consider all of the particular facts and circumstances involved in each bankruptcy case and to decide whether the consequence of a violation of subsection (d)(3) should be forfeiture of the unassumed lease, some other penalty, or no penalty at all").

DATED: June 13, 2025                    Respectfully submitted,

                                        HAHN & HAHN LLP


                                        By:    /s/ *Dean G. Rallis Jr.*
                                               Dean G. Rallis Jr.
                                               Attorneys for Creditor, CENTURY CITY MALL, LLC

DRALLIS\38907.00002\5221019.3

# DECLARATION

# OF

# LOUIS SCHILLACE

## DECLARATION OF LOUIS SCHILLACE

I, Louis Schillace, declare:

1.     This declaration is proffered in support of Movant's *Motion Pursuant to 11 U.S.C. § 365(d)(3)to Compel the Debtor to Pay Post Petition Date Rent and Allow Administrative Claim under 11 U.S.C. § 503(b)* (the "Motion"). I have personal knowledge of the following facts and, if called and sown as a witness, could and would competently testify thereto.

2.     I am the Senior General Manager for Westfield Century City.

3.     I am one of the custodians of the books, records and files of Movant as to those books, records and files that pertain to the rental of this Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the court if required.

4.     A true and correct copy of the Lease and all amendments are attached to the Motion as Exhibit 1.

5.     The tenant under the Lease has purportedly assigned its interests thereunder to the Debtor. The Landlord has not been provided with any documentation to support this contention by the Debtor and the Landlord has not consented to any such assignment of the Lease.

31445176.3

6.      Prior to commencing the present bankruptcy case on December 10, 2024, the Debtor accrued total arrearages of $164,498.56 in unpaid rent and other charges payable to the Movant under the lease.

7.      Since commencing the present bankruptcy case on December 10, 2024, the Debtor has: (a) not paid the pro rata portion of the December 2024 rent and other charges following the bankruptcy petition date, December 11 – 31, 2024, in the total amount of $11,762.11; (b) underpaid the monthly rent and other charges attributable to the months of January, February, and March of 2025, in the total amount of $1,689.51 (certain expense escalations first billed in April, 2025); and failed to pay any of the monthly rent and other charges for April, May, and June of 2025, in the total amount of $51,872.95. The foregoing rent defaults following the bankruptcy petition date total $65,324.57.

8.      In addition, rent and other charges in the amount of $17,926.29 will accrue on July 1, 2025 and as of the first day of each month thereafter.

9.      Attached to the Motion as Exhibit 2 is a true correct detailed report of the underpaid and unpaid monthly rents and other charges owed by the Debtor to the Movant.

10.     Movant seeks an order compelling the Debtor to pay the accrued unpaid post-petition date rents as described above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ____ day of June, 2025.

Louis Schillace

31445176.3

# Exhibit 1

# LEASE

### HEALTHY SPOT
**TRADE NAME**

### HEALTHY SPOT 015 LLC
**TENANT**

### 2580
**STORE NUMBER**



# CENTURY CITY

# INDEX TO LEASE

**Page No.**

DATA SHEET AND GRANT.. .. .. .. .. .. .. .ii
ARTICLE I. GRANT AND TERM
    Section 1.01. Conditions of Grant..............................1
    Section 1.02. Term .....................................................1
    Section 1.03. Late Opening..........................................2
ARTICLE II. RENTAL
    Section 2.01 Minimum Annual Rental ..... ...... ......2
    Section 2.02 Percentage Rental........ ... ..... .... ..2
    Section 2.03. Gross Sales ..........  .......  .... .... .. 3
    Section 2.04  Tenant's Tax Obligation ...  .... .. 4
    Section 2.05  Trash Removal Charge ....... .....  .....5
    Section 2.06. Additional Rent  .....  ....... .. 6
    Section 2.07. Late Charge .....  ........  .. .. 6
    Section 2.08. Tenant's Payment Obligations.. .. ... 7
ARTICLE III. RECORDS AND BOOKS OF ACCOUNT
    Section 3.01. Tenant's Records .......................... . 7
    Section 3.02. Reports by Tenant ..............................7
ARTICLE IV. AUDIT
    Section 4.01. Right to Examine Books ....................8
    Section 4.02. Audit.....................................................8
ARTICLE V. CONSTRUCTION OF PREMISES
    Section 5.01. Construction of Premises .................8
    Section 5.02 Certificate of Occupancy...................9
    Section 5.03. Condition of Premises .......................9
    Section 5.04. Ultimate Delivery Date .....................10
    Section 5.05. Required Improvements...................10
ARTICLE VI. ALTERATIONS, CHANGES
    AND ADDITIONS
    Section 6.01. Alterations by Tenant ......................10
    Section 6.02. Removal by Tenant .......................10
    Section 6.03. Changes and Additions ...................10
    Section 6.04. Rights of Landlord ...........................11
ARTICLE VII. CONDUCT OF BUSINESS BY TENANT
    Section 7.01. Permitted Use...................... ... .. ....11
    Section 7.02. Operation of Business ..... ... ...12
    Section 7.03 Hazardous Materials.........................13
    Section 7.04. Radius ..............................................15
ARTICLE VIII. COMMON AREAS
    Section 8.01. Operation and Maintenance of
        Common Areas...............................................16
    Section 8.02 Use of Common Areas......................16
    Section 8.03. Common Area Operating Costs
        and Expenses ....... ...... ...... ....... .... ... 17
ARTICLE IX. SIGNS
    Section 9.01. Tenant's Signs...................................17
ARTICLE X. MAINTENANCE OF PREMISES
    Section 10.01  Landlord's Obligations for
        Maintenance . .......  .......................................18
    Section 10.02. Tenant's Obligations for
        Maintenance ....  ...... ...... ....  ....... 18
ARTICLE XI. INSURANCE AND INDEMNITY
    Section 11.01. Tenant's Insurance ........................19
    Section 11.02. Landlord's Insurance ....................20
    Section 11.03. Covenant to Hold Harmless...........21
    Section 11.04. Waiver of Right of Recovery... . .....21
ARTICLE XII. UTILITIES
    Section 12.01 Utility Charges ..............................21
ARTICLE XIII ESTOPPEL STATEMENT,
    ATTORNMENT AND SUBORDINATION
    Section 13.01. Estoppel Statement ......... ...... .......23
    Section 13.02. Attornment ...  ......  ...... ..... ....23
    Section 13.03. Subordination  ......  ..............  . 23
    Section 13.04. Remedies...................... . ........ . 24
    Section 13.05. Notice to Mortgagee, Beneficiary or
        Ground Lessor ..  .........  ......  ......  .... . 24
ARTICLE XIV. ASSIGNMENT AND SUBLETTING
    Section 14.01. Restrictions on Transfer ... ...........24
    Section 14.02. Procedure for Transfer .. .. .......25
    Section 14.03. Transfer Rent Adjustment.. . .....26
    Section 14.04. Required Documents and Fees.............26
    Section 14.05. Transfer of Stock or Partnership
        Interest...... ...... ...... .....  ..... ... ... 26
    Section 14.06. Assignment and Sublease Rentals. ...  26
ARTICLE XV WASTE OR NUISANCE
    Section 15.01  Waste or Nuisance.. ...... ....................27

**Page No.**

ARTICLE XVI. TRADE NAME. PROMOTIONAL
PROGRAM AND MEDIA FUND
    Section 16.01  Trade Name .. ......  . ......  ...... ....27
    Section 16.02 Promotional Program .. .. .............27
ARTICLE XVII. DAMAGE AND DESTRUCTION
    Section 17.01. Reconstruction of Damaged Premises .. 28
    Section 17.02. Landlord's Option to Terminate
        Lease.............................................................. 29
ARTICLE XVIII. EMINENT DOMAIN
    Section 18.01. Total Condemnation of Premises. .. 29
    Section 18.02. Partial Condemnation ... ..  . ... ...29
    Section 18.03. Landlord and Tenant Damages . . ......30
ARTICLE XIX. DEFAULT
    Section 19.01. Rights upon Default......................... 30
ARTICLE XX. BANKRUPTCY OR INSOLVENCY
    Section 20.01. Tenant's Interest Not Transferable .. ... 32
    Section 20.02. Termination .................................... 32
    Section 20.03. Tenant's Obligations to Avoid
        Creditors' Proceedings....... ......................... 32
    Section 20.04  Election to Assume Lease ............. . . 33
    Section 20.05  Subsequent Bankruptcy .................... 33
    Section 20.06  Assignment ....................................... 33
    Section 20.07  Occupancy Charges....................... 33
    Section 20.08  Consent. .......................................33
    Section 20.09  Attorney Fees................................ ..33
    Section 20.10. Other Laws .... ...............................33
ARTICLE XXI. ACCESS BY LANDLORD
    Section 21.01. Right of Entry.............................. 34
ARTICLE XXII. TENANT'S PROPERTY
    Section 22.01. Taxes on Tenant's Property . .. ....34
    Section 22.02. Loss and Damage ...........  ... . ....34
    Section 22.03. Notice by Tenant ........ ...  - ......34
ARTICLE XXIII. HOLDING OVER
    Section 23.01. Holding Over .......  .  ....  .  .... ...35
    Section 23.02. Successors.................................... 35
ARTICLE XXIV. RULES AND REGULATIONS
    Section 24.01. Rules and Regulations.......  ...  . ...35
ARTICLE XXV. QUIET ENJOYMENT
    Section 25.01  Landlord's Covenant ................  . . ...35
ARTICLE XXVI. SECURITY
    Section 26.01. Security Deposit ................ ..... - .. 36
    Section 26.02 Lease Deposit ....  .....  .. ....  ....36
    Section 26.03. Letter of Credit ....  ..................... 36
ARTICLE XXVII. MISCELLANEOUS
    Section 27.01  Waiver: Election of Remedies........... 36
    Section 27.02  Entire Agreement....... ......  . .37
    Section 27.03  Interpretation: Use of Pronouns;
        Authority ...  .....  ....... ...... ......... ... .. ... 37
    Section 27.04. Delays; Force Majeure ... ..............  . 37
    Section 27.05. Notices ..........................................  37
    Section 27.06. Captions and Section Numbers .........  38
    Section 27.07. Broker's Commission .............. ... ... 38
    Section 27.08. Recording ...... ...... .....  ......  . 38
    Section 27.09 Furnishing of Financial Statements......38
    Section 27.10. Waiver of Counterclaim or Defenses in
        Action for Possession....................................38
    Section 27.11. Transfer of Landlord's Interest ...... ......38
    Section 27.12. Floor Area...................................... 38
    Section 27.13. Interest on Past Due Obligations....... 39
    Section 27.14. Liability of Landlord ....................... 39
    Section 27.15. Accord and Satisfaction.. .. ......... ... 39
    Section 27.16. Execution of Lease: No Option.. . .........39
    Section 27.17. Governing Law...... ...... ... ... .. 40
    Section 27.18. Specific Performance of
        Landlord's Rights.................. ...... .....  . .40
    Section 27.19. Survival of Tenant's Obligations... . .... 40
    Section 27.20. Certain Rules of Construction ............ 40
    Section 27.21. Confidentiality ...............  ..............  40
    Section 27.22. Attorney Fees................................  40
    Section 27.23. Index ............. ......  ... ..............  41
    Section 27.24. Waiver of Trial by Jury .. . ............... 41
    Section 27.25. Mortgagee Changes....................... 41
    Section 27.26  Real Estate Investment Trust............. 41
    Section 27.27  Equal Employment Opportunity ... .. ...41
    Section 27.28. Dog Park............... ......  . .....  ........41

EXHIBITS - See Data Sheet

## WESTFIELD CENTURY CITY

**City of Los Angeles
County of Los Angeles
State of California**

## LEASE

THIS LEASE is made as of this __13__ day of _February_____, 2018 (the "Commencement Date"), by and between **CENTURY CITY MALL, LLC,** a Delaware limited liability company, whose address is 2049 Century Park East, 41st Floor, Los Angeles, California 90067 ("Landlord"), and **HEALTHY SPOT 015 LLC,** a California limited liability company, whose address is: 6089 Bristol Parkway, Suite 200, Culver City, California 90230 ("Tenant").

Landlord, in consideration of the rent to be paid and the covenants to be performed by Tenant, does hereby, subject to the provisions of this Lease, demise and lease unto Tenant, and Tenant hereby rents and hires from Landlord, those certain premises identified on Exhibit A-2 attached hereto and made a part hereof ("the Premises") which is in and part of the development commonly known as **"WESTFIELD CENTURY CITY,"** a general site plan of which development is shown on Exhibit A-1 attached hereto and made a part hereof. The term "Development" as used herein shall include the real property shown on Exhibit A-1, the Department Stores, the locations of which are shown on Exhibit A-1, any Floor Area not included in the definition of Shopping Center, the parking facilities and the Shopping Center. Wherever the term "Shopping Center" is used, it shall be deemed to include the areas shown on Exhibit A-1 and shall be deemed to exclude the Department Stores, movie theatre, free standing units, full-service sit-down restaurants, all premises having an exterior entrance that does not front on a common area mall corridor, all basement space not used for retail purposes, and the parking facilities. In the event Landlord elects to enlarge the Shopping Center, any additional area may be included by Landlord in the definition of "Shopping Center" for purposes of this Lease. The term "Department Store" shall be deemed to include any retail store operating or proposed to be operated in the Development the gross leasable Floor Area of whose premises is twenty thousand (20,000) square feet or greater. The term "Floor Area" is defined in Section 27.12. Said site plan shows, among other things, the principal improvements which comprise or will comprise the Development. The Premises is described as follows:

Store No. 2580, being approximately 1,434 square feet.

## DATA SHEET

The following references furnish data to be incorporated in the specified sections of this Lease and shall be construed as if set forth in this Lease:

(1)    **Section 1.01: Conditions of Grant:**

Shopping Center Mailing Address:

Westfield Century City
10250 Santa Monica Boulevard
Suite 1
Los Angeles, California  90067

(2)    **Section 1.02: Term:**

Estimated Delivery Date: _____ March 15, 2018 _____.

Latest Rental Commencement Date: _____ July 15, 2018 (subject to Section 1.02 (b)).

Expiration Date of Term: _____ July 31, 2028 _____.

(3)    **Section 1.03: Late Opening Fee:** Intentionally deleted.

(4)    **Section 2.01: Minimum Annual Rental:**

Rental Commencement Date through July 31, 2019: _____ $12,906.00;

August 1, 2019 through July 31, 2020: _____ $13,422.24;

| | |
|---|---|
| August 1, 2020 through July 31, 2021: | $13,959.13; |
| August 1, 2021 through July 31, 2022: | $14,517.50; |
| August 1, 2022 through July 31, 2023: | $15,098.20; |
| August 1, 2023 through July 31, 2024: | $15,702.13; |
| August 1, 2024 through July 31, 2025: | $16,330.22; |
| August 1, 2025 through July 31, 2026: | $16,983.43; |
| August 1, 2026 through July 31, 2027: and | $17,662.77; |
| August 1, 2027 through the end of the Term: | $18,369.28. |

(5) **Section 2.02: Percentage Rental:**

   (a)   Percentage Rental Rate: Ten percent (10%)

   (b)   Annual Breakpoint(s) as follows:

| | |
|---|---|
| Rental Commencement Date through July 31, 2019: | $1,500,000.00; |
| August 1, 2019 through July 31, 2020: | $1,560,000.00; |
| August 1, 2020 through July 31, 2021: | $1,622,400.00; |
| August 1, 2021 through July 31, 2022: | $1,687,296.00; |
| August 1, 2022 through July 31, 2023: | $1,754,787.84; |
| August 1, 2023 through July 31, 2024: | $1,824,979.35; |
| August 1, 2024 through July 31, 2025: | $1,897,978.52; |
| August 1, 2025 through July 31, 2026: | $1,973,897.66; |
| August 1, 2026 through July 31, 2027 and | $2,052,853.57; |
| August 1, 2027 through the end of the Term: | $2,134,967.71. |

(6) **Address for Rental Payments:**

     Payee: Century City Mall, LLC
     Address: c/o Bank of America, 7950 Collection Center Drive, Chicago, IL 60693.

(7) **Section 2.03(d):** Intentionally Deleted.

(8) **Section 2.04: Tenant's Tax Obligation:**

   (a)   **Section 2.04(a):** Tax Administration Fee: 0%

   (b)   **Section 2.04(c):** Estimated to be $23.00 per square foot of Floor Area in the Premises per annum, subject to adjustment and reconciliation as provided in Section 2.04 of the Lease.

(9) **Section 2.05: Trash Removal Charge:** Paid direct

(10) **Section 3.02: Reports By Tenant:** Tenant's monthly and annual statements of Gross Sales should be submitted electronically to: sales_centurycity@us.westfield.com

(11) **Section 6.01: Alterations by Tenant:** An aggregate of $35,000.00 permitted in each lease year.

(12)  **Section 7.01:  Permitted Use:**  The Premises shall be used primarily for (a) the sale of pet-related goods, including, without limitation, sales of pet food, pet accessories, and other pet products, products relating to nature and the environment, (b) the sale and/or provision of pet-related services, including, without limitation, grooming, pet training, dental cleanings, pet massage therapy, and pet photography, (c) educational products and services related to any of the foregoing, or (d) any other uses incidental to any of the foregoing uses set forth above. The Premises shall be used solely for the use stated above and for no other use or purpose.

(13)  **Section 7.02(d):**  Intentionally Deleted.

(14)  **Section 7.04:  Radius Area:**  <u>1</u> mile.

(15)  **Section 8.02(b):  Use of Common Areas:**  <u>10</u> feet.

(16)  **Section 8.02(c):  Use of Common Areas – Employee Parking Charge:**  <u>$160.00</u> per month per employee, increased on a compounded basis by <u>Five percent (5%)</u> at each January 1st following the Rental Commencement Date.

(17)  **Section 8.03:  Common Area Charge:** <u>$63.00</u> per square foot of Floor Area in the Premises per annum, increased on a compounded basis by <u>Five percent (5%)</u> at each January 1st following the Rental Commencement Date.

(18)  **Section 8.04:  Common Area HVAC Charge:** <u>$0.00</u> per square foot of Floor Area in the Premises per annum, subject to adjustment as provided in Section 8.04 of the Lease.

(19)  **Section 11.01(a):  Tenant's Insurance:**

    (a)  Commercial General Liability Insurance:  $2,000,000.00 per occurrence, $4,000,000.00 general aggregate

    (b)  Broad Form/Extended Bodily Injury, Death and Property Damage, and Business Automobile Liability Insurance: <u>$1,000,000.00</u>

    (c)  Workers' Compensation Coverage:

        (i)  <u>$1,000,000.00</u> each accident

        (ii)  <u>$1,000,000.00</u> each employee by disease

        (iii)  <u>$1,000,000.00</u> policy aggregate by disease

    (d)  Product Liability Coverage: <u>$3,000,000.00</u>

(20)  **Section 12.01(a):  Utilities:**

    (a)  Water and Sewer Service:  <u>Sub-metered.</u>

    (b)  Fire Detection Services:  <u>$540.00</u> per annum

    (c)  Electric Services:  <u>Sub-metered.</u>

(21)  **Section 16.01:  Trade Name:**

    (a)  **Trade Name:** _____ HEALTHY SPOT _____.

    (b)  **Name of Shopping Center:** _____ WESTFIELD CENTURY CITY _____.

(22)  **Section 16.02:  Promotional Program:**

    (a)  <u>$5.00</u> per square foot of Floor Area in the Premises per annum, increased on a compounded basis by <u>Five percent (5%)</u> at each January 1st following the Rental Commencement Date.

    (b)  Initial Assessment: _____ None _____.

(23)  **Section 26.01:  Security Deposit:** _____ None _____.

(24)    **Section 26.02: Lease Deposit:** _____ None _____.

(25)    **Section 26.03: Letter of Credit:** _____ None _____.

(26)    **Section 27.05: Legal Notice Address:**

Landlord:                                    Tenant:

Century City Mall, LLC                       Healthy Spot 015 LLC
2049 Century Park East                       6089 Bristol Parkway, Suite 200
41st Floor                                   Culver City, California 90230
Los Angeles, California 90067                Attention: Andrew Kim
Attention: Legal Department

                                             With a copy to:

                                             Williams Anderson Ryan & Carroll LLP
                                             901 Main Street, Suite 6215
                                             Dallas, Texas 75202
                                             Attention: Mark Anderson

                                             Billing Address:

                                             Healthy Spot 015 LLC
                                             6089 Bristol Parkway, Suite 200
                                             Culver City, California 90230
                                             Attention: Andrew Kim

(27)    **Exhibit B:  Design and Construction of the Building and the Premises:**

    (a)    Plan Coordination and Administrative Services Fee:  Waived.

    (b)    Milestones [Section VII(A)]:

        (i)     Tenant's Concept Design Submission Date:  Completed.

        (ii)    Tenant's Final Plans Submission Date:  January 29, 2018.

        (iii)   Tenant's Building Permit Submission Date:  February 5, 2018.

        (iv)    Tenant's GC Hire Date:  January 26, 2018.

        (v)     Commencement of Tenant's Work Date:  March 15, 2018.

        (vi)    Late Milestone Fee(s) [Section VII(C)]:  Intentionally deleted.

    (c)    Construction Deposit:  A fully refundable deposit in the amount of $2,500.00.

    (d)    Construction Barricade:  Actual Cost.

    (e)    Barricade Graphic Charge:  Actual Cost.

    (f)    Design Fee:  Waived.

    (g)    Tenant Reimbursement Costs [Section IV(A)(1)]:  $5.00 per square foot of Floor Area in
    the Premises.

    (h)    Insurance:  Tenant's, Tenant's General Contractor, and Subcontractor's Required Minimum
    Coverages and Limits to Liability:

        (i)     Workers' Compensation Coverage:

            (A)    $1,000,000.00 each accident

            (B)    $1,000,000.00 each employee by disease

         (C)     <u>$1,000,000.00</u> policy aggregate by disease

    (ii)    Commercial General Liability Insurance (including Contractor's Protective Liability): <u>$1,000,000.00 per occurrence, $2,000,000.00 general aggregate.</u>

    (iii)    Comprehensive Automobile Liability Insurance: <u>$3,000,000.00</u>

    (iv)    Tenant's Protective Liability Insurance: <u>$3,000,000.00; however, if Tenant's contractor does not carry Protective Liability Insurance, Tenant's contractor shall be required to name Landlord (and the Additional Insured Entities named on Exhibit C) as an additional insured on its general liability policy and as a loss payee on contractor's builders risk insurance.</u>

    (v)    Tenant's Builder's Risk Insurance: <u>100%</u>

(28)    **Exhibit B-2: Reimbursement for Cost of Construction:**

    (a)    Amount of Allowance: <u>$236,000.00</u> which shall be payable in the following progress payments:

        (i)    Progress Payment #1:

            (A)    Amount of Allowance Payment: <u>$118,000.00;</u>

            (B)    Allowance Payable by Landlord to Tenant within: <u> 60 </u> days; and

            (C)    Allowance Payable on Completion of: <u>50</u>% of Tenant's Work in or to the Premises (as certified by Tenant's representative and verified by Landlord).

        (ii)    Progress Payment #2:

            (A)    Amount of Allowance Payment (the balance): <u>$118,000.00;</u>

        (B)    Allowance Payable within: <u> 60 </u> days and the satisfaction of the conditions as set forth in Section 1(a)-(g) of Exhibit B-2.

    (b)    Late Opening: Intentionally deleted

    (c)    **Additional Allowance: <u>$150,000.00</u>.** Landlord shall, at Tenant's election, increase the Allowance by up to the Additional Allowance amount. The amount of the Additional Allowance actually utilized by Tenant shall be paid to Landlord as additional Minimum Annual Rental and amortized over calendar months 25 through 120 of the Term (the "Amortization Period") at 8% per annum, in the same manner as a loan having equal monthly payments on the first day of each month with full repayment over calendar months 25 through 120 of the Term. Tenant's election to use all or a portion of the Additional Allowance shall be made by written notice to Landlord. Within ten days after Landlord's request therefor, Tenant shall execute and return an amendment modifying the Minimum Annual Rental accordingly. The Additional Allowance shall be subject to satisfaction of the same conditions as the Allowance and shall be paid with Progress Payment #2 (or pursuant to the terms of the amendment).

(29)    **Exhibit D: Chilled Water Service Charge:** <u>$0.65</u> per ton hour per annum, subject to adjustment as provided in Exhibit D.

    (30)    **Guarantor:** <u>Healthy Spot LLC, whose address is: 6089 Bristol Parkway, Suite 200, Culver City, California 90230, in accordance with the provisions of the Guaranty attached hereto.</u>

## ATTACHMENTS AND EXHIBITS

  The following exhibits are attached hereto, and such attachments and exhibits, as well as all drawings and documents prepared pursuant thereto, shall be deemed to be a part hereof:

EXHIBIT "A-1":...............................................................................................................SITE PLAN
EXHIBIT "A-2":.............................................................................................................FLOOR PLAN
EXHIBIT "A-3":......................................................................................................RELOCATION ZONE
EXHIBIT "A-4":.................................................................CUSTOMER DOGGIE DROP OFF PARKING
EXHIBIT "A-5":..............................................................................................................DOG PARK
EXHIBIT "B" and "B-1":................................................................ CONSTRUCTION OF PREMISES
EXHIBIT "B-2":.................................................. REIMBURSEMENT FOR COST OF CONSTRUCTION
EXHIBIT "C": ..........................................................................ADDITIONAL INSURED ENTITIES
EXHIBIT "D":..............................................................CHILLED WATER SERVICE CHARGE
EXHIBIT "E":...............................................................................DIGITAL MEDIA PROGRAM
EXHIBIT "F":..............................................................................................DATE CERTIFICATE
GUARANTY: ..........................................................................................HEALTHY SPOT LLC

# ARTICLE I

# GRANT AND TERM

## Section 1.01    CONDITIONS OF GRANT.

The exterior walls, the floor above, the roof and the area beneath the Premises are not demised hereunder, and the use thereof, together with the right to locate, both vertically and horizontally, install, maintain, use, repair and replace pipes, utility lines, ducts, conduits, flues, refrigerant lines, drains, sprinkler mains and valves, access panels, wires and structural elements leading through the Premises serving other parts of the Development is hereby reserved unto Landlord. Landlord agrees to use reasonable efforts to locate any such items in locations that do not materially interfere with Tenant's use of the Premises.

If the installation of any additional pipes, ducts, conduits, wires or appurtenant fixtures shall become necessary pursuant to the provisions of this Section 1.01, then Landlord shall use commercially reasonable efforts to install same above Tenant's finished ceiling, below the slab floor, in the walls or columns, or in non-sales areas of the Premises, and if the same cannot be installed above Tenant's finished ceiling, below the slab floor, in the walls or columns, or in non-sales areas of the Premises, Landlord and Tenant shall cooperate to minimize interference with Tenant's improvements and Tenant's use of the Premises.

Landlord shall use its commercially reasonable efforts to minimize interference with the construction of Tenant's improvements or the conduct of Tenant's business in the Premises. Except as otherwise set forth in this Lease, Landlord shall be responsible for any damage to the Premises caused by the installation or repair of the elements described in this Section 1.01.

## Section 1.02    TERM.

(a)    The "Term" of this Lease shall begin on the Commencement Date set forth on the Data Sheet, which is the date of execution of this Lease by Landlord and Tenant. The Term of this Lease shall end on the Expiration Date set forth in Item (2) of the Data Sheet, unless sooner terminated in accordance with this Lease.

(b)    The estimated date upon which Landlord will deliver possession of the Premises to Tenant with Landlord's Work substantially completed is the date set forth on the Data Sheet (the "Estimated Delivery Date"); the actual date upon which such delivery occurs is referred to in this Lease as the "Delivery Date." Tenant's obligation for payment of Minimum Annual Rental, Percentage Rental and Additional Rent shall commence upon the date (the "Rental Commencement Date") that is the earlier to occur of: (i) the date on which Tenant opens its store in the Premises for business to the public; or (ii) the one hundred twenty (120) days after Landlord's delivery of the Premises to Tenant ("Latest Rental Commencement Date") specified in Item (2) of the Data Sheet. Any occupancy of the Premises by Tenant following the Commencement Date and prior to the Rental Commencement Date shall be subject to all terms and conditions of this Lease other than payment of Rental. Unless otherwise approved in writing by Landlord, Tenant shall open its store in the Premises for business to the public (with improvements pursuant to Exhibit B hereto completed and the Premises fully fixtured, stocked with current season merchandise in place and staffed, with Tenant prepared to engage in selling merchandise and/or services as provided pursuant to Article VII) on the Grand Opening Date.

Landlord intends to deliver the Premises on or before the Estimated Delivery Date. If Landlord delivers the Premises after August 1, 2018, then Tenant shall have the right, any time after August 2, 2018 but prior to delivery of the Premises, to terminate this Lease upon 30 days' prior notice to Landlord. Promptly after termination of this Lease, Landlord shall reimburse Tenant costs incurred in negotiation of this Lease, including all costs for design and associated fees, in an amount not to exceed $40,000.00.

(c)    For the purposes of this Lease, the first lease year shall be the period commencing on the Rental Commencement Date and ending on January 31 next following; after the first lease year, the term "lease year" shall mean a fiscal year of twelve (12) consecutive calendar months ending on January 31 of each calendar year.

(d)    In order to document the Delivery Date and the Rental Commencement Date, within fifteen (15) days following Landlord's written request therefor which may be given at any time after Tenant initially opens its store in the Premises for business to the public, Tenant shall execute and return to Landlord a Date Certificate substantially in the form attached hereto and incorporated herein by this reference as Exhibit F.

(e)    Intentionally Deleted.

(f)    Intentionally Deleted.

**Section 1.03    LATE OPENING.**
Intentionally deleted.

# ARTICLE II

# RENTAL

**Section 2.01    MINIMUM ANNUAL RENTAL.**

(a)    From and after the Rental Commencement Date, Tenant shall pay to Landlord as the "Minimum Annual Rental" the sum set forth in the Data Sheet for each lease year during the Term in equal consecutive monthly installments in advance on or before the first day of each month, without prior demand or notice. Minimum Annual Rental, Percentage Rental, Additional Rent and all other sums payable to Landlord pursuant to this Lease shall be paid to Landlord in currency of the United States or other customary commercial manner at the address set forth in the Data Sheet under "Address for Rental Payments," or such other place as Landlord may designate, without any deductions or offsets whatsoever.

(b)    Should the Rental Commencement Date occur on a day other than the first day of a calendar month, then the Minimum Annual Rental for such fractional month shall be one three hundred sixty-fifth (1/365th) of the Minimum Annual Rental multiplied by the number of days remaining in the month. Should any lease year contain less than twelve (12) calendar months, said Minimum Annual Rental shall be prorated.

(c)    Intentionally deleted.

**Section 2.02    PERCENTAGE RENTAL.**

(a)    In addition to the payment of Minimum Annual Rental and Additional Rent, from and after the Rental Commencement Date, Tenant shall pay to Landlord in accordance with the provisions of this Section 2.02, "Percentage Rental" equal to the product of the Percentage Rental Rate specified in the Data Sheet times the amount by which Gross Sales (as defined in Section 2.03) exceed the "Annual Breakpoint" specified in the Data Sheet.

(b)    Percentage Rental shall be computed on all Gross Sales made during each lease year and payable by Tenant in installments commencing on the date which is thirty (30) days after that calendar month of each lease year in which Gross Sales to date for such lease year exceed the Annual Breakpoint. The first (1st) installment shall equal the product of (a) the Percentage Rental Rate and (b) the difference between Gross Sales to date for such lease year and the Annual Breakpoint for such lease year. Thereafter, for the balance of such lease year, each monthly installment of Percentage Rental shall be payable simultaneously with the delivery of each monthly statement of Gross Sales and shall equal the product of (i) the Percentage Rental Rate and (ii) Gross Sales for the month depicted on the monthly statement.

(c)    If, at the end of any lease year, the total amount of Percentage Rental paid by Tenant based upon Gross Sales for such lease year exceeds the total amount of Percentage Rental required to be paid by Tenant for such lease year, Tenant shall receive a credit, equivalent to such excess, against the next monthly payments of Percentage Rental due from Tenant to Landlord under this Lease. If at the end of the final lease year the total amount of Percentage Rental paid by Tenant exceeds the total amount of Percentage Rental required to be paid by Tenant for such lease year, such excess shall be refunded to Tenant within thirty (30) days after (i) Tenant has vacated the Premises in accordance with the provisions of this Lease and (ii) any Rental due Landlord from Tenant under this Lease has been paid in full or deducted therefrom. If at the end of any lease year, the total amount of Percentage Rental paid by Tenant for such lease year is less than the total amount of Percentage Rental required to be paid by Tenant for such lease year, Tenant shall pay the amount of such deficiency on or before the thirtieth (30th) day after the last day of such lease year. Should any lease year contain less than twelve (12) calendar months, then, the Annual Breakpoint shall be adjusted proportionately for such partial lease year.

(d)    It is expressly understood and agreed that Landlord does not consider Minimum Annual Rental in itself a fair and adequate rental for the Premises and would not have entered into this Lease unless Tenant had obligated itself to pay Percentage Rental, which Landlord expects to supplement the Minimum Annual Rental and the Additional Rent to provide a fair and adequate rental return. Therefore, if Tenant fails to continuously operate its business in accordance with the terms of this Lease, fails to keep the required store hours, or vacates the Premises prior to the expiration of the Term hereof, Landlord will suffer damages in an amount which is not readily ascertainable and thus Landlord, in any such event, shall have the right, at its option, to collect as Additional Rent, and not as a penalty, in addition to all other charges and Minimum Annual Rental due hereunder, one-thirtieth (1/30th) of an amount equal to the greater of (a) the amount of Minimum Annual Rental due for the month in which Tenant failed to operate as required by this Lease, or (b) the average monthly amount of Minimum Annual Rental and Percentage Rental payable for the immediately preceding lease year, for each day or portion thereof during which Tenant fails to

1    operate as required by this Lease including, without limitation, Tenant's failure to maintain the required
2    store hours, and, in addition, Landlord shall have the right to treat any of such events as a material default
3    and breach of this Lease subject to the provisions of Article XIX.

4

5         (c)    In the event the adjustments to the Annual Breakpoints occur on a non-lease year basis,
6    then Landlord will pro-rate each portion of the Annual Breakpoints that apply during a given lease year on
7    a daily basis to calculate a "blended breakpoint" that will be used to reconcile Tenant's Percentage Rental
8    for the applicable lease year. By way of example, if the Annual Breakpoint for the period of July 1, 2012
9    through June 30, 2013 equals $1,000,000.00, and the Annual Breakpoint for the period of July 1, 2013
10   through June 30, 2014 equals $1,003,000.00, then the blended breakpoint for the February 1, 2013 through
11   January 31, 2014 lease year shall be calculated as follows:

12

13        February 1, 2013-June 30, 2013: [$1,000,000.00 × (150÷365 days)] = $410,958.90, plus

14

15        July 1, 2013-January 31, 2014:  [$1,003,000.00 × (215÷365 days)]   = $590,808.22

16

17        Total Blended Breakpoint for 2/1/13 - 1/31/14 lease year:   $1,001,767.12.

18

19        The blended breakpoint as determined above shall then be compared to the Gross Sales
20   achieved at the Premises during the applicable lease year to calculate the Percentage Rental due with respect
21   to such lease year. If the lease year includes a leap year, then the blended breakpoint calculations for that
22   lease year shall be based on 366 days.

23

24   **Section 2.03   GROSS SALES.**
25        (a) The term "Gross Sales" as used herein shall be construed to include the entire amount of the
26   actual sales price (including all finance charges by Tenant or anyone on Tenant's behalf) whether for cash,
27   credit or otherwise, of all sales, rentals, leases, licenses or other transfer of merchandise or services and
28   other receipts whatsoever of all business conducted in or from the Premises, by Tenant, all subtenants,
29   assignees, licensees, concessionaires or otherwise, including, without limitation, orders made by mail,
30   catalogue, computer, internet, other electronic or telephone or facsimile orders (or any similar or new
31   technology used to place orders for goods and/or services) which: (a) originate at, or are accepted at, the
32   Premises but delivery or performance of which is made from or at a place other than the Premises; or (b)
33   originate at, or are accepted at, a place other than the Premises but delivery or performance of which is
34   made from the Premises or is fulfilled using inventory from the Premises; all deposits not refunded to
35   purchasers and which Tenant is entitled to retain without obligation to return the same; gross receipts from
36   vending machines, electronic games or similar devices, whether coin-operated or otherwise. A "sale" shall
37   be deemed to have been consummated for the purposes of this Lease, and the entire amount of the sales
38   price shall be included in Gross Sales, at such time as (i) the transaction is initially reflected in the books
39   or records of Tenant or any subtenant, assignee, licensee or concessionaire (if a concessionaire makes the
40   sale), or (ii) Tenant or any subtenant, assignee, licensee or concessionaire receives all or any portion of the
41   sales price, or (iii) the applicable goods or services are delivered to the customer, whichever first occurs,
42   irrespective of whether payment is made in installments, the sale is for cash or for credit, or all or any
43   portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time.
44   Subject to Section 2.03(b) below, no deduction shall be allowed for direct or indirect discounts, rebates,
45   credits or other reductions to employees or others, unless such discounts, rebates, credits or other reductions
46   are generally offered to the public on a uniform basis. All returns or refunds processed at the Premises not
47   previously reported in Gross Sales from the Premises are not deductible from Gross Sales.

48

49        (b)    Notwithstanding anything to the contrary contained in Section 2.03(a) above, Gross Sales
50   shall not include the following:

51

52             (1)    Goods returned to sources, including shippers or manufacturers, or transferred to
53   another store or warehouse owned by or affiliated with Tenant (where such exchange of goods or
54   merchandise is made solely for the convenient operation of the business of Tenant and not for purposes of
55   consummating a sale which has theretofore been made in or from the Premises and/or for the purpose of
56   depriving Landlord of the benefit of a sale which otherwise would be made in or from the Premises);

57

58             (2)    Alteration workroom charges and delivery charges at Tenant's cost of sales;

59

60             (3)    Receipts from public telephones, stamp machines, public toilet locks, or vending
61   machines installed solely for use by Tenant's employees;

62

63             (4)    Sales taxes, so-called luxury taxes; consumers' excise taxes, gross receipts taxes
64   and other similar taxes now or hereafter imposed upon the sale of merchandise or services, but only if
65   collected separately from the selling price of goods, merchandise or services and collected from customers;

66

(5)    Sales of trade fixtures, equipment or property which are not stock in trade, or any bulk sales not in the ordinary course of business;

(6)    Sales to employees at discounted or reduced prices, in accordance with Tenant's standard employee discount plan; however, said exclusion for discounted merchandise shall not exceed one percent (1%) of Tenant's Gross Sales per annum;

(7)    Sales of gift certificates and prepaid services, provided, however, that the value of gift certificates or prepaid services shall be included in Gross Sales when redeemed at the Premises, irrespective of where sold;

(8)    Gratuities paid to Tenant's service personnel or collected by Tenant for redistribution to Tenant's service personnel;

(9)    Insurance proceeds or other sums or credits received in the settlement of claims for loss, damage or destruction of or to Tenant's merchandise or trade fixtures;

(10)    Amounts paid over to or received by third parties (e.g., veterinarians) for pet vaccination and other similar, promotional events; and

(11)    Refunds or credits (as are generally offered to the public on a uniform basis, provided that if such credit is deducted from Gross Sales, and is subsequently redeemed at the Premises, the redeemed credit will be included in Gross Sales) made to customers in the ordinary course of business on transactions originating at the Premises and otherwise included in Gross Sales.

(c)    Intentionally Deleted

(d)    Intentionally deleted.

**Section 2.04    TENANT'S TAX OBLIGATION.**

(a)    Commencing with the Rental Commencement Date, and continuing for the balance of the Term, Tenant shall pay to Landlord as Additional Rent Tenant's Share of Taxes (as hereinafter defined) levied or assessed during or with respect to each fiscal tax year falling in whole or in part during the Term following the Rental Commencement Date. "Tenant's Share" shall mean the proportion that the number of square feet of Floor Area in the Premises bears to the total number of square feet of constructed gross leased and occupied Floor Area of all buildings in the Shopping Center (which leased and occupied Floor Area for purposes of this calculation shall not be less than 85% of the gross leasable Floor Area of the Shopping Center). As used herein, the term "Taxes" shall mean any and all taxes, surcharges, assessments, levies, fees and other governmental charges and impositions of every kind or nature, regular or special, direct or indirect, presently foreseen or unforeseen or known or unknown, levied or assessed by municipal, county, state, federal or other governmental taxing or assessing authority (i) upon, against or with respect to the real estate upon which the Development, or any part of it, is located and to any improvements located in the Shopping Center or the Development, and (ii) any other taxes which Landlord becomes obligated to pay with respect to the Development, irrespective of whether the same are assessed as real or personal property. Taxes shall not include Landlord's income or franchise taxes, nor any inheritance, estate, succession, transfer, gift, or corporation tax or capital levy that is or may be imposed on Landlord, nor any interest, penalties, fees, charges or assessments incurred solely as a result of Landlord's failing to pay any tax bill before delinquency, but shall include interest on Taxes withheld by virtue of Landlord making partial payment under protest in the event such partial payment is permitted in connection with a tax appeal proceeding. Further, Taxes shall not include special assessments for any portion of Landlord's cost to initially construct or redevelop the Shopping Center. To the extent that any such Taxes are the obligation of Tenant pursuant to Section 22.01, the same shall not be included in Tenant's Share pursuant to this Section 2.04. If the Development shall be part of or shall include a group of buildings or structures collectively owned or managed by Landlord or its affiliates, or shall include any space used for office or other non-retail purposes, Landlord may determine separately and allocate Taxes between such buildings and structures and the parcels on which they are located, and between the retail and non-retail area of the Development, in accordance with sound accounting and management principles. Prior to the proration of such Taxes as provided in this Section 2.04, there shall be deducted therefrom all amounts received from the Department Stores and/or any other tenant within the Development not included in the definition of Shopping Center towards such Taxes. The Taxes payable by Tenant pursuant to this Section 2.04(a) which are levied or assessed for the fiscal tax year in which the Rental Commencement Date occurs and for the fiscal tax year in which the Term of this Lease ends shall be prorated on a daily basis.

(b)    Should the state where the Development is located or any political subdivision thereof or any governmental, taxing or assessing authority, directly or indirectly by way of substitution for or in lieu of or in addition to or in any other way directly or indirectly used or intended to provide revenues to fund

all or any part of revenues theretofore provided or services theretofore funded by all or any part of the Taxes otherwise required to be paid in whole or in part by Tenant pursuant to this Section 2.04 or Section 22.01, whether presently foreseen or unforeseen or known or unknown, either (i) impose a tax of any kind or nature upon, against, in connection with or with respect to the rentals or other charges payable by or to Landlord by the Tenant or other tenants in or occupants of the Shopping Center and/or the Development or on the income of Landlord derived from the Shopping Center and/or the Development or on the revenues of the Shopping Center and/or the Development or on Landlord's (or the individuals or entities which constitute the partners of Landlord, if Landlord is a partnership) ownership of the Shopping Center and/or the Development or any portion thereof or interest therein, or any direct or indirect tax whatsoever other than the Taxes otherwise required to be paid in whole or in part by Tenant pursuant to this Section 2.04 or Section 22.01, and/or (ii) impose a tax of any kind or nature upon, against or with respect to the parking facilities or the number of parking spaces in the Development, such tax shall be deemed to constitute a part of Taxes payable by Tenant under this Lease and Tenant shall pay to Landlord its proportionate share thereof (or all thereof, with respect to taxes relating to items (i) through (iii) of Section 22.01) as determined and billed by Landlord and/or (iii) reappraise, or determine that the method utilized by Landlord in determining property Taxes to be incorrect, or redetermine the method upon which property taxes are imposed against the Shopping Center and/or the Development from time to time by virtue of a change in the ownership of Landlord's interest or otherwise by operation of law and/or (iv) impose a charge for assessments, taxes, fees, levies and charges imposed by governmental agencies for services such as fire protection, sidewalk and road maintenance, refuse removal and other public services generally provided without charge to property owners or occupants prior to the date of this Lease, the same shall be deemed as a part of Taxes payable by Tenant hereunder for the purposes of this Lease. For the purposes of this Section 2.04, the term "Shopping Center" shall include any land upon which temporary off-site utility systems and parking serving the Shopping Center and/or the Development are located.

(c)    Tenant's Share of Taxes, as reasonably determined by Landlord, shall be paid to Landlord as Additional Rent, in monthly installments on or before the first day of each month (or such longer period as Landlord may determine), in advance, in an amount estimated by Landlord and billed by Landlord to Tenant; provided that Landlord shall have the right initially to determine monthly estimates and to revise the estimates from time to time. Upon receipt of all tax bills pertaining to Taxes payable by Tenant, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Share of Taxes for such tax year. In the event any applicable tax bill is not available at the time Landlord bills Tenant for Taxes, Landlord may provide a good faith estimate of the amount of such tax. If the total amount paid by Tenant under this Section 2.04 for any calendar, tax, fiscal or lease year during the Term following the Rental Commencement Date shall be less than the actual amount due from Tenant for such year, as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due within thirty (30) days after demand therefor by Landlord; and if the total amount paid by Tenant hereunder for any such calendar, tax, fiscal or lease year shall exceed such actual amount due from Tenant for such year, such excess shall be credited against the next monthly payments due from Tenant to Landlord under this Lease. If at the end of the final lease year the total amount paid by Tenant hereunder for such lease year shall exceed such actual amount due from Tenant for such year, such excess shall be refunded to Tenant within thirty (30) days after Tenant has vacated the Premises in good condition at the conclusion of this Lease and any other sums due Landlord from Tenant under this Lease have been paid in full or deducted therefrom. A copy of a tax bill or statement or assessment notice submitted by Landlord to Tenant shall at all times be sufficient evidence of the amount of Taxes assessed or levied against the property to which such bill relates. Tenant's obligations under this Section 2.04 shall survive the expiration of the Term or earlier termination of this Lease.

(d)    Landlord reserves the right to contest any Taxes levied or assessed during the Term upon, against or with respect to the Shopping Center and/or the Development or any portion thereof or interest therein. Tenant shall pay to Landlord that proportion of all costs incurred by Landlord in connection therewith based on the formula specified in Section 2.04(a). Notwithstanding any such contest, or any related negotiation or appeal, Tenant shall pay, as provided for in this Section 2.04, Tenant's Share of Taxes. If, as a result of any such contest, negotiation or appeal, Taxes shall be increased, Tenant's Share of Taxes shall be computed on the basis of the amount of Taxes finally determined to be payable by Landlord, including any of Landlord's reasonable costs in any such contest. If, as a result of any such contest, negotiation or appeal, Taxes shall be decreased, Landlord's statement to Tenant of Taxes following such decrease shall include an adjustment for any prior tax years affected by such decrease reflecting the amount of such decrease in Taxes. Tenant's Share of any such adjustment, less all costs and expenses, including, but not limited to, attorney fees, expenses of accountants, consultants and appraisers, and administrative expenses incurred by Landlord in connection with such contest, negotiation or appeal and not previously paid by Tenant, shall be treated as a credit against Taxes payable by Tenant following such decrease.

**Section 2.05    TRASH REMOVAL CHARGE.**
(a)    Tenant, at Tenant's expense, shall at all times keep the Premises (including, without limitation, the service areas adjacent to the Premises, display windows and signs) orderly, neat, safe, clean

1    and free from rubbish and dirt.  Tenant shall dispose of all trash (wet or dry) on a daily basis in such
2    receptacles as shall be designated by Landlord for such disposal (and such receptacles shall be provided by
3    Landlord),, and until Tenant disposes of such trash, Tenant shall store the trash and other solid waste within
4    the Premises or in such areas as may be designated by Landlord for such storage.  Tenant shall not burn any
5    trash or garbage at any time in or about the Development.
6
7         (b)      Solid waste disposal contractors designated by Landlord shall remove trash from said
8    receptacles at such intervals as Landlord may determine, in Landlord's sole discretion.  The Data Sheet will
9    set forth whether the Tenant will initially pay (i) the "Trash Removal Charge" set forth on the Data Sheet,
10   or (ii) the solid waste disposal contractor designated by Landlord directly.  Landlord shall have the right to
11   change the method of payment at any time during the Term by providing Tenant thirty (30) days' prior
12   written notice.
13
14        (c)      In the event Landlord elects that Tenant pay a Trash Removal Charge, Tenant shall be
15   solely responsible for and shall promptly pay, as Additional Rent hereunder, the sum set forth in the Data
16   Sheet as the "Trash Removal Charge" for each lease year during the Term in equal consecutive monthly
17   installments in advance on or before the first day of each month, without prior demand or notice.  Such
18   Trash Removal Charge payable by Tenant shall be adjusted annually commencing on the 1st day of January
19   immediately following the Rental Commencement Date and each January 1st thereafter by the annual
20   percentage increase in the "Index" (as defined in Section 27.23) to the respective January or the closest
21   subsequent month thereto that the Index is published; provided, however, in no event shall Tenant pay less
22   than the Trash Removal Charge payable for the preceding year.
23
24             If Landlord elects that Tenant pay the solid waste disposal contractors directly, then
25   Landlord shall instruct such contractor to bill its charges directly to Tenant, and Tenant shall pay such
26   charges directly to the contractor, and no separate Trash Removal Charge shall be payable hereunder.
27
28             At any time during the Term, Landlord may, upon thirty (30) days' prior written notice to
29   Tenant, discontinue furnishing trash removal services to the Premises without thereby affecting this Lease
30   in any manner or otherwise incurring any liability to Tenant except that Landlord will no longer be required
31   to furnish trash removal services to the Premises.  If Landlord does not provide such services and if
32   Landlord has elected not to retain a third party to provide such services, Tenant shall arrange for the regular
33   pickup of all trash, garbage and other solid waste with a contractor and upon terms approved in writing by
34   Landlord, in its sole discretion.
35
36   **Section 2.06    ADDITIONAL RENT.**
37             In addition to Minimum Annual Rental and Percentage Rental hereunder, Tenant shall pay, as
38   "Additional Rent" (whether or not so designated herein), in a manner and at the place provided in this
39   Lease, all sums of money required to be paid by Tenant under this Lease.  If such amounts or charges are
40   not paid at the time and in the manner as provided in this Lease, they shall nevertheless be collectible as
41   Additional Rent with the next installment of Minimum Annual Rental thereafter falling due, but nothing
42   herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the
43   time the same becomes due and payable hereunder or to limit any other remedy of Landlord.  All amounts
44   of Minimum Annual Rental, Percentage Rental and Additional Rent (also collectively referred to in this
45   Lease as "Rental") payable in a given month shall be deemed to comprise a single rental obligation of
46   Tenant to Landlord.
47
48   **Section 2.07    LATE CHARGE.**
49             Unless specifically stated otherwise in this Lease, all Rental or other charges required to be paid by
50   Tenant pursuant to this Lease shall be due and payable ten (10) days after demand, without any notice from
51   Landlord and without any deductions or offsets whatsoever.  The parties hereby agree that late payment by
52   Tenant of any Rental owing under this Lease will cause Landlord to incur certain costs and expenses not
53   contemplated under this Lease, the exact amount of which costs are extremely difficult and impracticable
54   to fix.  Such costs and expenses may include, for example, administrative and collection costs, and
55   processing and accounting expenses. Therefore, in the event Tenant fails to pay any monthly installment of
56   Rental within ten (10) days after Tenant receives written notice from Landlord that such sum is owed
57   (provided that no such notice shall be required if Tenant has received two (2) or more written notices of
58   nonpayment from Landlord under this Section within the preceding twelve (12) months), then Tenant shall
59   pay a late charge of five percent (5%) of such amount as Additional Rent.  The parties hereby agree that
60   such late charge represents a fair and reasonable estimate of the costs and expenses Landlord will incur by
61   reason of late payment by Tenant.  Acceptance of such late charge by Landlord shall in no event constitute
62   a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising
63   any of the other rights and remedies granted in this Lease.  In the event Tenant pays the late charge set forth
64   hereunder but fails to pay contemporaneously therewith all unpaid amounts of Rental, Landlord's
65   acceptance of this late charge payment shall not constitute a waiver of Tenant's default with respect to

Tenant's nonpayment nor prevent Landlord from exercising all other rights and remedies available to Landlord under this Lease, at law or in equity.

### Section 2.08    TENANT'S PAYMENT OBLIGATIONS.

(a)    Landlord may, at its option and its sole discretion, apply any payments received from Tenant to any Rental, or other charges which are then due and payable. If Landlord shall not make any specific application of a payment received from Tenant, then any payment received from Tenant shall be applied first to the other charge, then to Rental which has been overdue for the longest period of time. No designation of any payment by Tenant for application to a specific portion of Tenant's financial obligations hereunder shall be binding upon Landlord. Any sums received by Landlord after termination of this Lease shall not constitute rent but shall be received only as reimbursement for use and occupancy of the Premises.

(b)    Tenant covenants to pay all charges under this Lease, including, without limitation, Minimum Annual Rental, Percentage Rental and Additional Rent and other charges, independent of any obligation of Landlord. No breach of this Lease by Landlord shall relieve Tenant of its obligation and duty to pay all such charges when due under the terms of this Article II.

## ARTICLE III

## RECORDS AND BOOKS OF ACCOUNT

### Section 3.01    TENANT'S RECORDS.

Tenant shall prepare and keep full, complete and proper books and source documents, in accordance with Generally Accepted Accounting Principles, of the Gross Sales, whether for cash, credit or otherwise, of each separate department at any time operated within the Premises and of the operations of each subtenant, concessionaire, licensee and/or assignee, and shall require and cause all such parties to prepare and keep books, source documents, records and accounts sufficient to substantiate those kept by Tenant ("Records"). The Records to be kept by Tenant may be kept electronically and shall include, without limitation, true copies of all state and local sales and use tax returns and reports, records of inventories and receipts of merchandise, records of bank deposits of the entire receipts from transactions at the Premises, daily receipts from all sales (including those from mail or telephone orders), and other pertinent original sales records and records of any other transactions conducted in or from the Premises by Tenant and any other persons conducting business from the Premises. Pertinent original sales records shall include, without limitation, a point of sale system of record keeping and such other reasonable documentation which would normally be examined by an independent accountant pursuant to Generally Accepted Auditing Standards in performing an audit of Tenant's sales sufficient to provide determination and verification of Gross Sales and the exclusions and deductions therefrom. Tenant's Records shall be preserved by Tenant at the Premises for at least three (3) years after expiration of each lease year or partial lease year. All of books, source documents, records and documentation maintained pursuant hereto shall at all reasonable times be open to the inspection of, and may be copied or extracted from, in whole or in part, by Landlord or Landlord's authorized representative or agent for a period of at least two (2) years after the expiration of each lease year.

Notwithstanding anything to the contrary contained in this Section, Tenant shall have satisfied its obligations under this Section if Tenant has maintained those original and customary records of Gross Sales as Tenant maintains in its other stores located in regional shopping centers and such records are adequate to provide Landlord with a clear audit trail in accordance with Generally Accepted Accounting Principles.

### Section 3.02    REPORTS BY TENANT.

Tenant shall furnish to Landlord, within thirty (30) days after the expiration of each month of each lease year, a complete statement, certified by Tenant, of the amount of Gross Sales, as defined in Section 2.03 of this Lease, made from the Premises during such period. Tenant shall furnish to Landlord, at the email address set forth in the Data Sheet, within thirty (30) days after the expiration of each lease year, a complete statement, certified by Tenant, showing in all reasonable detail the amount of such Gross Sales made by Tenant from the Premises during the preceding lease year or partial lease year. Tenant shall require all subtenants, concessionaires, licensees and/or assignees, if any, to furnish a similar statement. If Tenant or any subtenant, concessionaire, licensee and/or assignee fails more than twice in any lease year to furnish to Landlord any monthly or annual statement of Gross Sales within the time required by this Section 3.02, then Tenant shall pay within ten (10) days of demand therefor by Landlord as Additional Rent, a special handling fee of $100.00 per statement until such statement is delivered to Landlord. This remedy shall be in addition to any and all other remedies provided in this Lease or by law to Landlord. In addition, if Tenant or any subtenant, concessionaire, licensee and/or assignee, if any, fails to furnish any three (3) consecutive monthly or annual statements of Gross Sales within the time required by this Section 3.02, then, without limiting any of the Landlord's other rights under this Lease, Landlord shall have the right upon thirty (30) days' prior written notice to conduct an audit as set forth in Section 4.02 below and any and all charges occasioned by reason thereof shall be the sole obligation of Tenant and payable on demand.

# ARTICLE IV

# AUDIT

### Section 4.01    RIGHT TO EXAMINE BOOKS.

Notwithstanding the acceptance by Landlord of payments of Minimum Annual Rental or Percentage Rental or installments thereof, Landlord shall have the right to audit all rentals and other charges actually due hereunder. Within ten (10) days following Landlord's request, Tenant shall make available to Landlord at the Premises or at Tenant's principal business office in the United States for examination, extracting and/or copying all books, source documents, accounts, records and sales tax reports of Tenant and any subtenants, concessionaires, licensees and/or assignees, including Tenant's state and federal income tax returns, in order to verify the amount of Gross Sales made in and from the Premises. All of books, source documents, records and documentation maintained pursuant hereto shall at all reasonable times be open to the inspection of, and may be copied or extracted from, in whole or in part, by Landlord or Landlord's authorized representative or agent for a period of at least two (2) years after the expiration of each lease year.

### Section 4.02    AUDIT.

(a)    At its option, Landlord may at any time upon ten (10) days' prior written notice to Tenant, cause a complete audit (including a physical inventory) to be made by an auditor selected by Landlord of the entire records and operations of Tenant and/or any subtenants, concessionaires, licensees and/or assignees relating to the Premises for the period covered by any statement issued or required to be issued by Tenant or a concessionaire as above set forth in Article III. In connection with the audit, Landlord or its representative will have the right to inspect records from any other store operated by Tenant or an affiliate of Tenant, but only if such inspection is reasonably necessary to verify Tenant's Gross Sales reports. Tenant shall make available to Landlord's auditor at the Premises or at Tenant's principal business office in the United States, within ten (10) days following Landlord's notice requiring such audit, all of the books, source documents, accounts, records and sales tax reports of Tenant and any of its concessionaires which such auditor deems necessary or desirable for the purpose of making such audit, including Tenant's state and federal income tax returns. If such audit discloses that Tenant's Gross Sales as previously reported for the period audited were understated, Tenant shall immediately pay to Landlord the additional percentage rental due for the period audited. Further, if such understatement was in excess of three percent (3%) of Tenant's actual Gross Sales as disclosed by such audit, Tenant shall immediately pay to Landlord the actual out-of-pocket cost of such audit, and if such understatement was willful or fraudulent and in excess of ten percent (10%) of Tenant's Gross Sales as disclosed by such audit, Landlord may declare this Lease terminated and the Term ended, in which event this Lease shall cease and terminate on the date specified in such notice with the same force and effect as though the date set forth in such notice were the date set forth in this Lease for expiration of the Term, and Tenant shall vacate and surrender the Premises on or before such date in the condition required by this Lease for surrender upon the expiration of the Term; provided, however, Landlord shall not exercise its right to terminate this Lease by reason of such understatement of Tenant's Gross Sales if Tenant can demonstrate that such understatement was inadvertent and not deliberate.

(b)    If upon examination or audit Landlord's accountant or representative reasonably determines taking into account Generally Accepted Auditing Standards that sufficient documentation is not maintained, retained, recorded or available to verify Tenant's actual Gross Sales, Tenant shall pay for the actual out-of-pocket cost of such audit and, in addition, should Landlord deem it necessary, Tenant shall reconstruct, at its sole cost and expense, all Records for the determination of Gross Sales for any period being audited.

(c)    If Tenant subleases, licenses, or in any manner allows the Premises to be used by another party (the "Subtenant"), Tenant is responsible for ensuring that the Subtenant's Records conform to the requirements of this Lease. The failure of Subtenant to maintain its Records as required under this Lease, or to correctly report Gross Sales, will be deemed a failure on the part of Tenant to conform to the requirements of this Lease and if Tenant fails to cure such failure within fifteen (15) business days following notice from Landlord shall subject Tenant to the remedies set forth in Section 4.02(a) or Section 4.02(b) above, including termination of this Lease.

# ARTICLE V

# CONSTRUCTION OF PREMISES

### Section 5.01    CONSTRUCTION OF PREMISES.

(a)    Any improvements to be made to the Premises shall be substantially as set forth in Exhibit B attached hereto. Each of the parties hereto shall perform the obligations imposed upon such party in said Exhibit at the times and in the manner therein provided. It is understood and agreed by Tenant that any

1  minor changes from any plans or specifications covering Landlord's Work as defined in said Exhibit shall
2  not affect or change this Lease or invalidate the same.
3
4       (b)     Without limiting the generality of the incorporation by reference of all exhibits and/or
5  addenda to this Lease, Tenant's failure to furnish the plans and specifications required pursuant to Exhibit
6  B ("Plans and Specifications") to Landlord within the time periods and in the form required by Exhibit B,
7  or failure to perform any other obligation under Exhibit B, shall constitute a default under this Lease
8  pursuant to Article XIX below, which shall entitle Landlord to all remedies set forth in Article XIX below.
9  No material deviation from the final Plans and Specifications, once approved by Landlord, shall be made
10 by Tenant without Landlord's prior written consent. Approval of the final Plans and Specifications by
11 Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy, efficacy
12 or sufficiency, and Tenant shall be solely responsible for such items. Any occupancy of the Premises by
13 Tenant prior to the Rental Commencement Date shall be solely for the purpose of inspection, measurement
14 and obtaining information necessary to prepare Plans and Specifications and to construct its leasehold
15 improvements, and shall be subject to all terms and conditions of this Lease applicable to such entry prior
16 to the Rental Commencement Date pursuant to Section 1.02 above. Storefront barricades, reasonably
17 acceptable to Landlord, attractively screening the Premises from view during construction shall be erected
18 and maintained by Tenant at all times prior to Tenant's opening for business to the general public and shall
19 be removed by Tenant prior to such opening.
20
21      **Section 5.02     CERTIFICATE OF OCCUPANCY.**
22      Within the earlier of (a) ten (10) days after completion of construction of Tenant's Work in
23 accordance with the final Plans and Specifications as approved by Landlord (as described in Section 5.01
24 and Exhibit B) (but may be delivered prior to Tenant opening for business in the Premises); or (b) ten (10)
25 days after Tenant opens the Premises for business, Tenant shall deliver to Landlord the original of the
26 Certificate of Occupancy for the Premises issued by the appropriate governmental agency, original
27 execution copies of all mechanics' lien releases or other lien releases on account of Tenant's Work, notarized
28 and unconditional, in such form as Landlord shall have approved, copies of all building permits indicating
29 inspection and approval by the issuer of said permits, and an architect's certification that Tenant's Work
30 has been constructed in accordance with the final Plans and Specifications and is fully complete in
31 accordance with Exhibit B.
32
33      Initially, the Certificate of Occupancy shall be either the permanent or temporary certificate so long
34 as any temporary certificate allows the Tenant to occupy the Premises for the purpose of conducting
35 business therefrom. If Tenant initially opens for business on a temporary certificate, then Tenant shall
36 deliver the permanent Certificate of Occupancy to Landlord within thirty (30) days after completion of
37 Tenant's Work.
38
39      **Section 5.03     CONDITION OF PREMISES.**
40      (a)     Except as otherwise specifically provided in this Lease (including, without limitation, in
41 Exhibit B attached hereto), Tenant hereby agrees that upon delivery of possession of the Premises to Tenant,
42 Tenant shall accept such delivery of possession of the Premises in its then existing "AS IS" condition, and
43 Tenant acknowledges (i) that Tenant shall have inspected the Premises and shall be fully aware of the
44 condition of the Premises as of delivery of possession; (ii) that Landlord shall have no obligation to improve
45 or alter the Premises for the benefit of Tenant, except for Landlord's Work to be performed pursuant to the
46 terms of this Lease, if any; (iii) that, except as may be expressly provided in this Lease, neither Landlord
47 nor any of Landlord's employees, agents, representatives, contractors nor brokers has made any
48 representation or warranty of any kind respecting (a) the condition of the Premises, Shopping Center and/or
49 Development, (b) the suitability thereof for Tenant's use or the conduct of Tenant's business, or (c)
50 occupancy or operation within the Shopping Center or Development by any other person or entity. Tenant
51 irrevocably waives any claim based upon or related to any such claimed representation by Landlord or any
52 claimed representation by Landlord as to traffic to be expected at the Premises or sales to be expected at
53 the Premises. Tenant's taking possession of the Premises shall constitute Tenant's formal acceptance of the
54 same and acknowledgment that the Premises are in the condition called for under this Lease, subject to all
55 field conditions existing at the time of delivery of possession. In no event shall Landlord be liable for
56 damages or otherwise as a result of any failure to make the Premises available within the time and/or in the
57 condition provided in this Lease and no such failure shall permit Tenant to rescind or terminate this Lease
58 subject to the provisions of the third paragraph of Section 1.02(b).
59
60      Landlord shall repair latent defects in items of Landlord's Work completed at the commencement
61 of the Term of which Tenant notifies Landlord in writing within six (6) months following delivery of the
62 Premises to Tenant.
63
64      (b)     CASp Inspection. A Certified Access Specialist ("CASp") can inspect the subject premises
65 and determine whether the subject premises comply with all of the applicable construction-related
66 accessibility standards under state law. Although state law does not require a CASp inspection of the subject

premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises. As of the Commencement Date of this Lease, the Premises has not been inspected by a CASp, pursuant to California Civil Code §1938.

### Section 5.04    ULTIMATE DELIVERY DATE.

Notwithstanding anything to the contrary contained herein, if for any reason whatsoever (including, without limitation, excusable delay), the Delivery Date has not occurred prior to such date that is eighteen (18) months from the Estimated Delivery Date, and Tenant has not exercised its right to terminate the Lease in Section 1.02 (b), then this Lease shall be automatically terminated without further act of either party hereto and each of the parties hereto shall be released from any further obligation hereunder.

### Section 5.05    REQUIRED IMPROVEMENTS.

Tenant agrees to keep the cosmetic aspects of the interior of the Premises (wall covering, paint, ceiling, carpeting and other floor coverings, hereinafter "Cosmetic Improvements"), in first class condition at all times during the Term.  If any Cosmetic Improvements are not in first class condition, then Tenant shall remedy the problem within ninety (90) days following receipt of Landlord's notice thereof.

## ARTICLE VI

## ALTERATIONS, CHANGES AND ADDITIONS

### Section 6.01    ALTERATIONS BY TENANT.

Tenant shall not make or cause to be made any alterations, additions or improvements to the Premises without the prior written approval of Landlord (for example, but without limiting the generality of the foregoing, Tenant shall not install or cause to be installed any signs, floor covering, interior or exterior lighting, plumbing fixtures, shades, canopies, awnings, electronic detection devices, antennas, mechanical, electrical or sprinkler systems, or make any changes to the storefront). However, Tenant may make such alterations, additions and improvements to the interior of the Premises as do not in the aggregate exceed in any lease year the amount set forth in the Data Sheet, provided (a) the same are cosmetic and not structural in nature, do not affect a utility system, the storefront or storefront sign and are not inconsistent with the final Plans and Specifications approved by Landlord; (b) that Tenant complies with the provisions concerning contractors, labor relations, compliance with law, reporting of costs and insurance and bonds and the provisions of Exhibit B; and (c) that Tenant shall submit to Landlord fifteen (15) days written notice prior to undertaking any of the foregoing. Tenant shall present to Landlord Plans and Specifications for any other alterations, additions or improvements at the time approval is sought, in accordance with criteria and procedures as provided in Exhibit B. All alterations, decorations, additions and improvements made by Tenant shall be deemed to have attached to the Premises and to have become the property of Landlord upon such attachment.

### Section 6.02    REMOVAL BY TENANT.

Upon the expiration or earlier termination of this Lease, Tenant shall not remove any of such alterations, decorations, additions and improvements, except that trade fixtures, equipment and other personal property installed by Tenant ("Property") may be removed; provided that Tenant immediately repairs any damage caused by such removal. Further, Landlord may designate by written notice to Tenant (at the time of Landlord's approval of Tenant's Plans and Specifications) those alterations, decorations, additions and improvements which shall be removed by Tenant at the expiration or termination of this Lease, and Tenant shall, at its own cost and expense, promptly remove the same and immediately repair any damage to the Premises caused by such removal. If Tenant shall fail to remove any of its Property upon the expiration or earlier termination of this Lease, Landlord may, at Landlord's option, retain either any or all of the property, and title thereto shall thereupon vest in Landlord without compensation to Tenant; or remove all or any portion of the Property from the Premises and dispose of the Property in any manner, without compensation to Tenant. In the latter event, Tenant shall, upon demand, pay to Landlord the actual expense of such removal and disposition and the repair of any damage to the Premises resulting from or caused by such removal. The foregoing sentence shall not apply to any alterations that Tenant is not obligated to remove. The obligations contained in this Section 6.02 shall survive the expiration or earlier termination of this Lease.

### Section 6.03    CHANGES AND ADDITIONS.

(a)    Landlord reserves the right at any time, and from time to time, to make alterations to, and to build additional stories on, the building in which the Premises is located, and to construct other buildings and improvements in the Shopping Center and/or the Development, including any modifications of the Common Areas in connection therewith, to enlarge or reduce the Shopping Center and/or the Development,

1  to add decks or elevated parking facilities, and to sell or lease any part of the land comprising the
2  Development, as shown on Exhibit A-1, for the construction thereon of a building or buildings to be
3  occupied by a Department Store which may or may not be part of the Development. Landlord also reserves
4  the right at any time, and from time to time, to change, modify, or abolish any temporary off-site utility
5  serving the Shopping Center and/or Development. The purpose of Exhibit A-1 is to show the approximate
6  location of the Shopping Center while the purpose of Exhibit A-2 is to show the approximate location of
7  the Premises within the Shopping Center. Landlord reserves the right at any time to relocate, reduce,
8  enlarge, or reconfigure the various buildings, parking areas and other common areas shown on said exhibits;
9  provided, however, that no such changes shall reduce the parking areas below the number of parking spaces
10  required by law.
11
12          Except as may be required by applicable law, no changes or alterations by Landlord
13  pursuant hereto shall materially, detrimentally affect ingress to or egress from the Premises, or the
14  reasonable visibility of the Premises.
15
16          (b)      Landlord shall have the exclusive right to use all or any part of the roof of the Premises for
17  any purpose; to erect additional stories or other structures over all or any part of the Premises; to erect in
18  connection with the construction thereof temporary scaffolds and other aids to construction on the exterior
19  of the Premises, provided that access to the Premises shall not be denied; and to install, maintain, use, repair
20  and replace within the Premises pipes, ducts, conduits, wires and all other mechanical equipment serving
21  other parts of the Shopping Center, the same to be in locations as will not unreasonably deny Tenant's use
22  thereof. Landlord may make any use it desires of the side or rear walls of the Premises (including, without
23  limitation, freestanding columns and footings for all columns), provided that such use shall not encroach
24  on the interior of the Premises unless (i) all work carried on by Landlord with respect to such encroachment
25  shall be done during hours when the Premises are not open for business and otherwise shall be carried out
26  in such a manner as not to unreasonably interfere with Tenant's operations in the Premises, and (ii)
27  Landlord, at its expense, shall repair all damage to the Premises resulting from such work.
28
29          **Section 6.04    RIGHTS OF LANDLORD.**
30          (a)      Landlord hereby reserves the right at any time following the Commencement Date to
31  change the location of the Premises in the Shopping Center, the same may be expanded from time to
32  time; provided such relocated premises (i) is located within the area shown hatched on the Exhibit A-3 –
33  Relocation Zone, and (ii) shall contain approximately the same number of square feet and exterior frontage
34  as the original Premises. In the event Landlord elects to exercise such right, it shall so advise Tenant by
35  sixty (60) days prior written notice, and Tenant hereby agrees to be bound by such election and to execute,
36  upon receipt from Landlord, whatever amendments or other instruments as may be required to correctly
37  reflect the foregoing. Landlord shall renovate, at Landlord's cost and expense, the relocated Premises so
38  that the same are reasonably comparable to the original Premises (including leasehold improvements) and
39  of moving and reinstalling Tenant's trade fixtures and storefront sign. Landlord shall have no liability for
40  such relocation or the closing of the Premises other than as specifically set forth in this paragraph and
41  Tenant waives any such claims including, without limitation, claims for lost profits.
42
43          Further Tenant shall not be required to close its business in the Shopping Center in the
44  Premises until the Relocation Premises are completed, and Landlord will use reasonable efforts to cause
45  the relocation of Tenant's furniture, trade fixtures, equipment and inventory to the relocation premises to
46  occur after Tenant's normal business hours. and in any event Landlord agrees that there shall occur no
47  closure in Tenant's operations at the Shopping Center in connection with any such relocation of more than
48  one (1) business day, expect for any delay caused by Tenant.
49
50          (b)      Intentionally deleted.
51
52                          **ARTICLE VII**
53
54                  **CONDUCT OF BUSINESS BY TENANT**
55
56          **Section 7.01    PERMITTED USE.**
57          Tenant shall use the Premises only for the purpose of conducting the business specifically set forth
58  in the Data Sheet and for no other use or purpose. If any governmental license or permit shall be required
59  for the proper and lawful conduct of Tenant's business or other activity conducted in the Premises, or if a
60  failure to procure such a license or permit might or would in any way adversely affect Landlord, the
61  Shopping Center and/or the Development, then Tenant, at Tenant's expense, shall duly procure and
62  thereafter maintain such license or permit and submit the same for inspection by Landlord. Tenant, at
63  Tenant's expense, shall at all times comply with the requirements of each such license or permit.
64

**Section 7.02    OPERATION OF BUSINESS.**

    (a)    Tenant agrees to be open for business and to operate in all of the Premises during the entire Term following the Rental Commencement Date, and to actively and diligently conduct its business at all times in a first class and reputable manner, maintaining at all times a full staff of employees and a complete stock of current season merchandise. Tenant shall install and maintain at all times a display of merchandise in the display windows, if any, of the Premises and shall keep the same well lighted. Tenant shall be obligated to be open for business and to operate continuously during all hours established by Landlord as Shopping Center business hours. In the event Landlord has approved Tenant's remaining open for business after normal Shopping Center hours, then such approval shall be conditioned upon Tenant paying, as Additional Rent, its pro rata share of all additional costs incurred by Landlord as a result thereof which pro rata share shall be reasonably determined by Landlord based on the Floor Areas of all other tenants and occupants who shall be open for business during such additional hours and provided that Landlord provides Tenant with such costs prior to Tenant operating outside normal Shopping Center hours. Tenant's obligation to be open for business shall include, but not be limited to, opening for business not more than fifteen (15) minutes late, closing for business not more than fifteen (15) minutes early, and closing for business for not more than fifteen (15) minutes during Shopping Center business hours. Failure by Tenant to be open for business and to operate shall entitle Landlord, in addition to other remedies provided in this Section 7.02, this Lease or by law, to mandatory injunctive relief. Without limiting the generality of the foregoing, in the event the hours during which the Shopping Center is legally permitted to be open to the public are regulated by any lawful authority, then Landlord shall be the sole judge of which hours and days shall be Shopping Center business hours.

    Notwithstanding anything to the contrary in this Section 7.02, provided Tenant is not in default under the Lease and provided Tenant keeps the interior lights on in the Premises during all Shopping Center business hours, Tenant shall be permitted to maintain the following business hours: 8:00 a.m. through 8:00 p.m. Monday through Friday, and 9:00 a.m. through 8:00 p.m. Saturday and Sunday. Tenant may from time to time, change the hours during which it conducts business in the Premises, provided that such hours are generally consistent with the business hours of other Healthy Spot locations in the Los Angeles County region and provided such hours are no less than 10:00 a.m. through 8:00 p.m. daily. In the event Tenant desires to change such hours of operation, Tenant agrees to deliver prior written notice to the Shopping Center manager, however Tenant shall at all times have operating hours that include operating 7 days a week. Such hours shall not be considered "after normal Shopping Center hours" for purposes of allocating costs to Tenant under Section 7.02(a). Additionally, Tenant shall not (i) be required to operate on New Year's Day, Independence Day, Thanksgiving Day, and Christmas Day, and (ii) be subject to any additional operating requirements of Landlord on the day following Thanksgiving Day, Christmas Eve, or New Year's Eve.

    (b)    Tenant, at Tenant's expense, shall promptly comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all governmental authorities having jurisdiction affecting or applicable to the Premises or the cleanliness, safety, occupancy and use of the same, whether or not any such law, ordinance, order, rule, regulation or requirement is substantial, or foreseen or unforeseen, or ordinary or extraordinary, or shall necessitate changes or improvements (other than structural changes or improvements) or interfere with the use and enjoyment of the Premises. Tenant shall not do or permit anything to be done in or about the Premises, nor bring anything therein, which will in any way conflict with any such law, ordinance, order, rule, regulation or requirement affecting the occupancy or use of the Premises, the Shopping Center or the Development which has been or may hereafter be enacted or promulgated by governmental authorities, or in any way obstruct or interfere with the rights of others, nor shall Tenant use or allow the Premises to be used for any improper, immoral or objectionable purposes or do any act tending to injure the reputation of the Shopping Center and/or the Development. Tenant shall not give samples, approach customers or otherwise solicit business in the parking or other Common Areas or any part of the Development other than in the Premises, nor shall Tenant distribute any handbills or other advertising matter in the parking area or other Common Areas or any part of the Development other than in the Premises.

    Notwithstanding anything in this Lease to the contrary (i) Landlord acknowledges and agrees that household pets, including, without limitation, dogs and cats, may be kept in and/or brought upon the Premises, (ii) the presence of such household pets may result in noise and odors emanating from the Premises consistent with the presence of such animals on the Premises, (iii) Landlord will take no action restricting the ability of Tenant's invitees to bring their pets to the Premises, and (iv) the presence of such household pets in the Premises or about the Common Areas (in compliance with all Laws) will in no way violate the terms of this Lease.

    No auction, liquidation, going out of business, fire or bankruptcy sale may be conducted or advertised by sign or otherwise in the Premises. Tenant shall not permit the operation of any coin operated or vending machines or pay telephones in the Premises, other than in the areas reserved solely for the use of Tenant's employees. Tenant shall not sell or display any merchandise within five feet

1 (5') of the storefront leaseline or opening unless such sale or display shall be expressly approved on the
2 Plans and Specifications or otherwise approved by Landlord, in writing, except that Tenant shall be
3 permitted to display merchandise in the display windows, if any. Tenant shall not use the areas adjacent to
4 the Premises for business purposes or any other purpose. Tenant shall not store anything in service or exit
5 corridors. All receiving and delivery of goods and merchandise for the Premises, and all removal of
6 merchandise, supplies, equipment, trash and debris and all storage of trash and debris from the Premises
7 shall be made only by way of or in the areas provided by Landlord. Tenant shall be solely responsible for
8 prompt disposal within the Premises or in such areas as may be provided for such disposal by Landlord of
9 all trash and debris from the Premises. Tenant shall not use or permit the use of any portion of the Premises
10 as sleeping quarters, lodging rooms, for any unlawful purpose, or for cooking, except as specifically
11 permitted in Section 7.01.
12
13   Tenant shall not install any radio, television, communication dish or other similar device
14 or related equipment exterior to the Premises, shall not cause or make any penetration of the roof of the
15 Premises or the building in which the Premises is located, and shall not erect any aerial or antenna on the
16 roof or exterior walls of any building within the Development. Further, Tenant shall not broadcast any
17 radio or wireless signals into the Common Areas without express consent from Landlord. Tenant shall not
18 interfere with Common Area wireless technologies of Landlord, and shall cease to interfere immediately
19 upon notice of said interference by Landlord.
20
21  (c) If Tenant is permitted pursuant to this Lease to engage in the sale of food and/or beverages
22 from the Premises, whether in the area designated as a Food Court or otherwise, the same shall be offered
23 only pursuant to a menu approved in writing by the Landlord and attached as an exhibit to this Lease which
24 shall not be changed without Landlord's prior written consent. Further, in such event, Tenant shall provide
25 to Landlord upon demand proof satisfactory to Landlord that monthly cleaning and maintenance of all
26 grease traps, pans and hood ventilators located in the Premises has been performed by a suitable contractor.
27 A suitable contractor shall be one who is bondable and capable of performing Tenant's obligations
28 hereunder. If Tenant is permitted to engage in the sale of food and/or beverages from the Premises and the
29 Premises is not located within a Food Court area, Tenant shall be solely responsible for prompt collection
30 of all trash and debris within a radius of thirty feet (30') of the Premises. Tenant shall further be solely
31 responsible for prompt disposal within the Premises or in such areas as may be provided for such disposal
32 by Landlord of all such trash and debris. If Tenant fails to effect such prompt collection and disposal,
33 Landlord may provide for such collection and disposal and, in such event, Tenant shall pay to Landlord the
34 cost of such collection and disposal plus a fifteen percent (15%) administrative fee to Landlord within ten
35 (10) days after receipt of a written statement setting forth such cost.
36
37  (d) Intentionally Deleted.
38
39  **Section 7.03 HAZARDOUS MATERIALS.**
40  (a) For the purposes of this Section 7.03 the following terms shall have the following
41 meanings: (i) the term "Hazardous Material" shall mean: (aa) any material or substance that, whether by
42 its nature or use, is subject to regulation under any Environmental Requirement, or (bb) any material,
43 substance or waste which is toxic, ignitable, explosive, corrosive or reactive, or (cc) asbestos, or (dd)
44 petroleum and petroleum-based products, or (ee) formaldehyde, or (ff) polychlorinated biphenyls (PCBs),
45 (gg) Freon and other chlorofluorocarbons or (hh) such other material as is designated in a notice from
46 Landlord to Tenant (whether such notice is provided before or after Tenant first commences to use such
47 material); (ii) the term "Environmental Requirement" shall include the Comprehensive Environmental
48 Response, Compensation and Liability Act of 1980 (42 U.S.C. §9501 et seq.), the Hazardous Materials
49 Transportation Act (49 U.S.C. §1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C.
50 §6901 et seq.), the Toxic Substances Control Act (15 U.S.C. §2601 et seq.), the Clean Air Act (42 U.S.C.
51 §7401 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), all as presently in effect
52 and as the same may hereafter be amended, any regulation pursuant thereto, or any other present or future
53 law, ordinance, rule, regulation, order or directive addressing environmental, health or safety issues of or
54 by any Governmental Authority; and (iii) the term "Governmental Authority" shall mean the Federal
55 government, or any state or other political subdivision thereof, any local government, or any agency, court
56 or body of the Federal government, any state or other political subdivision thereof, exercising executive,
57 legislative, judicial, regulatory or administrative functions.
58
59  (b) Tenant hereby represents and warrants to Landlord that it will ensure that (i) no Hazardous
60 Material will be generated, manufactured, sold, transported or located at, on, in, under or about the
61 Premises; (ii) no Hazardous Material will be generated, manufactured, sold, transported or located at, in,
62 on, under or about the Premises in a manner which violates any Environmental Requirement, or which
63 requires cleanup or corrective action of any kind under any Environmental Requirement and (iii) no
64 Hazardous Material will be transported, released, emitted, sold, discharged, leached, dumped or disposed
65 of from the Premises onto or into any other property. However, the above prohibition concerning
66 Hazardous Materials shall not prevent Tenant from selling and using, as part of Tenant's services, regular

1   consumer products which contain small, safe amounts of such Hazardous Materials or maintaining small,
2   safe amounts of cleaning solutions at the Premises.
3
4          (c)      Tenant shall comply and shall cause any other person on or about the Premises, including,
5   without limitation, employees, invitees, contractors, subcontractors, licensees, subtenants or agents, to
6   comply in all respects with all Environmental Requirements, and shall cause itself and its employees,
7   invitees, contractors, subcontractors, licensees, subtenants or agents not to generate, store, handle,
8   manufacture, process, sell, dispose of, transport or otherwise use Hazardous Materials at, in, on, under or
9   about the Premises in a manner that could lead or potentially lead to the imposition on Landlord or the
10  Shopping Center or the Development of any liability or lien of any nature whatsoever.
11
12         (d)      Tenant shall (i) notify Landlord promptly in the event of any spill or other release of any
13  Hazardous Material at, in, on, under or about the Premises which is required to be reported to a
14  Governmental Authority under any Environmental Requirement; (ii) promptly forward to Landlord copies
15  of any notices received by Tenant relating to the alleged violations of any Environmental Requirement; and
16  (iii) promptly pay when due any fine or assessment against Tenant, Landlord or the Shopping Center or the
17  Development relating to any Environmental Requirement or the existence of Hazardous Materials at the
18  Premises.
19
20         (e)      If, at any time, it is determined that the operation or use of the Premises violates any
21  applicable Environmental Requirement, or that there are Hazardous Materials located at, in, on, under or
22  about the Premises resulting from Tenant, its agents, employees or anyone under Tenant's control having
23  brought onto the Premises or generated in the Premises any Hazardous Materials in violation of Tenant's
24  representation and warranty set forth in subsection 7.03(b) or its obligations under subsection 7.03(c) which
25  require special handling in collection, storage, treatment or disposal, or any other form of cleanup or
26  corrective action, Tenant shall within ten (10) days after receipt of notice thereof from any Governmental
27  Authority or from Landlord take, at its sole cost and expense, such actions as may be necessary to fully
28  comply in all respects with all Environmental Requirements; provided, however, that if such compliance
29  cannot reasonably be completed within such ten (10) day period, Tenant shall commence such necessary
30  action within such ten (10) day period and shall thereafter diligently and expeditiously proceed to fully
31  comply in all respects and in a timely fashion with all Environmental Requirements. If Tenant fails to
32  timely take, or to diligently and expeditiously proceed to complete in a timely fashion, any such action,
33  Landlord may, in its sole and absolute discretion, make advances or payments towards the performance or
34  satisfaction of the same, but shall in no event be under any obligation to do so. All sums so advanced or
35  paid by Landlord (including, without limitation, counsel and consultant fees and expenses, investigation
36  and laboratory fees and expenses, and fines or other penalty payments) and all sums advanced or paid in
37  connection with any judicial or administrative investigation or proceeding relating thereto, will
38  immediately, upon demand, become due and payable from Tenant. If Tenant fails to make such payment
39  within ten (10) days of such demand, Tenant shall be in default under this Lease and Landlord may, without
40  any further notice to Tenant terminate this Lease or resort to any other of its rights upon default set forth in
41  Article XIX. Tenant will execute and deliver, promptly upon request, such instruments as Landlord may
42  deem useful or necessary to permit Landlord to take such action, and such notes, mortgages, or other
43  security as Landlord may require to secure all sums to be advanced or paid by Landlord.
44
45         (f)      If a lien is filed against the Premises, the Development or the Shopping Center by any
46  Governmental Authority resulting from the need to expend or the actual expending of monies arising from
47  an Environmental Requirement, or a liability regarding Hazardous Materials related to an action or
48  omission, whether intentional or unintentional, of Tenant or for which Tenant is responsible, then Tenant
49  shall, within ten (10) days from the date that the Tenant is first given notice that such lien has been placed
50  (or within such shorter period of time as may be specified by Landlord if such Governmental Authority has
51  commenced steps to cause the property to be sold pursuant to such lien) either (i) immediately pay the claim
52  and remove the lien, or (ii) immediately furnish a cash deposit, bond, or such other security with respect
53  thereto as is satisfactory in all respects to Landlord and is sufficient to effect a complete discharge of such
54  lien.
55
56         (g)      If Landlord reasonably believes that (i) Tenant has permitted a Hazardous Material at the
57  Premises, or (ii) that any other condition violates or threatens to violate any Environmental Requirement,
58  Landlord may, at its option, cause an environmental site assessment of the Premises or portions thereof to
59  be conducted to confirm Tenant's compliance with the provisions of this Section, and Tenant shall cooperate
60  in all reasonable ways with Landlord in connection with any such environmental site assessment and shall
61  pay all costs and expenses incurred in connection therewith if it is determined that Tenant, its agents,
62  employees or anyone under Tenant's control has violated an Environmental Requirement. .
63
64         (h)      Subject to Section 11.04, Tenant shall defend, indemnify, and hold harmless Landlord its
65  affiliates, parent corporation, subsidiaries, partners, members, management company, successors and
66  assigns, and the employees, agents, officers, directors, shareholders, members, advisers, trustees and

1   fiduciaries of any of them from and against any and all loss, claims, demands, penalties, causes of action,
2   fines, liabilities, settlements, damages, consequential damages, costs or expenses of whatever kind or
3   nature, known or unknown, foreseen or unforeseen, contingent or otherwise (including, without limitation,
4   counsel and consultant fees and expenses, investigation and laboratory fees and expenses, court costs, and
5   litigation expenses) to the extent arising out of, or in any way related to (i) any breach by Tenant of any of
6   the provisions of this Section 7.03; (ii) the presence, use, generation, transportation, disposal, spillage,
7   discharge, emission, leakage, release, or threatened release of any Hazardous Material which is at, in, on,
8   under, or from the Premises, the Shopping Center or the Development including, without limitation, any
9   damage or injury resulting from any such Hazardous Material to or affecting the Premises, the Shopping
10   Center, the Development or any soil, water, air, vegetation, buildings, personal property, persons or
11   animals; (iii) any personal injury (including wrongful death) or property damage (real or personal) arising
12   out of or related to any such Hazardous Material; (iv) any lawsuit brought or threatened, settlement reached,
13   or order or directive of or by any Governmental Authority relating to such Hazardous Material; or (v) any
14   violation of any Environmental Requirement or any policy or requirement of Landlord hereunder. The
15   indemnities set forth in this subparagraph (h) are limited to actions or omissions of Tenant, its contractors,
16   subcontractors, licensees, concessionaires or others on the Premises at the request of or with the consent of
17   Tenant. Tenant shall indemnify Landlord for all losses, including, but not limited to, damages occasioned
18   by the inability of Landlord to relet the Premises or a reduction in the fair market and/or Rental value of the
19   Premises, Shopping Center or Development.
20
21            This indemnification shall, notwithstanding any exculpatory or other provision of any
22   nature whatsoever to the contrary set forth in the Lease, or any other document or instrument now or
23   hereafter executed between Landlord and Tenant, constitute the obligation and liability of the Tenant and
24   any guarantor. The obligations set forth in this Section 7.03 shall survive the termination of the Lease.
25
26            (i)      If the Lease is assigned to, or assumed by another party, or in the event of a sublease, it
27   shall be a condition of such assignment, assumption or sublease that the assignee, party assuming or
28   sublessee shall assume the obligations of this Section 7.03 in addition to such obligations of Tenant
29   continuing after and surviving such sublease, assignment or assumption. The obligations and liabilities of
30   Tenant under this Section 7.03 shall survive and continue in full force and effect and shall not be terminated,
31   discharged or released, in whole or in part, irrespective of any assignment, sublease or assumption and
32   irrespective of any other fact or circumstance of any nature whatsoever.
33
34            (j)      Tenant shall surrender the Premises to Landlord upon the expiration or earlier termination
35   of the Lease free of Hazardous Materials and free of any violation of any Environmental Requirement.
36   Upon surrender, Tenant shall provide Landlord with a statement by an officer of Tenant certifying to
37   Tenant's best knowledge that the Premises is free of Hazardous Materials.
38
39            Provided, however, references to Hazardous Materials under this subsection 7.03(j) shall
40   be deemed to refer only to such Hazardous Materials as were brought onto the Premises or generated in the
41   Premises by Tenant, any subtenant, licensee, concessionaire or assignee of Tenant, or any of their respective
42   employees, agents or contractors.
43
44   **Section 7.04   RADIUS.**
45            Tenant acknowledges that sales from a store owned by it or a related entity as described herein
46   within the radius set forth on the Data Sheet ("Radius Area") may reduce the Gross Sales that might
47   otherwise be made from the Premises. If such a business is operated, the specific effect on Gross Sales
48   may be difficult or impossible to establish with certainty. Therefore, in order to provide Landlord with a
49   fair and adequate rental for the Premises, in the event that during the Term hereof Tenant or any person,
50   firm, corporation or other entity who or which controls or is controlled by Tenant, or by any person, firm,
51   corporation or other entity who or which controls Tenant, shall directly, either individually or as a partner
52   or stockholder or otherwise, own, operate or become financially interested in any business similar to or in
53   competition with the business of Tenant described in the Data Sheet, within the Radius Area from the
54   Development, then the Gross Sales of any such business or businesses within said area shall be included in
55   the Gross Sales made from the Premises and the Percentage Rental hereunder shall be computed upon the
56   aggregate of the Gross Sales made from the Premises and by any such other business or businesses then
57   conducted within said area. Tenant shall be obligated to provide Landlord with a statement of Tenant's
58   Gross Sales for all such other businesses operated within such area, in accordance with the provisions of
59   Article III and Landlord shall have a right to examine the books and to audit such other businesses in a
60   manner as set forth in Article IV of this Lease.
61
62            This Section 7.04 shall not apply to any such business or businesses open and in operation within
63   said area as of the date of execution of this Lease. Landlord or Landlord's authorized representative or
64   agent shall have the right at all reasonable times during the Term hereof and for a period of at least two (2)
65   years after the expiration of the Term, to inspect, audit, copy and make extracts of the books, source

1   documents, records and accounts pertaining to such other business or businesses for the purpose of
2   determining or verifying the Additional Rent due to Landlord pursuant to this Section.
3
4                              **ARTICLE VIII**
5
6                              **COMMON AREAS**
7
8        **Section 8.01   OPERATION AND MAINTENANCE OF COMMON AREAS.**
9            Landlord shall cause to be operated and maintained during the Term all "Common Areas" (as
10  defined below) at a level comparable to other regional shopping malls in the region in which the
11  Development is located. The manner in which such areas and facilities shall be operated and maintained,
12  and the expenditures therefor, shall be at the sole discretion of Landlord and the use of such areas and
13  facilities shall be subject to such regulations as Landlord may establish, modify and enforce from time to
14  time.
15
16       **Section 8.02   USE OF COMMON AREAS.**
17           (a)       The term "Common Area(s)", as used in this Lease, shall mean, to the extent provided by
18  Landlord, all improved and unimproved areas within the Shopping Center and the Development including,
19  without limitation: (i) parking structures, areas and facilities (collectively, "parking facilities"), traffic
20  control and traffic information signs and equipment, roadways, pedestrian sidewalks, curbs, driveways, a
21  monorail system, if any, public transportation loading and unloading facilities not devoted to a single tenant,
22  truckways, delivery areas, landscaped areas, community rooms, office facilities, elevators, escalators, roofs,
23  skylights, beams, stairs and ramps not contained within any Floor Area, public restrooms and comfort
24  stations, service areas, service and fire exit corridors, passageways and other areas, amenities, facilities and
25  improvements provided by Landlord, and (ii) those areas within the Development and areas adjacent to the
26  Development containing parking facilities, signs, pylons or structures advertising the Development or
27  which from time to time may be provided by the owners of such areas for the convenience and use of
28  Landlord, the tenants of the Shopping Center and the Development, the owners and occupants of the
29  Department Stores and their respective concessionaires, agents, employees, customers, invitees and any
30  other licensees. The use and occupancy by Tenant of the Premises shall include the non-exclusive use of
31  the Common Areas in common with Landlord and with all others for whose convenience and use the
32  Common Areas have been or may hereafter be provided by Landlord or by the owners of Common Areas
33  not within the Shopping Center or the Development as specified in the preceding sentence, subject,
34  however, to such rules and regulations for the use thereof as may be prescribed from time to time by
35  Landlord or the owner of such Common Areas, including the right of Landlord or such owner to impose
36  parking charges, whether by meter or otherwise, and to determine the hours and mode of operation of the
37  elevators and escalators serving the Development and the Shopping Center. In no event, however, shall
38  Tenant, its agents or employees, use the Common Areas for the display or sale of merchandise.
39
40           Landlord shall have the right, but not the obligation, from time to time, to modify the
41  Common Areas, remove portions of the Common Areas from common use, to permit entertainment events,
42  advertising displays, educational displays, farmers' market events (including food use), and other displays
43  in the Common Areas that in Landlord's judgment tend to attract the public, to erect buildings or other
44  improvements on the Common Areas, to lease kiosks and to establish, modify and enforce reasonable rules
45  and regulations with respect to all Common Areas. Tenant shall not be entitled to any credit for income
46  earned by Landlord with respect to the Common Area.
47
48           Landlord may at any time close any Common Area to make repairs or changes, to prevent
49  the acquisition of public rights in such area or to discourage non-customer parking, to use areas for attendant
50  or valet parking, and may do such other acts in and to the Common Areas as in its judgment may be desirable
51  to improve the convenience thereof.
52
53           Landlord will provide two (2) non-exclusive, time-limited, parking spaces in the location shown
54  hatched on Exhibit A-4 ("Customer Doggie Drop Off Parking") for Tenant's customers and designated as
55  'short term' or "doggie drop off" parking spaces. Tenant recognizes that Landlord reserves the right to
56  change such parking spaces as Landlord deems necessary.
57
58           (b)       Except for any kiosk or other installation currently existing as of the Commencement Date,
59  Landlord agrees that there shall be no kiosk or other installation located within the number of feet set forth
60  on the Data Sheet directly in front of the front leaseline of the Premises throughout the Term of this Lease.
61
62           (c)       **EMPLOYEE PARKING.**
63           (1)       Tenant and its employees, when actually working in the Premises, shall not park
64  their cars or any other vehicles in the parking facilities except in the areas specifically designated by
65  Landlord for employee parking (i.e., Tenant's employees will not be permitted to park in the employee
66  parking area during their non-working hours). Such designated employee parking areas may be located in the

1    Development or at an off-site location within reasonably proximity of the Development, which Landlord shall
2    have the right to change or relocate. Automobile license numbers of employees' cars shall be furnished by
3    Tenant to Landlord upon Landlord's request. Tenant and its employees shall be required to comply with
4    all rules and protocols as set forth in Landlord's rules and regulations.
5
6               In the event any vehicle is parked by an employee of Tenant in a parking area not
7    designated for employee parking, (a) Landlord shall have the right to cause the vehicle to be towed, at
8    Tenant's expense, to a location designated by Landlord, and/or (b) Tenant shall pay to Landlord as
9    Additional Rent the sum of $50.00 per day per automobile parked by Tenant or an employee of Tenant in
10   a parking area not designated for employee parking. Tenant shall indemnify, defend and hold harmless
11   Landlord and its employees, agents, contractors and representatives from and against any and all claims of
12   the employee and/or owner of any vehicle so towed. Prior to imposing any charge upon Tenant hereunder,
13   Landlord shall give Tenant written notice of the first violation of this provision and Tenant shall have two
14   (2) days thereafter within which to cause the violation to be discontinued; if the violation is not discontinued
15   within said two-day period, then the per day fine shall commence without further action by Landlord. After
16   . notice of such first violation, no prior notice of any subsequent violation shall be required. All amounts
17   due under the provisions of this paragraph shall be payable by Tenant within ten (10) days after demand
18   therefor.
19
20               (2)    In the event Tenant elects to purchase an automobile parking access card for its
21   employee(s), then it shall pay to Landlord for each employee automobile parking access card at the rate as set
22   forth on the Data Sheet (the "Employee Parking Charge") Tenant (and not each individual employee of
23   Tenant) shall pay Landlord, as Additional Rent, the Employee Parking Charge, which shall be payable
24   monthly in advance on or before the first (1st) day of each calendar month. Landlord may delegate its
25   responsibilities hereunder to a parking operator in which case such parking operator shall have the rights
26   of control attributed hereby to the Landlord. The parking access cards are subject to all terms and conditions
27   of parking agreement separately agreed upon between Tenant and Landlord or Landlord's parking operator.
28   The parking access cards used by Tenant are provided to Tenant solely for the use by Tenant's own
29   personnel and such parking access cards may not be transferred, subleased, or otherwise alienated by Tenant
30   without Landlord's prior written approval.
31
32          **Section 8.03    COMMON AREA OPERATING COSTS AND EXPENSES.**
33          (a)    From and after the Rental Commencement Date, Tenant shall pay to Landlord the Common
34   Area Charge (as defined hereinbelow) as a contribution for the following (collectively "Operating Costs
35   and Expenses"): all costs and expenses of every kind and nature paid or incurred by Landlord in managing,
36   operating, equipping, policing and protecting, lighting, signing, cleaning, painting, heating, ventilating, air
37   conditioning, providing sanitation and sewer and other services, insuring, defending or prosecuting lawsuits
38   (or other legal proceedings), repairing, replacing and maintaining (i) the Common Areas (including the
39   parking facilities), (ii) all buildings and roofs within the Development and (iii) all other areas, facilities,
40   work and storage areas, leased or owned property, and buildings whether located within or outside of, the
41   Development or the Shopping Center.
42
43          (b)    The "Common Area Charge" shall initially mean the amount set forth on the Data
44   Sheet. The Common Area Charge shall be payable for each year during the Term and shall be increased
45   annually on a compounded basis by the percentage amount set forth on the Data Sheet. Landlord and
46   Tenant hereby agree that the Common Area Charge has been freely negotiated and agreed upon by the
47   parties and is not subject to dispute, review, or challenge by Tenant whether at law or in
48   equity. Accordingly, Tenant expressly waives any and all rights it has or may have to inspect and/or audit
49   Landlord's records relating to the Common Area Charge. The Common Area Charge shall be paid as
50   Additional Rent to Landlord at the address shown on the Data Sheet in monthly installments on the first
51   day of each calendar month, in advance, without demand, offset or reduction.
52
53                                    **ARTICLE IX**
54
55                                      **SIGNS**
56
57          **Section 9.01    TENANT'S SIGNS.**
58          Tenant shall affix a sign to the exterior surface of the storefront of the Premises located inside the
59   Shopping Center. Tenant shall pay all costs of fabricating, constructing, operating and maintaining such
60   sign including, without limitation, all charges for electricity. Tenant shall keep said sign well lighted during
61   such hours as Landlord shall designate and shall maintain said sign in good condition and repair during the
62   entire Term of this Lease. Said sign shall conform to the criteria for signs contained in Exhibit B, and the
63   size, content, design and location thereof shall be subject to the prior written approval of Landlord. Except
64   as hereinabove mentioned, Tenant shall not place or cause to be placed, erected or maintained on any
65   exterior door, wall, window or the roof of the Premises, or on the interior or exterior surface of the glass of
66   any window or door of the Premises, or on any sidewalk or other location outside the Premises, or on or

1    within any display window space in the Premises, or within five feet (5') of the front of the storefront
2    leaseline, whether or not there is display window space in the Premises, or within any entrance to the
3    Premises, any sign (flashing, moving, hanging, handwritten, or otherwise), decal, placard, decoration,
4    flashing, moving or hanging lights, lettering, or any other advertising matter of any kind or description;
5    provided, however, that subject to the prior written approval of Landlord with respect to design and
6    placement, Tenant may place decals for safety purposes on glass storefronts where warranted. No symbol,
7    design, name, mark or insignia adopted by Landlord for the Shopping Center or the Development shall be
8    used without the prior written consent of Landlord.  No illuminated sign located in the interior of the
9    Premises and visible from outside the Premises shall be permitted without the prior written approval of
10   Landlord.  All signs located in the interior of the Premises shall be in good taste so as not to detract from
11   the general appearance of the Premises or the Shopping Center.
12
13          Tenant shall have the right to use Tenant's standard national sign package throughout the interior
14   of the store whether visible or not from the exterior, which signage shall not be attached to the glass.
15   Tenant's sign package shall be of professional quality and presented in a first class manner, consistent with
16   the majority of Tenant's stores nationwide.
17
18                                          **ARTICLE X**
19
20                                **MAINTENANCE OF PREMISES**
21
22          **Section 10.01   LANDLORD'S OBLIGATIONS FOR MAINTENANCE.**
23          Landlord shall keep and maintain the roof (excluding any skylights, Tenant rooftop HVAC units
24   and/or roof penetrations made by Tenant, any of which shall only be permitted with Landlord's prior written
25   consent), foundation and the exterior surface of the exterior walls of the building in which the Premises are
26   located (exclusive of storefronts, doors, door frames, door checks, other entrances, windows and window
27   frames which are not part of Common Areas) in good repair, except that Landlord shall not be called upon
28   to make any such repairs occasioned by the act or omission or negligence of Tenant, its agents, employees,
29   invitees, licensees or contractors. Landlord shall not be called upon to make any other improvements or
30   repairs of any kind upon the Premises and appurtenances, except as may be required under Articles XVII
31   and XVIII hereof, and nothing contained in this Section 10.01 shall limit Landlord's right to reimbursement
32   from Tenant for maintenance, repair costs and replacement costs conferred elsewhere in this Lease.  In no
33   event shall Landlord be liable for consequential damages or Tenant's lost profits claimed to be caused by
34   any failure of maintenance or repair by Landlord.
35
36          **Section 10.02   TENANT'S OBLIGATIONS FOR MAINTENANCE.**
37          (a)    Except as provided in Section 10.01 of this Lease, Tenant, at Tenant's expense, shall keep
38   and maintain in first-class appearance, in a condition equal to or better than that which existed when Tenant
39   initially opened the Premises for business, reasonable wear and tear excepted, and in good condition and
40   repair (including replacement of parts and equipment, if necessary), the Premises and every part thereof
41   and any and all appurtenances thereto wherever located, including, without limitation, the interior surfaces
42   of the exterior walls, the exterior and interior portion of all doors, door frames, door checks, other entrances,
43   windows, window frames, plate glass, storefronts, all plumbing and sewage facilities within the Premises
44   (including free flow to the main sewer line), fixtures, ventilation, heating and air conditioning and electrical
45   systems exclusively serving the Premises (whether or not located in the Premises), sprinkler systems, walls,
46   floors and ceilings (including floor and ceiling coverings), and all other repairs, replacements, renewals and
47   restorations, interior and exterior, ordinary and extraordinary, foreseen and unforeseen, and all other work
48   performed by or on behalf of Tenant pursuant to Exhibit B and Article VI hereof.
49
50          (b)    Tenant shall keep and maintain the Premises in a clean, sanitary and safe condition in
51   accordance with applicable law and all directions, rules and regulations of the health officer, fire marshal,
52   building inspector or other proper officials of the governmental agencies having jurisdiction and Tenant
53   shall comply with all requirements of law, ordinances and otherwise, affecting the Premises, all at Tenant's
54   sole cost and expense.  Tenant also agrees to comply with requirements of any insurance underwriters,
55   inspection bureaus or a similar agency designated by Landlord with respect to the Premises which
56   requirements shall be uniformly required for tenants of similar use to Tenant's and provided that such
57   requirements do not materially interfere with the conduct of Tenant's business. At the end of the Term,
58   Tenant shall surrender the Premises in good order, condition and repair, reasonable wear and tear excepted.
59   Tenant, at its own expense, shall install and maintain such fire extinguishers and other fire protection
60   devices as may be required from time to time by any agency having jurisdiction thereof or by the insurance
61   underwriter insuring the building in which the Premises are located.
62
63          (c)    Tenant shall keep the Premises and all other parts of the Development free from any and
64   all liens arising out of any work performed, materials furnished or obligations incurred by or on behalf of
65   Tenant. Within twenty (20) days after written request therefor by Landlord, Tenant shall (a) bond against
66   or discharge any mechanics' or materialmen's lien or (b) furnish Landlord with a copy of the recorded

1    waiver of lien, recorded release of lien, or of the recorded bond discharging such lien. Tenant shall
2    reimburse Landlord as Additional Rent for any and all costs and expenses including, without limitation,
3    attorneys' fees, which may be incurred by Landlord by reason of the filing of any such liens and/or removal
4    of same, such reimbursement to be made within twenty (20) days after receipt by Tenant from Landlord of
5    a statement setting forth the amount of such costs and expenses such reimbursement to be paid to Landlord
6    in the manner and at the place provided in this Lease. Tenant shall give Landlord at least fifteen (15) days'
7    written notice prior to commencing or causing to be commenced any work on the Premises (whether prior
8    or subsequent to the Commencement Date), so that Landlord shall have reasonable opportunity to file and
9    post a notice of non-responsibility for Tenant's work, other than the initial Tenant's Work.

10

11        (d)    In the event Tenant fails, refuses or neglects to maintain the Premises as required hereunder
12    or to commence and complete repairs promptly and adequately, to remove or bond against any lien, to pay
13    any cost or expense, to reimburse Landlord, or otherwise to perform any act or fulfill any obligation required
14    of Tenant pursuant to this Section 10.02, Landlord may upon five (5) days' prior written notice to Tenant
15    (except in the event of emergency, in which case no notice shall be required), but shall not be required to,
16    perform such maintenance or to make or complete any such repairs, remove or bond against such lien, pay
17    such cost or perform such act or the like upon prior notice to, but at the sole cost and expense of Tenant.
18    Tenant shall reimburse Landlord, as Additional Rent, for all cost and expense of Landlord thereby incurred
19    within fifteen (15) days after receipt by Tenant from Landlord of a statement setting forth the amount of
20    such cost and expense.

21

22                                    ARTICLE XI

23

24                          INSURANCE AND INDEMNITY

25

26    Section 11.01    TENANT'S INSURANCE.
27        (a)    Tenant, at its sole cost and expense, shall, during the entire Term hereof, procure and keep
28    in force: (i) Commercial General Liability Insurance with respect to the Premises and the operations of
29    Tenant in, on or about the Premises, in which the limits shall be not less than the amount set forth on the
30    Data Sheet per occurrence combined single limit, bodily injury, death and property damage, and business
31    automobile liability insurance covering all owned, non-owned and hired or borrowed vehicles of Tenant
32    used in connection with the operation of its business from the Premises, in which the limits shall be not less
33    than the amount set forth on the Data Sheet per occurrence combined single limit, insuring for bodily injury,
34    death and property damage; (ii) plate glass insurance, at full replacement value; (iii) insurance against fire,
35    extended coverage, vandalism, malicious mischief, water damage which does not exclude backup from
36    sewers or drains and/or sprinkler leakage, and such other additional perils including earthquake and flood
37    as now are or hereafter may be included in a standard extended coverage endorsement from time to time in
38    general use in the county in which the Development is located, insuring Tenant's merchandise, trade
39    fixtures, furnishings, equipment and all other items of personal property of Tenant located on or in the
40    Premises, including steam boiler insurance, if applicable, in an amount equal to the full replacement cost
41    thereof; (iv) workers' compensation coverage as required by law and including Employer's Liability
42    Insurance in the amounts set forth on the Data Sheet per each accident, per each employee by disease, with
43    a policy aggregate by disease in the amount set forth on the Data Sheet; (v) with respect to alterations,
44    improvements and the like required or permitted to be made by Tenant under this Lease, contingent liability
45    and builders' risk insurance, in an amount satisfactory to Landlord; (vi) the insurance required under Exhibit
46    B, and (vii) product liability coverage (including, without limitation, if this Lease covers Premises in which
47    food and/or beverages are sold and/or consumed, liquor liability coverage for acts arising out of the serving
48    and/or consumption of food and/or alcoholic beverages on or obtained at the Premises, to the extent
49    obtainable), for not less than the amount set forth on the Data Sheet combined single limit, bodily injury,
50    death and property damage. In addition, if Landlord deems it necessary to increase the amounts or limits
51    of insurance required to be carried by Tenant hereunder, Landlord may reasonably increase said amounts
52    or limits, and Tenant shall so increase the amounts or limits of the insurance required to be carried by
53    Tenant hereunder and shall provide Landlord with policies or certificates indicating the increased amounts
54    or limits as provided in this Section 11.01.

55

56        (b)    All policies of insurance required to be carried by Tenant pursuant to this Section 11.01
57    shall be written by insurance companies of adequate financial capacity satisfactory to Landlord with a Best's
58    rating and Financial Size Category of not less than A-/VII and authorized to do business in the state in
59    which the Development is located. Any such insurance required of Tenant hereunder may be furnished by
60    Tenant under any blanket policy carried by it or under a separate policy therefor. An insurance certificate
61    (and endorsements where same become necessary), certifying that such policy has been issued, provides
62    the coverage required by this Section 11.01 and contains all of the provisions specified in this Section 11.01
63    (including, without limitation, naming of additional insured entities as required by Section 11.01(c) below
64    and a statement that no deductible or self-insured retention applies to such policy), shall be delivered to
65    Landlord, at the address set forth on the Data Sheet prior to the commencement of the Term of this Lease,
66    and such insurance information shall also be provided in connection with all renewals, not less than thirty

1  (30) days prior to the expiration of the term of each such policy. As often as any such policy shall expire
2  or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and
3  to like extent. Landlord may, at any time, and from time to time, inspect and copy any and all certificates
4  of insurance showing that Tenant has in place the insurance policies required to be procured by Tenant
5  hereunder.

6

7  (c)    Each policy evidencing insurance required to be carried by Tenant pursuant to this Section
8  11.01 shall contain the following clauses and provisions to the extent available under each policy: (i) a
9  provision that such policy and the coverage evidenced thereby shall be primary and non-contributing with
10  respect to any policies carried by Landlord and that any coverage carried by Landlord be excess insurance;
11  (ii) a provision including Landlord and the parties set forth on Exhibit C of this Lease and any other parties
12  designated by Landlord from time to time as additional insured entities; (iii) a waiver by the insurer of any
13  right to subrogation against Landlord and other additional insured entities (as set forth on Exhibit C), its
14  agents, employees and representatives which arises or might arise by reason of any payment under such
15  policy or by reason of any act or omission of Landlord, its agents, employees or representatives; (iv) a
16  severability of interest clause or endorsement; and (v) such policy shall be an "occurrence form" policy.
17  Any policy of insurance required to be carried by Tenant that names the parties set forth in this Section
18  11.01 (c) (ii) as additional insured entities shall not be subject to a deductible or self-insured retention, it
19  being the intent of the parties that such insurance shall fully and completely insure such additional insured
20  entities for all loss or expense.

21

22  (d)    In the event that Tenant fails to procure or to maintain, at the times and for the duration
23  specified in this Section 11.01, any insurance required by this Section 11.01, or fails to carry insurance
24  required by law or governmental regulation, Landlord may (but shall not be required to) at any time or from
25  time to time, and upon 15 days' prior written notice to Tenant, procure such insurance and pay the premiums
26  therefor, and the cost of same, plus a fifteen percent (15%) administrative fee shall be deemed Additional
27  Rent and shall be payable upon Landlord's demand.

28

29  (e)    Tenant will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or
30  about the Premises which will violate Landlord's policies of hazard or liability insurance or which will
31  prevent Landlord from procuring such policies in companies acceptable to Landlord. If anything done,
32  omitted to be done or suffered by Tenant to be kept in, upon or about the Premises shall cause the rate of
33  fire or other insurance on the Premises or on other property of Landlord or of others within the Shopping
34  Center to be increased beyond the minimum rate from time to time applicable to the Premises or to any
35  property for the use or uses made thereof, Tenant will pay, as Additional Rent, the amount of any such
36  increase upon Landlord's demand.

37

38  (f)    In the event Tenant retains any security guard contractor to service the Premises, Tenant
39  shall cause Landlord to receive a customary waiver of subrogation under the worker's compensation
40  insurance policy covering such security guard. Tenant shall provide Landlord with written notice if any
41  such security guard is to carry a firearm upon the Premises or Development, and in such event, Landlord
42  shall have the right to impose additional reasonable insurance requirements upon Tenant and/or such
43  security guard, which shall be complied with by Tenant and Tenant shall provide Landlord with evidence
44  of such compliance prior to the posting of such security guard at the Premises. Notwithstanding the
45  foregoing, Landlord shall have the sole and absolute right to prohibit any person (including any security
46  guard) from carrying a firearm upon the Premises, Shopping Center and/or Development.

47

48  **Section 11.02    LANDLORD'S INSURANCE.**
49  During the Term following the Rental Commencement Date, Landlord shall provide (a) in amounts
50  and coverages determined by Landlord (but not less than the replacement cost of the property so insured),
51  with or without deductibles, insurance coverage in the form of an "all-risk" type policy against loss or
52  damage by fire, flood, windstorm, hail, explosion, damage from aircraft and vehicles and smoke damage,
53  and such other risks as are from time to time included in a standard extended coverage endorsement,
54  insuring the Shopping Center and the leasehold improvements to the Premises (exclusive of Tenant's
55  merchandise, trade fixtures, furnishings, equipment, plate glass, signs and all other items of personal
56  property of Tenant); (b) to the extent the same is commercially available in the market during such period,
57  rental interruption insurance which insurance may be carried in amounts up to Tenant's total Rental
58  obligation for no less than twelve (12) months, (c) commercial general liability insurance; and (d) any other
59  insurance which Landlord determines in its reasonable judgment is proper with respect to the Shopping
60  Center and/or Development, including, but not limited to, flood, environmental hazard and earthquake, loss
61  or failure of building equipment, errors and omissions, workers' compensation insurance and fidelity bonds
62  for employees employed to perform services; all such insurance in form and amounts as determined in
63  Landlord's reasonable business judgment. If requested by Landlord, Tenant shall submit to Landlord a
64  statement setting forth the cost of Tenant's leasehold improvements promptly after completion thereof.
65  Landlord at its option may carry a special extended coverage endorsement. The cost of all insurance
66  maintained by Landlord pursuant to this Section shall be included as part of Operating Costs and Expenses

1    (as defined in Section 8.03 of this Lease). The Development may be included in a blanket policy (in which
2    case the cost of such insurance allocable to the Development will be determined by Landlord based upon
3    the insurer's cost calculations).
4
5          Landlord's insurance shall include liability and property damage insurance for the Shopping Center
6    Common Areas in amounts as determined by Landlord (although property coverage shall insure the
7    Shopping Center at full replacement value). Further, Landlord agrees to cause its insurance policy to
8    provide that Landlord's insurance company waives all right of recovery by way of subrogation against
9    Tenant in connection with any damage covered by such policy.
10
11    **Section 11.03  COVENANT TO HOLD HARMLESS.**
12          Subject to Section 11.04, Tenant covenants to defend and indemnify Landlord, its affiliates, parent
13    corporation, subsidiaries, partners, members, management company, successors, and assigns, and the
14    employees, agents, officers, directors, shareholders, members, advisers, trustees and fiduciaries of any of
15    them, save them harmless (except to the extent of loss or damage resulting from the intentional or willful
16    acts or omissions or the gross negligence of Landlord not required to be insured against by Tenant pursuant
17    to this Article XI) from and against any and all claims, actions, demands, judgments, awards, fines,
18    mechanics' liens or other liens, losses, damages, liability and expense, including attorneys' fees and court
19    costs, in connection with all losses, including loss of life, personal injury and/or damage to property, arising
20    from or out of any occurrence (or arising from or out of Tenant's failure to comply with any provision of
21    this Lease) caused wholly or in part by any act or omission of Tenant, its concessionaires, agents,
22    contractors, suppliers, employees, servants, customers or licensees and including any product liability claim
23    or any labor dispute involving Tenant or its contractors and agents. In case Landlord or any other party so
24    indemnified shall be made a party to any litigation commenced by or against Tenant, then Tenant shall
25    defend, indemnify, protect and save them harmless and shall pay, as the same becomes due and payable,
26    all costs, expenses and reasonable attorneys' fees and court costs incurred or paid by them in connection
27    with such litigation. Landlord reserves to itself, at its sole option, the right to appoint or approve of counsel
28    to defend its interest in any action where it or its related entity is a named party.
29
30          Subject to Section 11.04, Landlord agrees to indemnify and hold Tenant harmless from and against
31    all claims, liabilities, losses, damages and expenses for injury to or death of any person or loss or damage
32    to property in or upon the Common Areas which result from claims by third parties relating to the Common
33    Areas, except to the extent such claim is based upon an intentional, willful act or omission or gross
34    negligence of Tenant, any subtenant, licensee, concessionaire or assignee of Tenant, or any of their
35    respective agents, employees or contractors, or Tenant's breach of this Lease. In case Tenant shall, without
36    fault, be made a party to any such litigation, then Landlord shall protect and hold Tenant harmless and shall
37    pay all reasonable costs, expenses and attorneys' fees incurred or paid by Tenant in connection with such
38    litigation.
39
40    **Section 11.04  WAIVER OF RIGHT OF RECOVERY.**
41          Notwithstanding anything to the contrary contained in this Lease, neither Landlord nor Tenant
42    shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the
43    other party for any loss or damage to any building, structure or other tangible property, or any resulting loss
44    of income, or losses under worker's compensation laws and benefits, even though such loss or damage
45    might have been occasioned by the negligence of such party, its agents or employees. The provisions of
46    this Section 11.04 shall not limit the indemnification for liability to third parties pursuant to Sections 7.03
47    (h) or 11.03.
48
49                 **ARTICLE XII**
50
51                 **UTILITIES**
52
53    **Section 12.01  UTILITY CHARGES.**
54          (a)    Tenant shall be solely responsible for and shall promptly pay for all fees, deposits and
55    charges, including use and/or connection fees, hook-up fees, standby fees, and/or penalties for discontinued
56    or interrupted service, and the like, for water, gas, electricity, HVAC, fire alarm, burglar alarm, telephone,
57    cable television, sewer and sanitation, solid waste disposal and any other service or utility used in or upon
58    or furnished to the Premises, including, without limitation, any services to be supplied by Landlord from a
59    central utility plant or other utility system (including, without limitation, Landlord's charge for the HVAC
60    central plant system or any other charge) as more particularly set forth on the Data Sheet or on Exhibit D,
61    irrespective of whether any of the foregoing are initially paid in advance by Landlord, or otherwise.
62    Landlord, at its sole option, may elect to furnish any or all of such services with a separate charge therefor
63    to Tenant, at competitive rates within the immediate geographic area in which the Shopping Center is
64    located, such charge to be based upon the services used by Tenant, as reflected by meter, submeter or
65    otherwise. Tenant shall pay such charge, as Additional Rent, at such time and upon such terms as
66    installments of Minimum Annual Rental are due.

1         Tenant shall initially pay Landlord the sums set forth on the Data Sheet per annum for the
2  cost of providing: (i) water and sewer service; (ii) fire detection services; and (iii) electric service to the
3  Premises. All such sums shall be subject to reasonable annual adjustments by Landlord, payable as
4  Additional Rent, and paid in equal consecutive monthly installments in the same manner as Minimum
5  Annual Rental.
6
7      (b)    Except to the extent of Landlord's gross negligence, in no event shall Landlord be liable
8  for damages or otherwise for any interruption, reduction, disruption, curtailment or failure in the supply,
9  quality or character of electricity, services from a central utility plant or any other utility or other service,
10  or if either the quantity, quality or character thereof supplied to or by Landlord is changed or is no longer
11  available for Tenant's requirements, nor shall any such interruption, reduction, disruption, curtailment,
12  failure or change in quantity, quality or character constitute or be deemed to constitute constructive eviction
13  of Tenant, or excuse or relieve Tenant from its obligations under this Lease, including but not limited to the
14  payment of Rental.
15
16         If, as a direct result of the negligence or breach of this Lease by Landlord, there is an
17  interruption or discontinuance in any utility supplied to the Premises by Landlord which results in a
18  substantial and material interference with Tenant's ability to conduct its business in the Premises, and as a
19  result thereof Tenant is forced to close its business in the Premises for a period in excess of seventy two
20  (72) hours, then the payment of Minimum Annual Rental only shall abate from the expiration of such 72-
21  hour period until such time as such utility service is restored or Tenant is able to reopen the Premises for
22  business, whichever shall first occur.
23
24      (c)    Prior to the commencement of Tenant's occupancy of the Premises and/or at any time
25  thereafter until the expiration of the Term, Landlord may, upon thirty (30) days' prior written notice to
26  Tenant, elect to have Tenant obtain, and/or discontinue furnishing, as applicable, any utility to the Premises
27  (including, without limitation, heating, ventilation and air conditioning services), without thereby affecting
28  this Lease in any manner or otherwise incurring any liability to Tenant, and Landlord shall no longer be
29  obligated to furnish such utility to the Premises. If Landlord shall give Tenant notice of intention to so have
30  Tenant obtain, or for Landlord to cease furnishing, a utility to the Premises, Tenant may contract for and
31  receive such utility directly from the public utility corporation then serving the Shopping Center, and if
32  Tenant does so, Landlord shall permit Tenant, at Tenant's sole cost, to use Landlord's risers, wiring, electric
33  and any other installations then serving the Premises for such purpose, if any, to the extent that the same
34  are available, suitable and may be safely so used, consistent with concurrent and anticipated future use by
35  Landlord and other tenants. If Landlord is the initial provider of a utility service to Tenant, Landlord agrees
36  not to discontinue furnishing any utility to Tenant pursuant hereto until such time as Tenant shall be able
37  to receive said utility service from an alternate source of supply and Landlord will either connect the
38  Premises to a substitute utility service at no cost to Tenant, or reimburse Tenant for the reasonable cost of
39  obtaining a substitute utility service. Tenant agrees to act diligently in connecting to such alternate source
40  as soon as it becomes available. Landlord may from time to time during the Term elect to provide, or
41  resume provision of, any utility to the Premises obtained or provided by Tenant pursuant hereto, and
42  thereafter make an election for Tenant to provide such utility pursuant hereto, and thereafter re-elect again
43  pursuant hereto on an ongoing basis.
44
45      (d)    Notwithstanding any other provisions of this Article, to the extent utilities provided by
46  Landlord are utilities which could be supplied to Tenant as a direct customer of a public utility, the value
47  of such utility used by Tenant shall be computed for the purposes of this Article so as not to exceed the rate
48  schedules which would be applicable if Tenant were at the time a direct customer of such public utility
49  corporation.
50
51      (e)    Any obligation of Landlord to furnish light, power and services from a central utility plant
52  shall be conditioned upon the availability of adequate energy sources. Landlord shall have the right to
53  reduce heating, cooling and lighting within the Premises and the Common Areas as required by any
54  mandatory fuel or energy saving allocation, or similar statute, regulation, order or program.
55
56      (f)    Tenant shall operate its heating, ventilating and air conditioning ("HVAC") system(s)
57  serving the Premises so as to maintain comfortable conditions during regular Shopping Center business
58  hours. Temperatures in the Premises shall be compatible with temperatures in the Shopping Center.
59  Tenant's obligation to connect to the services supplied by Landlord, as set forth in this Section 12.01 and
60  Exhibit B, as well as Tenant's installation, operation and maintenance of its HVAC system(s) within the
61  Premises, shall be as set forth herein, in Exhibit B and in any related exhibit(s).
62
63      (g)    If Tenant desires to install any equipment which shall exceed the capacity of any utility
64  facilities or which shall require additional utility facilities, Tenant shall not have the right to do so without
65  Landlord's prior written approval of Tenant's Plans and Specifications and specifications therefor. If such
66  installation is approved by Landlord, and if Landlord provides such additional facilities to accommodate

Tenant's installation, Tenant agrees to pay Landlord, on demand, the cost of providing such additional utility facilities or utility facilities of greater capacity. Tenant shall in no event use any of the utility facilities in any way which shall overload or overburden the utility systems.

   (h)   Intentionally deleted.

   (i)   Tenant shall be permitted, without charge by the backbone provider retained by the Landlord, if any, therefor (the "Backbone Provider"), to provide Wi-Fi to its customers free of charge while its customers are within the Premises provided that: (a) Tenant installs, at Tenant's cost and expense, a system for the provision of Wi-Fi entirely independent of, and not interfering with, the infrastructure installed by the Backbone Provider; and (b) such system does not provide Wi-Fi service outside of the Premises except leakage to a de minimis extent which cannot reasonably be prevented. Tenant acknowledges that Wi-Fi service shall be provided by the Backbone Provider in the Common Areas. Tenant agrees that: (1) Wi-Fi service in the Common Areas may interfere with or disrupt Wi-Fi service in the Premises; and (2) Landlord or the Backbone Provider shall not be liable for any such interference or disruption or any failure, delay, interruption or reduction in Wi-Fi service in the Premises.

## ARTICLE XIII

## ESTOPPEL STATEMENT, ATTORNMENT AND SUBORDINATION

**Section 13.01  ESTOPPEL STATEMENT.**
   Within ten (10) days after written request therefor by Landlord, Tenant shall execute, in recordable form, and deliver to Landlord a statement, in writing, certifying (a) that this Lease is in full force and effect, (b) the Commencement Date, the Rental Commencement Date and the expiration date of this Lease, (c) that Rental and all other charges hereunder are paid currently without any offset or defense thereto, (d) the amount of Rental and all other charges hereunder, if any, paid in advance, (e) whether this Lease has been modified and, if so, identifying the modifications, (f) that, to Tenant's knowledge, there are no uncured defaults by Landlord or stating in reasonable detail those claimed by Tenant (provided that, in fact, such details are accurate and ascertainable), and (g) such other matters as may be reasonably requested by Landlord. Tenant's failure or refusal to execute timely such statement shall constitute an acknowledgment by Tenant that the statements contained in such statement are true and correct without exception, and may be relied upon by Landlord or by any prospective or existing transferee of all or any part of Landlord's interest in the Development or this Lease or by any of Landlord's lenders.

**Section 13.02  ATTORNMENT.**
   In the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage and/or deed of trust made by Landlord covering the Premises, or in the event Landlord sells, conveys or otherwise transfers its interest in the Shopping Center and/or the Development or any portion thereof containing the Premises, this Lease shall remain in full force and effect and Tenant hereby automatically attorns to the new owner provided the new owner assumes, in writing, the obligations of the Landlord hereunder on a going forward basis. Tenant covenants and agrees, at such new owner's request, to execute a commercially reasonable  instrument evidencing such attornment reasonably satisfactory to the new owner, recognizing the new owner as the landlord under this Lease (subject to the last sentence of this Section). Tenant acknowledges that such new owner shall not be bound by (i) any prepayment of more than one (1) month's Rent (except rental deposit but only to the extent received by said successor) or (ii) any material amendment of the Lease made after the later of the Commencement Date, or the date that such successor's lien or interest first arose, unless said successor shall have consented to such amendment or (iii) any claims, offsets or defenses of Tenant arising prior to such attornment, except for those specifically provided in the Lease. Payment by or performance of this Lease by any person, firm or corporation claiming an interest in this Lease or the Premises by, through or under Tenant without Landlord's consent in writing shall not constitute an attornment or create any interest in this Lease or the Premises. At Tenant's request, the new owner shall acknowledge in writing that, subject to the provisions of this Section, Tenant's interest in the Premises and rights under this Lease shall not be disturbed so long as Tenant is not in default under the terms of this Lease beyond the time permitted to cure such default.

**Section 13.03  SUBORDINATION.**
   Tenant further agrees this Lease shall be subordinate to the lien of any mortgage, deed of trust or any ground lease that may be placed upon the Premises or the Shopping Center or the Development and to any and all advances to be made thereunder, and to the interest thereon, and all renewals, modifications, replacement and extensions thereof. The foregoing shall be self-operative and no further instruments shall be required to effect such subordination of this Lease. Tenant also agrees that any mortgagee, beneficiary or ground lessor may elect to have this Lease constitute a prior lien to its mortgage, deed of trust or ground lease, and in the event of such election and upon notification by such mortgagee, beneficiary or ground lessor to Tenant to that effect, this Lease shall be deemed a prior lien to such mortgage, deed of trust or ground lease, whether this Lease is dated prior to or subsequent to the date of said mortgage, deed of trust

1    or ground lease. Tenant agrees that upon the demand of Landlord, or any mortgagee, beneficiary or ground
2    lessor, Tenant shall, within ten (10) days of the receipt of said demand, execute whatever instruments may
3    be required to carry out the intent of this Section 13.03 in the form requested by Landlord or such
4    mortgagee, beneficiary or ground lessor, including, without limitation, an appropriate and reasonable
5    recordable subordination agreement.
6
7          **Section 13.04   REMEDIES.**
8          Failure of Tenant to execute any statements or instruments necessary or desirable to effectuate the
9    foregoing provisions of this Article within ten (10) days after written demand so to do by Landlord shall
10   constitute a default of this Lease.
11
12         **Section 13.05   NOTICE TO MORTGAGEE, BENEFICIARY OR GROUND LESSOR.**
13         If Tenant is given notice of the name and address of a mortgagee, beneficiary or ground lessor, then
14   Tenant shall give written notice of any default by Landlord to such mortgagee, beneficiary or ground lessor
15   specifying the default in reasonable detail. Tenant shall afford mortgagee, beneficiary or ground lessor the
16   right to cure such default and if such mortgagee, beneficiary or ground lessor does perform on behalf of
17   Landlord, such default shall be deemed cured.
18
19                              **ARTICLE XIV**
20
21                         **ASSIGNMENT AND SUBLETTING**
22
23         **Section 14.01   RESTRICTIONS ON TRANSFER.**
24         (a)     Notwithstanding any provision contained herein to the contrary, Tenant agrees not to
25   mortgage, encumber, pledge or hypothecate all or any part of this Lease, Tenant's interest in the Premises,
26   or Tenant's business. Further, Tenant shall not transfer, assign, sublet, enter into franchise, license or
27   concession agreements, change ownership or voting control of, all or any part of this Lease, Tenant's interest
28   in the Premises or Tenant's business (collectively "Transfer") without first procuring the written consent of
29   Landlord, which consent shall not be unreasonably withheld, subject to the terms, covenants and conditions
30   contained in this Lease and to the right of Landlord to elect to terminate this Lease as provided in Section
31   14.02 below. Any attempted or purported Transfer without Landlord's prior written consent shall be void
32   and of no force or effect and shall not confer any estate or benefit on anyone. Further, any such attempted
33   or purported Transfer shall entitle Landlord immediately to terminate this Lease and all further obligations
34   of Landlord hereunder. A consent to one Transfer by Landlord shall not be deemed to be a consent to any
35   subsequent Transfer to any other party. No Transfer of this Lease or agreement entered into with respect
36   thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor from liability
37   under this Lease.
38
39         (b)     Landlord and Tenant agree that it shall not be unreasonable for Landlord to withhold its
40   consent to any proposed Transfer for any of the following reasons, which are not exclusive:
41
42                (1)     The contemplated use of the Premises by the proposed transferee, assignee or
43   sublessee (hereinafter referred to as the "Transferee") is not substantially identical to the "Use of Premises"
44   permitted under this Lease;
45
46                (2)     The proposed use of the Premises by the proposed transferee is inconsistent with
47   the retail tenant mix desired by Landlord;
48
49                (3)     The net worth and/or financial stability of the Transferee is, or may become,
50   inadequate to operate the business permitted to be conducted in the Premises in the manner required by this
51   Lease and/or to meet all of Tenant's financial and other obligations under this Lease;
52
53                (4)     The Transferee's reputation (or that of any of its affiliates) would have an adverse
54   effect upon the reputation of the Shopping Center or the other businesses located therein;
55
56                (5)     The Percentage Rental that would be reasonably anticipated from the sales of the
57   Transferee would reasonably be expected to be less than that of Tenant hereunder;
58
59                (6)     The Transferee would breach any covenant of Landlord respecting radius, location,
60   use or exclusivity in any other lease, financing agreement or other agreement relating to the Shopping
61   Center;
62
63                (7)     Tenant is in default pursuant to this Lease beyond any applicable notice and cure
64   period;
65

1    (8)    The nature of the Transferee's proposed or likely use of the Premises would involve
2    any risk, greater than that of Tenant's, of the use, release, disposition or mishandling of "Hazardous
3    Materials" (as defined in Section 7.03);
4
5    (9)    The Transferee is not likely to conduct on the Premises a business of a quality
6    substantially equal to that conducted by Tenant; or
7
8    (10)    Any ground lessor or mortgagee whose consent to such transfer is required fails to
9    consent thereto.
10
11    (c)    Notwithstanding anything to the contrary contained in this Lease, and provided Tenant is
12    not in default beyond any applicable grace or cure periods under this Lease, it is agreed that Tenant may,
13    without the prior consent of Landlord, assign this Lease or sublet the entire Premises to (i) an affiliate,
14    subsidiary or parent of Tenant or subsidiary or affiliate of Tenant's parent; (ii) an entity with which Tenant
15    is merged or consolidated; or (iii) an entity which purchases all or substantially all of Tenant's assets by
16    stock purchase or otherwise. Any assignment or subletting pursuant to the above shall be subject to the
17    following conditions: (1) Tenant shall remain fully liable during the unexpired Term of this Lease, except
18    with respect to subparagraph (ii) above; and (2) any such assignment or sublease shall be subject to all of
19    the terms, covenants and conditions of this Lease including, but not limited to, Tenant's obligation to
20    operate the business conducted in the Premises under the same Trade Name and in the same manner as
21    Tenant. In addition, any assignment or subletting pursuant to (ii) or (iii) above shall be subject to the
22    condition that the assignee or subtenant shall have a net worth equal to or greater than the net worth of
23    Tenant at the Commencement Date or the date of such Transfer, whichever is greater.
24
25    Section 14.02  PROCEDURE FOR TRANSFER.
26    Should Tenant desire to make a Transfer hereunder, Tenant shall, in each instance, give written
27    notice of its intention to do so to Landlord at least forty-five (45) days before the intended effective date of
28    any such proposed Transfer, specifying in such notice whether Tenant proposes to assign or sublet, or enter
29    into license, franchise or concession agreements, the proposed date thereof, and specifically identifying the
30    proposed Transferee, the net worth and previous business experience of the proposed Transferee, including
31    without limitation copies of the proposed Transferee's last two years' income statement, balance sheet and
32    statement of changes in financial position (with accompanying notes and disclosures of all material changes
33    thereto) in audited form, if available, and certified as accurate by the proposed Transferee. Such notice
34    shall be accompanied, in the case of a proposed assignment, subletting, license, franchise or concession
35    agreement, by a copy of the proposed assignment, sublease, license, franchise or concession agreement or,
36    if same is not available, a letter of commitment or a letter of intent. In the case of a proposed sale of Tenant's
37    business, Tenant shall provide a copy of the proposed sale and financing agreements.
38
39    Landlord shall, within thirty (30) days after its receipt of such notice of a proposed Transfer, by
40    giving written notice to Tenant of its intention to do so: (a) withhold its consent to the Transfer; (b) consent
41    to the Transfer; or (c) terminate this Lease, such termination to be effective thirty (30) days after receipt of
42    such notice by Tenant. Failure of Landlord to give Tenant written notice of Landlord's action with respect
43    to any request for Landlord's consent to a proposed Transfer shall not constitute or be deemed Landlord's
44    consent to such Transfer. Landlord's consent to a proposed Transfer shall only be given if and when
45    Landlord has notified Tenant in writing that Landlord consents to such proposed Transfer.
46
47    If Landlord shall exercise its termination right hereunder, Landlord shall have the right to enter into
48    a lease or other occupancy agreement directly with the proposed Transferee, and Tenant shall have no right
49    to any of the rents or other consideration payable by such proposed Transferee under such other lease or
50    occupancy agreement, even if such rents and other consideration exceed the rent payable under this Lease
51    by Tenant. Landlord shall have the right to lease the Premises to any other tenant, or not lease the Premises,
52    in its sole discretion. Tenant may, however, elect to nullify Landlord's election to terminate this Lease
53    under clause (c) by furnishing Landlord with written notice of Tenant's election to withdraw its proposed
54    Transfer within ten (10) days of Tenant's receipt of Landlord's notice of termination, in which event the
55    Lease shall remain in effect with the existing Tenant. Landlord and Tenant specifically agree that
56    Landlord's election to terminate this Lease under clause (c) may be made in Landlord's sole and absolute
57    discretion and that no test of reasonableness shall be applicable thereto. Failure of Tenant to furnish
58    Landlord notice of Tenant's election to nullify shall be deemed Tenant's election to terminate this Lease
59    without further liability of either party. If Landlord withholds its consent to any proposed Transfer pursuant
60    hereto and if Tenant requests in writing within ten (10) days after Tenant's receipt of Landlord's written
61    notice of such withholding of consent, Landlord shall provide to Tenant a statement of its reason(s) for
62    withholding consent to the proposed Transfer within a reasonable time after Landlord's receipt of Tenant's
63    request therefor. Tenant acknowledges and agrees that each of the rights of Landlord set forth herein in the
64    event of a proposed Transfer is a reasonable restriction on Transfer for purposes of applicable laws.
65    Landlord and Tenant agree that Tenant shall have the burden of proving that Landlord's consent to the
66    proposed Transfer was withheld unreasonably. Landlord shall have no liability to Tenant or to any proposed

Transferee in damages if it is adjudicated that Landlord's consent shall have been unreasonably withheld and/or that such unreasonable withholding of consent shall have constituted a breach of this Lease or other duty to Tenant, the proposed Transferee or any other person. In such event, Tenant's sole remedy shall be to have the proposed Transfer declared valid, as if Landlord's consent had been duly and timely given (although Tenant shall be entitled to reasonable attorneys' fees if it is the successful party in such litigation, in accordance with the terms of this Lease).

### Section 14.03   TRANSFER RENT COMPENSATION.

Tenant shall pay to Landlord, immediately upon receipt thereof, fifty percent (50%) of the excess of (1) all compensation received by Tenant for a Transfer (other than a Transfer pursuant to 14.01 (c) and (d)), less the actual out-of-pocket costs reasonably incurred by Tenant with unaffiliated third parties (e.g. brokerage commissions and any actual Improvements to the Premises specifically made for the transferee) in connection with such Transfer (such costs shall be amortized on a straight-line basis over the term of the Transfer in question), over (2) the Rent allocable to the portion of the Premises covered the Transfer thereby.

### Section 14.04   REQUIRED DOCUMENTS AND FEES.

Each Transfer to which Landlord has consented shall be evidenced by a written instrument in form satisfactory to Landlord, executed by Tenant and the Transferee, under which the Transferee shall agree in writing for the benefit of Landlord (except as otherwise agreed in writing by Landlord) to assume, perform and abide by all of the terms, covenants and conditions of this Lease to be done, kept and performed by Tenant, including the payment of all amounts due or to become due under this Lease directly to Landlord and the obligation to use the Premises only for the purpose specified in this Lease. Tenant shall reimburse Landlord for Landlord's reasonable attorneys' and administrative fees not exceeding $1,000.00 incurred in the processing of, and documentation for, each such requested Transfer, whether or not the Transfer is consummated.

### Section 14.05   TRANSFER OF STOCK OR PARTNERSHIP INTEREST.

If Tenant is a corporation which, under the current laws, rules or guidelines promulgated by the governmental body or agency having jurisdiction and authority to promulgate the same, is not deemed a public corporation, or is an unincorporated association or partnership, the transfer, assignment or hypothecation, in the aggregate of more than a controlling interest of the total outstanding stock or interest in such corporation, association or partnership shall be deemed a Transfer within the meaning and provisions of this Lease.

### Section 14.06   ASSIGNMENT AND SUBLEASE RENTALS.

The following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)      Tenant hereby assigns and transfers to Landlord all of Tenant's interest in all rentals and income arising from any sublease of all or a portion of the Premises heretofore or hereafter made by Tenant, and Landlord may collect such rent and income and apply same toward Tenant's obligations under this Lease; provided, however, that until a breach shall occur in the performance of Tenant's obligations under this Lease, Tenant may, except as otherwise provided in this Lease, receive, collect and enjoy the rents accruing under such sublease. Landlord shall not, by reason of this or any other assignment of such sublease to Landlord, nor by reason of the collection of the rents from a subtenant, be deemed liable to the subtenant for any failure of Tenant to perform and comply with any of Tenant's obligations to such subtenant under such sublease. Tenant hereby irrevocably authorizes and directs any such subtenant, upon receipt of a written notice from Landlord stating that a breach exists in the performance of Tenant's obligations under this Lease, to pay to Landlord the rents and other charges due and to become due under the sublease. The subtenant shall rely upon any such statement and request from Landlord and shall pay such rents and other charges to Landlord without any obligation or right to inquire as to whether such breach exists and notwithstanding any notice from or claim from Tenant to the contrary. Tenant shall have no right or claim against said subtenant, or, until the breach has been cured, against Landlord, for any such rents and other charges so paid by said subtenant to Landlord.

(b)      In the event of a breach by Tenant in the performance of its obligations under this Lease, Landlord, at its option and without any obligation to do so, may require any subtenant to attorn to Landlord, in which event Landlord shall undertake the obligations of the subhandlord under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Landlord shall not be liable for any prepaid rents or security deposit paid by such subtenant to Tenant or for any other prior defaults or breaches of Tenant as sublandlord under such sublease.

# ARTICLE XV

# WASTE OR NUISANCE

### Section 15.01  WASTE OR NUISANCE.

Tenant shall not commit nor permit any of its employees, invitees, contractors, subcontractors, licensees, subtenants or agents to commit any waste upon the Premises and shall not place a load upon the floor of the Premises which exceeds the floor load per square foot which such floor was designed to carry. Tenant shall not commit nor permit any of its employees, invitees, contractors, subcontractors, licensees, subtenants or agents to commit any nuisance or other act or thing which may impact Landlord's operation of the Development or disturb the quiet enjoyment of any other occupant or tenant of the Development. Tenant shall not use or permit to be used any medium that might constitute a nuisance outside the Premises, such as: (a) loudspeakers, sound amplifiers, tape decks, compact disc players, radios, televisions, or any other sound producing or other device which will carry sound in excess of the guidelines in Exhibit B-1, and provided Tenant complies with the guidelines in Exhibit B-1 the same shall not be deemed a nuisance; (b) any light(s) or any other light producing or other illuminating device which emanates from the Premises; or (c) odors.  Upon written notice from Landlord, Tenant shall cause any such noise, light/illumination, or odors to cease.  Tenant agrees that business machines and mechanical equipment used by Tenant which cause vibration or noise that may be transmitted to the building or buildings comprising the Development or to the Premises to such a degree as to be reasonably objectionable to Landlord or to any occupant, shall be placed and maintained by Tenant at its expense in a manner sufficient to eliminate such vibrations or noise, such as by cork, rubber or spring-type vibration isolators. Tenant shall not allow any use of the Premises or any other portion of the Development in a manner which is a source of annoyance, disturbance or embarrassment to Landlord or to the other tenants of the Development or which is deemed by Landlord, in its sole discretion, as not in keeping with the character of the Development.  The Premises shall not be used for any unlawful, immoral or other purpose deemed improper by Landlord.

Notwithstanding the foregoing, general odors that are commonly associated with a pet daycare and groomer operation shall not be a violation of this Section 15.01.

# ARTICLE XVI

# TRADE NAME; PROMOTIONAL PROGRAM

### Section 16.01  TRADE NAME.

(a)    Tenant shall operate its business in the Premises under the name specifically set forth in the Data Sheet ("Trade Name") so long as the same shall not be held to be in violation of any applicable law, and shall not change the advertised name or character of the business operated in the Premises without the prior written approval of Landlord.

Tenant shall have the right to change its Trade Name to such trade name as is utilized by Tenant in all or substantially all of its other stores in the Los Angeles area so long as such trade name is not then presently being used in the Development and is tasteful. Tenant shall furnish Landlord with reasonable prior notice of such change in trade name.  Tenant agrees that any change in trade name will require the installation of a new storefront sign at Tenant's expense, the plans for which shall require Landlord's prior written approval and shall conform to Landlord's criteria for signs.

(b)    Tenant shall use the name of the Shopping Center set forth on the Data Sheet (or such other name as Landlord shall designate during the Term as provided by written notice to Tenant) to describe the location of the Premises for all advertising, promotional and marketing materials which refer to the location of the Premises.  This will include all television, radio, print or collateral materials which are used to promote Tenant's location. However, Tenant shall obtain the approval for the Westfield logo or representations from the Marketing Director of the Shopping Center prior to using such logo or representations, which approval shall not be unreasonably withheld or delayed.

### Section 16.02  PROMOTIONAL PROGRAM.

(a)    Landlord shall provide or cause to be provided a program of advertising and promotional events and services ("Promotional Program") which, in Landlord's sole judgment, will serve to promote the Shopping Center and/or the Development. Landlord shall not be obligated to spend more than is actually collected from tenants in providing the Promotional Program. Any promotional services and personnel provided shall be under the exclusive control and supervision of Landlord, who shall have the sole authority to employ and discharge personnel and to establish a budget for the Promotional Program. Tenant agrees to the mention or nonmention of Tenant's Trade Name in the general advertising and, in either event, Tenant shall, upon the request of Landlord, furnish copy, pictures or an example of its merchandise for promotion in such advertising.

(b)     Tenant shall pay to Landlord, as Tenant's share of the cost of the Promotional Program, an annual promotional charge ("Promotional Charge") which originally shall equal the amount set forth in the Data Sheet. All payments, charges, dues and assessments payable under this Section shall be payable in monthly installments on the first day of each month as Additional Rent. The Promotional Charge payable by Tenant shall be increased annually equal to the percentage amount set forth in the Data Sheet.

(c)     Intentionally deleted.

(d)     Tenant shall comply with Landlord's digital media program, the terms of which are more particularly set forth in Exhibit "E".

## ARTICLE XVII

## DAMAGE AND DESTRUCTION

**Section 17.01    RECONSTRUCTION OF DAMAGED PREMISES.**

(a)     In the event the Premises shall be partially or totally destroyed by fire or other casualty insured under the insurance carried by (or required to be carried by) Landlord pursuant to Section 11.02 of this Lease so as to become partially or totally untenantable, then the damage to the Premises shall be promptly repaired (unless Landlord shall elect not to rebuild as hereinafter provided), whereupon the Minimum Annual Rental and Additional Rent payable by Tenant to Landlord shall be abated in proportion to the Floor Area of the Premises rendered untenantable, and the Annual Breakpoint shall likewise be proportionately reduced. Payment of full Minimum Annual Rental and Additional Rent so abated shall commence, and Tenant shall be obligated to reopen for business on the thirtieth (30th) day following the date that Landlord advises Tenant that the Premises are tenantable (which shall mean that Landlord shall have repaired, restored or reconstructed the Premises, including the leasehold improvements as defined in Exhibit B), unless Tenant opens at an earlier time or remains open following such damage or destruction. Tenant hereby waives the provisions of any statute or other law that may be in effect at the time of the occurrence of any such damage or destruction under which a lease is automatically terminated or pursuant to which a tenant is given the right to terminate a lease by reason of such an event of damage or destruction.

(b)     Landlord shall be obligated to cause such repairs to be made unless Landlord, at its sole option, elects to cause Tenant to make such repairs to the leasehold improvements, in which event Tenant shall promptly complete the same and Landlord will make available to Tenant for the sole purpose of reconstruction of Tenant's leasehold improvements such portion of any insurance proceeds received by Landlord from its insurance carrier under a policy carried pursuant to Section 11.02 of this Lease as may be allocated to the leasehold improvements of the Premises by Landlord. In the event of any such repairs, restoration and reconstruction by Tenant, an architect duly registered in the state where the Premises is located (if such registration is required by applicable code or governmental authorities) shall be selected and appointed by Tenant to prepare any necessary drawings and specifications and to supervise the work and direct the payment of such insurance proceeds. Such insurance proceeds shall be payable to Tenant only upon being provided certificates by said architect stating that the payments specified therein are properly payable for the purpose of reimbursing Tenant for the expenditures actually made by Tenant in connection with such work. At the election of Landlord or Landlord's mortgagee, direct payments may be made to material suppliers and laborers upon written certification by said architect that such payments are due and payable. In making such repairs, restoration or reconstruction, Tenant, at its expense, shall comply with all laws, ordinances and governmental rules and regulations and shall perform all work or cause such work to be performed with due diligence and in a first-class manner. All permits required in connection with said repairs, restoration and reconstruction shall be obtained by Tenant at Tenant's sole cost and expense. Any amount expended by Tenant in excess of such insurance proceeds received by Landlord and made available to Tenant shall be the sole obligation of Tenant.

(c)     In the event of repair, restoration or reconstruction by Landlord, any amount expended by Landlord in repairing the Premises in excess of the proceeds of insurance received by Landlord pursuant to Section 11.02 of this Lease which were allocated to the Premises shall be repayable by Tenant to Landlord within ten (10) days after receipt by Tenant of a statement setting forth the amount of such excess. The party required hereunder to repair, restore or reconstruct the damage to the Premises shall reconstruct such Premises in accordance with the Plans and Specifications originally approved by Landlord or new drawings prepared by Tenant's architect at Tenant's sole cost and expense and acceptable to Landlord and Tenant, and shall otherwise comply with the criteria and procedures of Exhibit B unless Landlord elects otherwise. In no event shall Landlord be required to repair or replace Tenant's merchandise, trade fixtures, signs, furnishings, equipment or other items of personal property, but the same shall be repaired or replaced promptly to a condition at least equal to that prior to the damage or destruction thereof by Tenant.

**Section 17.02  LANDLORD'S AND TENANT'S OPTION TO TERMINATE LEASE.**

If (i) more than thirty-five percent (35%) of the Floor Area of the building in which the Premises are located or of the Shopping Center or of the parking facilities or of the Common Areas, shall be damaged or destroyed by fire or other casualty at any time, or (ii) during the last three (3) years of the Term of this Lease, more than twenty-five percent (25%) of the Floor Area of the Premises or of the building in which the Premises are located or of the Shopping Center or of the parking facilities or of the Common Areas shall be damaged or destroyed by fire or other casualty, or (iii) all or any part of the Shopping Center or said building or the Premises or of the parking facilities or of the Common Areas is damaged or destroyed at any time by the occurrence of any risk not insured under the insurance carried by Landlord pursuant to Section 8.03 or Section 11.02, then Landlord either may elect that the building and/or Premises and/or Shopping Center and/or the parking facilities and/or the Common Areas, as the case may be, shall be repaired and rebuilt or, at its sole option, may terminate this Lease by giving written notice to Tenant of Landlord's election so to terminate, such notice to be given within ninety (90) days after the occurrence of such damage or destruction.

Within ninety (90) days following an event of casualty as described in this Article XVII, Landlord shall give Tenant its reasonable estimate for the time of completing repair or restoration of the Premises; in the event Landlord's estimate to complete the repair or restoration of the Premises exceeds twelve (12) months following the date of such casualty , then Tenant shall have a one-time right (under this provision), as its sole remedy, to terminate this Lease, such notice if given at all, to be given in writing within (30) days' following receipt of Landlord's estimated completion notice.

Landlord's option to terminate this Lease as described in this Section 17.02 shall be conditioned upon Landlord exercising its option to terminate the leases of substantially all of the other tenants of the Shopping Center impacted in the same manner by such casualty (to the extent that Landlord possesses the right to do so under its leases with tenants).

If this Lease is not terminated by Landlord and the repair or restoration of the Premises is not substantially completed within twelve (12) months after the occurrence of such casualty, then Tenant shall have the right, as its sole remedy, to terminate this Lease at any time thereafter on thirty (30) days' prior written notice to Landlord (unless such repair or restoration shall be substantially completed during such thirty (30) day period).

# ARTICLE XVIII

# EMINENT DOMAIN

**Section 18.01  TOTAL CONDEMNATION OF PREMISES.**

If the whole of the Premises shall be taken by any public authority under the power of eminent domain or sold to a public authority under threat or in lieu of such taking, then the Term of this Lease shall cease as of the day upon which possession is taken by such public authority, and Minimum Annual Rental, Percentage Rental, Additional Rent and other charges shall be paid up to that day with a proportionate refund by Landlord of such Rental payments as may have been paid in advance for a period subsequent to the date of the taking.

**Section 18.02  PARTIAL CONDEMNATION.**

(a)    If (i) less than the whole but more than ten percent (10%) of the Floor Area of the Premises or if in Tenant's reasonable estimation Tenant cannot continue to conduct its business in the Premises in a manner substantially comparable to that prior to the taking, or (ii) more than fifty percent (50%) of the square footage of the parking facilities or of the Common Areas shall be so taken under eminent domain, or sold to public authority under threat or in lieu of such taking, Tenant shall have the right either to terminate this Lease as of the day possession is taken by such public authority, or, subject to Landlord's right of termination as set forth in Section 18.02(c) of this Article, to continue in possession of the remainder of the Premises, upon notifying Landlord in writing within ten (10) days after such taking of Tenant's intention. In the event Tenant elects to remain in possession, all of the terms provided herein shall continue in effect, except that as of the day possession of such percentage of the Premises is taken by public authority, the Minimum Annual Rental and Additional Rent payable by Tenant to Landlord shall be reduced in proportion to the Floor Area of the Premises taken and the Annual Breakpoint shall likewise be proportionately reduced; thereafter, Landlord shall, at Landlord's cost and expense to the extent of any available condemnation award, make all the necessary repairs or alterations to the basic building, so as to constitute the remaining Premises a complete architectural unit, and Tenant, at Tenant's sole cost and expense, shall similarly act with respect to Tenant's leasehold improvements, trade fixtures, furnishings and equipment.

(b)    If twenty percent (20%) or less of the Floor Area of the Premises shall be so taken, the Term of this Lease shall cease, only on the part so taken, as of the day possession shall be taken by such

1   public authority, and Tenant shall pay Rental and other charges up to that day; thereafter, the Minimum
2   Annual Rental and Additional Rent payable by Tenant to Landlord shall be reduced in proportion to the
3   Floor Area of the Premises so taken and the Annual Breakpoint shall likewise be proportionately reduced.
4   Landlord shall, at Landlord's cost and expense to the extent of any available condemnation award, make all
5   necessary repairs or alterations to the basic building, so as to constitute the remaining Premises a complete
6   architectural unit, and Tenant, at Tenant's sole cost and expense, shall similarly act with respect to Tenant's
7   leasehold improvements, trade fixtures, furnishings and equipment.
8
9       (c)     If more than twenty-five percent (25%) of the Floor Area of the building in which the
10  Premises are located, or more than twenty-five percent (25%) of the Premises, or more than twenty-five
11  percent (25%) of the square footage of the Shopping Center or of the parking facilities or of the Common
12  Areas shall be taken under power of eminent domain, or sold to public authority under threat or in lieu of
13  such taking, Landlord may, by written notice to Tenant delivered on or before the tenth (10th) day following
14  the date of surrender of possession to the public authority, terminate this Lease as of the date possession is
15  taken by public authority. The Minimum Annual Rental, Percentage Rental, Additional Rent and other
16  charges shall be paid up to the day possession is taken by public authority, with an appropriate refund by
17  Landlord of such Rental payments as may have been paid in advance for a period subsequent to that date.
18
19      (d)     A voluntary sale or transfer of interest of all or any part of the Premises or of the Common
20  Area in the Shopping Center by Landlord to any public or quasi-public body, agency, person or other entity,
21  corporate or otherwise, having the power of eminent domain, either under threat of condemnation or while
22  condemnation proceedings are pending, shall be deemed to be a taking under the power of eminent domain
23  for the purposes of this Article XVIII.
24
25      (e)     Landlord's option to terminate this Lease as described in this Section 18.02 shall be
26  conditioned upon Landlord exercising its option to terminate the leases of substantially all of the other
27  tenants of the Shopping Center impacted in the same manner by such condemnation (to the extent that
28  Landlord possesses the right to do so under its leases with such tenants).
29
30      **Section 18.03   LANDLORD AND TENANT DAMAGES.**
31  All damages awarded for such taking under the power of eminent domain or proceeds from any
32  sale under threat or in lieu of such a taking, whether for the whole or part of the Premises or leasehold
33  improvements thereto, shall belong to and be the property of Landlord, irrespective of whether such
34  damages shall be awarded or proceeds obtained as compensation for diminution in value to the leasehold
35  improvements thereto, or to the fee of the Premises, and Tenant shall have no claim against either Landlord
36  or the condemning authority with respect thereto; provided, however, that Landlord shall not be entitled to
37  any award specifically designated as compensation for, depreciation to, and cost of removal of, Tenant's
38  stock and trade fixtures, or (subject to the rights of any mortgagee or beneficiary of any mortgage or deed
39  of trust made by Landlord covering the Premises or the Development) to any award specifically designated
40  as compensation for the unamortized cost of Tenant's leasehold improvements less any unamortized portion
41  of Landlord contribution to Tenant's Work, such amortization to be calculated on a straight-line basis over
42  the Term of this Lease. Tenant hereby waives the provisions of any statute or other law that may be in effect
43  at the time of the occurrence of any such taking under which a lease is automatically terminated or pursuant
44  to which a tenant is given the right to terminate a lease by reason of such a taking.
45
46      If allowed by applicable law, Tenant may seek a separate award from the condemning authority for
47  the loss of its leasehold improvements and trade fixtures installed by Tenant at Tenant's expense as well as
48  Tenant's lost goodwill and relocation costs. However, Tenant shall have no right to any portion of any
49  proceeds awarded to or received by Landlord or Landlord's mortgagee as a result of any condemnation.
50
51                              **ARTICLE XIX**
52
53                              **DEFAULT**
54
55      **Section 19.01   RIGHTS UPON DEFAULT.**
56      (a)     Notwithstanding any provision herein to the contrary and irrespective of whether all or any
57  rights conferred upon Landlord by this Article XIX are expressly or by implication conferred upon Landlord
58  elsewhere in this Lease, in the event of (i) any failure of Tenant to pay any Minimum Annual Rental,
59  Percentage Rental or Additional Rent or any other charges or sums whatsoever due hereunder (including
60  without limitation, amounts due as reimbursement to Landlord for costs incurred by Landlord in performing
61  obligations of Tenant hereunder upon Tenant's failure so to perform) for more than five (5) days after
62  written notice from Landlord to Tenant that such rental or any other charges or sums whatsoever due
63  hereunder were not received on the date required for payment pursuant to this Lease, provided that such
64  notice from Landlord shall be in lieu of, and not in addition to, any notice of default required by applicable
65  laws, or (ii) any default or failure by Tenant to perform any other of the terms, conditions, or covenants of
66  this Lease to be observed or performed by Tenant for more than thirty (30) days after written notice from

1     Landlord to Tenant of such default (unless such default cannot be cured within said thirty (30) days in
2     which event Tenant shall not be deemed to be in default hereunder if Tenant shall have commenced to cure
3     said default promptly within thirty (30) days and shall thereafter proceed to prosecute such cure to
4     completion with all reasonable dispatch and diligence, provided that in no event shall such cure period
5     extend beyond one hundred twenty (120) days), provided that such notice from Landlord shall be in lieu
6     of, and not in addition to, any notice of default required by applicable laws, or (iii) subject to Section 27.04
7     of Landlord delays, any failure by Tenant to move into the Premises and to initially open for business on
8     or before the date which is thirty (30) days after Rental Commencement Date, (and Landlord shall not have
9     the right to terminate this Lease for so long as Tenant has commenced and is diligently proceeding to take
10    all steps necessary to open for business as required by this Lease), or (iv) except as otherwise provided in
11    this Lease, any failure by Tenant to operate continuously in the manner and during the hours established by
12    Landlord pursuant to Section 7.02(a) hereof or for the purpose specified in the Data Sheet (the Permitted
13    Use), or (v) Tenant's abandonment of the Premises, or permitting this Lease to be taken under any writ of
14    execution or similar writ or order, then Landlord, in addition to or in lieu of other rights or remedies it may
15    have under this Lease or by law, shall have the following rights [(i) – (v) shall be deemed "Events of
16    Default" and any remedy shall be exercised following the notice/cure period set forth in the applicable
17    Event of Default description] to be exercised during continuation of such Event of Default: Landlord may
18    at its sole discretion: (A) immediately terminate this Lease and Tenant's right to possession of the Premises
19    by giving Tenant written notice that this Lease is terminated, in which event, upon such termination,
20    Landlord shall have the right to recover from Tenant the sum of (1) the worth at the time of award of the
21    unpaid rental which had been earned at the time of termination; (2) the worth at the time of award of the
22    amount by which the unpaid rental which would have been earned after termination until the time of award
23    exceeds the amount of such rental loss that Tenant affirmatively proves could have been reasonably
24    avoided; (3) the worth at the time of award of the amount by which the unpaid rental for the balance of the
25    Term after the time of award exceeds the amount of such rental loss that Tenant affirmatively proves could
26    be reasonably avoided; (4) any other amount necessary to compensate Landlord for all the detriment
27    proximately caused by Tenant's failure to perform Tenant's obligations under this Lease or which in the
28    ordinary course of things would be likely to result therefrom; and (5) all such other amounts in addition to
29    or in lieu of the foregoing as may be permitted from time to time under applicable law; or (B) have this
30    Lease continue in effect for so long as Landlord does not terminate this Lease and Tenant's right to
31    possession of the Premises, in which event Landlord shall have the right to enforce all of Landlord's rights
32    and remedies under this Lease including the right to recover the Minimum Annual Rental, Percentage
33    Rental, Additional Rent and other charges payable by Tenant under this Lease as they become due under
34    this Lease; or (C) without terminating this Lease, Landlord may pay or discharge any breach or violation
35    hereof which amount so expended shall be added to the next monthly incremental payment of Minimum
36    Annual Rent, Percentage Rental and Additional Rent due and treated in the same manner as Rental
37    hereunder; or (D) without terminating this Lease, make such alterations and repairs as may be necessary in
38    order to relet the Premises, and relet the Premises or any part thereof for such term or terms (which may be
39    for a term extending beyond the Term) at such rental or rentals and upon such other terms and conditions
40    as Landlord in its sole discretion may deem advisable.
41
42        (b)    If Landlord proceeds under Section 19.01(a)(D) above, upon such reletting all Rental and
43    other sums received by Landlord from such reletting shall be applied, first, to the payment of any
44    indebtedness other than Rental due hereunder from Tenant to Landlord; second, to the payment of any costs
45    and expenses of such reletting, including reasonable brokerage fees for such reletting (as allowable to the
46    remaining unexpired Term hereof, but not beyond) and attorney fees and of costs of such alterations and
47    repairs; third, to the payment of Rental due and unpaid hereunder; and the residue, if any, shall be held by
48    Landlord and applied in payment of future Minimum Annual Rental and Additional Rent payable by Tenant
49    hereunder, as the same may become due and payable hereunder. If such Minimum Annual Rental,
50    Additional Rent and other sums received from such reletting during any month are less than that to be paid
51    during that month by Tenant hereunder, Tenant shall pay such deficiency to Landlord; if such rentals and
52    sums shall be more, Tenant shall have no right to the excess. Such deficiency shall be calculated and paid
53    monthly. No re-entry or taking possession of the Premises by Landlord shall be construed as an election
54    on its part to terminate this Lease unless a written notice of such intention is given to Tenant or unless the
55    termination thereof is decreed by a court of competent jurisdiction. Notwithstanding any such reletting
56    without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous
57    breach and shall have the remedies provided herein. Should Landlord at any time terminate this Lease for
58    any breach, in addition to any other remedies it may have, it may recover from Tenant all damages it may
59    incur by reason of such breach, including the cost of recovering the Premises, all of which amount shall be
60    immediately due and payable from Tenant to Landlord. Landlord shall use its reasonable efforts to mitigate
61    its damages hereunder; however, the failure or refusal of Landlord to relet the Premises shall not affect
62    Tenant's liability; further, Landlord shall use its reasonable efforts to relet the Premises and to otherwise
63    mitigate damages occasioned as a result of Tenant's default hereunder, provided, however, in no event shall
64    Landlord be required to relet the Premises in advance or over other available spaces in the Shopping Center.
65    The terms "entry" and "re-entry" are not limited to their technical meanings. If Tenant shall default
66    hereunder prior to the date fixed as the commencement of any renewal or extension of this Lease, Landlord

1   may cancel and terminate such renewal or extension agreement by written notice. In the event of re-entry
2   by Landlord, Landlord may remove all persons and property from the Premises and such property may be
3   stored in a public warehouse or elsewhere at the cost of, and for the account of Tenant, without notice or
4   resort to legal process and without Landlord being deemed guilty of trespass, conversion or becoming liable
5   for any loss or damage which may be occasioned thereby. In the event Tenant shall not remove its property
6   from the Premises within ten (10) days after Tenant has vacated the Premises, then such property shall be
7   deemed abandoned by Tenant and Landlord may dispose of the same without Landlord having any liability
8   to Tenant. If Landlord removes such property from the Premises and stores it at Tenant's risk and expense,
9   and if Tenant fails to pay the cost of such removal and storage after written demand therefor and/or to pay
10  any Rental then due, then after the property has been stored for a period of thirty (30) days or more Landlord
11  may sell such property at public or private sale, in the manner and at such times and places as Landlord
12  deems commercially reasonable following reasonable notice to Tenant of the time and place of such sale.
13  The proceeds of any such sale shall be applied first to the payment of the expenses for removal and storage
14  of the property, the preparation for the conducting of such sale, and for attorneys' fees and other legal
15  expenses incurred by Landlord in connection therewith, and the balance shall be applied as provided in this
16  Section 19.01(b).
17
18          (c)    At any time that Tenant shall have delivered checks to Landlord for payments pursuant to
19  this Lease which shall have on at least two (2) occasions within any twelve (12) month period during the
20  Term of this Lease (whether consecutive or not or whether involving the same check or different checks)
21  been returned by Landlord's bank for any reason, Landlord shall not be obligated to accept any payment
22  from Tenant unless such payment is made by cashier's check or in bank certified funds.
23
24          (d)    For purposes of subclauses (1) and (2) of Section 19.01(a), "worth at the time of award"
25  shall be computed by allowing interest at the maximum rate permitted by law (see Section 27.13) and for
26  purposes of subclause (3) of Section 19.01(a), "worth at the time of award" shall be computed by
27  discounting such amount at the discount rate of the Federal Reserve Bank whose jurisdiction includes the
28  Development at the time of award, plus one percent (1%); the Rental reserved in this Lease shall be deemed
29  to be a monthly rental arrived at (i) by adding to the monthly installment of Minimum Annual Rental
30  payable under this Lease an amount equal to the monthly average of all the Percentage Rental based on
31  Gross Sales received by or payable to Landlord hereunder during the period that Tenant was conducting
32  Tenant's business in the Premises in the manner and to the extent required pursuant to this Lease, plus (ii)
33  one twelfth (1/12th) of the annual average of all Additional Rent payable by Tenant hereunder (such as, by
34  way of example, Tenant's Share of Taxes).
35
36          (e)    Anything to the contrary notwithstanding, Landlord shall not be required to give notice
37  under this Article XIX more than twice in any consecutive twelve month period.
38
39          (f)    Intentionally deleted.
40
41                                   **ARTICLE XX**
42
43                           **BANKRUPTCY OR INSOLVENCY**
44
45          **Section 20.01   TENANT'S INTEREST NOT TRANSFERABLE.**
46          Except as may specifically be provided pursuant to the Federal Bankruptcy Code, neither Tenant's
47  interest in this Lease, nor any estate hereby created in Tenant nor any interest herein, shall pass to any
48  trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law.
49
50          **Section 20.02   TERMINATION.**
51          In the event the interest or estate created in Tenant hereby shall be taken in execution or by other
52  process of law, or if Tenant's guarantor, if any, or its executors, administrators, or assigns, if any, shall be
53  adjudicated insolvent or bankrupt pursuant to the provisions of any state act or the Federal Bankruptcy
54  Code or if Tenant is adjudicated insolvent by a court of competent jurisdiction other than the United States
55  Bankruptcy Court, or if a receiver or trustee of the property of Tenant or Tenant's guarantor, if any, shall
56  be appointed by reason of the insolvency or inability of Tenant or Tenant's guarantor, if any, to pay its debts
57  as the same become due or if any assignment shall be made of the property of Tenant or Tenant's guarantor,
58  if any, for the benefit of creditors, then Landlord shall have the right to elect by written notice to Tenant to
59  terminate this Lease and all rights of Tenant hereunder, and Tenant shall vacate and surrender the Premises
60  but shall remain liable as herein provided.
61
62          **Section 20.03   TENANT'S OBLIGATION TO AVOID CREDITORS' PROCEEDINGS.**
63          Tenant or Tenant's guarantor, if any, shall not cause or give cause for the appointment of a trustee
64  or receiver of the assets of Tenant or Tenant's guarantor, if any, and shall not make any assignment for the
65  benefit of creditors, or become or be adjudicated insolvent. The allowance of any petition under insolvency
66  law except under the Federal Bankruptcy Code or the appointment of a trustee or receiver of Tenant or

1 Tenant's guarantor, if any, or of the assets of either of them, shall be conclusive evidence that Tenant caused,
2 or gave cause therefor, unless such allowance of the petition, or the appointment of a trustee or receiver, is
3 vacated within sixty (60) days after such allowance or appointment. Any act or occurrence described in
4 this Section 20.03 shall be deemed a material breach of Tenant's obligations hereunder, and providing
5 Landlord with the right to elect by written notice to Tenant to terminate this Lease and all rights of Tenant
6 hereunder, and Tenant shall vacate and surrender the Premises but shall remain liable as herein provided.
7 Landlord does, in addition, reserve any and all other remedies provided in this Lease or by law.
8
9     **Section 20.04  ELECTION TO ASSUME LEASE.**
10    (a)    This is a "lease of real property in a shopping center" within the meaning of Section
11 365(b)(3) of the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code").
12
13    (b)    In the event that Tenant becomes a Debtor under Chapter 7, 11 or 13 of the Bankruptcy
14 Code, and the Trustee or Tenant, as Debtor-In-Possession, elects to assume this Lease for the purpose of
15 assignment to a third party or otherwise, such election and assignment, if any, may only be made if all of
16 Landlord's conditions are met. If the Trustee or Tenant, as Debtor-In-Possession, fails to elect to assume
17 or reject this Lease by the sixtieth (60th) day after the entry of the Order for Relief in a case under Chapter
18 7, 11 and 13 of the Bankruptcy Code, this Lease shall thereafter be deemed rejected and terminated in
19 accordance with Section 365(d)(4) of the Bankruptcy Code. The Trustee or Tenant, as Debtor-In-
20 Possession, shall thereupon immediately surrender possession of the Premises to Landlord and Landlord
21 shall have no further obligation to Tenant or Trustee under the Lease. The acceptance of rent by Landlord
22 after the sixtieth (60th) day shall not be deemed a waiver of Landlord's rights herein and under Section
23 365(d)(4) of the Bankruptcy Code, and Landlord's right to be compensated for damages in such bankruptcy
24 case shall survive.
25
26    **Section 20.05  SUBSEQUENT BANKRUPTCY.**
27    In the event that this Lease is assumed by a Trustee appointed for Tenant or by Tenant as Debtor-
28 In-Possession and thereafter Tenant is liquidated or files a subsequent Petition for reorganization or
29 adjustment of debts under Chapter 11 or 13 of the Bankruptcy Code, then, and in either of such events,
30 Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder, by giving Tenant
31 written notice of its election to so terminate, by no later than thirty (30) days after the occurrence of either
32 of such events.
33
34    **Section 20.06  ASSIGNMENT.**
35    If the Trustee or Debtor-In-Possession has assumed this Lease pursuant to the terms and conditions
36 of Sections 20.02 or 20.03, for the purpose of transferring Tenant's interest under this Lease or the estate
37 created thereby, to any other person, such interest or estate may be so transferred only if Landlord shall
38 acknowledge in writing that the intended transferee has provided "adequate assurance of future
39 performance" of all of the terms, covenants and conditions of this Lease to be performed by Tenant.
40
41    **Section 20.07  OCCUPANCY CHARGES.**
42    When, pursuant to the Bankruptcy Code, the Trustee or Tenant, as Debtor-In-Possession shall be
43 obligated to pay reasonable use and occupancy charges for the use of the Premises or any portion thereof,
44 such charge shall not be less than the Minimum Annual Rental as defined in this Lease and other monetary
45 obligations of Tenant for the payment of Additional Rent.
46
47    **Section 20.08  CONSENT.**
48    Neither Tenant's interest in this Lease, nor any lesser interest of Tenant herein, nor any estate of
49 Tenant hereby created, shall pass to any trustee, receiver, transferee for the benefit of creditors, or any other
50 person or entity, or otherwise by operation of law under the laws of any state having jurisdiction of the
51 person or property of Tenant unless Landlord shall consent to such transfer in writing. No acceptance by
52 Landlord of Rental or any other payments from any such trustee, receiver, transferee, person or other entity
53 shall be deemed to have waived the need to obtain Landlord's consent for any transfer of Tenant's interest
54 under this Lease.
55
56    **Section 20.09  ATTORNEY FEES.**
57    If, in the context of Tenant's bankruptcy case, Landlord is compelled at any time to incur any
58 expense, including attorneys' fees, in enforcing or attempting to enforce the terms of this Lease or to enforce
59 or attempt to enforce any actions required under the Bankruptcy Code to be taken by the Trustee or by
60 Tenant, as Debtor-In-Possession, then the sum so paid by Landlord shall be awarded to Landlord by the
61 Bankruptcy Court and shall be immediately due and payable by the Trustee or by Tenant's bankruptcy
62 estate to Landlord in accordance with the terms of the order of the Bankruptcy Court.
63
64    **Section 20.10  OTHER LAWS.**
65    The provisions of this Article XX concerning the rights of Landlord, and the obligations of Trustee,
66 Tenant, Debtor, Receiver, Debtor-In-Possession and assignee are in addition to such rights and obligations

1  provided by law, including those applicable provisions of the Bankruptcy Code. Nothing contained in this
2  Article XX shall limit or reduce in any manner whatsoever such rights and obligations which are otherwise
3  provided by law.
4
5                                    **ARTICLE XXI**
6
7                              **ACCESS BY LANDLORD**
8
9       **Section 21.01  RIGHT OF ENTRY.**
10      Landlord and Landlord's agents shall have the right to enter the Premises for any reasonable purpose
11  upon reasonable advance notice to Tenant. Landlord shall have the further right to enter the Premises to
12  make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable,
13  and Landlord shall be allowed to take all material into and upon the Premises that may be required therefor
14  without the same constituting an eviction of Tenant in whole or in part, and Minimum Annual Rental,
15  Percentage Rental, Additional Rent and other charges reserved hereunder shall not abate while said repairs,
16  alterations, improvements or additions are being made, by reason of loss or interruption of business of
17  Tenant, or otherwise. In exercising such right of entry, Landlord shall use every reasonable effort not to
18  disrupt Tenant's business in the Premises. Landlord or Landlord's agents shall have the further right to enter
19  the Premises at any time without notice in the event of emergency. During the six (6) months prior to the
20  expiration of the Term of this Lease, Landlord may exhibit the Premises to prospective tenants and their
21  representatives, including brokers, for purposes including but not limited to the inspection and measurement
22  of the Premises.
23
24      Landlord shall furnish Tenant with reasonable prior notice of any entry onto the Premises
25  hereunder, except in the event of emergency. In exercising such right of entry, Landlord shall use every
26  reasonable effort not to disrupt Tenant's business in the Premises and Landlord agrees to repair and restore
27  any damage caused by any work or activity performed by Landlord in the exercise of its rights hereunder.
28
29                                    **ARTICLE XXII**
30
31                              **TENANT'S PROPERTY**
32
33      **Section 22.01  TAXES ON TENANT'S PROPERTY.**
34      Tenant shall be responsible for, and agrees to pay prior to delinquency, any and all Taxes or other
35  taxes, assessments, levies, fees and other governmental charges and impositions of every kind or nature,
36  regular or special, direct or indirect, presently foreseen or unforeseen or known or unknown, levied or
37  assessed by municipal, county, state, federal or other governmental taxing or assessing authority, upon,
38  against or with respect to (i) Tenant's leasehold interest in the Premises, (ii) all furniture, fixtures,
39  equipment, inventory and any other personal property of any kind owned by, or placed, installed or located
40  in, within, upon or about the Premises by Tenant, any concessionaire or any previous tenant or occupant,
41  and (iii) all alterations, additions, or improvements of whatsoever kind or nature, if any, made to the
42  Premises, by Tenant, any concessionaire or any previous tenant or occupant, irrespective of whether any
43  such tax is assessed, real or personal, and irrespective of whether any such tax is assessed to or against
44  Landlord or Tenant (collectively, "Tenant's Taxes"). Tenant shall provide Landlord with evidence of
45  Tenant's timely payment of such Tenant's Taxes upon Landlord's request. If at any time any of such
46  Tenant's Taxes are not levied and assessed separately and directly to Tenant (for example, if the same are
47  levied or assessed to Landlord, or upon or against the building containing the Premises and/or the land
48  underlying said building), Tenant shall pay to Landlord Tenant's share thereof as determined and billed by
49  Landlord.
50
51      **Section 22.02  LOSS AND DAMAGE.**
52      Landlord shall not be responsible or liable to Tenant for any loss or damage that may be occasioned
53  by or through the acts or omissions of persons occupying premises or any part of the premises adjacent to
54  or connected with the Premises or any part of the building of which the Premises are a part, or any other
55  area in the Development, or for any loss or damage resulting to Tenant or its property from bursting,
56  stoppage or leaking of water, gas, sewer or steam pipes, or (without limiting the foregoing) for any damage
57  or loss of property within the Premises from any cause whatsoever.
58
59      **Section 22.03  NOTICE BY TENANT.**
60      Tenant shall give immediate notice to Landlord in case of any damage to or destruction of all or
61  any part of, or of accidents occurring within the Premises, or of defects therein or of any damage to or
62  destruction of any inventory, fixtures or equipment within the Premises.
63

# ARTICLE XXIII

## HOLDING OVER

### Section 23.01  HOLDING OVER.

If possession of the Premises is not surrendered to Landlord on the Expiration Date, then Tenant shall pay to Landlord on account of use and occupancy of the Premises, for each month (or any portion thereof) during which Tenant (or a Person claiming by, through or under Tenant) holds over in the Premises after the Expiration Date, an amount equal to one hundred fifty percent (150%) of the aggregate Rental that was payable under this Lease during the last month of the Term. Landlord's right to collect such amount from Tenant for use and occupancy shall be in addition to any other rights or remedies that Landlord may have hereunder or at law or in equity. Nothing contained in this Section 23.01 shall permit Tenant to retain possession of the Premises after the Expiration Date or limit in any manner Landlord's right to regain possession of the Premises, through summary proceedings or otherwise. Landlord's acceptance of any payments from Tenant after the Expiration Date shall be deemed to be on account of the amount to be paid by Tenant in accordance with the provisions of this Section 23.01. Tenant expressly waives, for itself and for any person claiming through or under Tenant, any rights that Tenant or any such person may have under the provisions of legal requirements, in connection with any holdover summary proceedings that Landlord may institute to enforce the foregoing provisions of this Article. Tenant shall indemnify, defend and hold harmless Landlord from and against any and all loss, claims, demands, liabilities, damages (including, without limitation, consequential damages), costs and/or expenses (including, without limitation, attorneys' fees and expenses) resulting from any failure by Tenant to surrender the Premises in the manner and condition required by this Lease upon the expiration of the Term or earlier termination of this Lease, including, without limitation, any claims made by any proposed new tenant founded upon such failure.

### Section 23.02  SUCCESSORS.

All rights and liabilities herein given to, or imposed upon, the parties to this Lease shall inure to and be imposed upon the respective heirs, executors, administrators, successors and assigns of the said parties; and if there shall be more than one Tenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved in advance by Landlord in writing or permitted by Article XIV.

# ARTICLE XXIV

## RULES AND REGULATIONS

### Section 24.01  RULES AND REGULATIONS.

Tenant agrees to comply with and observe all reasonable rules and regulations established by Landlord from time to time, provided the same shall (i) apply uniformly to all tenants of the Shopping Center and (ii) not materially interfere with the conduct of Tenant's business in the Premises. The rules and regulations imposed by Landlord under this Section shall not materially impair or diminish Tenant's rights or materially increase Tenant's obligations set forth in this Lease. Tenant's failure to keep and observe said rules and regulations shall constitute a breach of the terms of this Lease in the same manner as if the rules and regulations were contained herein as covenants. In the case of any conflict between said rules and regulations and this Lease, this Lease shall be controlling.

# ARTICLE XXV

## QUIET ENJOYMENT

### Section 25.01  LANDLORD'S COVENANT.

For so long as an Event of Default does not exist, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject nevertheless to the terms and conditions of this Lease, any mortgage and/or deed of trust to which this Lease is subordinated and any reciprocal easement agreement made between Landlord and tenants or others occupying the Department Stores. Nothing in any such reciprocal easement agreement shall materially limit Tenant's rights or materially increase Tenant's obligations under this Lease or materially interfere with Tenant's substantial ability to conduct its business from the Premises.

**ARTICLE XXVI**

**SECURITY**

**Section 26.01  SECURITY DEPOSIT.**

At or before Tenant's execution of this Lease, Tenant shall deposit with Landlord the sum set forth in the Data Sheet as a security deposit and payment and performance guaranty. Landlord shall retain said sum throughout the Term of this Lease as security for the faithful performance by Tenant of all of the terms, covenants and conditions of this Lease. (Such sum is occasionally referred to herein as the "deposit".) If Tenant defaults with respect to any provision of this Lease, including but not limited to the provisions relating to the payment of Rental, Landlord may use, apply or retain all or any part of the deposit for the payment of any Rental or any other sum in default, or for the payment of any loss or damage which Landlord may suffer by reason of Tenant's default, or to compensate Landlord for any other amount which Landlord may spend or become obligated to spend by reason of Tenant's default. In no event, except as specifically hereinafter provided, shall Landlord be obliged to apply the same to Rental or other charges in arrears or to damages for Tenant's failure to perform said covenants, conditions and agreements; however, Landlord may so apply the deposit, at its option. Landlord's right to bring a special proceeding to recover or otherwise to obtain possession of the Premises before or after Landlord's declaration of the termination of this Lease for non-payment of Rental or for any other reason shall not in any event be affected by reason of the fact that Landlord holds the deposit.

In the event that Landlord regains possession of the Premises, whether by special proceeding, reentry or otherwise, because of Tenant's default or failure to carry out the covenants, conditions and agreements of this Lease, Landlord may apply such deposit to all damages suffered through the date of said repossession and may retain the deposit to apply to such damages as may be suffered or shall accrue thereafter by reason of Tenant's default or breach. In the event any bankruptcy, insolvency, reorganization or other creditor-debtor proceedings shall be instituted by or against Tenant, or its successors or assigns, or any guarantor of Tenant hereunder, such deposit shall be deemed to be applied first to the payment of any Rental and/or other charges due Landlord for all periods prior to the institution of such proceedings, and the balance, if any, of such deposit may be retained by Landlord in partial liquidation of Landlord's damages.

The deposit shall not constitute a trust fund. Landlord shall not be obligated to keep such deposit as a separate fund but may commingle the deposit with its own funds. Tenant shall not be entitled to interest on the deposit. In the event Landlord applies the deposit in whole or in part, Tenant shall, within five (5) days after written demand by Landlord, deposit sufficient funds to maintain the deposit in the initial amount. Failure of Tenant to deposit such additional funds shall entitle Landlord to avail itself of the remedies provided in this Lease for non-payment of Rental by Tenant. If Tenant fully and faithfully performs every provision of this Lease to be performed by it, the security deposit or any balance thereof, less any sums then due Landlord from Tenant under this Lease, shall be returned to Tenant (or, at Landlord's option to the last assignee of Tenant's interest thereunder) within thirty (30) days following the later of the expiration of the Term of this Lease or Tenant's vacating the Premises.

**Section 26.02  LEASE DEPOSIT.**
Intentionally Deleted.

**Section 26.03  LETTER OF CREDIT.**
Intentionally Deleted.

**ARTICLE XXVII**

**MISCELLANEOUS**

**Section 27.01  WAIVER; ELECTION OF REMEDIES.**

One or more waivers of any covenant or condition by Landlord shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by Landlord to or of any act by Tenant requiring Landlord's consent or approval shall not be deemed to render unnecessary Landlord's consent or approval to or of any subsequent similar act by Tenant. No breach by Tenant of a covenant or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord. The rights and remedies of Landlord under this Lease or under any specific Section, subsection or clause hereof shall be cumulative and in addition to any and all other rights and remedies which Landlord has or may have elsewhere under this Lease or at law or equity, whether or not such Section, subsection or clause expressly so states.

1    **Section 27.02    ENTIRE AGREEMENT.**
2        The Data Sheet and all exhibits and/or addendum(s), and/or rider(s), if any, attached to this Lease
3    are hereby made a part of this Lease, with full force and effect as if set forth herein. This Lease supersedes
4    all prior agreements between the parties and sets forth all the covenants, promises, agreements and
5    conditions, and understandings between Landlord and Tenant concerning the Premises and there are no
6    actual or implied covenants, promises, agreements, conditions or understandings, either oral or written,
7    between them other than as are set forth herein and none thereof shall be used to interpret, construe,
8    supplement or contradict this Lease. Landlord has made no representations or warranties regarding the
9    profitability of the Premises, the Shopping Center or the Development, and Tenant has not entered into this
10   Lease in reliance on any such representations, warranties or financial projections prepared or furnished to
11   Tenant by Landlord. Although the printed provisions of this Lease were drawn by Landlord, the parties
12   hereto agree that this circumstance alone shall not create any presumption, canon of construction or
13   implication favoring the position of either Landlord or Tenant. The parties agree that any deletion of
14   language from this Lease prior to its mutual execution by Landlord and Tenant shall not be construed to
15   have any particular meaning or to raise any presumption, canon of construction or implication, including,
16   without limitation, any implication that the parties intended thereby to state the converse, obverse or
17   opposite of the deleted language. No alteration, amendment, change or addition to this Lease shall be
18   binding upon Landlord or Tenant unless reduced to writing and signed by each party. Tenant shall pay all
19   of Landlord's costs, expenses and reasonable fees of its attorney(s) in connection with any amendment,
20   change or addition to this Lease made at the request of or to accommodate Tenant, which cost shall not be
21   in excess of $1,000.00 per occurrence.
22
23   **Section 27.03    INTERPRETATION; USE OF PRONOUNS; AUTHORITY.**
24       Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party,
25   as creating the relationship of principal and agent or of partnership or of joint ventures between the parties
26   hereto, it being understood and agreed that neither the method of computation of Rental, nor any other
27   provision contained herein, nor any acts of the parties herein, shall be deemed to create any relationship
28   between the parties hereto other than the relationship of landlord and tenant. Whenever herein the singular
29   number is used the same shall include the plural, and the masculine gender shall include the feminine and
30   neuter genders. If this Lease is signed on behalf of a corporation, partnership or other entity, such entity is
31   authorized to enter into and the signer is duly authorized to execute this Lease on behalf of such corporation,
32   partnership or entity.
33
34   **Section 27.04    DELAYS; FORCE MAJEURE.**
35       In the event either party hereto shall be delayed in the performance of its initial construction, or
36   maintenance and/or repair obligations, by reasons of strikes; lockouts; labor disputes; Acts of God; inability
37   to procure labor, materials, or reasonable substitutes therefor; or shall at any time be so delayed by reason
38   of the diminution of power or power failure(s); restrictive governmental laws or controls; judicial orders;
39   enemy or hostile governmental action; civil commotion; fire or other casualty, or reasons of a similar nature
40   not the fault of the party delayed in performing work or doing acts required under the terms of this Lease,
41   then performance of such act shall be excused for the period of the delay and the period for the performance
42   of any such act shall be extended for a period equivalent to the period of such delay; provided, however,
43   that the time for performance shall in no event be extended due to financial or economic problems of either
44   party, their architects, contractors, agents or employees, or delay caused by the inability of architects,
45   contractors, suppliers or other employees and agents to meet deadlines, delivery or contract dates (unless
46   such inability is caused by Acts of God, war, civil disobedience or strike). Notwithstanding anything to the
47   contrary, the occurrence of any of the events of force majeure herein described shall not excuse Tenant's
48   obligations to pay Minimum Annual Rental, Percentage Rental and Additional Rent (unless the provisions
49   of Article XVII or Article XVIII apply) or excuse such obligations as this Lease may otherwise impose on
50   the party to obey, remedy or avoid such event; moreover should the work performed by Tenant or Tenant's
51   contractor result in a strike, lockout and/or labor dispute, such strike, lockout and/or labor dispute shall not
52   excuse Tenant's performance. Further, Landlord's reduction of heat, light, air conditioning, or any other
53   services whatsoever to the Shopping Center and/or the Development because of any similar or dissimilar
54   event constituting a cause for excusable delay hereunder shall not relieve Tenant from its obligations
55   pursuant to Article VII of this Lease, except to the extent such reduction results in a substantial and material
56   interference with Tenant's ability to conduct its business in the Premises. It shall be a condition of Tenant's
57   right to claim an extension of time as a result hereof that Tenant notify Landlord in writing within ten (10)
58   calendar days after the first occurrence of any such event, and the cause, specifying the nature thereof and
59   the period of time contemplated or necessary for performance.
60
61   **Section 27.05    NOTICES.**
62       Notwithstanding the fact that certain descriptions elsewhere in this Lease of notices required to be
63   given by one party to the other may omit to state that such notices shall be in writing, any notice, demand,
64   request or other instrument which may be or is required to be given under this Lease shall be in writing and
65   sent by (i) United States certified mail, return receipt requested, postage prepaid, (ii) United States express
66   mail, (iii) air courier (such as Federal Express), or (iv) personal delivery, and shall be addressed (a) if to the

Landlord, at the address set forth on the Data Sheet, or such other address or addresses as Landlord may designate by written notice, together with copies thereof to such other parties designated by Landlord and, (b) if to Tenant, at the address set forth on the Data Sheet, or such other address or addresses as Tenant shall designate by written notice provided that Tenant's address for notices shall be a street address and not a post office box. Notices shall be deemed given upon receipt or refusal by the intended recipient.

### Section 27.06   CAPTIONS AND SECTION NUMBERS.

The captions, section numbers, article numbers and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such sections or articles of this Lease nor in any way affect this Lease.

### Section 27.07   BROKER'S COMMISSION.

Tenant represents and warrants to Landlord that there are and shall be no claims for brokerage commissions or finder's fees in connection with this Lease (other than from the Broker), and each party agrees to indemnify the other and hold it harmless from all liabilities arising from any claim for brokerage commissions and finder's fees in connection with this Lease (other than from the Broker). Such agreement shall survive the termination of this Lease.

The parties acknowledge that Location3 (the "Broker") has been enlisted as the broker for this transaction. The brokerage commission shall be paid by Landlord to Broker upon written request therefor and in accordance with a commission agreement signed by the parties.

### Section 27.08   RECORDING.

Tenant shall not record this Lease or any short form or memorandum of this Lease. Tenant, upon the request of Landlord's ground lessor(s), mortgagee(s) or beneficiary(ies) under deed(s) of trust, shall execute and acknowledge a short form or memorandum of this Lease for recording purposes.

### Section 27.09   FURNISHING OF FINANCIAL STATEMENTS.

Tenant has provided Landlord at or prior to the date of this Lease with statements reflecting its financial condition as of a date within the last twelve (12) months as an inducement to Landlord to enter into this Lease, and Tenant hereby represents and warrants that its financial condition has not materially and adversely changed since the date of those statements. Upon Landlord's written request in connection with a proposed sale, transfer or financing transaction with respect to all or any portion of the Development, Tenant shall promptly furnish Landlord, from time to time, but not more frequently than once in any lease year, with financial statements reflecting Tenant's then current financial condition and written evidence of ownership of controlling stock interest if Tenant is a corporation or controlling partnership interest if Tenant is a partnership. Landlord and anyone hereunder that Landlord is permitted to divulge such statements and information shall treat such financial statements and information provided to it pursuant to Articles III and IV of this Lease confidentially, and shall not disclose them except to Landlord's lenders or otherwise as reasonably necessary for the operation of the Development or administration of Landlord's business or unless disclosure is required by any judicial or administrative order or ruling.

### Section 27.10   WAIVER OF COUNTERCLAIM OR DEFENSES IN ACTION FOR POSSESSION.

Landlord and Tenant agree that in any action brought by Landlord to obtain possession of the Premises, the parties desire an expeditious resolution of such litigation. Accordingly, Tenant shall not file and hereby waives the right to file any non-compulsory counterclaim in such action.

### Section 27.11   TRANSFER OF LANDLORD'S INTEREST.

In the event of any transfer or transfers of Landlord's interest in the Premises including a so-called sale-leaseback, the transferor shall be automatically relieved of any and all obligations on the part of Landlord accruing from and after the date of such transfer, provided that (a) the interest of the transferor, as Landlord, in any funds then in the hands of Landlord in which Tenant has an interest shall be turned over, subject to such obligations, to the then transferee; (b) notice of such sale, transfer or lease shall be given to Tenant as required by law; and (iii) such transferee shall expressly assume, in writing, Landlord's obligations under this Lease. Upon the transfer of any such lease in a sale-leaseback transaction prior to termination of this Lease, the former lessee thereunder shall become and remain liable as Landlord hereunder until a further transfer. No holder of a mortgage to which this Lease is or may be subordinate, and no lessor under a so-called sale-leaseback, shall be responsible in connection with the security deposited hereunder, unless such mortgagee or holder of such deed of trust or lessor shall have actually received the security deposited hereunder.

### Section 27.12   FLOOR AREA.

(a)   "Floor Area" as used in this Lease means with respect to any leasable area in the Shopping Center and/or the Development, the aggregate number of square feet of floor space of all floor levels therein, including any mezzanine space, measured from (i) the outside faces of all perimeter walls thereof other

than any demising wall separating such premises from other leasable premises, (ii) the center lines of any such demising wall, (iii) the outside face of any interior wall, and (iv) the building and/or leaseline adjacent to any entrance to such premises.

(b)    For the purposes of this Lease, in determining the gross leasable Floor Area or the gross leased and occupied Floor Area of the Shopping Center and/or the Development, there shall be excluded therefrom any premises leased for the operation of a U.S. Government Post Office facility or other governmental facility, a child care center, community room, library, project offices and related rooms, movable retail merchandising units and temporary uses or units located in the Common Areas. No deduction or exclusion from Floor Area shall be made by reason of columns, ducts, stairs, elevators, escalators, shafts or other interior construction or equipment. At the Commencement Date, the gross leased and occupied Floor Area in effect for the whole of any lease year shall be the average gross leased and occupied Floor Area in effect during such lease year (which leased and occupied Floor Area for purposes of this calculation shall not be less than 75% of the gross leasable Floor Area of the Shopping Center). Landlord reserves the right during the Term to change the method of computation to determine Floor Area on a monthly or quarterly "average" basis.

(c)    Intentionally deleted.

(d)    Either party, at its option and at its sole cost and expense, shall have the right to re-measure the Floor Area of the Premises within fifteen (15) days after the Delivery Date. A representative of Landlord shall be present during any such re-measurement. If the actual Floor Area of the Premises, calculated in accordance with the provisions of this Lease, varies from the Floor Area noted on the Data Sheet and Exhibit A-2, then Landlord and Tenant shall enter into an amendment of this Lease to: (i) amend the Floor Area of the Premises; and, (ii) to proportionately adjust the Minimum Annual Rental, the Annual Breakpoints, and the Allowance. Further, all other charges and dollar amounts under this Lease which are specifically stated to be calculated based on the Floor Area of the Premises shall be calculated based on the amended Floor Area of the Premises. Such amendment shall be effective as of the Rental Commencement Date. If neither party exercises its right to re-measure the Floor Area of the Premises as set forth hereinabove, the parties shall be deemed to have waived any right to re-measure the Floor Area of the Premises and any resulting amendment to the Lease as provided above. *[THIS SECTION 27.12(D) IS FOR THIS DEVELOPMENT LEASE FOR FIRST GENERATION SPACE AT WESTFIELD CENTURY CITY AND NOT FOR CONFORMING IN OTHER LEASES BETWEEN THE PARTIES OR THEIR AFFILIATES).]*

**Section 27.13    INTEREST ON PAST DUE OBLIGATIONS.**
Any amount due from Tenant to Landlord hereunder which is not paid when due (including, without limitation, amounts due as reimbursement to Landlord for costs incurred by Landlord in performing obligations of Tenant hereunder upon Tenant's failure to so perform) shall bear interest at the lesser of (a) the "Prime Rate" as published in Wall Street Journal plus three percent (3%); or (b) the highest rate then allowed under the usury laws of the state where the Development is located from the date due until paid, unless otherwise specifically provided herein, but the payment of such interest shall not excuse or cure any default by Tenant under this Lease.

**Section 27.14    LIABILITY OF LANDLORD.**
If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and if as a consequence of such default Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Development and out of rents or other income from such property receivable by Landlord, or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Development subject, nevertheless to the rights of Landlord's mortgagee, and neither Landlord nor any of the partners comprising the partnership which may be the Landlord herein shall be liable for any deficiency.

**Section 27.15    ACCORD AND SATISFACTION.**
Payment by Tenant or receipt by Landlord of a lesser amount than the Rental or other charges herein stipulated shall be deemed to be on account of the earliest Rental or other charges due from Tenant to Landlord. No endorsements or statement on any check or any letter accompanying any check or payment as Rental or other charges shall be deemed an accord and satisfaction, and Landlord shall accept such check or payment without prejudice to Landlord's right to recover the balance of any and all Rental or other charges due from Tenant to Landlord or to pursue any other remedy provided in this Lease or by law.

**Section 27.16    EXECUTION OF LEASE; NO OPTION.**
The submission of this Lease to Tenant shall be for examination purposes only, and does not and shall not constitute a reservation of an option for Tenant to lease, or otherwise create any interest by Tenant in the Premises or any other premises in the Development. Execution of this Lease by Tenant and the return

1   of same to Landlord shall not be binding upon Landlord, notwithstanding any time interval, until Landlord
2   has executed and delivered this Lease to Tenant.
3
4      **Section 27.17   GOVERNING LAW.**
5      This Lease shall be governed by and construed in accordance with laws of the state where the
6   Premises is situated. If any provision of this Lease or the application thereof to any person or circumstances
7   shall, to any extent be invalid or unenforceable, such provision shall be adjusted rather than voided, if
8   possible, in order to achieve the intent of the parties, to the extent possible; in any event, all other provisions
9   of this Lease shall be deemed valid and enforceable to the full extent.
10
11     **Section 27.18   SPECIFIC PERFORMANCE OF LANDLORD'S RIGHTS.**
12     Landlord shall have the right to obtain specific performance of any and all covenants or obligations
13  of Tenant under this Lease, and nothing contained in this Lease shall be construed as or shall have the effect
14  of abridging such right.
15
16     **Section 27.19   SURVIVAL OF TENANT'S OBLIGATIONS.**
17     All obligations of Tenant under this Lease which cannot be ascertained to have been fully
18  performed prior to the expiration or earlier termination of this Lease shall survive the expiration or earlier
19  termination of this Lease.
20
21     **Section 27.20   CERTAIN RULES OF CONSTRUCTION.**
22     Time is of the essence in Tenant's performance of this Lease. Notwithstanding the fact that certain
23  references elsewhere in this Lease to acts required to be performed by Tenant hereunder, or to breaches or
24  defaults of this Lease by Tenant, omit to state that such acts shall be performed at Tenant's sole cost and
25  expense, or omit to state that such breaches or defaults by Tenant are material, unless the context clearly
26  implies to the contrary, each and every act to be performed or obligation to be fulfilled by Tenant pursuant
27  to this Lease shall be performed or fulfilled at Tenant's sole cost and expense, and all breaches or defaults
28  by Tenant hereunder shall be deemed material. Tenant shall be fully responsible and liable for the
29  observance and compliance by concessionaires of and with all the terms and conditions of this Lease, which
30  terms and conditions shall be applicable to concessionaires as fully as if they were the Tenant hereunder;
31  and failure by a concessionaire fully to observe and comply with the terms and conditions of this Lease
32  shall constitute a default hereunder by Tenant. Nothing contained in the preceding sentence shall constitute
33  a consent by Landlord to any concession, subletting or other arrangement proscribed by Article XIV.
34
35     **Section 27.21   CONFIDENTIALITY.**
36     Any and all information contained in this Lease or provided to or by Tenant and/or Landlord by
37  reason of the covenants and conditions of this Lease, economic or otherwise, shall remain confidential
38  between Landlord and Tenant and shall not be divulged to third parties; provided, however Landlord shall
39  be permitted to divulge the contents of statements and reports derived and received in connection with the
40  provisions of Article III and Article IV in connection with any contemplated sales, transfers, assignments,
41  encumbrances or financing arrangements of Landlord's interest in the Shopping Center and/or the
42  Development or in connection with any administrative or judicial proceedings in which Landlord is
43  involved where Landlord may be required to divulge such information.
44
45     **Section 27.22   ATTORNEY FEES.**
46     If at any time after the date that this Lease has been executed by Landlord and Tenant, either
47  Landlord or Tenant institutes any action or proceeding against the other relating to the provisions of this
48  Lease or any default hereunder, the non-prevailing party in such action or proceeding shall reimburse the
49  prevailing party for the reasonable expenses of attorneys' fees and all costs and disbursements incurred
50  therein by the prevailing party, including, without limitation, any such fees, costs or disbursements incurred
51  on any appeal from such action or proceeding. Subject to the provisions of local law, the prevailing party
52  shall recover all such fees, costs or disbursements as costs taxable by the court or arbiter in the action or
53  proceeding itself without the necessity for a cross-action by the prevailing party.
54
55     Notwithstanding anything to the contrary contained herein, if Landlord is compelled to engage the
56  services of attorneys (either outside counsel or in-house counsel) to enforce the provisions of this Lease, to
57  the extent that Landlord incurs any cost or expense (including such reasonable attorney fees for outside
58  counsel or payroll and overhead expenses for in-house counsel, as the case may be) in connection with such
59  enforcement, including instituting, prosecuting or defending its rights in any action, proceeding or dispute
60  by reason of any default by Tenant, or as otherwise set forth in this Section 27.22 or elsewhere in this Lease,
61  the sum or sums so paid or billed to Landlord, together with all interest, costs and disbursements, shall be
62  deemed Additional Rent and shall be due from Tenant immediately upon receipt of an invoice therefor
63  following the occurrence of such expenses.
64

**Section 27.23  INDEX.**

As used in this Lease, the term "Index" shall mean the Consumer Price Index For All Urban Consumers (1982-84=100), U.S. City Average, All Items, published by the Bureau of Labor Statistics of the U.S. Department of Labor. In the event such Index is not published by the Bureau of Labor Statistics or another governmental agency at any time during the Term of this Lease, the most closely comparable statistics on the purchasing power of the consumer dollar as published by a responsible financial authority and as selected by Landlord shall be used for making any computation under this Lease otherwise to be made on the basis of the Index. If during the Term the Consumer Price Index is changed or discontinued, Landlord shall choose a comparable index, formula or other means of measurement of the relative purchasing power of the dollar and such substitute index, formula or other means shall be utilized in place of the Consumer Price Index as if it had been originally designated in this Lease.

**Section 27.24  WAIVER OF TRIAL BY JURY.**

Landlord and Tenant desire and intend that any disputes arising between them with respect to or in connection with this Lease be subject to expeditious resolution in a court trial without a jury. Therefore, Landlord and Tenant each hereby waive the right to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding or other hearing brought by either Landlord against Tenant or Tenant against Landlord or any matter whatsoever arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises or any claim of injury or damage, or the enforcement of any remedy under any law, statute, or regulation, emergency or otherwise, now or hereafter in effect.

**Section 27.25  MORTGAGEE CHANGES.**

Tenant shall not unreasonably withhold its consent to changes or amendments to this Lease requested by any current or future ground lessor or holder of a mortgage or deed of trust or such similar financing instrument covering Landlord's fee or leasehold interest in the Premises, as the case may be, so long as such changes do not alter the economic terms of this Lease or otherwise diminish the rights or increase the obligations of Tenant.

**Section 27.26  REAL ESTATE INVESTMENT TRUST.**

Landlord and Tenant agree that Minimum Annual Rental, Percentage Rental and all Additional Rent paid to Landlord under this Lease (collectively referred to in this Section as "Rent") shall qualify as "rents from real property" within the meaning of Section 856(d) and Section 512(b)(3)of the Internal Revenue Code of 1986, as amended (the "Code") and the U.S. Department of Treasury Regulations promulgated thereunder (the "Regulations"). In the event that Landlord, in its sole discretion, determines that there is any risk that all or part of any Rent shall not qualify as "rents from real property" for the purposes of Section 856(d) or Section 512(b)(3) of the Code and the Regulations promulgated thereunder, other than by reason of the application of Section 856(d)(2)(B) or 856(d)(5) of the Code or the Regulations relating thereto, then such Rent shall be adjusted so that, in Landlord's sole discretion. it will so qualify; as "rents from real property", provided, however, that any adjustments required pursuant to this Section shall be made so as to produce the equivalent (in economic terms) Rent as payable prior to such adjustment.

**Section 27.27  EQUAL EMPLOYMENT OPPORTUNITY.**

It has been determined that Landlord qualifies as a Federal Contractor. If applicable, during the performance of this Lease, the parties hereto hereby incorporate by reference the provisions set forth in 41 C.F.R. § 60-1.4, § 60-250.5 and § 60-741.5 and those set forth in 29 C.F.R. Part 471, Appendix A to Subpart A, which provisions apply to all nonexempt contractors and vendors.

**Section 27.28  DOG PARK.**

Landlord, at its sole cost and expense, shall construct a dog park in the Shopping Center in the location shown on the depiction attached hereto as Exhibit A-5 (the "Dog Park"). The design and construction of the Dog Park shall be designed by Landlord in its reasonable discretion, although Landlord agrees to use commercially reasonable efforts to involve Tenant in the design and planning stages of the Dog Park. The Dog Park will be constructed and open for enjoyment prior to the Rental Commencement Date, and the Dog Park shall remain open for at least five years following the Rental Commencement Date. If (a) the Dog Park is not constructed and open for enjoyment prior to the Rental Commencement Date, or (b) Landlord elects to close the Dog Park prior to the date that is five years following the Rental Commencement Date ("Dog Park Term"), then Tenant will receive a $4,000 Minimum Annual Rent reduction on a monthly basis from and after the Rental Commencement Date until the Dog Park is constructed and open for enjoyment (or re-opened, as the case may be); notwithstanding the foregoing to the contrary, in the event Tenant ceases operating in the Premises prior to expiration of the Dog Park Term, then Tenant shall not be entitled to any Minimum Annual Rental reduction should the Dog Park Term end before the expiration of the Dog Park Term but after Tenant ceases operating. Tenant, at its sole cost and

1   expense, shall be responsible for maintaining and repairing the Dog Park.  Tenant shall provide "Healthy
2   Spot" branded dog waste bags for customer use in the Dog Park.
3
4       Landlord shall have the right to brand the Dog Park to other tenants or advertisers; provided,
5   however, that Landlord may not depict any branding or advertising from any competing brand or retailer,
6   specifically including: Petco, Unleashed, Kriser's, Petsmart, Centinella, Pet Food Express, Just Food for
7   Dogs.
8
9       To the extent Landlord provides any Shopping Center-wide signage or directory program that lists
10  tenants, occupants, amenities or other services of the Shopping Center, Landlord agrees to also refer to the
11  availability and location of the Dog Park in connection with any such program.
12
13
14      *[BALANCE OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF**, Landlord and Tenant, personally or by their duly authorized agents, have executed this Lease as of the day and year first above written.

**HEALTHY SPOT 015 LLC,**
a California limited liability company

By: _____

Print Name: _AUDREW KIM_

Its _CEO_

By: _____

Print Name: _MARK BOONNARK_

Its: _COO_ | _FOUNDER_

**TENANT**

**CENTURY CITY MALL, LLC,**
a Delaware limited liability company

By:     UC Century Genpar, LLC,
        a Delaware limited liability company,
        its managing member

By:     Westfield America Limited Partnership,
        a Delaware limited partnership,
        its sole member

By:     Westfield U.S. Holdings, LLC,
        a Delaware limited liability company,
        its general partner

By: _____

        Nicholas Dierman
        Assistant Secretary

**LANDLORD**



SANTA MONICA BLVD.

CENTURY PARK WEST

AVE OF THE STARS

CONSTELLATION BLVD.

# EXHIBIT A1

This drawing is diagrammatic and shows only approximate conditions, locations, quantities and proposed elements. The size, location, identity or existence of any element or specific occupant may be added eliminated or modified at the sole and absolute discretion of the Landlord. Failure to verify actual conditions shall be at the sole risk and responsibility of the tenant.



Century City

SITE PLAN

N.T.S
SCALE

A1

10250 SANTA MONICA BLVD # 196      LOS ANGELES, CALIFORNIA





1"        1"

39"        11'–2"              18'–10"

303' - 0" FFL

43'–3"                    43'–3"

FHV/FE

33'–2"



## CENTURY CITY

| Level 2 | 2580 | HEALTHY SPOT | 1,434 S.F. |
| 8/21/17 | | | |

This Pre-Dev Exhibit A2 was produced prior to 100% completion of the CD phase and/or during development of an expansion. The Layout and/or GLA is subject to change per Base Building updates. Subject to all terms and conditions contained in the Lease, this exhibit shall not be deemed to be a warrant, representation, or agreement on the part of Landlord that the Shopping Center and/or Development will be, or will remain, as depicted hereon, or that the number of square feet depicted for any space, if any, is accurate or will remain the same during the Term.

## PRE-DEV
## A2

C:\Users\istarostanko\Desktop\A2_dwg\8–21–17\CEN2–A2–2580 HEALTHY SPOT SPACE 1 OF 2–080717.dwg



# EXHIBIT A3 - RELOCATION ZONE

SPACE: 2580
HEALTHY SPOT

This drawing is diagramatic and shows only approximate conditions, locations, quantities and proposed elements. The size, location, identity or existence of any element or specific occupant may be added eliminated or modified at the sole and absolute discretion of the Landlord. Failure to verify actual conditions shall be at the sole risk and responsibility of the tenant.

DEVELOPMENT PLAN

N.T.S
SCALE



Century City

10760 SANTA MONICA BLVD # 196        LOS ANGELES, CALIFORNIA



CENTURY CITY
Aug 21, 2017

A3
1 of 2 of 2

T:\CEN\Lease\04-Plot\02-Exhibit A3+\CEN2-EXHIBIT A3-2580 HEALTHY SPOT-RELOCATION ZONE-082117.dwg



**EXHIBIT A4 - CUSTOMER DOGGIE DROP OFF PARKING**

**SPACE: 2580**
**HEALTHY SPOT**

This drawing is diagramatic and shows only approximate conditions, locations, quantities and proposed elements. The size, location, identity or existence of any element or specific occupant may be added eliminated or modified at the sole and absolute discretion of the Landlord. Failure to verify actual conditions shall be at the sole risk and responsibility of the tenant.

**DEVELOPMENT PLAN**

N.T.S
SCALE

**Westfield**
Century City

10250 SANTA MONICA BLVD # 196        LOS ANGELES, CALIFORNIA



CENTURY CITY
Dec 21, 2017

**A4**
Level3

I:\CEN\Lease\04-Plot\02-Exhibit A3+\CEN3-EXHIBIT A4-2580 HEALTHY SPOT-CUSTOMER DOGGIE DROP OFF PARKING-121817/dwg



# EXHIBIT A5 - DOG PARK

**SPACE: 2580**
**HEALTHY SPOT**

This drawing is diagramatic and shows only approximate conditions,
locations, quantities and proposed elements.  The size, location, identity or
existence of any element or specific occupant may be added eliminated or
modified at the sole and absolute discretion of the Landlord.  Failure to verify
actual conditions shall be at the sole risk and responsibility of the tenant.

## DEVELOPMENT PLAN

N.T S
SCALE

# Westfield
## Century City

10250 SANTA MONICA BLVD # 196        LOS ANGELES, CALIFORNIA

CENTURY CITY
Dec 18, 2017

A5
Level 2 of 2

T:\CEN\Lease\04-Plot\02-Exhibit A3+\CEN2-EXHIBIT A5-2580 HEALTHY SPOT-DOG PARK-121817.dwg

### EXHIBIT B - DEVELOPMENT

### WESTFIELD CENTURY CITY

### DESIGN AND CONSTRUCTION OF THE BUILDING AND THE PREMISES

This Exhibit B, including any attachments hereto, is hereby made part of the lease (the "Lease") between Landlord and Tenant.

I.    **DEFINITIONS**

    A.    The term "Landlord's Work" shall mean Landlord's total responsibilities (or any portion thereof) for the construction and improvement of the Shopping Center building ("Building") and the Premises. The cost of Landlord's Work shall be borne as set forth under Article III and Article IV of this Exhibit B. Landlord's Work shall be of a design, type, size, location, elevation and quantity as may be selected by Landlord. Any item of work required to complete the Premises which is not hereinafter specifically made the responsibility of Landlord, shall be considered to be a part of Tenant's Work.

    B.    The term "Tenant's Work" shall mean Tenant's total responsibilities (or any portion thereof) for the construction and improvement of the Premises. Tenant's Work shall be performed at Tenant's sole cost and expense. Tenant's Work shall include, but not be limited to, all work necessary and/or required to complete the Premises, except those items of work specifically set forth as Landlord's Work.

    C.    The term "leasehold improvements" shall mean all of Tenant's Work described and performed pursuant to this Exhibit B for the purpose of the Lease (except for removable trade fixtures, merchandise, and items of personal property).

II.    **GENERAL REQUIREMENTS AND PROVISIONS**

    A.    Tenant's Work shall be subject to Landlord's prior approval and shall be designed and constructed to comply with the requirements set forth in the most current edition of Landlord's criteria for the Shopping Center (the "Tenant Design Criteria Package"). All details and information contained in the Tenant Design Criteria Package, whether appearing on Tenant's plans or not, shall be considered a part of Tenant's plans and construction requirements. By this reference, the Tenant Design Criteria Package and Landlord's Base Building Drawings and specifications ("Base Building Drawings") are incorporated herein and made a part of this Lease. This Exhibit, Landlord's Base Building Drawings. and the Tenant Design Criteria Package are hereinafter collectively referred to as "Tenant's Construction Requirements."

    B.    The design and construction of Tenant's Work must comply with the following requirements (collectively, the "Standards"):

        1.    This Exhibit B;

        2.    Tenant Design Criteria Package;

        3.    Landlord's Base Building Drawings;

        4.    Construction Manual and Construction Rules and Regulations for the Shopping Center;

        5.    Tenant's Final Working Drawings, as approved by Landlord; ·

        6.    All applicable laws, ordinances, codes, regulations and the requirements of all jurisdictional authorities; and

        7.    Intentionally deleted.

        In the event of a conflict between any of the above-referenced items, the most stringent requirement shall govern each increment of Tenant's Work.

    C.    Tenant's Work shall be performed in a first-class and workmanlike manner, and shall be in good and usable condition on the date of completion thereof. All materials used in Tenant's construction of the Premises and installations made by Tenant as a part of Tenant's Work shall be of new, commercial grade and first-class quality.

    D.    After Tenant's initial construction of the Premises, any and all elective remodeling proposed by Tenant or any and all remodeling required of Tenant by Landlord under the applicable provisions

of this Lease shall be performed in accordance with the Standards and all other requirements set forth in this Exhibit B and the most current edition of the Tenant Design Criteria Package.

E.    In the event Tenant and/or Tenant's General Contractor park(s) in Landlord's on-site parking at the Shopping Center, said on-site parking fee shall be an amount equal to $200.00 per month per car; Landlord's off-site parking shall be an amount equal to $185.00 per month per car. Tenant (and/or Tenant's General Contractor) shall pay Landlord, as Additional Rent, which shall be payable upon receipt of Landlord's invoice or monthly in advance on or before the first (1st) day of each calendar month. Landlord may delegate its responsibilities hereunder to a parking operator in which case such parking operator shall have the rights of control attributed hereby to the Landlord.

## III.    LANDLORD'S WORK AT LANDLORD'S EXPENSE

Work to be performed or provided at Landlord's sole cost and expense ("Landlord's Work") shall be limited to the following:

A.    A basic building structure, with finished Common Areas, constructed of such materials as are permitted by the governing codes.

B.    Tenant areas will be provided with a concrete floor slab in retail areas, food court areas, and kiosk locations. Tenant's General Contractor shall infill as required to accommodate floor installation per Tenant Design Criteria Package. At Landlord's determination, restaurant premises with excessive underground plumbing and utilities may be provided with compacted fill. The floor slab shall be installed by Tenant in accordance with Article V of this Exhibit B. In all areas where the concrete floor slab is not provided within the Premises. Tenant shall be required at Tenant's expense to furnish and install the concrete floor slab in accordance with Landlord's Base Building Drawings.

C.    Any mall frontage above the storefront lines, and, where required in Landlord's sole opinion, mall frontage vertical neutral strips centered upon the lease lines of the Premises. For certain premises located within the "existing" Shopping Center, Tenants shall modify and install new neutral pier pursuant to the Tenant Design Criteria Package.

D.    Landlord shall construct the basic facade of the Building with openings to be utilized by Tenant for their storefront design, which storefront shall be included in Tenant's Work and in accordance with the requirements of the Tenant Design Criteria Package and Landlord's Base Building Drawings.

E.    Common use service corridors, located as required by code or as selected by Landlord, with such corridor walls finished on the corridor side only.

F.    As may be required of Landlord by any jurisdictional authority. Landlord shall provide, at all common corridor demising walls, partition enclosure of the Premises with five-eighth inch (5/8") fire code gypsum board or other approved material on the corridor side only.

G.    All building finishes outside of the Premises which are not specifically made the responsibility of Tenant or another tenant of the Shopping Center.

H.    A main electrical service distribution system of a type and capacity set forth in the Tenant Design Criteria Package and Landlord's Base Building Drawings and consisting of the following facilities:

1.    A remote electrical service area outside the Premises.

2.    Main electrical service distribution equipment within the remote electrical service area, from which Tenant's main electrical service will be available.

3.    Empty electrical service conduit stubbed to the Premises from the applicable remote electrical service area, from which Tenant's main electrical service will be available.

I.    A main telephone service terminal board located outside the Premises. from which Tenant's main telephone service shall be available.

J.    A domestic water service main and cold water supply line for the Premises, from which Tenant's domestic water service shall be available.

K.    A sanitary sewer service main for the Premises, from which Tenant's sanitary sewer service shall be available.

L.    A fire sprinkler service main for the Premises, from which Tenant's fire sprinkler service shall be available.

M.  A central fire alarm system for Tenant's individual interface connection.  Any tenants whose premises are greater than 20,000 square feet of Floor Area must install a dedicated alarm system for those premises or as required by all local jurisdictional authorities.

N.  The installation of metal studs to separate the Premises from adjoining stores and/or Common Areas. Such studs shall extend from the mall finished floor elevation to the underside of the deck above.

O.  For tenants other than food service tenants, ducted outside air duct to the Premises in accordance with Landlord's base building drawings.

P.  Landlord may provide a chilled water connection.

Q.  For tenants other than Food service tenants, ducted toilet exhaust to the Premises in accordance with Landlord's Base Building Drawings.

R.  For certain food service tenants with prior approval from Landlord, a gas service main for the premises, from which tenants service shall be available.

S.  For Premises that cross building expansion joint lines, Tenant is responsible for installation of expansion joint cover.

T.  For purposes of this Lease at Westfield Century City, Landlord's Work shall also include:
  • Electrical: Landlord to provide 200 Amps at 277/480 volts, 3-phase, 4 wire service. Electrical Meter furnished and installed by Landlord
  • Plumbing: Landlord to provide a 1.5" water line separately metered, with a minimum 65 psi water pressure. a 4" sewer stubbed to the Premises with a 3" vent line
  • Sprinklers: Landlord will provide a sprinkler system with upturned heads to local codes. All stand pipes will be located outside of the Premises
  • Life Safety: Firm Alarm J Box is present
  • Telephone/Data: Landlord to provide 1 ¼" conduit with pull cord to MPOE room for Tenant's use.
  • Floor: Landlord to provide a smooth & level concrete floor in broom swept condition
  • Ceiling: Landlord to provide clear open ceiling with no obstructions below 14' and clear access to grease and make-up air shafts

## IV.  LANDLORD'S WORK AT TENANT'S EXPENSE

A.  Tenant Reimbursement Costs.

  1.  Landlord will provide for Tenant's account the following items of equipment, work, or services at Tenant's cost ("Tenant Reimbursements").   The cost for Tenant Reimbursements shall equal to the amount as set forth on the Data Sheet, and such amount shall be due and payable by Tenant to Landlord, as Additional Rent, upon receipt of Landlord's invoice therefor at any time on or after the Commencement Date (but no earlier than sixty (60) days prior to the Estimated Delivery Date).

    a.  Temporary electrical power for Tenant's use during all or part of the construction of the Premises.  Landlord reserves the right to limit both the amount of power consumed and the times such power is available.

    b.  Trash containers for use by Tenant or Tenant's General Contractor during all or part of Tenant's construction of the Premises.

    c.  Temporary toilet facilities for use by Tenant's General Contractor and construction personnel during Tenant's construction of the Premises.

    d.  Based upon the electrical service sizing criteria set forth in the Tenant Design Criteria Package, a main electrical service protection device (circuit breaker or fuse socket) located within the remote electrical service area, from which Tenant's main electrical service will be available.

    e.  Drainage and filling services for the sprinkler system main serving the Premises to facilitate Tenant's construction.

    f.  Programming and testing of the fire alarm devices and sequence of operations.

    g.  Temporary site services (i.e., safety orientation, vertical transportation, site security) to provide Tenant's contractors with adequate site access to perform Tenant Work.

h.  Permit expediting to coordinate plan check services with local jurisdictional authorities.

i.  Landlord and Tenant hereby agree and acknowledge that the City of Los Angeles requires the engagement of a commissioning professional to document and certify that the building systems operate in accordance with governmental agency regulations. To that end, in order to expedite the commissioning certification process and to take advantage of economic efficiencies, Landlord may elect to engage a project wide commissioning professional. If Tenant elects not to use the commissioning professional selected by Landlord, then Tenant shall on or before the date Tenant submits its preliminary plans to Landlord, notify Landlord in writing of such election; in which event Tenant shall be obligated to engage such professional at Tenant's sole cost and expense. In the event Tenant fails to engage such professional or fails to notify Landlord of such election as set forth above, then Tenant hereby agrees that Landlord may engage such professional on Tenant's behalf and at Tenant's cost and expense, which costs shall be subject to charge back to Tenant.

j.  **For restaurant and food use tenants only,** Landlord shall provide, furnish and install point of connection to shared grease interceptor system. Grease interceptors will be installed in accordance with current code standards and local jurisdictional authorities. In certain premises, restricted access to grease interceptor system may require Tenant to install grease trap within the Premises.

2.  In the event Tenant elects for Landlord to provide the following items, then, in addition that that which is set forth in Section IV(A)(1), Tenant will be billed separately said items described below:

a.  For restaurant and food use tenants, if so elected, Landlord shall provide, furnish, and install kitchen exhaust ducts, dishwasher exhaust ducts, make-up air ducts, shafts, and refrigerant lines, outside of the Premises in a location determined by Landlord.

b.  If so elected, Landlord shall provide, furnish, and install main electrical feeder wires.

B.  Tenant Contractor Costs.  In addition to the Tenant Reimbursements set forth above, Landlord may provide for Tenant's account, as Landlord deems necessary or practical, in Landlord's sole opinion, or as may be requested of Landlord by Tenant or Tenant's General Contractor, items of construction, equipment, improvements or services at Tenant's cost. For Tenant's convenience, Landlord shall charge Tenant's General Contractor directly for these various items, either prior to the commencement of Tenant's Work, or at such other time(s) as Landlord may deem appropriate. In the event that Tenant's General Contractor shall refuse to pay Landlord for such items, Landlord shall invoice Tenant directly for reimbursement. Such items may include, but not necessarily be limited to, the following:

1.  Common Area mall tile for use at Tenant's storefront.

2.  For restaurant and food use tenants, Landlord shall provide, furnish and install point of connection to shared grease interceptor system. Grease interceptors will be installed in accordance with current code standards and local jurisdictional authorities. In certain premises, restricted access to grease interceptor system may require Tenant to install grease trap within the Premises.

3.  For restaurant and food use tenants, should Tenant elect for Landlord to provide, furnish and install kitchen exhaust ducts, dishwasher exhaust ducts, make-up air ducts, shafts, refrigerant lines, outside of the Premises in a location determined by Landlord. Tenant will be billed separately for this work.

4.  Temporary construction barricade.

C.  Post Grand Opening Tenant Costs:  For those tenants who do not open with the Grand Opening, Landlord will provide for Tenant's account the following items of equipment or services at Tenant's cost ("Post Grand Opening Costs"). The Post Grand Opening Costs shall be payable by Tenant as Additional Rent and billed by Landlord after the Commencement Date of the Lease.

1.  A branch piped skeletal fire sprinkler system within the Premises in accordance with Landlord's insurance carrier requirements, the requirements of the local fire marshal, all governing building codes and applicable NFPA standards and the Tenant Design Criteria Package. Landlord may install or may have installed sprinkler system components

(including, but not limited to, system valves, branch lines, drops, and heads) in the Premises.

2. Temporary construction barricade in the event Tenant does not construct and install its own temporary construction barricade in accordance with Landlord's criteria, including compliance with Landlord's barricade graphics program.

## V. TENANT'S WORK AT TENANT'S EXPENSE

All of Tenant's Work shall be in compliance with the Standards as defined in Article II(B) above.

A. General Construction Requirements.

1. Tenant shall be responsible to finish and level any concrete floor slab(s) within the Premises, as may be required to accept Tenant's finished floor material and eliminate any tripping hazards. Where floor slab elevations within the Premises are above or below Common Area floor elevations, Tenant shall provide the necessary transitions at storefront areas and rear service door areas to make the floor of the Premises even with any adjoining floor elevation. Restaurant and Food Court Tenants shall furnish and install concrete floor slabs at any slab leave-out locations in accordance with the Base Building Drawings.

2. Installation of a finished floor in all sales areas and all other areas within the Premises visible to the public. As may be required by Landlord, Tenant shall match the Common Area finished floor material from Tenant's storefront lease line to the store's closure line.

3. Installation of a finished ceiling throughout the Premises in accordance with the Tenant Design Criteria Package (or as otherwise approved by Landlord and all jurisdictional authorities).

4. Installation of fire rated partitioning and enclosures throughout the Premises as may be required by Landlord, all governing codes and all jurisdictional authorities.

5. Installation of interior partitioning and completion of demising walls (fire rated gypsum board or other required finish) throughout the Premises, as may be required to complete the Premises.

6. Installation of all construction and finish materials throughout the Premises and on the storefront of the Premises which are not specifically made the responsibility of Landlord. Such material installations shall include, but not be limited to, all wall coverings, floor coverings, ceiling materials and Tenant's storefront construction.

7. For certain tenants located within the "existing" Shopping Center, tenants shall modify and install new neutral pier per Tenant Design Criteria Package.

8. Supply and install Premises storefront facing the interior of the Shopping Center.

9. If applicable, installation of an additional storefront located on the exterior of the Shopping Center building, as set forth in the Tenant Design Criteria Package and Landlord's Base Building Drawings.

10. Trash storage room of adequate capacity and fire rating; or, if such a room is not required, Tenant shall provide a designated area within the Premises which is adequate, in Landlord's judgment, to store Tenant's trash.

11. Installation, where applicable, of a recessed doorway, including door and door-frame construction to provide access from the Premises to a service area or egress corridor to the exterior of the Building.

12. Installation of all interior and exterior doors and associated hardware as may be required to complete the Premises. Such doors and hardware shall comply with all required fire ratings.

13. Installation of all furniture, fixtures, cabinetwork, shelving, personal property, and equipment as may be required to complete the Premises.

14. Tenant shall ensure that all slab and roof penetrations which are a part of Tenant's Work are structurally reinforced, properly sealed and remain watertight to prevent possible damage. Failure to do so shall be at the sole risk and expense of Tenant in the event damage occurs. All such penetrations must conform to the Standards and any other Landlord criteria and shall be subject to Landlord's approval as to location and construction details. Roofing and weatherproofing of any installation or penetration by Tenant must be

performed by Landlord's authorized roofing contractor, and Tenant shall pay all costs therefor directly to such roofing contractor.

15.    Tenant must install a waterproof membrane to waterproof all floor/slab and slab penetrations in all lavatories, kitchens, and similar water prone areas where water is used for food preparation or cleaning. Perimeter walls of such areas must be waterproofed to a point of no less than twelve inches (12") above the slab. In addition, Tenant must slope floor surfaces to an area drain to prevent the passage of water, waste and other liquids out of such areas. All waterproofing must be performed or supervised by Landlord's required waterproofing consultant and Tenant shall pay all costs directly to such waterproofing consultant

16.    Installation of thermal and acoustical insulation within the Premises as required to comply with the following:

   a.    Installation of thermal insulation shall meet with the Standards and requirements of all governing codes and jurisdictional authorities, as may be required to complete the Premises.

   b.    Installation of acoustical insulation, sound dampening material, or roof equipment mounting details shall meet with the Standards and the requirements of all governing codes, specifically including the Tenant Design Criteria Package. At a minimum, Tenant shall install sufficient acoustical insulation to prevent the transmission of any sound or noise in excess of 40 decibels (dB) from the Premises. Tenant agrees that the 40 dB sound level may be verified by Landlord through the use of a portable sound level meter, and, in the event Landlord determines that Tenant is transmitting sound or noise outside the Premises in excess of the 40 dB level, Tenant will immediately resolve this condition in a manner approved by Landlord.

   c.    Those premises located below or immediately adjacent to a theater which is located within the Shopping Center shall be subject to and comply with the noise limits and mitigation guidelines set forth in Exhibit B-1 attached hereto.

17.    Mezzanines will not be permitted within the Premises without Landlord's prior written approval. Where permitted, mezzanines shall be designed and installed to be independent of the building structure and shall comply with the requirements of the Tenant Design Criteria Package and all governing codes.

B.    Signage. Design, fabrication, and installation of Tenant's sign(s) and menu boards (if applicable) shall be subject to the prior approval of Landlord, and where applicable, the prior approval of all jurisdictional authorities, Department Stores, and any other party that Landlord may deem appropriate. Tenant shall submit all required plans, details and specifications to Landlord for Landlord's approval prior to the fabrication and installation of Tenant's sign(s), including menu boards. Tenant's sign(s) and menu boards shall be designed and constructed to comply with the standard tenant sign criteria established by Landlord for the Shopping Center.

C.    Utility Services and Facilities. The installation, connection to the utility facilities provided by Landlord, and completion of utility services for the Premises shall be a part of Tenant's Work. All such work shall be performed in accordance with the Standards and the provisions of the Tenant Design Criteria Package, Landlord's Base Building Drawings and the following:

1.    Tenant's main electrical service shall be of a type and capacity set forth in the Tenant Design Criteria Package and Landlord's Base Building Drawings. If Tenant requires electrical service capacity in excess of that provided by Landlord, all costs of providing such increased service shall be paid by Tenant. Tenant shall:

   a.    Make application, where applicable, for metered electrical service to the Premises from the serving utility authority and comply with all utility authority requirements for such metered service, including the procurement and installation of all required meters, meter bases and current transformers, if applicable.

   b.    Based upon the electrical service sizing criteria set forth in the Tenant Design Criteria Package, provide a main electrical service disconnect switch, located within the Premises.

   c.    As may be required, provide all required conduit and conductor installations to complete Tenant's main electrical service to and within the Premises.

d.    Provide all required electrical system installations within the Premises in accordance with the Tenant Design Criteria Package and the regulations and requirements of all jurisdictional authorities.

2.    Tenant's telephone service will be available from the main terminal board located outside the Premises. Tenant shall provide either an empty main telephone service conduit or exposed telephone service cable, from the applicable telephone service terminal board, from which Tenant's main telephone service will be available, to the Premises. Tenant's telephone service shall be provided by the telephone company providing service to the Shopping Center. Tenant shall apply for telephone service and provide telephone system wiring to and within the Premises as required by the serving telephone company and comply with all their requirements and regulations.

3.    Tenant shall install a fire/smoke detection system within the Premises. Such detection system shall include all required wiring, conduit, devices, equipment and controls, and shall comply with all system requirements set forth by Landlord and all jurisdictional authorities. Where applicable, Tenant shall use a Fire-Life Safety contractor as specified by Landlord for certain portions of Tenant's Work including, without limitation, final programming and connection to Landlord's fire alarm system.

4.    If required, Tenant shall install a smoke evacuation system within the Premises. Such system shall include all required wiring, conduit, devices, equipment and controls, and shall comply with all system requirements set forth by Landlord and all jurisdictional authorities.

5.    Tenant shall make all required plumbing system installations to serve the Premises. Where provided, Tenant shall connect to, and extend from the sanitary sewer and domestic water service mains provided by Landlord for the Premises. All such installations shall comply with the following:

a.    Tenant shall procure and install a water check valve and pressure regulating valve as required.

b.    Tenant shall provide and install toilet facilities within the Premises in accordance with governing codes and Landlord's standard criteria. Where required by code, Tenant shall provide and install at least one (1) toilet room facility for use by Tenant's employees.

c.    Tenant shall install grease and hair traps as required to comply with all governing codes, the requirements of Landlord (including, but not limited to the Standards) and all jurisdictional authorities. Wherever possible, such traps are to be located within the Premises.

6.    Tenants located within the food use areas of the Shopping Center shall be required to install a grease trap/collection system within the Premises. The system may be either above-ground or semi-recessed; provided that in either event access for maintenance of the grease trap/collection system shall be through the Premises only.

7.    Restaurant tenants shall be required to furnish and install a grease interceptor/collection system outside of the Premises in a location determined by Landlord and in a size allowable per the Los Angeles County Public Works Industrial requirements.

8.    Restaurant, food, and salon uses, or any other uses that require substantial domestic water usage, will be required to install a water submeter located within the Premises. Such water submeter shall be located not more than 4'-0" above the finished floor. The water submeter shall gauge water usage in gallons.

9.    Tenant shall install a branch piped fire sprinkler system within the Premises. Tenant shall connect to Landlord's fire sprinkler supply main, or branch, and extend piping for branches, drops, and heads, as required to complete the fire sprinkler system within the Premises in accordance with the requirements of the local fire marshal, all governing building codes, applicable NFPA standards, the Standards, and the Tenant Design Criteria Package and Landlord's Base Building Drawings. Tenant sprinkler system shop drawings and calculations must be submitted for review and approval by all local authorities having jurisdiction prior to installation of the sprinkler system.

10.   Final connection to Landlord's fire sprinkler supply main shall not be made until the entire system within the Premises is completed, pressure tested and ready for service.

11.   Tenant shall provide a heating, ventilating, and air conditioning (HVAC) system to serve the Premises. The location of any equipment outside the Premises shall be approved in

writing by Landlord.  The design and installation of the HVAC system shall be in accordance with the Standards and the provisions of the Tenant Design Criteria Package.

12.    Tenant shall provide, as required, all exhaust air systems to serve the Premises in accordance with the Standards, including the provisions of the Tenant Design Criteria Package and Landlord's Base Building Drawings.

13.    As determined by Landlord, at Landlord's sole discretion, tenants having odor- producing operations must maintain a negative pressure within their Premises and shall install a high velocity forced draft ventilation system discharging to the atmosphere via the roof area. Tenant shall be responsible for proper diffusion of the exhaust in such a manner as to prevent these odors from entering adjacent air intakes. The total exhaust from the Premises must exceed maximum make up air provided for the Premises by an amount exceeding the minimum outside air requirements of the heated/air-conditioned area for the Premises. Tenant shall provide and install all necessary components of said system in a manner acceptable to Landlord, at Tenant's sole cost and expense. Said system shall include, but not be limited to, exhaust hood(s), make up and exhaust ducts, fire dampers and fire rated duct chases/shafts where required (construction as required by code and located in areas approved by Landlord), exhaust and make- up fans, controls and grease drip pans.

14.    Any and all grease producing rooftop equipment shall be designed and installed in accordance with the Landlord's rooftop criteria found as an attachment within the design criteria. Tenants shall be obligated to maintain all grease producing rooftop equipment pursuant to the Landlord's rooftop equipment criteria. Air scrubbers shall be required for all grease producing rooftop equipment. The Landlord may, at its sole discretion, implement a rooftop grease maintenance management program under which restaurant tenants will be obligated to participate at their prorated share of cost.

15.    In the event Tenant desires the use of a natural gas service, such service shall be subject to Landlord's prior approval.  If such service is approved by Landlord, Tenant shall provide all required natural gas piping valves, regulators, and meters from the central manifold and meter area Landlord may provide outside the Premises, from which Tenant's natural gas service will be available, to a location within the Premises.  All pipe routing, earthquake valves and installation details shall be in accordance with all applicable governing codes and subject to Landlord's prior approval.

D.    Tenant's Work shall include the procurement of all necessary permits, licenses, variances and utility services required to facilitate Tenant's construction and occupancy of the Premises, and the payment of any fees, including connection fees, and taxes associated with such permits, licenses, variances and utility services, as may be required by public authorities and serving utility companies. Tenant shall make all necessary applications, provide all necessary information, pay all required monies and take all necessary actions to obtain such items from the applicable jurisdictional authorities and serving utility companies.

E.    Tenant shall not use any materials in connection with Tenant's Work which contain asbestos or other materials or substances that are hazardous or toxic.  In the event that Tenant introduces or allows to be introduced in the Premises any asbestos containing material or other material or substance that is now or may hereafter be defined as hazardous or toxic or is otherwise regulated as a material or substance posing a potential health threat to persons, then prior to the expiration or earlier termination of this Lease or as required by applicable federal, state or local laws, rules or regulations, Tenant shall, at Tenant's sole cost and expense, remove any such materials or substances in accordance with all applicable federal, state or local laws, rules or regulations and in the manner that Landlord may direct which may include the use of contractors and/or consultants specified by Landlord.

F.    Tenant may be required to provide additional items of work or services as a part of Tenant's Work. If applicable, any such work or services shall be provided in accordance with the Standards or the provisions of the Tenant Design Criteria Package.

VI.    PLANS

A.    Landlord shall furnish to Tenant or, at Tenant's direction, to Tenant's agent, certain design and construction information pertinent to the Premises, including, but not limited to, one (1) copy of the Tenant Design Criteria Package, one (1) electronic copy of Landlord's Base Building Drawings, and one (1) lease outline drawing (Exhibit A-2).

B.    Within fifteen (15) calendar days after the date of this Lease, or such other date as may be required for Tenant to achieve its Rental Commencement Date, Tenant shall, at Tenant's sole cost and expense:

1.      Engage the services of a licensed architect and licensed mechanical, electrical and sprinkler system engineers ("Tenant's Architect and Engineers"), for the purpose of preparing Plans and Specifications for Tenant's Work.

2.      Notify Landlord of the identity and contact information for Tenant's Architect and Engineers.

C.      Tenant agrees that Tenant's Architect and Engineers may act as Tenant's agents for all Tenant design and plan development purposes and obligations of this Exhibit B. Tenant shall pay all fees of its Architect and Engineers. In addition, Tenant shall pay to Landlord upon receipt of a statement therefor for Plan Coordination and Administrative Services a fee based on the Floor Area of the Premises at the rate set forth on the Data Sheet.

D.      At a date as may be required by Landlord for Tenant to achieve its Rental Commencement Date, Tenant shall, at Tenant's sole cost and expense, cause Tenant's Architect and Engineers to coordinate, prepare and deliver to Landlord for Landlord's approval, preliminary design drawings, final plans and sign shop drawings (collectively, "Tenant's Plans"). The plan submission process and requirements can be referenced in the Tenant Design Criteria Package. Tenant's submittal shall include, but not be limited to, the following:

1.      One (1) sample board of Tenant's final storefront and interior materials and colors;

2.      One (1) digital rendering of Tenant's final storefront design; and

3.      One (1) complete set of PDF formatted computer files printed at full size of drawings for Tenant's Work, containing all applicable architectural, details and specifications, in accordance with the Tenant Design Criteria Package and instructions by Landlord.

E.      Tenant covenants and agrees that the concepts drawings have been prepared in strict accordance with Tenant's Construction Requirements. Landlord shall promptly review the concept drawings and notify Tenant's Architect of the matters, if any, in which the preliminary drawings fail to meet with Landlord's approval. Within ten (10) calendar days after receipt of any such notice from Landlord, Tenant or Tenant's Architect shall cause the concept drawings to be revised in such manner as is required to obtain Landlord's approval and shall submit the revised concept drawings for Landlord's approval. Upon Landlord's approval of the preliminary drawings. Landlord shall cause one (1) set to be electronically stamped on Landlord's behalf, thereby evidencing Landlord's approval. Landlord shall return such set to Tenant or Tenant's Architect. The preliminary drawings bearing Landlord's approval shall become and are hereinafter referred to as the "Concept Plans".

F.      Within fifteen (15) calendar days after the date of Landlord's approval of the Concept Plans, or such other date as may be required for Tenant to achieve its Rental Commencement Date, Tenant shall, at Tenant's sole cost and expense, cause Tenant's Architect and Engineers to coordinate, prepare and deliver to Landlord, in one package, one (1) complete set of all applicable final architectural, structural, electrical, mechanical (HVAC and plumbing), and sprinkler system working drawings and specifications "Tenant's Final Drawings").

G.      Tenant covenants and agrees that Tenant's Final Drawings have been prepared in conformity to the Preliminary Plans and in strict accordance with Tenant's Construction Requirements as defined in II(A) of this Exhibit. Landlord shall promptly review Tenant's Final Drawings and notify Tenant's Architect of the any matters that fail to conform. Within ten (10) calendar days after receipt of any such notice from Landlord, Tenant or Tenant's Architect shall cause Tenant's Final Drawings to be revised in such manner as is required to obtain Landlord's approval and shall submit one (1) set of PDF formatted computer files, or other Landlord approved electronically formatted drawing files of the revised set of Tenant's Final Drawings for Landlord's approval. Upon Landlord's determination that Tenant's Final Drawings conform to the Concept Plans and Tenant's Construction Requirements, Landlord shall cause one (1) set of Tenant's Final Drawings, or the revised set of Tenant's Final Drawings, as the case may be, to be electronically stamped on Landlord's behalf, thereby evidencing Landlord's approval thereof. Landlord shall return such set to Tenant or Tenant's Architect. Tenant's Final Drawings bearing Landlord's final approval shall become and are hereinafter referred to as the "Final Working Drawings". Tenant shall commence Tenant's Work promptly after Landlord's approval of the Final Working Drawings, but not prior to the date that the Premises are in the condition for delivery by Landlord.

H.      Tenant's Final Working Drawings must be designed to accommodate and provide access to any ducts, pipes, or conduits installed within the Premises to serve the Shopping Center or any part thereof, including, but not limited to, the premises of any other tenant. If there is a conflict and relocation of any mechanical or electrical component is necessary, Tenant must submit to Landlord for approval all plans, details and specifications required by Landlord for such relocation. If approved, the complete relocation shall be performed as directed by Landlord, and at Tenant's sole cost and expense.

I.      After Landlord's approval of the Final Working Drawings, no changes shall be made to the Final Working Drawings except with the prior written approval of Landlord. However, in the course of construction Landlord may make such changes in, on or about the Building or the Premises as may be required as a result of "as built" conditions. During all phases of plan development and prior to bidding plans or commencing construction, Tenant or Tenant's Architect and Engineers shall make a physical on-site inspection of the Premises to verify the "as built" location, conditions and physical dimensions of the Premises and conformance of the Final Working Drawings. Failure to do so shall be at the sole risk and expense of Tenant. Landlord's review and approval of Tenant's Plans, Final Working Drawings and specifications is for compliance with Landlord's criteria only, and this approval does not relieve Tenant of responsibility for compliance with the Lease, field verification of dimensions and existing conditions, discrepancies between Final Working Drawings and "as built" conditions of the Premises, coordination with other trades, job conditions and compliance with all governing codes and regulations applicable to Tenant's Work. No responsibility for proper engineering, safety, design of facilities or compliance with all applicable governing codes and regulations is implied or inferred on the part of Landlord by any such approval.

## VII.   MILESTONES

A.     The "Milestones" refer to the following requirements:

        1.     Tenant shall submit Tenant's Concept Design to Landlord on or before the date set forth on the Data Sheet ("Tenant's Concept Design Submission Date");

        2.     Tenant shall submit Tenant's Final Plans to Landlord on or before the date set forth on the Data Sheet ("Tenant's Final Plans Submission Date");

        3.     Tenant shall apply for the building permit necessary to perform Tenant's Work on or before the date set forth on the Data Sheet ("Tenant's Building Permit Submission Date") Tenant shall respond to City issued corrections within 10 business days;

        4.     Tenant shall hire its general contractor on or before the date set forth on the Data Sheet ("Tenant's GC Hire Date"); and

        5.     Tenant shall commence construction of Tenant's Work on or before the date set forth on the Data Sheet ("Commencement of Tenant's Work Date").

     Notwithstanding the foregoing, Landlord may, upon no less than thirty (30) days prior written notice to Tenant, extend any of the above stated Milestone dates to a later date.

B.     Tenant agrees and acknowledges that Tenant is obligated to initially open for business on the Rental Commencement Date and in order to do so must comply with the Milestones.

C.     Intentionally deleted.

## VIII.  GENERAL BUILDING SPECIFICATIONS

A.     Tenant shall engage the services of a licensed general contractor ("Tenant's General Contractor") for the purpose of constructing the Premises and performing related services as required to complete Tenant's Work. Tenant's General Contractor shall at all times be subject to Landlord's approval. Tenant's General Contractor shall be bonded and insured as required under the provisions of this Lease. By this reference, Tenant agrees not to act as its own general contractor and further agrees that Tenant's General Contractor can act as Tenant's agent for all Tenant construction purposes and obligations of this Exhibit B.

B.     Each contractor and subcontractor participating in the construction of Tenant's Work shall be duly licensed in the state where the Premises is located, and each contract and subcontract shall contain the guaranty of the contractor or subcontractor that the portion of Tenant's Work covered thereby will be free from any and all defects in workmanship and materials for the period of time which customarily applies in good contracting practices, but in no event less than one (1) year after the completion of Tenant's Work. The aforesaid guaranty shall include the obligations to repair or replace in a first-class and workmanlike manner, and without any additional charge, any and all of Tenant's Work done or furnished by said contractor or subcontractor, or by any of his subcontractors, employees or agents, which shall be or become defective because of faulty materials or workmanship within the period covered by such guaranty (and of which notice is given to such contractor or subcontractor within such period); and the correction, as aforesaid, of any such matter shall include, without any additional charge therefor, all expenses and damages in connection with the removal, replacement or repair in a first-class manner of any other part of Tenant's Work which may be damaged or disturbed thereby. All warranties or guarantees as to materials or workmanship on or with respect to Tenant's Work shall be written so that they shall inure to the benefit of Landlord and Tenant as their respective interests may appear and can be directly enforced by either, and Tenant shall give to Landlord any assignments or other assurance necessary to effectuate the same.

C.  Tenant shall submit to Landlord at least five (5) days prior to the commencement of construction the following information:

    1.  The name and address of the General Contractor Tenant intends to engage for the construction of the Premises, including names and telephone numbers of on-site and off-site representatives;

    2.  The names and addresses of Tenant's mechanical, electrical and plumbing subcontractors, including names and telephone numbers of on-site and off-site representatives;

    3.  A schedule setting forth key dates relating to Tenant's Work;

    4.  Copies of insurance certificates required by Article IX below; and

    5.  Intentionally deleted.

D.  The following provisions with respect to construction procedures and materials shall apply to Tenant's Work:

    1.  Tenant and Tenant's General Contractor participating in Tenant's Work shall comply with the following:

        a.  At all times during construction, Tenant's General Contractor shall have available on-site one (1) full set of Final Working Drawings, endorsed with Landlord's approval, the approval stamp and permit number of the local municipality's building department, local fire marshal or other governmental entity having jurisdiction over Tenant's Work or other evidence that the Tenant has received building department approval.

        b.  Provide a full-time supervisor or representative, representing either Tenant's General Contractor or Tenant, who will be present in the Premises at all times when work is being performed in the Premises.

        c.  Make appropriate arrangements, as directed by Landlord, for temporary utility connections, if available within the Shopping Center. Landlord does not represent that any temporary utility services will be available for Tenant's use. Tenant must verify the availability of such services with Landlord prior to the commencement of Tenant's Work. If temporary services are not available, Tenant must install permanent utility services for the Premises immediately upon the commencement of Tenant's Work. If temporary services are available, Tenant shall pay the cost of all connections, proper maintenance, use and the removal of such temporary services. Tenant shall pay all utility charges incurred by Tenant's General Contractor and any subcontractor.

        d.  Store all building materials, tools and equipment within the Premises or such other locations as may be specifically designated by Landlord's tenant construction coordinator. In no event shall any material be stored in the Common Areas or service corridors.

        e.  During Tenant's construction of the Premises, Tenant shall remove any and all trash, debris and rubbish on a daily basis as directed by Landlord. Upon completion of Tenant's Work, Tenant shall remove all temporary structures, surplus materials, debris and rubbish of whatever kind remaining in the Premises, the Building or the Shopping Center. No debris shall be deposited in the Common Areas or service corridors except as directed by Landlord.

        f.  Properly protect Tenant's Work and secure all parts of Tenant's Work against accident, storm and any other hazard. Tenant's Work must be performed entirely within the Premises.

        g.  Tenant or Tenant's General Contractor is responsible for initiating, maintaining, supervising, and enforcing all safety precautions and programs as required by applicable federal, state and local laws, codes and regulations in connection with the performance of Tenant's Work as set forth in the Contractor Safety Rules provided by Landlord to Tenant's General Contractor. Tenant's General Contractor is solely responsible for the on-site safety of its employees and subcontractors performing work for the benefit of Tenant and the Shopping Center, as well as the safety of the general public and other contractor employees impacted by Tenant's Work.

2.    Tenant and Tenant's General Contractor shall comply with the following:

    a.    Tenant's Work shall be coordinated with all work being performed or to be performed by Landlord and other occupants of the Shopping Center so that Tenant's Work will not interfere with or delay the completion of any other work. No contractor or subcontractors participating in Tenant's Work shall at any time damage, injure, interfere with or delay the completion of Landlord's Work or any other construction within the Shopping Center, and each of them shall comply with all procedures and regulations prescribed by Landlord for the integration of Tenant's Work with the work to be performed in connection with Landlord's Work and all other construction within the Shopping Center.

    b.    Recognizing that Landlord shall be employing such contractors, Tenant agrees to engage the services of contractors whose employees employed at the job site are members of, or represented by, organizations for the purpose of collective bargaining, to the end that there shall be no labor dispute which would interfere with the operation, construction and completion of the Shopping Center or any other work, and Tenant further agrees to enforce the same condition upon all contractors engaged by Tenant with respect to their subcontractors which may be engaged by any such contractors.

    c.    Tenant will comply with the instructions of Landlord or Landlord's General Contractor for the purpose of avoiding, ending and/or minimizing labor disputes, including the removal of any subcontractor causing or involved in such dispute. Upon notice from Landlord or Landlord's General Contractor, Tenant will take such action, including the prosecution of legal proceedings in court or with agencies such as the National Labor Relations Board, as Landlord or Landlord's General Contractor shall deem appropriate.

    d.    **For all California centers located in Los Angeles, Orange, Riverside and San Diego counties:** If the Shopping Center is undergoing a development, any carpenters utilized by Tenant must be Union Carpenters. "Union Carpenters" means union contractors that perform work that includes stud framing, drywall, door and hardware installation, acoustical ceilings, batt insulation, etc. (millwork is not included in this definition); this includes work in all areas of the Shopping Center including those in the operating portion. If the Shopping Center is not undergoing a development, Tenant is encouraged but not required to use Union Carpenters. The term "development" as used herein includes expansions, remodels, construction of ancillary buildings and renovations of the existing Shopping Center.

E.    Intentionally deleted

F.    During construction Tenant's General Contractor shall be required to comply with the following:

    1.    The work of Tenant's General Contractor and subcontractors shall be subject to inspection by Landlord and its supervisory personnel. Any defects and/or deviations from Tenant's Final Working Drawings shall be rectified by Tenant's General Contractor and/or subcontractors at no expense to Landlord.

    2.    Unless otherwise approved by Landlord, Tenant shall cause its General Contractor and/or subcontractors to limit their access to the Premises via the rear entrances and no access will be allowed from or to the Shopping Center Common Areas unless no rear access is available.

    3.    Tenant shall protect all of Landlord's Work that may be affected by Tenant's Work. Repair of damage caused to Landlord's Work by Tenant's General Contractor or subcontractors shall be at Tenant's expense. Landlord will carry out necessary repairs without notice and Tenant shall pay for the cost of such repairs upon demand.

    4.    Tenant's General Contractor will be required to abide by and comply with all construction rules and regulations of the Shopping Center, copies of which will be obtained by Tenant or Tenant's General Contractor prior to the commencement of Tenant's Work, and to make certain deposits with and/or payments in amount(s) set forth in the Data Sheet to Landlord in accordance with such requirements. Notwithstanding such requirements, Tenant shall indemnify and protect Landlord with respect to any breach of such construction rules and regulations by Tenant's General Contractor or the failure of Tenant's General Contractor to make any required deposits or payments in amount(s) set forth in the Data Sheet.

G.    Landlord shall have the right to perform, on behalf of and for the account of Tenant, which shall be subject to reimbursement of the cost thereof by Tenant, any and all of Tenant's Work which

Landlord determines in its reasonable discretion should be performed immediately and on an emergency basis for the best interest of the project, including without limitation, work which pertains to structural components, mechanical, sprinkler and general utility systems, roofing and removal of unduly accumulated construction material and debris. The cost of such Tenant's Work carried out by Landlord on behalf of Tenant shall be the cost paid by Landlord and based on the cost of similar work and to include any loading for overtime or any other loading as a result of carrying out emergency work.

Whenever Landlord shall have elected to perform any or all of Tenant's Work, whether pursuant to this Paragraph G or any other provision of the Lease, Landlord may revoke such election by written notice to Tenant. In such event, full responsibility for such work shall revert to Tenant. Except for an emergency, Landlord shall not perform any work on behalf of or for the account of Tenant until Landlord has notified Tenant of the need for such work and Tenant fails to perform such work within three (3) days.

IX.    COMPLETION OF CONSTRUCTION

A.    Tenant shall not be permitted to, and shall not, open for business in the Premises until the "Opening Requirements" set forth below are met. In order that Landlord shall have assurance that the Premises shall be in a good and safe condition, in compliance with all laws, that adequate insurance has been obtained, that the Premises has been constructed in accordance with the Final Working Drawings and that Tenant's obligations under the Lease have been performed, the following requirements (the "Opening Requirements") shall be satisfied:

1.    Prior to the opening of the Premises for business, Tenant shall deliver to Landlord (a) insurance certificates evidencing Tenant's compliance with Article XI of the Lease; (b) copies of local business licenses and any other licenses required to operate in the Premises; (c) a certificate of occupancy or its equivalent; and (d) all evidence typically required in the jurisdiction where the Shopping Center is located to provide evidence of compliance with all applicable building and fire codes and all other government requirements;

2.    Landlord shall have inspected the Premises to determine whether Tenant's Work is complete in accordance with the requirements of the Lease and Landlord shall have approved all such work. After Landlord's inspection of Tenant's Work in the Premises, Landlord shall issue a punch list indicating those items not in compliance with the Standards. Within twenty (20) business days of receipt of said punch list, Tenant or Tenant's General Contractor shall perform such work;

3.    Tenant or Tenant's General Contractor shall have paid Landlord all outstanding amounts for work completed by Landlord on behalf of Tenant (and invoiced to Tenant) to include, but not be limited to, the work and services itemized in this Exhibit B; and

4.    Tenant shall pay Landlord all Minimum Annual Rental and Additional Rent which has then accrued under the Lease.

No approval by Landlord shall make Landlord responsible for the condition of the Premises or constitute a representation by Landlord of compliance with any applicable requirements or constitute a waiver of any rights and remedies that Landlord may have under this Lease or at law or in equity. On the date Tenant opens for business in the Premises, Tenant shall be deemed to have accepted the Premises and agrees that it is in the condition, with respect to any of Landlord's obligations, which is required under this Lease. The Opening Requirements shall apply not only to Tenant's initial construction, but to any subsequent opening after any temporary closure, casualty, damage or permitted alterations.

B.    Within fifteen (15) business days after completion of Tenant's Work, Tenant shall deliver to Landlord the following:

1.    Tenant's final notarized original affidavit that Tenant's Work has been completed to Tenant's satisfaction and in strict accordance with the Final Working Drawings and Tenant's Construction Requirements, which affidavit may be relied on by Landlord. Any deliberate or negligent misstatement, or any intentionally false statement made by Tenant therein, shall constitute a breach of this Lease.

2.    The final notarized original affidavit of Tenant's General Contractor performing Tenant's Work stating that Tenant's Work has been completed in accordance with the Final Working Drawings and that all subcontractors, laborers and material suppliers engaged in furnishing materials or rendering services for Tenant's Work have been paid in full.

3.    A final notarized original, unconditional waiver of lien with respect to the Premises executed by Tenant's General Contractor and, if requested by Landlord, final notarized original, unconditional waiver of liens executed by each subcontractor, laborer and material supplier engaged in or supplying materials or services for Tenant's Work. All waiver of lien documents must, in every circumstance, be totally unconditional releases.

C.    After Landlord's inspection of Tenant's Work in the Premises, Landlord shall issue a punch list indicating those items not in compliance with the Standards. Within fifteen (15) business days of receipt of said punch list, Tenant or Tenant's General Contractor shall perform such work and notify Landlord of its completion.

X.    INSURANCE

A.    Prior to performing any Tenant's Work, Tenant shall procure and maintain, or shall cause Tenant's General Contractor to procure and maintain, during all periods of construction and fixturing work within the Premises, all of the insurance policies required in the amounts and/or limits as set forth below (hereinafter referred to as "Required Insurance"). Tenant or Tenant's General Contractor shall not be permitted to commence any work until all Required Insurance has been obtained and certificates evidencing such insurance have been delivered to Landlord. In the event Tenant's construction and fixturing work within the Premises is identified as "cosmetic" or "partial" in nature, then after the Commencement Date, Tenant may make a written request of Landlord to lower the below-referenced limits of the Required Insurance, and Landlord may reduce the Required Insurance limits, which reduction shall be based upon Landlord criteria and determined in Landlord's sole discretion.

B.    Tenant's General Contractor's and Subcontractor's Required Minimum Coverages and Limits to Liability.

1.    Worker's Compensation, as required by State law, and including Employer's Liability Insurance with a limit of not less than amounts set forth on the Data Sheet per each accident, per each employee by disease, with a policy aggregate by disease in the amount set forth on the Data Sheet; and any insurance required by any Employee Benefit Acts or other statutes applicable where the work is to be performed as will protect Tenant's General Contractor and subcontractors from any and all liability under the aforementioned acts.

2.    Commercial General Liability Insurance (including Contractor's Protective Liability) in which the limits shall be not less than the amount set forth on the Data Sheet per occurrence combined single limit, bodily injury and property damage. Such insurance will provide for explosion, collapse and underground coverage. Such insurance shall insure Tenant's General Contractor against any and all claims for bodily injury, including death resulting therefrom and damage to or destruction of property of any kind whatsoever and to whomever belonging and arising from its operations under the contract whether such operations are performed by Tenant's General Contractor, subcontractors, or any of their subcontractors, or by anyone directly or indirectly employed by any of them.

3.    Comprehensive Automobile Liability Insurance, including the ownership, maintenance and operation of any automotive equipment, owned, hired and non-owned, in the minimum amount set forth on the Data Sheet combined single limit, bodily injury and property damage. Such insurance shall insure Tenant's General Contractor and all subcontractors against any and all claims for bodily injury, including death resulting therefrom and damage to the property of others caused by accident and arising from its operations under the Contract and whether such operations are performed by the General Contractor, subcontractors or by anyone directly or indirectly employed by any of them.

C.    Tenant's Protective Liability Insurance - Tenant shall provide Owner's Protective Liability Insurance insuring Tenant against any and all liability to third parties for damages because of bodily injury (or death resulting therefrom) and property damage liability of others or a combination thereof which may arise from work in connection with the Premises, and any other liability for damages which Tenant's General Contractor and/or subcontractors are required to insure against under any provisions herein. Said insurance shall provide policy limits which shall provide, at a minimum, coverage of the amount set forth on the Data Sheet combined single limit, bodily injury and property damage.

D.    Tenant's Builder's Risk Insurance - Completed Value Builders' Risk Material Damage Insurance policy covering the work to be performed for Tenant in the Premises as it relates to the building within which the Premises is located. The policy shall include as insureds Tenant, its General Contractor, all subcontractors and Landlord, as their interests may appear. The amount of insurance to be provided shall be at the percentage set forth on the Data Sheet of the replacement cost.

E.    All such insurance policies required under this Exhibit, except as noted above, shall include Landlord, its Architect, its Consultant, its General Contractor, subcontractors, and parties set forth

in the Lease and any other parties designated by Landlord from time to time as additional insured entities, except the Worker's Compensation Insurance; further provided, said Worker's Compensation Insurance shall contain an endorsement waiving all rights of subrogation against Landlord, its Architect, its Consultant, its General Contractor and subcontractors.

F.   Certificates of insurance shall provide that no reduction in the amounts or limits of liability or cancellation of such insurance coverage shall be undertaken without thirty (30) days prior written notice to Landlord.

G.   The insurance required under this Exhibit shall be in addition to the insurance required to be procured by Tenant pursuant to the Lease.

-END-

**EXHIBIT B-1**

**BACKGROUND MUSIC NOISE MITIGATION REQUIREMENTS FOR TENANTS LOCATED BELOW and / or ADJACENT TO THEATERS**

| Qualitative Description of Background Noise | Maximum r.m.s. Sound Pressure Level * | | | Noise Mitigation Guidelines ** |
|---|---|---|---|---|
| | dBA | In any Octave Band 31 - 250Hz dB re: 20 μ Pa+ | In any Octave Band 500-8000 Hz dB re: 20 μ Pa+ | |
| "Soft to "Medium" | <70 dBA | < 80 | < 70 | None |
| "Loud" | 70 – 85 dBA | < 85 | < 85 | Suspended loudspeakers must be vibrations isolated using one inch (1") deflection spring hangers. |
| "Very Loud" | > 85 dBA | > 85, but not exceeding 95⁰ | >85, but not exceeding 95⁰ | Acoustical analysis is required by an independent acoustical consultant. Acoustical analysis will document: noise levels, floor ceiling assembly, location of speakers, details of floor ceiling penetration, etc. Construction requirements may include: single/multi level vibration isolated drywall ceiling with <12" gap between ceiling and slab above; batt insulation in the cavity; vibration isolation of speakers; sound attenuates within ductwork penetrating floor ceiling construction; etc. |

\*    Measured during the hours of simultaneous operation of Tenant and the theater above.

\+    Octave band sound pressure levels dB re  20 μ PA

⁰    Sound levels generated in Food Court, Common Areas or tenant areas shall not be permitted to exceed 95 dB (octave band sound pressure level, dB re: 20 μ Pa) at any time.

\*\*    Provided for guidance only. Tenant is required to meet the above requirements irrespective of the mitigation guidelines presented.

**EXHIBIT B-2**

**REIMBURSEMENT FOR COST OF CONSTRUCTION**

This Exhibit B-2 is hereby made part of the lease (the "Lease") between Landlord and Tenant.

In the event a conflict arises between the provisions of this Exhibit B-2 and any other part of this Lease, this Exhibit B-2 shall modify and supersede such other part of the Lease to the extent necessary to eliminate any such conflict but no further. All terms which are defined in the Lease shall have the same meaning when used herein.

**Section 1.**     **CONSTRUCTION REIMBURSEMENT AND PAYMENT.**

Subject to the provisions of this Exhibit B-2, and provided Tenant is not in default under this Lease beyond any applicable notice and cure period, Landlord shall reimburse to Tenant a total amount (hereinafter called the "Allowance") equal to the amount set forth on the Data Sheet. The Allowance shall be due only once during the original Term of this Lease, including any extensions thereof. The Allowance progress payments shall be payable as set forth in the Data Sheet. In addition to the foregoing, Tenant's final payment shall not be made until receipt of Tenant's written application for such payment and the satisfaction of all of the following conditions:

(a)     Completion of the improvements in or to the Premises required by the Lease to be made by Tenant;

(b)     Acquisition by Tenant of a Certificate of Occupancy for the Premises properly issued by the governmental body having jurisdiction there over (or other equivalent authority to open);

(c)     The opening by Tenant of Tenant's business in the Premises;

(d)     The lien period for the work performed by Tenant shall have expired and no liens in connection with the same shall have been filed, or if said lien period shall not have expired, Tenant has furnished Landlord with unconditional waivers of lien and sworn statements from Tenant's general contractor and any subcontractor or any person performing labor and/or supplying materials in excess of $5,000.00 in connection with such work showing that all of said persons have been paid in full;

(e)     Full payment by Tenant of all sums due Landlord for items of work performed by Landlord on behalf of Tenant as outlined in Exhibit B;

(f)     Submission by Tenant to Landlord of a breakdown of Tenant's final and total construction costs, along with all supporting invoices, agreements and related documents covering the amount of the Allowance and a summary of the names of all subcontractors and persons providing labor and/or materials in excess of $5,000.00 for Tenant's Work; and

(g)     Receipt by Landlord of Internal Revenue Service Form W-9, Request For Taxpayer Identification Number and Certification.

**Section 2.**     **APPLICATION FOR PAYMENT.**

(a)     Application for payment along with required supporting documentation should be submitted electronically at http://www.westfieldtenantcoordination.com/tenantallowance. Instructions for use and additional information can also be accessed using this website address. When prompted for a security code, use WestfieldTA.

(b)     If Tenant has not made application for the Allowance or satisfied all conditions to Landlord's obligation to pay the Allowance within two (2) years after the Rental Commencement Date of this Lease, then Landlord's obligation to pay the Allowance shall automatically terminate without any notice required by Landlord. The rights given Landlord in this paragraph shall be in addition to all other rights and remedies under the Lease, at law or in equity arising from Tenant's failure to open for business in the Premises.

(c)     For any progress payment provided hereunder, Tenant shall have furnished Landlord with the applicable conditional lien waivers for the then current progress payment and unconditional lien waivers for the immediately preceding progress payment from Tenant's general contractor and any subcontractor or any person performing labor and/or supplying materials in connection with such work showing that all such persons have been paid to date for all work performed to such date. In addition, Tenant must provide

Landlord with Internal Revenue Service Form W-9, Request For Taxpayer Identification Number and Certification, before any payment of the Allowance can be made.

**Section 3.**    **RIGHT OF DEDUCTION.**

Any improvement or work done or authorized by Tenant or performed to Tenant's account, the cost of which remains unpaid at the time the Allowance is otherwise payable, and any accrued recurrent Rental which remains unpaid at the time the Allowance is payable, will be deducted from any Allowance payment by Landlord to Tenant, and Landlord may hold the same as security against any liens arising therefrom if Tenant has not posted a bond or other security, or Landlord may pay such unpaid cost for and on behalf of Tenant.

**Section 4.**    **LATE OPENING.**

Intentionally deleted.

**Section 5.**    **MISCELLANEOUS.**

Notwithstanding anything to the contrary contained herein, Tenant acknowledges that unless this Lease qualifies as a "short-term lease" within the meaning of the Internal Revenue Code of 1986 as amended, any payments made by Landlord to Tenant and designated as an Allowance hereunder shall be treated in accordance with the requirements of the Internal Revenue Code of 1986 (as amended). Subject to the foregoing, Tenant represents to Landlord that the Allowance will be expended by Tenant for purposes of constructing or improving long term real property. Based upon the foregoing representation, Landlord and Tenant agree that the monies to be paid by Landlord to Tenant pursuant to this Section are being paid to Tenant as reimbursement for amounts expended for the purpose of Tenant's constructing or improving qualified long-term real property as defined in Section 110(c)(1) of the Internal Revenue Code of 1986, as amended, for use in such Tenant's trade or business at the Premises, which Premises Landlord and Tenant acknowledge constitutes retail space. It is the intent of Landlord and Tenant that Landlord and Tenant shall consider any such payment as made in accordance with this Section 110 of the Internal Revenue Code of 1986, as amended, and Landlord and Tenant shall provide the Internal Revenue Service any and all information concerning such payments as may be required by the Internal Revenue Service. If, but only to the extent that, Tenant's foregoing representation is not correct, then Landlord and Tenant agree that the monies to be paid by Landlord to Tenant pursuant to this Section are not being paid to Tenant as reimbursement for amounts expended for the purpose of constructing or improving long-term real property as defined in Section 110(c)(1) of the Internal Revenue Code of 1986, as amended, for use in Tenant's trade or business at the Premises and Tenant agrees to promptly provide Landlord written notice setting forth the portion of the Allowance not so expended.

-EDN-

# EXHIBIT C

## ADDITIONAL INSURED ENTITIES

## WESTFIELD CENTURY CITY

Century City Mall, LLC, Westfield America, Inc., Westfield America Limited Partnership, Westfield Property Management LLC, and any and all of their respective parents, partners, subsidiaries and affiliates, assigns, employees, agents, officers and representatives, together with any mortgagee from time to time of the Landlord's interest, are named as additional insured, as their interests may appear.

C-1

### EXHIBIT D

### WESTFIELD CENTURY CITY

### CHILLED WATER SERVICE CHARGE

This Exhibit D is hereby attached to and made a part of the Lease between Landlord and Tenant.

I.    Chilled Water Service.

Landlord and Tenant acknowledge that the Premises are served by a central chilled water system that provides certain elements of the air conditioning service to the Premises ("Chilled Water Service") which shall be determined and subject to adjustment, if applicable, as provided herein this Exhibit D and subject to the terms of the Lease. Tenant shall pay Landlord for such Chilled Water Service (the "Chilled Water Service Charge").

II.    Chilled Water Service Charge.

A.    The initial basic charge of the Chilled Water Service Charge will be an annual amount as set forth on the Data Sheet ($0.65 per ton per hour), payable in equal monthly installments as Additional Rent on the same day that Minimum Annual Rental is due hereunder, which amount shall be subject to adjustment as provided in Section III of this Exhibit D.

B.    All Chilled Water Service consumed by Tenant shall be separately metered by a submeter installed by Tenant, at Tenant's sole cost and expense, and thereafter said submeter shall be maintained in good working order and condition by Tenant at Tenant's sole cost and expense. Landlord reserves the right to calibrate such meter at Tenant's expense to assure accuracy of such meter(s). Landlord shall cause the Chilled Water Service submeter to be read from time to time and shall bill Tenant (but not more often than monthly) for Tenant's consumption of Chilled Water Service used at the Premises based on the reading of the Chilled Water Service submeter and Landlord's standard rates for Chilled Water Service

C.    No systems installed by Tenant for heating, air conditioning or electrical distribution shall adversely affect any common mechanical systems serving the Shopping Center or any mechanical systems installed by other tenants in the Shopping Center.

III.    Adjustments.

A.    The Chilled Water Service Charge shall be adjusted annually commencing on the January 1st immediately succeeding the Rental Commencement Date and every January 1st thereafter by the annual percentage increase of the "Index" (as defined herein) to the respective January or the closest subsequent month thereto that the Index is published; provided, however, in no event shall Tenant pay less for any year than the Chilled Water Service Charge for the preceding year.

B.    The term "Index" shall mean the Consumer Price Index For All Urban Consumers (1982-84=100), U.S. City Average, All Items, published by the Bureau of Labor Statistics of the U.S. Department of Labor. In the event such Index is not published by the Bureau of Labor Statistics or another governmental agency at any time during the Term, the most closely comparable statistics on the purchasing power of the consumer dollar as published by a responsible financial authority and as selected by Landlord shall be used for making any computation under this Lease otherwise to be made on the basis of the Index.

IV.    Charge for Additional Hours.

If Tenant desires to receive Chilled Water Service before or after the hours during which such service is normally furnished, such service will be furnished at Tenant's expense at a charge to be determined by Landlord.

V.    Tenant Requirement.

It is understood and agreed that the air handling unit and related equipment installed inside the Premises are not part of the Chilled Water Service and shall be installed, serviced and maintained

by Tenant at its sole cost and expense. The Tenant side of the system shall be designed within the parameters of the Tenant Criteria Manual.

VI.    <u>Revised Rate Schedule</u>.

In addition to the adjustments provided above, the Chilled Water Service Charge may be increased from time to time by the issuance by Landlord to reflect any increased cost due to a conversion to a substitute source of energy.

[END]

**EXHIBIT "E"**

**DIGITAL MEDIA PROGRAM**

Support for Digital and Technological Initiatives.  Tenant agrees that it shall comply with the requirements of Landlord in order to support the digital and other technological initiatives of Landlord designed to increase consumer visits and sales and otherwise enhance the overall consumer experience (the "Digital Media Program").  Tenant's obligation to comply with any such requirement shall only apply to the extent such requirement (i) does not violate or conflict with Tenant's non-disclosure or other privacy agreements existing as of the date of the Lease and (ii) will not require Tenant to make any material modifications to its existing technology solely to comply with Landlord's Digital Media Program.  Tenant shall reasonably cooperate with Landlord in connection with the implementation of Landlord's Digital Media Program and shall use commercially reasonable efforts to cause Tenant's future systems to have capability for and be compatible with Landlord's Digital Media Program.  Tenant shall provide Landlord with a copy of any non-disclosure or other privacy agreements existing as of the date of the Lease that do not comply with Landlord's Digital Media Program and agrees that Tenant's non-disclosure or other privacy agreements to be implemented after the date of this Lease shall comply with Landlord's Digital Media Program.

1.  Product:  Tenant agrees to provide Landlord electronic feeds, preferably real-time, (through a reasonable mechanism specified by Landlord, which may include XML, API, .CSV, etc.) of its current product/service offerings at the Premises, related digital images and pricing Product Feeds") for use by Landlord for Digital Marketing Purposes (as defined below).  Tenant hereby grants Landlord (including third party contractors/partners working on Landlord's behalf) a royalty free right and license during the Term hereof to use, reproduce, reasonably modify, publicly display and distribute the Product Feed information (including product/service names and prices, related digital images, trademarks and the like) in connection with the marketing and promotion of Tenant's business at the Premises as well as the Shopping Center (which may be done in connection with Landlord's marketing and promotion of other shopping centers owned and/or operated by Landlord or Landlord's affiliates generally), including, without limitation, in connection with digital signage, digital promotions and offers, mobile/web applications, digital booking services and the like (collectively, "Digital Marketing Purposes").  Landlord will ensure that usage by Landlord of Tenant's Product Feeds information conforms to Tenant's brand guidelines.

2.  Demographic Information/Social Media:  Tenant agrees to provide Landlord reasonable access to non-personally identifiable, non-proprietary data and information that Tenant may generate or possess through its use or operations at the Premises, including, without limitation, non-personally identifiable, non-proprietary demographic information relating to sales and data and information from various social media applications and platforms (e.g., Four Square, Facebook and the like).  Tenant hereby grants Landlord (including third party contractors/partners working on Landlord's behalf) a royalty free right and license during the Term hereof to use such information for Digital Marketing Purposes.  The parties also agree to cooperate reasonably and in good faith on the use of social media tools for purposes of driving visits and sales at the Premises and enhancing the overall consumer experience (which social media tools may be used in connection with Landlord's marketing and promotion of its other centers generally).

3.  Mobile Payments:  Tenant agrees that its payment systems at the Premises will be compatible with one or more mobile payment system (e.g., Square, PayPal or the like); provided, however, if Tenant's current payment systems do not comply with this requirement, Tenant shall not be required to comply with this requirement until such time as the technology utilized by Tenant evolves to the point where Tenant has the capability to comply.

-END-

## EXHIBIT "F"

## DATE CERTIFICATE

**THIS DATE CERTIFICATE** (the "Certificate"), made _____, 20____, by and between **CENTURY CITY MALL, LLC**, a Delaware limited liability company, whose address is 2049 Century Park East, 41ˢᵗ Floor, Los Angeles, California 90067 ("Landlord"), and **HEALTHY SPOT 015 LLC**, a California limited liability company, whose address is: 8915 South La Cienega Boulevard, Unit E, Inglewood, California 90301 ("Tenant").

## RECITALS

A.      Landlord and Tenant have entered into that certain Lease dated as of the _____of _____, 20____ (the "Lease") for Space No. 2580 located in the Shopping Center (as such term is defined in the Lease), as more fully described in the Lease; and

B.      The parties desire to establish certain dates under the Lease.

**NOW THEREFORE**, in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree as follows:

1.      <u>Delivery Date</u>.  The Delivery Date occurred on _____.

2.      <u>Rental Commencement Date</u>.  The Rental Commencement Date is _____.

3.      <u>Expiration Date</u>.  The Expiration Date is _____.

4.      <u>Miscellaneous</u>.  Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to them in the Lease.  Time is of the essence of this Certificate.  This Certificate shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors.  In the event of conflict or inconsistency between the provisions of this Certificate and any provisions of the Lease, the provisions of this Certificate shall govern.  Except as set forth in this Certificate, all of the terms and conditions of the Lease shall continue in full force and effect throughout the term of the Lease.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Certificate as of the date first above written.

**HEALTHY SPOT 015 LLC,**
a California limited liability company


By: _____

Print Name: _____

Its _____


By: _____

Print Name: _____

Its _____



**CENTURY CITY MALL, LLC,**
a Delaware limited liability company

By:      UC Century Genpar, LLC,
         a Delaware limited liability company,
         its managing member

By:      Westfield America Limited Partnership,
         a Delaware limited partnership,
         its sole member

By:      Westfield U.S. Holdings, LLC,
         a Delaware limited liability company,
         its general partner

By: _____


**TENANT**



**LANDLORD**

## GUARANTY

THIS GUARANTY (the "Guaranty") is made this __13__ day of __February__, 2018, by the undersigned ("Guarantor") to and for the benefit of **CENTURY CITY MALL, LLC**, a Delaware limited liability company ("Landlord").

WHEREAS, Landlord and **HEALTHY SPOT 015 LLC**, a California limited liability company ("Tenant") have entered into that certain Lease dated the __13__ of __February__, 2018 (the "Lease") for Premises located in **WESTFIELD CENTURY CITY**, City of Los Angeles, State of California as more fully described in the Lease; and

WHEREAS, it is a condition precedent to all the obligations of Landlord pursuant to the Lease that Guarantor shall have executed and delivered this Guaranty.

NOW, THEREFORE in consideration of and an inducement to the execution of this Lease by Landlord, the Guarantor hereby covenants and agrees as follows:

A.      The Guarantor hereby guarantees the full, faithful and timely payment and performance by Tenant of all the payments, covenants and other obligations of Tenant under or pursuant to the Lease. If Tenant shall default at any time in the payment of any Minimum Annual Rental, Additional Rent or any other sums, costs or charges whatsoever, or in the performance of any of the other covenants and obligations of Tenant, under or pursuant to the Lease, then the Guarantor, at its expense, shall on demand of Landlord fully and promptly pay all Minimum Annual Rental, Additional Rent, sums, costs and charges to be paid by Tenant, under or pursuant to the Lease, and in addition shall, upon Landlords demand therefor, pay to Landlord any and all sums due to Landlord, including (without limitation) all interest on past due obligations of Tenant, costs advanced by Landlord, and any and all damages and expenses, which may arise as a consequence of Tenant's default. The Guarantor hereby waives all requirements of notice of the acceptance of this Guaranty and all requirements of notice of breach or nonperformance by Tenant.

B.      The obligations of the Guarantor hereunder are independent of, and may exceed, the obligations of Tenant. A separate action or actions may, at Landlord's option, be brought and prosecuted against the Guarantor, whether or not any action is first or subsequently brought against Tenant, or whether or not Tenant is joined in any such action, and the Guarantor may be joined in any action or proceeding commenced by Landlord against Tenant arising out of, in connection with or based upon the Lease. The Guarantor waives any right to require Landlord to proceed against Tenant or pursue any other remedy in Landlord's power whatsoever, any right to complain of delay in the enforcement of Landlord's rights under the Lease, and any demand by Landlord and/or prior action by Landlord of any nature whatsoever against Tenant, or otherwise.

C.      This Guaranty shall remain and continue in full force and effect and shall not be discharged in whole or in part notwithstanding (whether prior to or subsequent to the execution hereof) any alteration, renewal, extension, modification, amendment or assignment of, or subletting, concession, franchising, licensing or permitting under, the Lease. The Guarantor hereby waives all requirements of notice of all of the foregoing, and agrees that the liability of the Guarantor hereunder shall be based upon the obligations of Tenant set forth in the Lease as the same may be altered, renewed, extended, modified, amended or assigned. For the purpose of this Guaranty and the obligations and liabilities of the Guarantor hereunder, "Tenant" shall be deemed to include any and all concessionaires, licensees, franchisees, department operators, assignees, subtenants, permittees or others directly or indirectly operating or conducting a business in or from the Premises, as fully as if any of the same were the named Tenant under the Lease.

D.      The Guarantor's obligations hereunder shall remain fully binding although Landlord may have waived one or more defaults by Tenant, extended the time of performance by Tenant, released, returned or misapplied other collateral at any time given as security for Tenant's obligations (including other guaranties) and/or released Tenant from the performance of its obligations under the Lease, and for any such waiver of default, extension of time and/or release of Tenant from obligations under the Lease, the same shall apply for Guarantor with respect to such specific waiver, extension of time and/or release of an obligation.

E.      This Guaranty shall remain in full force and effect notwithstanding the institution by or against Tenant of bankruptcy, reorganization, readjustment, receivership or insolvency proceedings of any nature, or the disaffirmance of the Lease in any such proceedings or otherwise.

F.      If this Guaranty is signed by more than one party, their obligations shall be joint and several, and the release of one of such guarantors shall not release any other of such guarantors. If this Guaranty is

signed on behalf of a corporation, partnership or other entity, the signer is duly authorized to execute this obligation on behalf of such corporation, partnership or other entity.

G.    This Guaranty shall be applicable to and binding upon the heirs, executors, administrators, representatives, successors and assigns of Landlord, Tenant and the Guarantor. Landlord may, without notice, assign this Guaranty in whole or in part.

H.    The execution of this Guaranty prior to execution of the Lease shall not invalidate this Guaranty or lessen the obligations of the Guarantor(s) hereunder.

I.    Notwithstanding anything to the contrary herein, Guarantor's total, aggregate obligations under this Guaranty shall not exceed one (1) years' worth of Rental (calculated based upon the Rental that would have been otherwise payable by Tenant (or any successors, assigns, as provided in this Lease) under the Lease for the one (1) year period following the date of Tenant's default [as if Tenant had not defaulted under the Lease]).

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty on the date first written above.

HEALTHY SPOT LLC,
a California limited liability company

By: _____

Its _CEO - ANDREW KIM_____

By: _____

Its _COO | FOUNDER_____
_MARK BOONNARK_____

Home Address:        6089 Bristol Parkway, Suite 200
(or principal place    Culver City, California 90230
of business, if
corporate guarantor)

# UNIBAIL-RODAMCO-WESTFIELD

2049 Century Park East, 41st Floor, Los Angeles, CA 90067 | T. +1 (310) 478-4456

July 1, 2019

| | | |
|---|---|---|
| Ref: 10022 | Date: 03Jul19 | SHIPPING: 6.11 |
| Dep: 10022 | Wgt: 0.10 LBS | SPECIAL: 0.44 |
| | | HANDLING: 0.00 |
| | DV: 0.00 TOTAL: 6.55 |
| | Svcs: ** 2DAY ** | |
| | TRCK: 6745 6990 6464 | |

Healthy Spot 015 LLC
6089 Bristol Parkway, Suite 200
Culver City, California 90230
Attn: Andrew Kim

**RE:** **ACKNOWLEDGEMENT OF ASSIGNMENT** for that lease dated February 13, 2018 (and all amendments thereto, collectively, the "Lease") by and between Century City Mall LLC, a Delaware limited liability company ("Landlord") and Healthy Spot 015 LLC ("Assignor"), a California limited liability company, for Store No. 2580 ("Premises").

Landlord has received notice regarding the Assignor assigning all of its right, title and interest in and to the Lease (the "**Assignment**") to Healthy Spot Gamma, LLC, a California limited liability company (the "**Assignee**"), which is an affiliated of Assignor. The consummation of the Assignment was effective on or about April 13, 2019 (the "**Effective Date**").

The signature of the undersigned shall serve as Landlord's acknowledgment of and, only to the extent required under Article XIV of the Lease, consent to the foregoing assignment, provided that the following shall be applicable as of the Effective Date:

1.   Assignee shall be deemed Tenant under the Lease and shall accept, assume and agree to be bound by and to perform the terms, provisions, covenants, conditions and agreements under the Lease from the Effective Date forward.

2.   Assignor shall remain fully liable under the Lease for the remainder of the Term.

3.   Assignor is not in default beyond any applicable grace or cure periods under the Lease prior to the consummation of the Assignment.

4.   There will be no change to the Trade Name or Permitted Use under the Lease.

5.   Tenant's Notice and Billing addresses shall remain as in the Lease.

Through the signature of the undersigned, the Landlord acknowledges that such Assignment is a permitted Transfer under Section 14.01(d) of the Lease and does not constitute a default.

Capitalized terms used but not otherwise defined herein shall have the same meaning as set forth in the Lease, unless otherwise herein defined. This Landlord's Acknowledgement may be executed and delivered via electronic facsimile or "PDF" email transmission, which shall be deemed an original, having the same legal effect as original signatures. This Landlord's Acknowledgement may also be executed in multiple counterparts, each of which shall be considered one agreement, even though all parties do not sign the same counterpart. The signature pages taken from separate individually executed counterparts of this Landlord's Acknowledgement may be combined to form multiple fully executed counterparts. All executed

Healthy Spot/CEN
LL Acknowledgement

# UNIBAIL-RODAMCO-WESTFIELD

2049 Century Park East, 41st Floor, Los Angeles, CA 90067 | T. +1 (310) 478-4456

counterparts of this Landlord's Acknowledgement shall be deemed to be originals, but all such counterparts, taken together or collectively, as the case may be, shall constitute one and the same agreement.

Acknowledged and agreed to this ___1st___ day of ___July_____, 2019.

**LANDLORD:**

By:    **WESTFIELD PROPERTY MANAGEMENT LLC,**
       a Delaware limited liability company,
       in its capacity as agent for Landlord

By:    _____

                        Rory A. Packer
                        Assistant Secretary

Healthy Spot/CEN
LL Acknowledgement

DocuSign Envelope ID: 43A94266-747F-4243-A95A-F958C3533777

## TEMPORARY DEFERRED RENTAL LEASE AMENDMENT NO. 1

THIS TEMPORARY DEFERRED RENTAL LEASE AMENDMENT (this "Amendment") is entered into as of ___September 9th___, 2020 ("Effective Date"), by and between **CENTURY CITY MALL, LLC**, a Delaware limited liability company ("Landlord"), and **HEALTHY SPOT GAMMA, LLC**, a California limited liability company ("Tenant"), for that certain lease or tenancy agreement (as may be amended from time to time) dated as of February 13, 2018 by and between Landlord and Tenant ("Lease") for **Store No. 2580** ("Premises") in **WESTFIELD CENTURY CITY** (the "Shopping Center")  All capitalized terms not otherwise defined herein shall have the meanings given such terms in the Lease

WHEREAS, due to the Covid-19 pandemic ("Event"), Tenant has requested temporary rent relief under the Lease and Landlord is willing to grant such temporary rent relief in the nature of temporary deferral of the payment of certain Rental subject to the terms and conditions set forth herein  The relief provided herein is expressly made in consideration of the unprecedented circumstances arising from the Event

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the Lease is hereby amended as follows as of the Effective Date

1  <u>Deferral</u>  Landlord hereby grants Tenant a **temporary deferral** ("Deferral") of the payment of Minimum Annual Rental, the Common Area Charge and the Promotional Charge commencing on April 1, 2020 and ending on June 30, 2020  Commencing upon July 1, 2020 and ending on August 31, 2021, Landlord hereby grants Tenant a Deferral of 30% of the payment of Minimum Annual Rental, the Common Area Charge and the Promotional Charge (collectively "Deferred Rental Period")  Tenant shall continue to pay all other Rental under the Lease during the Deferred Rental Period  Upon the expiration of the earlier termination of the Deferred Rental Period, Tenant shall resume full payment of all Rental and all other charges due as originally set forth in the Lease

2  <u>Repayment</u>  In addition to Tenant's obligation in the Lease to timely pay all Rental when due, Tenant shall repay all deferred Rental to Landlord ("Deferred Rental Payment"), without interest or penalty, in twelve (12) equal monthly installments with the first installment due on October 1, 2020 and the remaining installments due on the first day of each month thereafter ("Repayment Period"), until paid in full  Notwithstanding the above, if as of the Effective Date the Term is set to expire prior to the twelve (12) month Repayment Period set forth above, the Repayment Period shall commence on October 1, 2020 and continue in equal monthly installments until the expiration of the Term  The Deferred Rental Payments shall be deemed Additional Rent under the Lease and shall not be deemed repayment of past due Rental  Any deferred Percentage Rental shall be added by Tenant to the Deferred Rental Payments in equal installments over the Repayment Period

3  <u>Tenant Covenants</u>  As a material inducement for Landlord to grant Tenant the Deferral, Tenant covenants and agrees to the following terms and conditions ("Tenant's Covenants")

    a  <u>Termination Rights</u>  To the extent applicable, the following (collectively, "Tenant's Termination Rights") are hereby tolled and shall be of no force or effect during the Deferred Rental Period and continuing thereafter through the twelve (12) months following the later of the last day of the Repayment Period or the date upon which Tenant has repaid all deferred Rental  (i) any Tenant's co-tenancy requirement rights in Sections 1 02 or 7 02 or otherwise in the Lease (including, without limitation, any applicable measuring period), (ii) any Tenant's Gross Sales kick out

rights in Section 2 03 or otherwise in the Lease (including, without limitation. any applicable measuring period), and (iii) any other rights Tenant has to pay reduced Rental or terminate the Lease (except in connection with a casualty in Article XVII or otherwise in the Lease, or condemnation in Article XVIII or otherwise in the Lease, or any temporary Abatement previously granted and still in effect under a prior Lease amendment) If, as of the Effective Date, less than forty-eight (48) months would remain in the Term of the Lease, then Tenant's Termination Rights are hereby deemed deleted from the Lease Further, if Tenant does not perform all obligations under the Lease, as amended by this Amendment, and fails to cure within any applicable cure period provided for in the Lease, Tenant's Termination Rights shall thereafter be null and void and deemed deleted from the Lease

b   Reopening If, as of the Effective Date, (i) the Shopping Center has not reopened for business. Tenant shall use its best efforts to fully reopen for business in the Premises within five (5) days of the reopening of the Shopping Center but in no event later than ten (10) days after the Shopping Center reopens or (ii) the Shopping Center has reopened for business but Tenant has not reopened for business in the Premises, Tenant shall reopen for business in the Premises within five (5) days following the Effective Date

c   Confidentiality   Tenant hereby agrees to keep all information contained herein or provided to or by Tenant and/or Landlord confidential, and Tenant shall not divulge any such information to any third parties

4   Default   If, during the Term (as it may be extended), Tenant does not perform all obligations under the Lease, as amended by this Amendment, and fails to cure within any applicable cure period provided for in the Lease, the Deferral and Deferred Rental Period shall automatically terminate   Within five (5) days of receipt of notice of termination of the Deferral and Deferred Rental Period, Tenant shall pay all Rental originally due under the Lease from the beginning of the Deferred Rental Period through the date of the notice of termination of the Deferral and Deferred Rental Period minus any payment already received by Landlord   For avoidance of doubt, Tenant's full payment of all Rental within this five (5) day period will **not** resuscitate the Deferral and/or the Deferred Rental Period   Tenant further agrees that the Event shall not be a defense to Tenant's performance of any obligations under the Lease, as amended by this Amendment, and Tenant hereby waives any defenses or rights of offset it may have related to the Event Termination of the Deferral and Deferred Rental Period under this Section will be in addition to any rights and remedies available to Landlord under the Lease or at law in the event of a default by Tenant Tenant's Covenants shall survive the expiration or the earlier termination of the Deferral and Deferred Rental Period under this Section   To the extent a Guaranty was signed in connection with the Lease and notwithstanding anything to the contrary contained in the Guaranty, Guarantor hereby fully guarantees Tenant's payment obligation under this Section upon automatic termination of the Deferral and the Deferred Rental Period due to a default

5   Release   In consideration of Landlord's undertakings in this Amendment, Tenant, its past, present or future owners. members. parents, divisions, subsidiaries. affiliates, successors and assigns, agents. trustees, directors, officers. shareholders, and employees, personally and in their official capacity. hereby remise, release, and forever discharge Landlord of and from all, and all manner of action and actions, cause and causes of action, suits. debts, dues, sums of money, accounts, agreements, promises, variances, trespasses, damages, claims. and demands whatsoever in law or in equity related to the Lease (as amended. including, without limitation, by this Amendment) and the Premises (including, without limitation, arising out of, or in connection with, the Event and/or closure of the Shopping Center). which Tenant ever had or has against Landlord through the date of this Amendment, whether past, present, future, actual or contingent, known or unknown, foreseen or unforeseen, "Landlord" shall include itself,

Westfield Property Management LLC, Westfield, LLC, URW WEA LLC, and any of their past, present, and future owners or members, parents, divisions, subsidiaries, affiliates, successors and assigns, its agents, members, trustees, directors, officers, shareholders, and employees, personally and in their official capacity.

With respect to the matters released in the aforementioned paragraph, the Tenant hereby expressly waives all rights under the provisions of Section 1542 of the Civil Code of the State of California. Section 1542 of this California Civil Code reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

6  No Default.  Provided Tenant complies with the terms of this Amendment. Landlord hereby waives any late fees, penalties, defaults and rights to take legal action for late payment of any amounts due under the Lease prior to the Effective Date.

7  Entire Agreement, Counterparts, Electronic Signature.  This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. Except as amended herein, the Lease between the parties shall remain in full force and effect. If any provision of this Amendment is found to be invalid, illegal or unenforceable such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and all other provisions of this Amendment shall be deemed valid and enforceable to their full extent. Tenant acknowledges and agrees that it is voluntarily and knowingly entering into this Amendment notwithstanding any provisions that are or may be inconsistent with or different from any and all local ordinance or order relating to or arising from the Event. This Amendment may be executed in multiple counterparts, each of which shall be considered an original, and all of which shall constitute one and the same instrument. Delivery of this Amendment may be effectuated by hand delivery, mail, overnight courier or electronic communication (including by PDF sent by electronic mail, facsimile, or similar means of electronic communication). Signatures delivered by electronic communication shall have the same legal effect as manual signatures. For purposes of facilitating the execution of this Amendment during COVID-19 stay-at-home orders, a facsimile or electronic signature (e.g., Adobe signature functionality) shall be deemed to be an original signature. In addition, pursuant to the Electronic Signatures in Global and National Commerce Act (ESIGN) the parties hereby expressly agree to the other's election to use certificate-based electronic signature software operated by DocuSign for execution of this Amendment and the certificate-based electronic signature generated by this software shall have the same legal effect as a handwritten signature and shall be considered legally admissible evidence of the parties' intention to be legally bound by this Amendment. The parties declare that they have received all information required to be fully aware of the certificate-based electronic signature process and each party hereby waives any claim which it may have against the other party as a result of the use of such electronic signature software.

[SIGNATURES FOLLOW]

IN WITNESS WHEREOF, Landlord and Tenant and Guarantor (if applicable) have duly executed this Amendment as of the day and year first above written.

**TENANT**

**HEALTHY SPOT GAMMA, LLC**,
a California limited liability company

By: _____

Print Name: Mark Boonnark

Its: COO

**LANDLORD**

**CENTURY CITY MALL, LLC,**
a Delaware limited liability company

**By:**    **Westfield Property Management LLC,**
       **a Delaware limited liability company,**
       **in its capacity as agent for Landlord**

By: _____
   3ECD8FBBB6B5475...

Print Name: Candice Mayer-Gillet

Its: VP Operating Management

# Exhibit 2

**EXHIBIT 2**

**Healthy Spot**
**Century City**
**Lease # 923166**

| Invoice Date | Gross Amount | Open Amount | G/L Offset | Remark |
|---|---|---|---|---|
| 07/27/2021 | 5,205.78 | 2,571.67 | REL | 2019 Y/E ELE RECON |
| 03/01/2023 | 9,608.50 | 1,050.72 | CME | Common Area Main Esc 5 JAN 5% |
| 04/01/2023 | 604.05 | 267.24 | CPL | Central Plant       JAN Esc |
| 05/01/2023 | 604.05 | 267.24 | CPL | Central Plant       JAN Esc |
| 06/01/2023 | 604.05 | 267.24 | CPL | Central Plant       JAN Esc |
| 07/01/2023 | 256 | 83 | WTR | Water |
| 07/01/2023 | 256 | 83 | WTR | Water |
| 07/01/2023 | 256 | 83 | WTR | Water |
| 07/01/2023 | 604.05 | 267.24 | CPL | Central Plant       JAN Esc |
| 07/01/2023 | 256 | 83 | WTR | Water |
| 08/01/2023 | 604.05 | 267.24 | CPL | Central Plant       JAN Esc |
| 08/01/2023 | 256 | 83 | WTR | Water |
| 09/01/2023 | 604.05 | 267.24 | CPL | Central Plant       JAN Esc |
| 09/01/2023 | 256 | 83 | WTR | Water |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 10/01/2023 | 604.05 | 267.24 | CPL | Central Plant       JAN Esc |
| 10/01/2023 | 256 | 83 | WTR | Water |
| 10/01/2023 | 150 | 150 | OTH | DIRTY WINDOWS |
| 11/01/2023 | 604.05 | 267.24 | CPL | Central Plant       JAN Esc |

# EXHIBIT 2

**Healthy Spot**
**Century City**
**Lease # 923166**

| Invoice Date | Gross Amount | Open Amount | G/L Offset | Remark |
|---|---|---|---|---|
| 11/01/2023 | 256 | 83 | WTR | Water |
| 12/01/2023 | 604.05 | 267.24 | CPL | Central Plant      JAN Esc |
| 12/01/2023 | 256 | 83 | WTR | Water |
| 01/01/2024 | 10,088.92 | 887.47 | CME | Common Area Main Esc 5 JAN 5% |
| 02/01/2024 | 45 | 45 | FDS | Fire Detection System |
| 02/01/2024 | 10,088.92 | 10,088.92 | CME | Common Area Main Esc 5 JAN 5% |
| 02/01/2024 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 02/01/2024 | 749 | 749 | ELE | Electricity |
| 02/01/2024 | 1,308.51 | 1,308.51 | MR3 | Small Shop |
| 02/01/2024 | 256 | 256 | WTR | Water |
| 02/01/2024 | 800.71 | 800.71 | PCH | Promotional Charge 5% JAN 5% |
| 02/27/2024 | 1,087.97 | 895.09 | RPT | REVISED 2018 Y/E Tax Adjustmen |
| 02/27/2024 | 8,595.03 | 5,434.00 | RPT | RVS 2019 Y/E Tax Adjustment |
| 02/27/2024 | 2,162.88 | 2,162.88 | RPT | RVS 2020 Y/E Tax Adjustment |
| 02/27/2024 | 4,195.73 | 4,195.73 | RPT | REVISED 2020 Y/E Tax Adjustmen |
| 03/01/2024 | 10,088.92 | 480.42 | CME | Common Area Main Esc 5 JAN 5% |
| 03/01/2024 | 604.05 | 267.24 | CPL | Central Plant      JAN Esc |
| 03/01/2024 | 256 | 83 | WTR | Water |
| 03/01/2024 | 800.71 | 38.13 | PCH | Promotional Charge 5% JAN 5% |
| 04/01/2024 | 3,824.85 | 3,824.85 | SVS | REG 4 CORRECTIONS |
| 04/02/2024 | 622.73 | 622.73 | CPL | Central Plant      JAN Esc |
| 04/02/2024 | 622.73 | 18.68 | CPL | Central Plant      JAN Esc |
| 05/23/2024 | 41.7 | 41.7 | RWT | 2023 Y/E WTR RECON |
| 05/23/2024 | 799.9 | 799.9 | REL | 2023 Y/E ELE RECON |
| 06/01/2024 | 622.73 | 285.92 | CPL | Central Plant      JAN Esc |
| 06/01/2024 | 10,088.92 | 8,692.07 | CME | Common Area Main Esc 5 JAN 5% |
| 06/01/2024 | 256 | 83 | WTR | Water |
| 06/01/2024 | 800.71 | 38.13 | PCH | Promotional Charge 5% JAN 5% |
| 07/01/2024 | 45 | 45 | FDS | Fire Detection System |
| 07/01/2024 | 10,088.92 | 10,088.92 | CME | Common Area Main Esc 5 JAN 5% |
| 07/01/2024 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 07/01/2024 | 749 | 749 | ELE | Electricity |
| 07/01/2024 | 622.73 | 622.73 | CPL | Central Plant      JAN Esc |
| 07/01/2024 | 1,308.51 | 1,308.51 | MR3 | Small Shop |
| 07/01/2024 | 256 | 256 | WTR | Water |
| 07/01/2024 | 800.71 | 800.71 | PCH | Promotional Charge 5% JAN 5% |
| 08/01/2024 | 45 | 45 | FDS | Fire Detection System |

# EXHIBIT 2

**Healthy Spot**
**Century City**
**Lease # 923166**

| Invoice Date | Gross Amount | Open Amount | G/L Offset | Remark |
|---|---|---|---|---|
| 08/01/2024 | 10,088.92 | 10,088.92 | CME | Common Area Main Esc 5 JAN 5% |
| 08/01/2024 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 08/01/2024 | 749 | 749 | ELE | Electricity |
| 08/01/2024 | 622.73 | 622.73 | CPL | Central Plant      JAN Esc |
| 08/01/2024 | 1,360.85 | 1,360.85 | MR3 | Small Shop |
| 08/01/2024 | 256 | 256 | WTR | Water |
| 08/01/2024 | 800.71 | 800.71 | PCH | Promotional Charge 5%  JAN 5% |
| 09/01/2024 | 1,360.85 | 1,360.85 | MR3 | Small Shop |
| 09/01/2024 | 622.73 | 622.73 | CPL | Central Plant      JAN Esc |
| 09/01/2024 | 45 | 45 | FDS | Fire Detection System |
| 09/01/2024 | 10,088.92 | 10,088.92 | CME | Common Area Main Esc 5 JAN 5% |
| 09/01/2024 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 09/01/2024 | 749 | 749 | ELE | Electricity |
| 09/01/2024 | 256 | 256 | WTR | Water |
| 09/01/2024 | 800.71 | 800.71 | PCH | Promotional Charge 5%  JAN 5% |
| 10/01/2024 | 10,088.92 | 10,088.92 | CME | Common Area Main Esc 5 JAN 5% |
| 10/01/2024 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 10/01/2024 | 749 | 749 | ELE | Electricity |
| 10/01/2024 | 622.73 | 622.73 | CPL | Central Plant      JAN Esc |
| 10/01/2024 | 256 | 256 | WTR | Water |
| 10/01/2024 | 800.71 | 800.71 | PCH | Promotional Charge 5%  JAN 5% |
| 10/01/2024 | 1,360.85 | 1,360.85 | MR3 | Small Shop |
| 10/01/2024 | 45 | 45 | FDS | Fire Detection System |
| 11/01/2024 | 749 | 749 | ELE | Electricity |
| 11/01/2024 | 622.73 | 622.73 | CPL | Central Plant      JAN Esc |
| 11/01/2024 | 800.71 | 800.71 | PCH | Promotional Charge 5%  JAN 5% |
| 11/01/2024 | 1,360.85 | 1,360.85 | MR3 | Small Shop |
| 11/01/2024 | 45 | 45 | FDS | Fire Detection System |
| 11/01/2024 | 10,088.92 | 10,088.92 | CME | Common Area Main Esc 5 JAN 5% |
| 11/01/2024 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 11/01/2024 | 256 | 256 | WTR | Water |
| 11/19/2024 | 3,620.00 | 3,620.00 | LAW | PROFESSIONAL SERVICES |
| 11/22/2024 | 1,438.64 | 1,438.64 | LAW | PROFESSIONAL SERVICES |
| 12/01/2024 | 1,360.85 | 1,360.85 | MR3 | Small Shop |
| 12/01/2024 | 622.73 | 622.73 | CPL | Central Plant      JAN Esc |
| 12/01/2024 | 45 | 45 | FDS | Fire Detection System |
| 12/01/2024 | 10,088.92 | 10,088.92 | CME | Common Area Main Esc 5 JAN 5% |

## EXHIBIT 2

**Healthy Spot**
**Century City**
**Lease # 923166**

| Invoice Date | Gross Amount | Open Amount | G/L Offset | Remark |
|---|---|---|---|---|
| 12/01/2024 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 12/01/2024 | 749 | 749 | ELE | Electricity |
| 12/01/2024 | 256 | 256 | WTR | Water |
| 12/01/2024 | 800.71 | 800.71 | PCH | Promotional Charge 5% JAN 5% |
| | 206,988.28 | 164,498.56 | | |
| | | **152,736.45** | | **Total Prepetition Claim (through Dec 10, 2024)** |
| | | **11,762.11** | | **Post Petition Subtotal (Dec 11- 31, 2024)** |

[Post Petition Amounts Continue on Next Page]

## EXHIBIT 2

**Healthy Spot**
**Century City**
**Lease # 923166**

| Invoice Date | Gross Amount | Open Amount | G/L Offset | Remark |
|---|---|---|---|---|
| 01/01/2025 | 1,360.85 | 544.49 | MR3 | Small Shop |
| 02/01/2025 | 1,360.85 | 544.49 | MR3 | Small Shop |
| 03/01/2025 | 1,360.85 | 544.49 | MR3 | Small Shop |
| 04/01/2025 | 641.41 | 18.68 | CPL | Central Plant      JAN Esc |
| 04/01/2025 | 641.41 | 18.68 | CPL | Central Plant      JAN Esc |
| 04/01/2025 | 641.41 | 18.68 | CPL | Central Plant      JAN Esc |
| 04/01/2025 | 1,360.85 | 1,360.85 | MR3 | Small Shop |
| 04/01/2025 | 749 | 749 | ELE | Electricity |
| 04/01/2025 | 45 | 45 | FDS | Fire Detection System |
| 04/01/2025 | 10,593.37 | 10,593.37 | CME | Common Area Main Esc 5 JAN 5% |
| 04/01/2025 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 04/01/2025 | 256 | 256 | WTR | Water |
| 04/01/2025 | 840.75 | 840.75 | PCH | Promotional Charge 5% JAN 5% |
| 04/01/2025 | 641.41 | 641.41 | CPL | Central Plant      JAN Esc |
| 04/03/2025 | -1,905.92 | -1,905.92 | RPT | Y/E Tax Adjustment |
| 05/01/2025 | 840.75 | 840.75 | PCH | Promotional Charge 5% JAN 5% |
| 05/01/2025 | 10,593.37 | 10,593.37 | CME | Common Area Main Esc 5 JAN 5% |
| 05/01/2025 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 05/01/2025 | 749 | 749 | ELE | Electricity |
| 05/01/2025 | 256 | 256 | WTR | Water |
| 05/01/2025 | 1,360.85 | 1,360.85 | MR3 | Small Shop |
| 05/01/2025 | 641.41 | 641.41 | CPL | Central Plant      JAN Esc |
| 05/01/2025 | 45 | 45 | FDS | Fire Detection System |
| 06/01/2025 | 840.75 | 840.75 | PCH | Promotional Charge 5% JAN 5% |
| 06/01/2025 | 10,593.37 | 10,593.37 | CME | Common Area Main Esc 5 JAN 5% |
| 06/01/2025 | 3,439.91 | 3,439.91 | RET | Property Tax |
| 06/01/2025 | 749 | 749 | ELE | Electricity |
| 06/01/2025 | 256 | 256 | WTR | Water |
| 06/01/2025 | 1,360.85 | 1,360.85 | MR3 | Small Shop |
| 06/01/2025 | 641.41 | 641.41 | CPL | Central Plant      JAN Esc |
| 06/01/2025 | 45 | 45 | FDS | Fire Detection System |

| | 57,879.73 | 53,562.46 | **Post-Petition (Jan - June 2025)** |
|---|---|---|---|
| | | 11,762.11 | **Post Petition Subtotal (Dec 11- 31, 2024)** |
| | | 65,324.57 | **Post-Petition Total** |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  301 E. Colorado Boulevard, Ninth Floor, Pasadena, CA 91101-1977

A true and correct copy of the foregoing document entitled (*specify*): **CENTURY CITY MALL, LLC'S MOTION PURSUANT TO 11 U.S.C. § 365(d)(3) TO COMPEL THE DEBTOR TO PAY POST PETITION DATE RENT AND ALLOW ADMINISTRATIVE CLAIM UNDER 11 U.S.C. § 503(b); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF LOUIS SCHILLACE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **June 13, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **June 13, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Levene, Neale, Bender, Yoo & Golubchik LLP
2818 La Cienega Avenue
Los Angeles, CA 90034

Thomas F. Murphy
5335 Wisconsin Avenue NW, Suite 600
Washington, DC 20015

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **June 13, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
Honorable Deborah J. Saltzman
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1634
Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 13, 2025 | Jessica L. Evans | /s/ *Jessica L. Evans* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DRALLIS\38907.00002\5221015.1

**F 9013-3.1.PROOF.SERVICE**

## SERVICE LIST

**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

Jonathan Arias on behalf of Creditor
American Express National Bank, c/o
Zwicker & Associates, P.C.
bknotices@zwickerpc.com

Todd M Arnold on behalf of Debtor Healthy
Spot Operating LLC
tma@lnbyg.com

Jamie Altman Buggy on behalf of Creditor
Essex Portfolio, L.P.
jbuggy@harvestllp.com,
jkeatingwolk@harvestllp.com,atenreiro@ha
rvestllp.com

Robert Carrasco on behalf of Debtor
Healthy Spot Operating LLC
rmc@lnbyg.com, rmc@lnbyg.com

Shawn M Christianson on behalf of
Interested Party Courtesy NEF
cmcintire@buchalter.com,
schristianson@buchalter.com

Ivo Keller on behalf of Creditor Ivy Station
Residential LLC
ikeller@sflaw.com, calendar@sflaw.com

Sweeney Kelly on behalf of Creditor ACH
Capital West, LLC
kelly@ksgklaw.com

Sweeney Kelly on behalf of Creditor
Instafunding LLC a/k/a TVT SPVL
kelly@ksgklaw.com

Elizabeth S Lynch on behalf of Creditor
ZIWI USA, Inc.
blynch@chinnery.com

Noreen A Madoyan on behalf of U.S.
Trustee United States Trustee (LA)
Noreen.Madoyan@usdoj.gov

Stephen Malkiewicz on behalf of Interested
Party Courtesy NEF
stephen.malkiewicz@cintas.com

David L. Neale on behalf of Debtor Healthy
Spot Operating LLC
dln@lnbyg.com

Jean Pierre Nogues, Jr on behalf of Creditor
One Thousand Grand Avenue Holdings
LLC
jpn@msk.com

Dean G Rallis, Jr on behalf of Creditor
Westfield, LLC and Century City Mall,
LLC
drallis@hahnlawyers.com,
jevans@hahnlawyers.com;drallis@ecf.court
drive.com;jevans@ecf.courtdrive.com;croge
rs@hahnlawyers.com;acastillo@hahnlawye
rs.com

Daniel H Reiss on behalf of Debtor Healthy
Spot Operating LLC
dhr@lnbyg.com, dhr@ecf.inforuptcy.com

Abe G Salen on behalf of Creditor ZIWI
USA, Inc.
asalen@wzllp.com,
kmartin@wzllp.com,ddouglas@wzllp.com,
akaderbarek@wzllp.com

Daren M Schlecter on behalf of Interested
Party Courtesy NEF
daren@schlecterlaw.com,
assistant@schlecterlaw.com

Gary A Starre on behalf of Creditor
Sepulveda Blvd. Properties, LLC, a
California limited liability company
gastarre@gmail.com,
mmoonniiee@gmail.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov