DANIEL H. REISS (SBN 150573)
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dhr@lnbyg.com

Attorneys for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>HEALTHY SPOT OPERATING, LLC,<br><br>Debtor and Debtor in Possession. | Case No.: 2:24-bk-20065-DS<br><br>Chapter 11 Case<br><br>**DEBTOR'S MOTION FOR ORDER: (1) AUTHORIZING SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (2) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES; AND (3) RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MARK BOONNARK**<br><br>[UPON APPLICATION FOR ORDER SHORTENING TIME]<br><br>Date: July 29, 2025<br>Time: 1:00 p.m.<br>Place: Courtroom 1639<br>255 East Temple Street<br>Los Angeles, CA 90012 |

**TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:**

Healthy Spot Operating, LLC, the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case ("Debtor"), hereby moves (the "Sale Motion") this Court pursuant to sections 105(a), 363 and 365 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 3012, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order in substantially the form annexed hereto as **Exhibit B** (the "Proposed Order"): (1) authorizing the sale of the Debtor's real property and personal property assets (the "Assets") free and clear of all liens and encumbrances; (2) authorizing the assumption of assignment of certain unexpired leases and executory contracts; and (3) related relief.

Pursuant to Local Bankruptcy Rule ("LBR") 6004-1(c)(3), Debtor proposes to sell substantially all of its assets to Pet Pros LLC and NPM Franchising, LLC, both Washington limited liability companies (collectively, hereinafter the "Stalking Horse Purchaser"), subject to higher or better offers ("Stalking Horse Purchase Agreement"). The Assets to be sold and the terms of the sale are set forth fully in the Stalking Horse Purchase Agreement, a copy of which is attached hereto as **Exhibit A.**

The terms of the Stalking Horse Purchase Agreement can be summarized as follows:

1. Stalking Horse Purchaser shall acquire the Assets (as that term is defined in the Stalking Horse Purchase Agreement), free and clear of all liens, claims, encumbrances and other interests (except as provided in the Stalking Horse Purchase Agreement);

2. Debtor shall assume and assign certain executory contracts and unexpired leases (the "Assigned Contracts") to the Stalking Horse Purchaser as set forth on Schedules B, C and G of the Stalking Horse Purchase;

3. The purchase price for the Assets and assignment of the Assigned Contracts (the "Purchase Price") is set forth on Schedule H to the Stalking Horse Purchase Agreement is $6,315,158.00, and shall consist of:

i. payment of cash consideration to Debtor in the sum of $950,000;

ii. assumption of the Assumed Liabilities (as defined in the Stalking Horse Purchase Agreement);

iii. a credit bid of the amount of the Stalking Horse Purchaser's secured claims of $2,876,344.20;[1] and

iv. all amounts paid in connection with the assumption and assignment of the Assigned Contracts.

A list of the Assigned Contracts and the amounts to be paid in order to cure arrearages under Bankruptcy Code Section 365(b) is set forth in Schedules B, C and G to the Stalking Horse Purchase Agreement.

Debtor is concurrently filing herewith its *Motion By Debtor For Entry Of An Order (A) Approving Bidding Procedures And Bid Protections In Connection With The Sale Of Substantially All Of The Debtor's Assets, (B) Approving The Form And Manner Of Notice Thereof, And (C) Scheduling An Auction And Sale Hearing, (D) Approving Procedures For The Assumption And Assignment Of Contracts, (E) Granting Related Relief* (the "Sales Procedures Motion"), which shall be heard prior to the hearing on this Motion. All terms and procedures ordered by this Court with respect to the Sales Procedures Motion (the "Sale Procedures Order") are incorporated hereat and shall be binding as set forth therein.

This Motion is based upon this Motion, the Notice of this Motion concurrently filed herewith, the annexed Memorandum of Points and Authorities, the Declaration of Mark Boonnark annexed hereto, the evidence provided herewith, the Sale Procedures Order, the record in this case, such other and further evidence and argument as may be presented to the Court at or before a hearing on this Motion.

WHEREFORE, Debtor hereby moves the Court for an order in substantially the form of the Proposed Order:

---

[1] This credit bid is dependent on the Court approving Debtor's Motion for Order Approving Stipulation by and Among the Debtor, ACH Capital West, LLC, Instafunding LLC, Pet Pros, LLC, and NPM Franchising, LLC Regarding Claim Allowance and Credit Bidding, which Debtor anticipates filing concurrently with the Sale Motion.

1. Authorizing the sale of the Assets to the Stalking Horse Purchaser under the terms of the Stalking Horse Purchase Agreement free and clear of all liens, claims, interests and encumbrances pursuant to Sections 363(a) and (f), except as otherwise set forth herein;

2. Finding that the Stalking Horse Purchaser's interests are protected as a good faith purchaser of the Debtor's assets pursuant to Section 363(m);

3. Authorizing Debtor to assume and assign the Assigned Contracts pursuant to Section 365 and all terms thereof, including the cure amounts set forth in Schedules C and G of the Stalking Horse Purchase Agreement for purposes of Section 365(b)(1)(A);

4. Waiving the 10-day stay period set forth in Bankruptcy Rules 6004(h) and 6006(d); and

5. Granting such further relief as the Court deems just and proper.

Dated: July 10, 2025

LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.

By: ___*/s/ Daniel H. Reiss*___
DANIEL H. REISS
Attorneys for Chapter 11 Debtor and
Debtor in Possession

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

On or about July 10, 2025, Debtor entered into that certain Asset Purchase Agreement with NPM Franchising LLC, a Washington limited liability company and Pet Pros LLC, a Washington limited liability company, jointly and severally (hereinafter the "Stalking Horse Purchaser"), subject to higher or better offers ("Stalking Horse Purchase Agreement"). A true copy of the Stalking Horse Purchase Agreement is annexed hereto as **Exhibit "A"**.

The terms of the Stalking Horse Purchase Agreement can be summarized as follows:

1. Stalking Horse Purchaser shall acquire the Assets (as that term is defined in the Stalking Horse Purchase Agreement), free and clear of all liens, claims, encumbrances and other interests (except as provided in the Stalking Horse Purchase Agreement);

2. Debtor shall assume and assign certain executory contracts and unexpired leases (the "Assigned Contracts") to the Stalking Horse Purchaser as set forth on Schedules B, C and G of the Stalking Horse Purchase;

3. The purchase price for the Assets and assignment of the Assigned Contracts (the "Purchase Price") is set forth on Schedule H to the Stalking Horse Purchase Agreement is $6,315,158.00, and shall consist of:

i. payment of cash consideration to Debtor in the sum of $950,000;

ii. assumption of the Assumed Liabilities (as defined in the Stalking Horse Purchase Agreement);

iii. a credit bid of the amount of the Stalking Horse Purchaser's secured claims of $2,876,344.20;[2] and

iv. all amounts paid in connection with the assumption and assignment of the Assigned Contracts.

---

[2] This credit bid is dependent on the Court approving Debtor's Motion for Order Approving Stipulation by and Among the Debtor, ACH Capital West, LLC, Instafunding LLC, Pet Pros, LLC, and NPM Franchising, LLC Regarding Claim Allowance and Credit Bidding, which Debtor anticipates filing concurrently with the Sale Motion.

A list of the Assigned Contracts and the amounts to be paid in order to cure arrearages under Bankruptcy Code Section 365(b) is set forth in Schedules B, C and G to the Stalking Horse Purchase Agreement.

For the reasons stated herein, Debtor believes that a sale of the Assets is in the best interests of this bankruptcy estate, and respectfully submits that this Court should approve a sale of the Assets and enter an order in substantially the form set forth herein as **Exhibit B**.

## II.

## STATEMENT OF FACTS.

**A. Background.**

Debtor is a comprehensive pet care retail business which, as of the Petition Date, had a network of 20 retail stores in premier locations across Southern and Northern California, as well as a growing e-commerce channel. Debtor's focus is on fostering healthy pet lifestyles. Each of Debtor's stores provides a suite of best-in-class services, including pet grooming, daycare, nutrition consulting, dental cleaning and dog training classes, aiming to cater to the complete spectrum of client needs in pet care. Debtor specializes in a curated offering of pet care products, including an extensive selection of wholesome and organic food options, environmentally-friendly toys, treats, training aids, grooming supplies, and its private label offering, Mind Body Bowl. Debtor has established itself as a benchmark brand for pet services and retail, and is able to command industry leading average purchase per customer, basket size, margins, and customer loyalty by leveraging the synergy of daily need services and consumables like grooming and pet food.

Along with the retail locations, Debtor has also developed a growing direct-to-consumer ecommerce and wholesale business with its private label brand Mind Body Bowl, which speaks to the same holistic approach to pet health and care embodied in the stores. Mind Body Bowl is currently on shelf in 400+ grocery stores including Erewhon, Gelsons, and Bristol Farms. This serves to further monetize the brand as well as extend the brand reach geographically and demographically. Gross annual sales are approximately $41 million, and Debtor has approximately 300 employees.

**B. Debtor's Post-Petition Activities and Operations.**

As reflected in the Court record, this bankruptcy case was precipitated by the acts of one or more purported secured creditors that caused a nearly complete cessation of Debtor's cash flows.[3] One purported secured creditor, Instafunding LLC aka TVT SPVL ("Instafunding") filed

---

[3] A detailed background of Debtor and the reasons for this bankruptcy case is set forth in the

an alleged “confession of judgment” in Utah State court on December 3, 2024, and immediately took steps to enforce such judgment aggressively, even prior to its entry by the Utah State Court. In addition, Instafunding sent a notice of its purported lien to Debtor’s merchant credit card processor TSYS Merchant Solutions, LLC dba Global Payments on or about December 3 or 4, 2024. This notice of lien caused all of Debtor's cash flow from credit card purchases to cease. This was devastating to Debtor's operations as in excess of 95% of its operating revenues come from its credit card sales. Therefore, Debtor was placed in the difficult position of having to file an emergency bankruptcy petition as the holiday season was already underway.

Since the Petition Date, due to Instafunding's heavy-handed tactics and the emergency nature of Debtor's bankruptcy filing, Debtor was involved with myriad tasks outside of its ordinary course of business. Debtor's management was tasked with all of the burdensome administrative tasks that are attendant to the commencement and prosecution of a chapter 11 case. At the very beginning of the case, Debtor had to obtain a Court order granting use of cash collateral, and to also “unfreeze” the approximately $1.5 million held by its merchant credit card processor that had been withheld from Debtor due to Instafunding's strong-arm tactics. In addition, Debtor’s limited management resources were absorbed with dealing with vendors and various business partners concerned about the sudden and unexpected bankruptcy case filing. Debtor’s management also had to attend to its workforce of approximately 300 employees to ensure high morale was maintained in Debtor’s retail workforce through the holidays.

Debtor's post-petition efforts have been aimed at stabilizing the company’s operations and remain as a going concern despite the challenges of this chapter 11 bankruptcy, unexpected events such as the recent Los Angeles fires, and competitive business environment. Debtor has obtained orders from this Court relating to its unique cash management needs, authority to use cash collateral, and issues relating to payment of utility deposits and priority wages. Further, Debtor’s administrative staff has dealt with numerous case administration tasks, including,

---

Omnibus Declaration of Mark Boonnark in Support of Emergency Motions filed on December 11, 2024 (Dkt. No. 9).

among others: (1) compliance with the operating requirements under the Bankruptcy Code, Bankruptcy Rules, and the Guidelines of the United States Trustee (the "UST"), (2) preparing the 7-Day Package for submission to the UST and gathering documents and information related thereto, (3) transitioning from pre-petition to post-petition banking relationships; (4) preparing monthly operating reports, all amidst operating Debtor's business in a competitive environment. As mentioned, Debtor also had to deal with the unexpected business challenges posed by the recent fires throughout Los Angeles County, which adversely impacted multiple of Debtor's retail locations.

Nonetheless, Debtor maintained its focus on options for successfully emerging from this chapter 11 case. Since the Petition Date, Debtor implemented various strategies to increase sales and improve operating efficiencies. Unfortunately, despite Debtor's best efforts, Debtor is now experiencing significant negative operating cash flows and its ability to remain a going concern is highly questionable. As set forth in the *Revised Cash Collateral Budget* filed with this Court on April 28, 2025 [Dkt. No. 136], it was anticipated that Debtor would have a *negative* cash balance commencing the week of June 30, 2025. Therefore, Debtor has determined that a sale of its operating assets as a going concern will maximize the value of the bankruptcy estate and is the best interests of creditors and other parties in interest.

**C. Summary of Marketing Efforts.**

Debtor has been engaged in substantial efforts to market the Assets for sale prior to the Petition Date, as well as since the Petition Date. Debtor believes that such marketing has been thorough and over a substantial period of time so as to maximize the value of the Assets for the benefit of the estate.

**1. Pre-Petition Marketing Efforts.**

Investment bankers Critical Point Partners were engaged in July 2022 to lead a capital raise process for a company then known as Healthy Spot LLC and related companies (collectively, "Old Healthy Spot"), which was founded by Andrew Kim and Mark Boonnark in 2008. Critical Point and Mr. Boonnark played a key role in marketing the company and

managing financial discussions with potential investors and acquirers. In or about January 2023, Critical Point was engaged to market Old Healthy Spot through a sale process under Article 9 of the Uniform Commercial Code, which culminated in a competitive auction and asset sale a few months later to Oaktree Capital, which had been an investor in Old Healthy Spot.[4] As part of that transaction, Debtor was formed as the operating entity. However, even after the Article 9 sale, Debtor continued to seek a long-term capital solution. At the end of 2023, Critical Point resumed an active marketing effort alongside Force 10 (for restructuring advisory services) and Debtor's management, which continued through the Petition Date.

**2. Post-Petition Marketing Efforts**.

Since the Petition Date, the Debtor has consulted with Critical Point (Debtor’s investment banker retained pre-petition) to help determine which interested parties were the most realistic for a post-petition bankruptcy sale. Based on that advice and Mr. Boonnark’s extensive involvement with pre-petition marketing efforts, Debtor reached out to the Stalking Horse Purchaser, Skyline, Corbel Capital, and approximately five other private equity and/or strategic buyers, all of whom had expressed significant interest at or near the Petition Date. Although Debtor was heavily burdened by the administrative requirements of the chapter 11 case during the first two months of the bankruptcy case, Debtor nonetheless maintained contact with the parties most interested in acquiring Debtor’s operations. Most or all of these interested parties requested and/or were provided with updated financial information by Debtor, and some had requests for further financial data. Certain of the parties Mr. Boonnark reached out to, however, did not express an interest to re-evaluate financials. Pet Food Express/Rainier – an approximately 70-store California-based retail chain that is owned by a private equity fund - had previously put forth a term sheet, and was the lead party interested in Old Healthy Spot.

Although Debtor thought that Pet Food Express would be the most realistic post-petition competitor to the Stalking Horse Buyer, the principal of Pet Food Express told Mr.

---

[4] Oaktree Capital owns a majority stake in Debtor's parent company, Healthy Spot Holding, LLC.

Boonnark that they were no longer interested in pursuing an acquisition. By the end of February/early March 2025, everyone except the Stalking Horse Buyer and Skyline had passed on a purchase of assets or equity investment.

Debtor believes that the main reason parties have lost interest over the last several months is the Debtor' cash burn rate and declining sales volumes, as well a general decline in interest in brick-and-mortar retailers with "employee-heavy businesses" (especially in California). In addition, it is common that private equity funds have specific mandates preventing their companies from investing in special situations or distressed businesses, especially those that are not currently EBITDA positive. Mr. Boonnark believes that the appetite for risk has greatly decreased in Debtor's industry over the last couple of years.

Due to the Debtor's negative cash flows and fragile cash position, it is not economically feasible to employ an investment banker to conduct a formal marketing process. Mr. Boonnark has approached Critical Point to act as an investment banker post-petition since it already had direct contact with most of the interested potential buyers/investors. Critical Point said that they would require a minimum fee of $150,000. However, as set forth in the *Revised Cash Collateral Budget* filed with this Court on April 28, 2025 [Dkt. No. 136], it was anticipated that Debtor would have a *negative* cash balance commencing the week of June 30, 2025. Therefore, Debtor does not have the financial resources to employ an investment banker, nor to have a sale process over a longer period of time than contemplated herein.

Notably, Critical Point said that it would just basically be reaching out to the same parties as before, indicating that its employment would not add value of any significance. Importantly, Critical Point expressed its belief that the Stalking Horse Purchaser was the best prospect for a sale of the Assets, giving Debtor confidence in pursuing the proposed Sale. Finally, the Debtor has also notified substantially all vendors in the industry, so the Debtor believes that the industry is well-informed of the situation; however, there has been no "word-of-mouth" interest from other parties. In addition, this Motion has been served on all parties that expressed interest in an

investment in the Debtor or a purchase of its assets in the approximately one-year period prior to the Petition Date. *See* **Exhibit C** to the Boonnark Declaration.

In summary, over a nearly three-year period, the assets and operations of Old Healthy Spot and Debtor were consistently and comprehensively marketed. The companies engaged with approximately 200 qualified potential investors and acquirors - not including those who were contacted but did not respond—and maintained ongoing discussions with all credible investors and strategic partners.

Therefore, Debtor is confident that the Assets have been adequately marketed to date, and the sales procedures proposed in the concurrently filed *Motion By Debtor For Entry Of An Order (A) Approving Bidding Procedures And Bid Protections In Connection With The Sale Of Substantially All Of The Debtor's Assets, (B) Approving The Form And Manner Of Notice Thereof, And (C) Scheduling An Auction And Sale Hearing, (D) Approving Procedures For The Assumption And Assignment Of Contracts, (E) Granting Related Relief* (the "Sales Procedures Motion") are sufficient and appropriate under the circumstances to maximize the value of this bankruptcy estate.

**D. Benefits of the Sale and Need for An Expedited Bidding Process.**

Based on the ongoing negative cash flows of Debtor, Debtor will not realistically be able to continue as a going concern. Due to Debtor's negative cash flows, Debtor will be shortly unable to continue as a going concern, nor pay essential operating expenses such as payroll, employee benefits, rent, insurance or utilities. As a result, Debtor is seeking the relief requested herein on an expedited basis. For these reasons, Debtor is requesting that a hearing be set on this Sale Motion on shortened time to ensure that Court authority is obtained to consummate the sale as soon as possible.

Further, Debtor's assets are encumbered by the secured claims of TVT and ACH, whose filed secured claims exceed $3.0 million.[5] Debtor is fairly certain, therefore, absent a sale of the

[5] On February 2, 2025, ACH filed Claim Nos. 9 and 10 against Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10). Also on

Assets on a going concern basis, that there will be no value available for any creditors in this case, other than possibly for those holding secured claims.

The Stalking Horse Purchase Agreement provides substantial economic benefit to the estate that would not exist without the proposed sale and is overwhelmingly in the best interests of the Debtor's bankruptcy estate. First, because Debtor's assets will be sold as a going concern which benefits customers, the business community and employees. Debtor anticipates that the jobs of over 220 employees will be preserved as many of Debtor's retail locations will remain in business. Secondly, as set forth on Schedule H of the Stalking Horse Purchase Agreement, the Stalking Horse Purchaser is assuming pre-petition and post-petition trade debt ($1,775,788.16), accrued employee PTO ($215,514.00), and paying lease cure amounts ($497,511.64) in the aggregate of amount of $2,488,813.80 as part of its purchase price. Due to these substantial benefits to the estate, Debtor’s employees and the community currently served by Debtor’s business, Debtor believes that the proposed sale is an excellent achievement for this chapter 11 case and should be approved. None of these benefits would be available outside of the Sale.

Debtor concedes that the proposed timeframe for the Sale is rather compressed. However, due to the precipitous decline in Debtor's business performance, Debtor cannot – and the Stalking Horse Purchaser is not willing to – extend the sale process longer than is proposed herein. As stated above, Debtor's business and operations have been constantly and aggressively marketed for multiple years, including post-petition, and Debtor has no expectation that another purchaser would bid on the Assets, nor provide the substantial economic benefit that the Stalking Horse Purchase Agreement provides. Further, Debtor strongly believes that it does not have the luxury to engage in an expensive and lengthy marketing effort, nor does Debtor believe that additional marketing time and resources would yield a better result than is presented by the Stalking Horse Purchase Agreement. In fact, any further delay may cause irreparable harm to the estate.

---

February 2, 2025, TVT filed Claim Nos. 11 and 12 against Debtor, asserting secured claims in the amounts of $994,045.42 (Claim No. 11) and $810,624.99 (Claim No. 12).

**E. The Stalking Horse Purchaser is the Holder of a First Priority Secured Claim and is Entitled to Credit Bid its Claim to Purchase the Assets.**

Debtor has filed, or is concurrently filing herewith, a motion[6] to approve a stipulation establishing that the Stalking Horse Bidder is the holder of first priority secured claims in the aggregate amount of $2,876,344.20 and has the right to credit bid such claims in connection with the sale (the "Credit Bid Stipulation"). As set forth in the Stalking Horse Purchase Agreement, the Stalking Horse Purchaser requires that: (i) the secured claims of TVT SPVL.com and ACH Capital West, LLC (the "ACH/TVT Claims") be allowed in certain agreed amounts; (ii) the Stalking Horse Purchaser acquires the ACH/TVT Claims; and (iii) and the Stalking Horse Purchaser be authorized to credit bid the allowed amount of the ACH/TVT Claims under Section 363(k) of the Bankruptcy Code as part of the purchase price for the Assets. This Motion presumes that the Credit Bid Motion (for which Debtor filed an application for order shortening notice on its approval) was granted, and that the Stalking Horse Purchaser has the rights to credit bid its secured claims as part of the purchase price of the Assets.

The record in the case establishes that there are no other secured claims against the assets of Debtor's bankruptcy estate. On January 23, 2025, the Debtor filed, among other things, its Schedules of Assets and Liabilities [Docket No. 62] (the "Schedules"). On its Schedule D, the Debtor scheduled ACH Capital West, LLC as holding an unliquidated and disputed secured claim in the amount of $1,231,902.55. *See* Schedule D, #2.1. Also on Schedule D, the Debtor scheduled "TVT SPVL.com"[7] as holding an unliquidated and disputed secured claim in the amount of $1,700,868.52. *See* Schedule D, #2.3.

On February 2, 2025, ACH filed Claim Nos. 9 and 10 (the "ACH Claims") against the Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10). Also on February 2, 2025, TVT filed Claim Nos. 11 and 12 (the "TVT Claims,"

---

[6] Motion for Order Approving Stipulation by and Among the Debtor, ACH Capital West, LLC, Instafunding LLC, Pet Pros, LLC, and NPM Franchising, LLC Regarding Claim Allowance and Credit Bidding (the "Credit Bid Motion").

[7] The Debtor also listed "Insta Funding LLC" (the formal legal name of TVT) and Valerga LLP, TVT's state court counsel, as notice only parties.

and together with the ACH Claims, the aforementioned "ACH/TVT Claims"). There are no other secured claims scheduled by Debtor,[8] nor has any party other than ACH or TVT filed proofs of claim asserting a lien in the Assets of Debtor.[9]

**III.**

**THE STALKING HORSE PURCHASE AGREEMENT SHOULD BE APPROVED.**

**A. The Sale Satisfies the Requirements of Section 363 of the Bankruptcy Code.**

As a general matter, a Court considering a motion to approve a sale under § 363(b) should determine from the evidence presented before it that a "good business reason" exists to grant such a motion. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). In addition, the Court must further find it is in the best interest of the estate. To make this determination, a Court should consider whether:

(1) the sale is fair and reasonable, i.e., the price to be paid is adequate;

(2) the property has been given adequate marketing;

(3) the sale is in good faith, i.e., there is an absence of any lucrative deals with insiders, and

(4) adequate notice has been provided to creditors.

*In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 502-505 (C.D. Cal. 1999). Debtor submits that the proposed sale of the Assets satisfy each of these requirements.

a. Sound Business Purpose.

The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter*), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under §363(b). The facts pertaining to the sale at issue here amply substantiate

---

[8] The Court is requested to take judicial notice of Debtor's Bankruptcy Schedule D (Dkt. No. 62, pgs. 16 - 17). As stated above, all of the parties on Schedule D relate to the ACH/TVT Claims.

[9] A true copy of the claims register in this case is annexed hereto as **Exhibit D**.

Debtor's business decision that the contemplated sale of the Property serves the best interests of the estate's creditors and merits the approval of this Court.

The Stalking Horse Purchase Agreement provides substantial economic benefit to the estate that would not exist without the proposed sale and is overwhelmingly in the best interests of the Debtor's bankruptcy estate. First, because Debtor's assets will be sold as a going concern which benefits customers, the business community and employees. Debtor anticipates that the jobs of over 220 employees will be preserved as many of Debtor's retail locations will remain in business. Secondly, as set forth on Schedule H of the Stalking Horse Purchase Agreement, the Stalking Horse Purchaser is assuming pre-petition and post-petition trade debt ($1,775,788.16), accrued employee PTO ($215,514.00), and paying lease cure amounts ($497,511.64) in the aggregate of amount of $2,488,813.80 as part of its purchase price. Due to these substantial benefits to the estate, Debtor's employees and the community currently served by Debtor's business, Debtor believes that the proposed sale is an excellent achievement for this chapter 11 case and should be approved. None of these benefits would be available outside of the Sale.

Therefore, given that the estate will receive the foregoing economic benefit, the proposed sale is a reasonable exercise of Debtor's business judgment and should be approved.

b. <u>Fair and Reasonable Price</u>.

In order for a sale to be approved under 11 U.S.C. §363(b), the purchase price must be fair and reasonable. See generally, *In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985). Debtor is given substantial discretion in this regard. <u>Id</u>. In addition, courts have broad discretion with respect to matters under § 363(b). *See Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985). In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold. *Wilde Horse Enterprises, Inc.*, 136 B.R. at 841 (*citing In re Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985)), *In re Alpha Industries, Inc.*, 84 B.R. 703, 705 (Bankr. Mont. 1988).

As discussed above, the extensive marketing efforts by Debtor both pre-petition and post-petition provide the Court with a reasonable basis to conclude that the proposed purchase

price reflects or exceeds the fair market value of the Assets. Moreover, Debtor is providing the opportunity for other interest parties to engage in a competitive bidding process, as set forth fully in the concurrently filed Sale Procedures Motion.

c. Good Faith Buyer.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction. *In re Wilde Horse Enterprises*, 136 B.R. at 842. In this case, the sale of the Assets has been proposed in good faith. The Stalking Horse Purchase Agreement has been negotiated at arms-length and represents the highest and best offer for the Assets. There have been no collusive, deceptive or fraudulent practices by any party of which Debtor is aware. Under these circumstances, the sale of the Assets has been proposed in good faith and for the benefit of the estate.

d. Accurate and Reasonable Notice.

A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988). The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections. *Id.*

Here, Debtor has served the notice of this Motion upon the Office of the United States Trustee, all creditors, all parties who claim a security or other interest in some or all of the Assets, parties requesting special notice and any party against whom direct relief is sought by the Motion. The notice is accurate and reasonable and provides, among other things, the terms and conditions of the sale and states the time for filing objections.

**B. Section 363(f) Authorizes Debtor to Sell The Assets Free and Clear of Liens, Claims, Interests and Encumbrances.**

Debtor seeks to sell the Assets free and clear of any and all liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, Section 363(f) authorizes a trustee to sell assets free and clear if any one of the following conditions is satisfied:

(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest in a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4) such interest is in bone fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Section 363(f) of the Bankruptcy Code is supplemented by Section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Debtor submits that the proposed sale of Assets to the Stalking Horse Purchaser free and clear of all of the liens, claims, interests and encumbrances satisfies one or more of the requirements under section 363(f) of the Bankruptcy Code.

1. Section 363(f)(1).

Section 363(f)(1) authorizes a sale if "applicable nonbankruptcy law permits sale of such property free and clear of such interest." 11 U.S.C. § 363(f)(1); *see also In re Royal St. Bistro, L.L.C.,* 26 F.4th 326, 328 (5th Cir. 2022) ("Bankruptcy law recognizes and defers to state law in Section 363(f)"). Under California foreclosure law, when a property is sold pursuant to a foreclosure sale, the Stalking Horse Purchaser obtains title free and clear of all encumbrances junior in priority to its liens. *See San Francisco Design Ctr. Assocs. v. Portman Companies*, 41 Cal. App. 4th 29, 45 (1995). First, Debtor knows of no other party claiming a lien or interest in the assets other than the Stalking Horse Purchaser. Further, and in any event, it is not subject to reasonable dispute that the Stalking Horse Purchaser could foreclose its first position lien on the Assets pursuant to its secured claims and, under California law, all junior encumbrances would be extinguished. *Id*. As a result, Section 363(f)(1) authorizes the Sale free and clear of all lien, claims, encumbrances and interests that were imposed upon the Assets junior in priority. *See In*

*re Spanish Peaks Holdings II, LLC,* 872 F.3d 892, 901 (9th Cir. 2017) (authorizing sale of debtor's property free and clear of leases pursuant to Section 363(f)(1)); *see also Royal St. Bistro,* 26 F.4th at 327-28 (sale free and clear of unexpired leasehold interests permitted where under state law leases would be extinguished via foreclosure sale).

2. Section 363(f)(2).

Section 363(f)(2) authorizes a sale free and clear of liens and interests if the holder of such lien or interest consents. Here, the only secured party asserting a lien or other interest in the Assets – the Stalking Horse Purchaser - consents to the proposed Sale. Debtor does not know of any party other than the Stalking Horse Purchaser that claims a security interest in the Assets. As such, the condition under Section 363(f)(2) that the party claiming an interest in the Assets consents to a sale free and clear of such interests is satisfied.

3. Section 363(f)(5).

Additionally, and similar to Section 363(f)(1), to the extent that a party objects to the Sale on the basis that it allegedly holds a prepetition lien or encumbrance on the Assets, Debtor believes that any such party could be compelled to accept a monetary satisfaction of such claim or interests under section 363(f)(5) of the Bankruptcy Code. Courts have held that a lien is an "interest" that may be avoided under section 363(f)(5) where a senior lienholder could foreclose and extinguish the liens of junior lienholders. *See In re Jolan, Inc.,* 403 B.R. 866, 869-70 (Bankr. W.D. Wash. 2009) (holding that section 363(f)(5) was satisfied by the availability of foreclosure and other proceedings); *see also In re Urb. Commons 2 W. LLC*, 2025 WL 717024, at *1 (Bankr. S.D.N.Y. Mar. 4, 2025) (finding that debtors' proposed free-and-clear sale satisfied Section 363(f)(5) because, under state law, a foreclosure sale would extinguish the objecting junior holder's lien). Here, the Stalking Horse Purchaser could foreclose on the Assets, which action would eliminate and extinguish the liens held by all other lienholders as to the Assets and compel the junior lienholders to look to any proceeds from the sale for satisfaction. *See In re Wagabaza*, 582 B.R. 486, 496 (Bankr. C.D. Cal. 2018) *citing* Miller & Starr, 5 Cal. Real Est. § 11:100 (3d ed.) ("A foreclosure sale of a senior deed of trust eliminates the liens of junior

lienors, but the junior liens attach to any surplus sales proceeds that must be paid to the junior lienors.”).

Recently, in *Urban Commons*, the Bankruptcy Court for the Southern District of New York addressed the unsettled issue concerning the circumstances in which a debtor may sell its property free and clear of liens and other interests, and held that Section 363(f)(5) is satisfied when there is a “realistic possibility” that a proceeding could be initiated to compel junior interest holders to accept monetary satisfaction of their claim. *Urb. Commons, supra*, 2025 WL 717024 at *5. The *Urban Commons* court further found that this reading of Section 363(f)(5) makes sense in light of Congress’ general reliance on state law to determine parties’ rights in bankruptcy and that it “would have looked to such state law mechanisms [as foreclosure sales] to determine which property interests would be extinguished by a bankruptcy sale.” *Id*.

Accordingly, the Stalking Horse Purchaser’s ability to foreclose on the Assets under applicable law satisfies Section 363(f)(5).

**C. The Stalking Horse Purchaser is Entitled to Credit Bid For The Assets As the First-Priority Senior Secured Creditor.**

Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of an allowed claim secured by property that is the subject of a sale “may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.” 11 U.S.C. § 363(k); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.2 (2012) (“The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan.”). As set forth above, the Stalking Horse Purchaser holds a valid, first priority lien securing claims in the aggregate amount of $2,876,344.20. Therefore, its credit bid as part of the consideration paid under the Stalking Horse Purchase Agreement is proper.

**D. The Stalking Horse Purchaser Should Be Entitled to The Protections of Section 363(m) of The Bankruptcy Code**

Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor in the event that a sale conducted under Section 363(b) is later reversed or otherwise modified on appeal. Specifically, Section 363(m) states:

> The reversal or modification on appeal of an authorization under [Section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

Section 363(m) reflects the policy of finality and efficiency in bankruptcy proceedings. *See In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 2018 WL 1229989, at *3 (C.D. Cal. Jan. 19, 2018) *citing In re Energytec, Inc.*, 739 F.3d 215, 218–19 (5th Cir. 2013) (noting that § 363(m) "codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved") (citation omitted); *In re Colarusso*, 382 F.3d 51, 62 (1st Cir. 2004) (statutory mootness pursuant to § 363(m) "reflects the salutary policy of affording finality to judgments approving sales in bankruptcy by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids") (citation omitted).

Importantly, the policy of finality afforded by Section 363(m) has the effect of allowing the estate to obtain the best price for the debtor's assets. *Id. citing In re Colony Hill Assocs.*, 111 F.3d 269, 272 (2d Cir. 1997) ("Limiting appellate jurisdiction in this manner furthers the policy of finality in bankruptcy sales ... and assists the bankruptcy court to secure the best price for the debtor's assets."). This policy attracts investors, effectuates debtor rehabilitation, and avoids the sale of a debtor's assets at deep discounts due to uncertainty.

Although the Bankruptcy Code does not define the term "good faith", the Ninth Circuit has followed traditional equitable principles in holding that a good faith purchaser is one who buys "in good faith" and "for value." *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992). Typically, a purchaser's lack of good faith is shown by "fraud, collusion between the Stalking Horse Purchaser and other bidders or Debtor, or an attempt to take grossly unfair advantage of other bidders." *Id. quoting In re Suchy*, 786 F.2d 900, 902 (9th Cir.1985).

In this case, it is clear that the Stalking Horse Purchaser is entitled to the safe harbor provided by Bankruptcy Code Section 363(m). The negotiations between the Stalking Horse Purchaser and Debtor at all times were conducted as arm's length and in good faith, there are no side-agreements, arrangements or understandings between Debtor and Stalking Horse Purchaser other than as set forth in the Stalking Horse Purchase Agreement, and all of the consideration to be paid by the Stalking Horse Purchaser to Debtor is as fully disclosed herein and in the Stalking Horse Purchase Agreement.

The Stalking Horse Purchaser is not an insider of Debtor. Throughout the negotiations of the proposed Sale, Debtor exercised its sound business judgment and acted with the intent of obtaining the best possible deal for the estate and its creditors. The proposed sale accomplishes these appropriate objectives. Therefore, if the Court approves the proposed Sale transaction, it is appropriate to grant the Stalking Horse Purchaser the good-faith protections provided in Section 363(m).

**E. Assumption and Assignment of the Assigned Contracts Should Be Authorized as a Sound Exercise of Debtor's Business Judgment**

Section 365(a) of the Bankruptcy Code provides that Debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The decision to assume or reject an unexpired lease is a matter within the "business judgment" of Debtor. *In re G.I. Indus., Inc.*, 204 F.3d 1276, 1282 (9th Cir. 2000). Any assumption of the Assigned Contracts is an exercise of Debtor's sound business judgment because the assignment of such Contracts to the Stalking Horse Buyer is necessary to Debtor's

ability to obtain the best value for the Assets. The assumption and assignment of the Assigned Contracts is a critical element of the Stalking Horse Purchase Agreement. Of course, given that the core value of Debtor's assets are its ongoing retail operations, Debtor's assumption of the Assigned Contracts for the purposes of carrying out the terms of the Stalking Horse Purchase Agreement, is a sound exercise of Debtor's business judgment and, therefore, should be approved. By this Motion, Debtor is providing notice to all counterparties to the Assigned Contracts regarding the proposed assumption and assignment and related amount necessary to cure arrearages under said Contracts (the "Cure Costs"). The schedule of the Cure Costs is set forth as Schedules C[10] and G to the Stalking Horse Purchase Agreement. Bankruptcy Code § 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor. This subsection provides:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, Debtor may not assume such contract or lease unless, at the time of

assumption of such contract or lease, Debtor –

(A) cures, or provides adequate assurance that Debtor will promptly cure, such default . . . ;

(B) compensates, or provides adequate assurance that Debtor will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

Bankruptcy Code § 365(f)(2) provides, in pertinent part, that:

Debtor may assign an executory contract or unexpired lease of the debtor only if --

(A) Debtor assumes such contract or lease in accordance with the

[10] Debtor estimates that the Cure Amount for all executory contracts listed on Schedule C is zero.

provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Moreover, an executory contract or unexpired lease may be assigned "notwithstanding a provision in an executory contract or unexpired lease . . . or applicable law, that prohibits, restricts, or conditions the assignment of such contracts or lease. . . ." 11 U.S.C. §

Pursuant to Section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease if "adequate assurance of future performance by the assignee of such contract or lease is provided." The meaning of "adequate assurance of future performance" depending on the facts and circumstances of each case, but should be given "a practical, pragmatic construction." *In re Art & Architecture Books of the 21st Century*, 2013 WL 4874342, at *8 (Bankr. C.D. Cal. Sept. 12, 2013) *citing In Re Evelyn Byrnes, Inc.*, 32 B.R. 825, 828–829 (Bankr.S.D.N.Y.1983). The necessary degree of assurance "falls considerably short of an absolute guaranty." *In re X10 Wireless Tech., Inc.*, 2005 WL 6960205, at *3 (B.A.P. 9th Cir. Apr. 5, 2005) *citing In re Tex. Health Enters., Inc.*, 246 B.R. 832, 835 (Bankr.E.D.Tex.2000); *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr.E.D.Tex.1999). As set forth above, by notice of this Motion each counterparty will have the opportunity to object to the Stalking Horse Purchaser's ability to provide adequate assurance.

Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

The Stalking Horse Purchaser is a major provider of pet food products and services with a national presence. Beginning with a single store in Westminster California in 1977, the

Stalking Horse Purchaser now boasts a network of over 200 locations nationwide including corporate owned and franchised pet nutrition stores and pet wellness spas. As such, the Stalking Horse Purchase is a unique and appropriate purchaser of Debtor's Assets. The Stalking Horse Purchaser's business concentrates on providing health and nutrition services to pets and their owners through their retail locations which provide products and grooming services, as well as online resources such as podcasts, articles, the latest research, and pathways to the best veterinary resources. Due to the size and experience of Stalking Horse Purchaser in the pet care industry, which is very similar to Debtor’s business, the Stalking Horse Purchaser is able to perform all obligations under the Assigned Contracts.

To the extent any defaults exist under any Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment as set forth in this Motion. If necessary, the Debtor will submit additional facts prior to or at the Sale Hearing to show the financial capability of the Stalking Horse Purchaser (or a successful overbidder) regarding its ability to perform under the Assigned Contracts. All Cure Costs shall be paid directly to the Assigned Contract counterparties by the Stalking Horse Purchaser. The notice of this Motion. the Sales Procedure Motion, and the hearing on this Motion will provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Purchaser to provide adequate assurance of future performance under the Assigned Contracts.

In addition, Debtor submits that it is an exercise of sound business judgment to assume and assign the Assigned Contracts to the Stalking Horse Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of Debtor and its estate, creditors, and all parties-in-interest. The Assigned Contracts being assigned to the Stalking Horse Purchaser are an integral part of the Assets being purchased by the Stalking Horse Purchaser, and accordingly, such assumption and assignment of the Assigned Contracts are reasonable and enhance the value of Debtor’s estate. The Court

should therefore authorize Debtor to assume and assign the Assigned Contracts as set forth herein.

**F. Debtor Requests the Court to Waive the Fourteen-Day Waiting Periods Set Forth in Bankruptcy Rules 6004(h) and 6006(d).**

Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to Bankruptcy Code § 363 are automatically stayed for fourteen (14) days after entry of the order. Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen (14) days after entry of the order. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally* 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

## IV.

## CONCLUSION

Wherefore, Debtor respectfully requests that the Court enter an order substantially in the form of the proposed order annexed hereto as **Exhibit B**:

1. Authorizing the sale of the Assets to the Stalking Horse Purchaser under the terms of the Stalking Horse Purchase Agreement free and clear of all liens, claims, interests and encumbrances pursuant to Sections 363(a) and (f), except as otherwise set forth herein;

2. Finding that the Stalking Horse Purchaser's interests are protected as a good faith purchaser of the Debtor's assets pursuant to Section 363(m);

3. Authorizing Debtor to assume and assign the Assigned Contracts pursuant to Section 365 and all terms thereof, including the cure amounts for purposes of 365(b)(1)(A);

4. Waiving the 10-day stay period set forth in Bankruptcy Rules 6004(h) and 6006(d); and

5. Granting such further relief as the Court deems just and proper.

Dated: July 10, 2025

LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.

By: ___*/s/ Daniel H. Reiss*___
DANIEL H. REISS
Attorneys for Chapter 11 Debtor and
Debtor in Possession

**DECLARATION OF MARK BOONARK**

I, Mark Boonnark, hereby declare as follows:

1. I serve as the chief executive officer of Healthy Spot Operating, LLC, the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"). I have personal knowledge of the facts set forth herein, and, if called as a witness, I would testify competently with respect thereto.

2. I have reviewed and am familiar with and am knowledgeable about the books and records of Debtor, which books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded. I make this declaration in support of the annexed Motion. Unless otherwise indicated, the capitalized terms herein shall have the same meaning herein as in the Motion.

3. On December 10, 2024, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. Debtor is a comprehensive pet care retail business which, as of the Petition Date, had a network of 20 retail stores in premier locations across Southern and Northern California, as well as a growing e-commerce channel. Debtor's focus is on fostering healthy pet lifestyles. Each of Debtor's stores provides a suite of best-in-class services, including pet grooming, daycare, nutrition consulting, dental cleaning and dog training classes, aiming to cater to the complete spectrum of client needs in pet care. Debtor specializes in a curated offering of pet care products, including an extensive selection of wholesome and organic food options, environmentally-friendly toys, treats, training aids, grooming supplies, and its private label offering, Mind Body Bowl. Debtor has established itself as a benchmark brand for pet services and retail, and was able to command industry leading average purchase per customer, basket size, margins, and customer loyalty by leveraging the synergy of daily need services and consumables like grooming and pet food.

4. Along with the retail locations, Debtor has also developed a growing direct-to-consumer ecommerce and wholesale business with its private label brand Mind Body Bowl,

which speaks to the same holistic approach to pet health and care embodied in the stores. Mind Body Bowl is currently on shelf in 400+ grocery stores including Erewhon, Gelsons, and Bristol Farms. This serves to further monetize the brand as well as extend the brand reach geographically and demographically. Gross annual sales are approximately $40 million, and Debtor has approximately 300 employees.

5. The Debtor continues to operate and manage its business and affairs as a debtor-in-possession pursuant. Debtor's post-petition efforts have been aimed at stabilizing the company's operations and remain as a going concern despite the challenges of this chapter 11 bankruptcy, unexpected events such as the recent Los Angeles fires, and competitive business environment. Since the Petition Date, Debtor implemented various strategies to increase sales and improve operating efficiencies. Unfortunately, despite Debtor's best efforts, Debtor is now experiencing significant negative operating cash flows and its ability to remain a going concern is highly unlikely. As set forth in the *Revised Cash Collateral Budget* filed with this Court on April 28, 2025 [Dkt. No. 136], it was anticipated that Debtor would have a *negative* cash balance commencing the week of June 30, 2025.

6. Based on the ongoing negative cash flows of Debtor, Debtor will not realistically be able to continue as a going concern. Further, Debtor's assets are encumbered by the asserted secured claims of TVT SPVL.com and ACH Capital West, LLC (described further below), whose filed secured proofs of claim exceed $3.0 million.[11] Debtor is fairly certain, therefore, absent a sale of its assets on a going concern basis, that there will be no value available for any creditors in this case, other than possibly for those holding secured claims. Therefore, Debtor has determined that a sale of its operating assets as a going concern will maximize the value of the bankruptcy estate and is the best interests of creditors and other parties in interest.

7. On or about July10, 2025, Debtor entered into that certain Asset Purchase

[11] On February 2, 2025, ACH filed Claim Nos. 9 and 10 against Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10). Also on February 2, 2025, TVT filed Claim Nos. 11 and 12 against Debtor, asserting secured claims in the amounts of $994,045.42 (Claim No. 11) and $810,624.99 (Claim No. 12).

Agreement with Buyer, subject to higher or better offers ("Stalking Horse Purchase Agreement"). A true copy of the Stalking Horse Purchase Agreement is annexed hereto as **Exhibit "A"**.

8. The Sale to Buyer under the terms of the Stalking Horse Purchase Agreement provides substantial economic benefit to the estate that would not exist without the Sale, and is in the overwhelming best interests of the Debtor's bankruptcy estate. The Stalking Horse Purchase Agreement provides substantial economic benefit to the estate that would not exist without the proposed sale and is overwhelmingly in the best interests of the Debtor's bankruptcy estate.

9. First, because Debtor's assets will be sold as a going concern which benefits customers, the business community and employees. Debtor anticipates that the jobs of over 220 employees will be preserved as many of Debtor's retail locations will remain in business. Secondly, as set forth on Schedule H of the Stalking Horse Purchase Agreement, the Stalking Horse Purchaser is assuming pre-petition and post-petition trade debt ($1,775,788.16), accrued employee PTO ($215,514.00), and paying lease cure amounts ($497,511.64) in the aggregate of amount of $2,488,813.80 as part of its purchase price. Due to these substantial benefits to the estate, Debtor's employees and the community currently served by Debtor's business, Debtor believes that the proposed sale is an excellent achievement for this chapter 11 case and should be approved. None of these benefits would be available outside of the Sale.

10. Due to the substantial benefits of the Sale to the estate, Debtor's employees and the community currently served by Debtor's business, Debtor believes that the proposed sale is an excellent achievement for this chapter 11 case and should be approved.

11. Debtor has been engaged in substantial efforts to market the Assets for sale for approximately a year prior to the Petition Date, as well as since the Petition Date. Debtor believes that such marketing has been thorough and over a substantial period of time so as to maximize the value of the Assets for the benefit of the estate. I have served as the main representative of Debtor is all marketing efforts described herein, interfacing with potentially

interested buyers and investors, as well as the professionals involved.

12. Critical Point Partners was engaged in July 2022 to lead a capital raise process for a company then known as Healthy Spot LLC and related companies (collectively, "Old Healthy Spot"), which was founded by me and Andrew Kim in 2008. Critical Point and I played a key role in marketing the company and managing financial discussions with potential investors and acquirers. In or about January 2023, Critical Point was engaged to market Old Healthy Spot through a sale process under Article 9 of the Uniform Commercial Code, which culminated in a competitive auction and asset sale a few months later to Oaktree Capital, which had been an investor in Old Healthy Spot.[12] As part of that transaction, Debtor was formed as the operating entity. However, even after the Article 9 sale, Debtor continued to seek a long-term capital solution. At the end of 2023, Critical Point resumed an active marketing effort alongside Force 10 (for restructuring advisory services) and Debtor's management, which continued through the Petition Date.

13. Since the Petition Date, I have consulted with Critical Point to help determine which interested parties were the most realistic for a post-petition bankruptcy sale. Based on that advice and my extensive involvement with pre-petition marketing efforts, Debtor reached out to the Stalking Horse Purchaser, Skyline, Corbel Capital, and approximately five other private equity and/or strategic buyers, all of whom had expressed significant interest at or near the Petition Date. Although Debtor was heavily burdened by the administrative requirements of the chapter 11 case during the first two months of the bankruptcy case, Debtor nonetheless maintained contact with the parties most interested in acquiring Debtor’s operations. Most or all of these interested parties requested and/or were provided with updated financial information by Debtor, and some had requests for further financial data. Certain of the parties I reached out to, however, did not express an interest to re-evaluate financials. Pet Food Express/Rainier – an approximately 70-store California-based retail chain that is owned by a

[12] Oaktree Capital owns a majority stake in Debtor's parent company, Healthy Spot Holding, LLC.

private equity fund - had previously put forth a term sheet, and was the lead party interested in Old Healthy Spot, which had been sold through the aforementioned UCC Article 9 sale process.[13]

14. Although I thought that Pet Food Express would be the most realistic post-petition competitor to the Stalking Horse Buyer, the principal of Pet Food Express told me they were no longer interested in pursuing an acquisition. By the end of February/early March 2025, everyone except the Stalking Horse Buyer and Skyline had passed on a purchase of assets or equity investment.

15. I believe that the main reason parties have lost interest over the last several months is the Debtor' cash burn rate and declining sales volumes, as well a general decline in interest in brick-and-mortar retailers with "employee-heavy businesses" (especially in California). In addition, it is common that private equity funds have specific mandates preventing their companies from investing in special situations or distressed businesses, especially those that are not currently EBITDA positive. I believe that the appetite for risk has greatly decreased in Debtor's industry over the last couple of years.

16. Due to the Debtor's negative cash flows and fragile cash position, it is not economically feasible to employ an investment banker to conduct a formal marketing process. I approached Critical Point to act as an investment banker post-petition since it already had direct contact with most of the interested potential buyers/investors. Critical Point said that they would require a minimum fee of $150,000. However, as mentioned above, it was anticipated that Debtor would have a *negative* cash balance of approximately $379,000 for the week of June 30, 2025. Therefore, Debtor has not had the financial resources to employ an investment banker, nor to have a sale process over a longer period of time than contemplated herein.

17. Notably, Critical Point said that it would just basically be reaching out to the

---

[13] Debtor was formed in connection with the purchase of assets that occurred through an UCC Article 9 sales process.

same parties as before, indicating that its employment would not add value of any significance. Importantly, Critical Point expressed its belief that the Stalking Horse Purchaser was the best prospect for a sale of the Assets, giving Debtor confidence in pursuing the proposed Sale. Finally, Debtor has also notified substantially all vendors in the industry, so the Debtor believes that the industry is well-informed of the situation; however, there has been no "word-of-mouth" interest from other parties of which I am aware. In addition, this Motion and the Sale Motion has been served on all parties that expressed interest in an investment in the Debtor or a purchase of its assets in the approximately one-year period prior to the Petition Date. *See* **Exhibit C**.

18. I believe that launching a sales process with a locked-in buyer (as compared with proceeding with a blind auction with no actual sale agreement in hand) is in the best interests of this estate and will result in the highest price possible being paid for the Assets.

19. Debtor concedes that the proposed timeframe for the proposed sale is rather compressed. However, due to the precipitous decline in Debtor's business performance, Debtor cannot – and the Stalking Horse Purchaser is not willing to – extend the sale process longer than is proposed herein. Debtor's business and operations have been constantly and aggressively marketed for multiple years, including post-petition, and Debtor has no expectation that another purchaser will bid on the Assets, nor provide the substantial economic benefit that the Stalking Horse Purchase Agreement provides.

20. Further, Debtor strongly believes that it does not have the luxury to engage in an expensive and lengthy marketing effort, nor does Debtor believe that additional marketing time and resources would yield a better result than is presented by the Stalking Horse Bid. In fact, any further delay may cause irreparable harm to the estate. Due to Debtor's negative cash flows, Debtor will be shortly unable to continue as a going concern, nor pay essential operating expenses such as payroll, employee benefits, rent, insurance or utilities. As a result, Debtor is seeking the relief requested herein on an expedited basis. For these reasons, Debtor is requesting that a hearing be set on the annexed Motion on shortened time to ensure that

Court authority is obtained to consummate the sale as soon as possible.

21. On January 23, 2025, the Debtor filed, among other things, its Schedules of Assets and Liabilities. On its Schedule D, the Debtor scheduled ACH Capital West, LLC as holding an unliquidated and disputed secured claim in the amount of $1,231,902.55. Also on Schedule D, the Debtor scheduled "TVT SPVL.com" as holding an unliquidated and disputed secured claim in the amount of $1,700,868.52.

22. Based on the record in this bankruptcy case, I am informed that on February 2, 2025, ACH filed Claim Nos. 9 and 10 against the Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10) on account of "Sept 2024 Receivables Purchase Agr." I am also informed that on February 2, 2025, TVT filed Claim Nos. 11 and 12 against the Debtor, asserting secured claims in the amounts of $994,045.42 (Claim No. 11) and $810,624.99 (Claim No. 12) on account of "June 2024 Contract Receivables Purchase Agr."

23. As a necessary condition to proceeding with the Sale, and as set forth in the Stalking Horse Purchase Agreement, Buyer requires that: (i) the ACH/TVT Claims be allowed in certain agreed amounts; (ii) Buyer acquires the ACH/TVT Claims; and (iii) and Buyer be authorized to credit bid the allowed amount of the ACH/TVT Claims under Section 363(k) of the Bankruptcy Code as part of the purchase price for the Assets.

24. I am not aware of any other party other than ACH and TVT that asserts a lien in the assets of Debtor. I am informed that the record in this case also establishes that there are no other secured claims against Debtor, as there are no other secured parties scheduled by Debtor, nor has any party other than ACH or TVT filed proofs of claim asserting a lien in the assets of Debtor.[14]

25. The Stalking Horse Purchaser is a major provider of pet food products and services with a national presence. I am informed that, beginning with a single store in Westminster California in 1977, the Stalking Horse Purchaser now boasts a network of over 200

[14] A true copy of the claims register in this case is annexed hereto as **Exhibit D**.

locations nationwide including corporate owned and franchised pet nutrition stores and pet wellness spas. I have been in communication with the Stalking Horse Purchaser for over a year regarding a potential investment in, or purchase of the assets of, the Debtor and am very familiar with its business. I believe the Stalking Horse Purchase is a unique and appropriate purchaser of Debtor's Assets. The Stalking Horse Purchaser's business concentrates on providing health and nutrition services to pets and their owners through their retail locations which provide products and grooming services, as well as online resources such as podcasts, articles, the latest research, and pathways to the best veterinary resources. Due to the size and experience of Stalking Horse Purchaser in the pet care industry, which is very similar to Debtor’s business, I am confident that the Stalking Horse Purchaser is able to perform all obligations under the Assigned Contracts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of July, 2025 in Los Angeles, California.

MARK BOONNARK

# EXHIBIT "A"

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***") is made and entered into effective as of _______________, 2025, by and among Pet Pros, LLC, a Washington limited liability company ("***Pet Pros***"), NPM Franchising, LLC, a Washington limited liability company ("***NPM***", and together with Pet Pros, collectively, "***Buyer***"), and Healthy Spot Operating, LLC, a Delaware limited liability company ("***Seller***").

## RECITALS

WHEREAS, Seller presently conducts the business of owning and operating retail pet stores for selling pet food, products, and services in the State of California and over the internet (collectively, the "***Business***");

WHEREAS, on December 10, 2024, Seller filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "***Bankruptcy Code***"), with the United States Bankruptcy Court for the Central District of California (the "***Bankruptcy Court***"), Case No. 2:24-bk-20065-DS (the "***Bankruptcy Case***");

WHEREAS, Buyer has sought Bankruptcy Court approval of that certain *Stipulation* (the "***Stipulation***") by and among Buyer, Seller, ACH Capital West, LLC ("***ACH***"), and Instafunding LLC a/k/a TVT SPVL ("***TVT***") allowing the claims, deemed filed under Section 1111(a) of the Bankruptcy Code, of ACH (Claim Nos. 9 & 10) and TVT (Claim Nos. 11 & 12) (collectively, the "***ACH/TVT Claims***") for the purpose of submitting a credit bid, under Section 363(k) of the Bankruptcy Code, in accordance with the Bid Procedures as set forth in the Bid Procedures Order and the Sale Motion;

WHEREAS Buyer anticipates that, upon Bankruptcy Court approval of the Stipulation, it will acquire all rights, title and interest in and to the ACH/TVT Claims, and shall file a *Transfer of Claim Other Than for Security* (the "***Claims Transfer Notice***") with the Bankruptcy Court;

WHEREAS, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and the Bid Procedures to be approved by the Bankruptcy Court (the "***Bid Procedures Order***"), Seller will solicit offers for the sale of certain assets of the bankruptcy estate of Seller;

WHEREAS, pursuant to the Bid Procedures Order, Buyer will serve as the Stalking Horse Bidder (as defined in the Bid Procedures Order), which establishes a baseline bid for the sale of the assets, subject to higher or better offers;

WHEREAS, upon the Bid Deadline, should no higher or better offers be received by Seller, Buyer will be designated the Successful Bidder, in accordance with the Bid Procedures, subject to Bankruptcy Court approval; and

WHEREAS, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Seller, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein.

**NOW THEREFORE**, for and in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Purchase and Sale of Purchased Assets**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer hereby purchases, acquires, and accepts from Seller, on an "as is, where is" basis and without any representation or warranty on the part of Seller as to fitness, merchantability or otherwise, and Seller hereby sells, transfers, assigns, conveys, and delivers to Buyer, all of the Purchased Assets, free and clear of all liens, claims, interests and encumbrances (subject to the terms of this Agreement and the final order by the Bankruptcy Court granting the motion to authorize and approve the Contemplated Transactions (as defined below)), for the consideration set forth in Section 4.1; provided that NPM shall only purchase, acquire, and accept the IP Assets (as defined below), and Pet Pros shall purchase, acquire, and accept all Purchased Assets except for the IP Assets. "***Purchased Assets***" means all of the direct or indirect right, title, and interest of Seller in and to (a) all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories for and situated in the Purchased Stores (collectively, the "***Inventory***") of Seller; (b) all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, shelving, display tables and counters, refrigerators/freezers, grooming tables, kennels, cabinets, washers and dryers, tubs, computers, telephones, and other tangible personal property for and associated with the stores set forth on Schedule A (collectively, the "***Purchased Stores***"); (c) the real estate leases associated with the Purchased Stores (and only such Purchased Stores) set forth on Schedule B, including, without limitation, all deposits, prepayments, and other similar amounts retained by the applicable landlord (the "***Store Leases***"); (d) all rights and incidents of interest, and benefits accruing to, Seller under all contracts and agreements of Seller set forth on Schedule C to the extent associated with the Purchased Stores, whether written or oral (collectively, the "***Vendor Contracts***," and together with the Store Leases, the "***Assumed Contracts***"); (e) all accounts receivable of Seller associated with the Purchased Stores as of the Closing Date; (f) all intellectual property assets of Seller, including but not limited to patents, trademarks, brands, logos, trade names, copyrights and works of authorship, and all registrations, applications for registration, and renewals of, any of the foregoing, internet domain names and social media account or user names, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, trade secrets, know-how, inventions, computer programs, operating systems, applications, firmware and other code, and all other intellectual or industrial property rights (the "***IP Assets***"); (g) to the extent transferable, all permits, licenses, approvals, authorizations, registrations, certificates, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets; (h) all rights to any actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise; (i) all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such items relating to the payment of taxes) related to and in connection with the Purchased Assets or the Assumed Liabilities; (j) all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets; (k) all insurance policies and benefits, including rights and proceeds, owed by Seller, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities; (l) originals, or where not available, copies, of all books and records of Seller, including but not limited to books of

account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, emails, and purchasing histories, price lists, distribution lists, supplier lists, quality control records and procedures, research and development files, records and data, sales material and records, operations manuals, employee handbooks, marketing and promotional surveys and research, marketing and branding manuals, telephone numbers, and other files; (m) all goodwill and the going concern value of the Business; and (n) any other assets as set forth on Schedule D.

2. **Excluded Assets**. Notwithstanding Section 1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties, or rights of Seller (the "***Excluded Assets***"): (a) all bank accounts and cash on hand of Seller as of the Closing; (b) all benefit plans of Seller and assets attributable thereto; (c) all inventory, other personal property, and the real estate leases associated with the Closing Stores (as defined below); and (d) the assets, properties, and rights specifically set forth on Schedule E.

3. **Assumption of Liabilities**. At the Closing, Buyer hereby assumes and agrees to pay, perform, and discharge when due the following liabilities of Seller (collectively, the "***Assumed Liabilities***"): (a) trade accounts payable by Seller to third parties under as set forth on Schedule F, which remain unpaid as of the Closing Date, in the total amount of $1,775,788.16 (the "***Assumed Payable***"); (b) all liabilities under the Vendor Contracts but only to the extent that such liabilities are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller prior to the Closing Date; (c) liabilities and obligations of Seller for accrued but unused vacation, paid sick leave, paid time off as of the Closing Date with respect to the Transferred Employees (as defined below) in an aggregate amount not to exceed $215,514.00; and (d) all amounts owed under each Store Lease from the date of Seller's assignment of the Store Leases to Buyer (or any third party designed by Buyer). With respect to each of the Store Leases, Seller represents and warrants, as of the date hereof, to Buyer that, to the knowledge of Seller, there has been no release or threatened release at, on, under or from, and no hazardous substance is present at, on or under, any property covered by the Store Lease. Except for the Assumed Liabilities, Buyer will not assume and is not liable for any of Seller's obligations or liabilities of any kind or nature.

4. **Consideration**.

4.1 The aggregate consideration for the Purchased Assets shall consist of the following: (a) a credit bid in the amount $3,086,209.34 or such other amount consisting of Buyer's ACH/TVT Claims; (b) an amount (the "***Closing Payment***") equal to Ninety Hundred Fifty Thousand Dollars ($950,000.00), *minus* the aggregate amounts owed to the counterparty to each Store Lease that are due and payable on the Closing Date, as set forth on Schedule G, to cure defaults under such Store Lease (the "***Lease Cures***") as contemplated by Section 365 of the Bankruptcy Code; and (c) the assumption of the Assumed Liabilities. At Closing, Buyer shall pay, or cause to be paid, the Closing Payment to Seller by wire transfer of immediately funds to an account or accounts designated by Seller in writing prior to the Closing. Notwithstanding anything in this Agreement to the contrary, Buyer may pay, perform, or discharge any or all of the Assumed Liabilities after the Closing, and except for the Lease Cures, nothing contained in this Agreement

requires Buyer to pay, perform, or discharge any Assumed Liabilities on the Closing Date.

4.2 Each of the components of the consideration for the Purchased Assets set forth in Section 4.1 (in each case, to the extent relevant for and together with any other amounts constituting consideration for applicable tax purposes) shall be allocated as set forth on Schedule H attached hereto by mutual agreement of Buyer and Seller, in accordance with the provisions of Section 1060 of the Internal Revenue Code of 1986, as amended or any other applicable provision of applicable law.

5. **Inventory Schedule**. Within three (3) business days prior to the Closing, Seller will have prepared and delivered to Buyer a schedule setting forth Seller's good faith estimates of the Inventory level and value as of the Closing, in form and substance satisfactory to Buyer. Seller shall allow and assist Buyer and its authorized representative to conduct Inventory checks or inspections and promptly provide all documents, books, and records related to Seller's Inventory as requested by Buyer.

6. **Prorations**. Current taxes, payroll, and other items of expense relating to or attributable to the Assumed Contracts shall be prorated between Seller and Buyer as of the Closing Date. All liabilities and obligations, excluding the Assumed Liabilities, due in respect of periods prior to or as of the Closing Date shall be paid or otherwise satisfied by Seller, and all liabilities and obligations due in respect of periods after the Closing Date shall be paid or otherwise satisfied by Buyer.

7. **Closing**. The closing (the "***Closing***") of the transactions contemplated by this Agreement (the "***Contemplated Transactions***") shall take place remotely on the date (the "***Closing Date***") that is the first business day following the date on which all conditions to the obligations of Seller and Buyer to consummate the Contemplated Transactions set forth in Section 9 (other than conditions with respect to actions Seller or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto; provided, however, that the parties shall use reasonable best efforts to effectuate the Closing on or before August 1, 2025.

8. **Closing Deliverables**.

(a) Seller's Closing Deliverables: At or prior to the Closing, Seller shall deliver to Buyer the following documents and other items:

(i) a bill of sale, assignment and assumption agreement, in form reasonably satisfactory to the parties (the "***Bill of Sale***"), duly executed by Seller;

(ii) a trademark assignment agreement assigning all of Seller's registered trademarks to NPM, in form reasonably satisfactory to the parties (the "***Trademark Assignment***"), duly executed by Seller;

(iii) duly executed amendment to or assignment of the Store Leases in form and substance satisfactory to Buyer or its assignees;

(iv) resolution(s) of the member(s) of Seller authorizing the execution and delivery of this Agreement and the other agreements, instruments, and documents required to be delivered at the Closing to which it is a party and the taking of any and all actions reasonably necessary to consummate the Contemplated Transactions;

(v) an order of the Bankruptcy Court approving this Agreement and the Contemplated Transactions (the "***Sale Order***") reasonably acceptable to Buyer; and

(vi) all other documents, certificates, instruments, or writings reasonably requested by Buyer in connection herewith.

(b) Buyer's Closing Deliverables: At or prior to the Closing, Buyer shall deliver to Seller the following documents and other items:

(i) the Closing Payment;

(ii) the Bill of Sale, duly executed by Buyer;

(iii) the Trademark Assignment, duly executed by NPM; and

(iv) all other documents, certificates, instruments, or writings reasonably requested by Seller in connection herewith.

9. **Closing Conditions**.

(a) Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver (to the extent waivable) of the following conditions:

(i) receipt of an order of the Bankruptcy Court entered in the Bankruptcy Case approving the Stipulation;

(ii) the full execution and filing of the Claims Transfer Notice in the Bankruptcy Case;

(iii) receipt of the approval of the Contemplated Transactions by the Bankruptcy Court through entry of the Sale Order (the "***Bankruptcy Court Approval***");

(iv) receipt of the approval of the Contemplated Transactions by Buyer's board of managers or similar governing body and/or equity holders.

(v) receipt of the approval of the Contemplated Transactions by Buyer's lenders; and

(vi) delivery of the documents set forth in Section 8(a) by Seller to Buyer.

(b) Seller's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver (to the extent waivable) of the

following conditions:

(i) receipt of the Bankruptcy Court Approval; and

(ii) delivery of the documents set forth in Section 8(b) by Buyer to Seller.

10. **Termination**.

(a) At any time prior to the Closing, this Agreement may be terminated in accordance with this Section 10(a) and the Contemplated Transactions abandoned:

(i) by the mutual written consent of Buyer, on the one hand, and Seller, on the other hand;

(ii) by written notice from Buyer to Seller or Seller to Buyer, if one or more of the conditions set forth in Section 8 cannot be satisfied;

(iii) by written notice from Buyer to Seller, if Seller has failed to perform any covenant or agreement set forth in this Agreement (including an obligation to consummate the Closing); or

(iv) by written notice from either Buyer or Seller, if the Closing has not occurred at or before 11:59:59 p.m. Pacific Time on August 20, 2025.

(b) In the event of termination of this Agreement pursuant to Section 10(a), this Agreement shall become null and void and of no further force and effect, except (i) as otherwise expressly set forth herein and (ii) that Sections 10(b) and 12 shall survive any termination of this Agreement.

11. **Covenants**.

(a) At least three (3) business days prior to the Closing Date, Buyer shall provide Seller with notice of the employees of Seller with respect to the Purchased Stores that Buyer intends to offer employment. Seller hereby acknowledges that Buyer intends to offer employment to all existing employees at the Purchased Stores (except for the Manhattan Beach store listed on Schedule A) as of the date hereof and further agrees that, upon Buyer's reasonable request, Seller shall reasonably cooperate with and shall not impair Buyer's efforts to obtain the employment of such Business Employees. Each employee who receives and accepts such offer of employment prior to the Closing and commences work with Buyer on or promptly after the Closing Date shall be referred to herein as a "***Transferred Employee***". Seller shall terminate all Transferred Employees as of the Closing Date, and Buyer shall assume, and be responsible for, all liabilities and obligations that arise and are incurred after the Closing related to, any Transferred Employee ("***Post-Closing Employee Obligations***"). For clarity, Post-Closing Employee Obligations do not include, and Buyer does not assume, any liabilities to any Transferred Employee that existed, accrued or arose prior to the Closing, except for the liabilities that Buyer expressly assumed in Section 3(c) of this Agreement.

(b) From the date hereof, Buyer and Seller shall use reasonable efforts to cooperate with each other in assigning and assuming the Store Leases in accordance with Section 365 of the Bankruptcy Code. Seller shall use reasonable efforts to discontinue, or cause to be discontinued, any and all operations at the stores set forth on Schedule I (collectively, the "***Closing Stores***") in a timely manner. Within ten (10) business days after the Closing, Seller shall cause the Closing Stores to remove all signage containing, and to discontinue all use of any other materials that include, any reference to any marks, branding, and any other intellectual property used in the Business.

(c) Seller shall cooperate in good faith to transition the Business and provide Buyer with all necessary assistance and support in all aspects of the operation of the Business for a period of ninety (90) days following the Closing Date, without additional cost to Buyer.

(d) All stamp, transfer, documentary, sales, use, value added, registration, property, excise and other similar taxes and fees relating thereto (including any penalties, interest and additions to such taxes) incurred in connection with this Agreement and the Contemplated Transactions, if any, will be borne by Buyer.

(e) From and after the Closing Date, Seller shall not, and shall cause its affiliates not to: (i) market or offer any products or services using any of the words or terms (in any combination) that are identical or confusingly similar to, or a colorable imitation or dilutive of any of the words and terms ever used by the Company to market or offer any of the Company's products or services; or (ii) use the name "Healthy Spot" or any name that is confusingly similar to, or a colorable imitation or dilutive of such name, including on stationery, business cards or signage, without Buyer's prior written consent.

12. **Miscellaneous**. At any time and from time to time after the Closing, at Buyer's reasonable request and without further consideration, Seller shall execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment, and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order to more effectively transfer, convey, and assign to Buyer, and to confirm the foregoing assignment and Buyer's rights to all of the Purchased Assets, and, to the fullest extent permitted by law, the Assumed Liabilities. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of Buyer and Seller. If any one or more of the provisions of this Agreement shall be determined to be invalid, illegal, or unenforceable in any respect under any applicable law, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired; provided, however, that in any such case the parties agree to use their best efforts to achieve the purpose of the invalid provision by a new legally valid provision. This Agreement shall be interpreted and construed according to, and governed by, the laws of the State of California, excluding any such laws that might direct the application of the laws of another jurisdiction. All costs and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the party incurring such costs and expenses. Except as otherwise provided herein, references to Sections and Schedules, herein are references to Sections and Schedules of this Agreement. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or portable document format (PDF) signatures will be

deemed to be original signatures for all applicable purposes.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the parties have duly executed this Asset Purchase Agreement as of the date first above written.

**SELLER:**

**HEALTHY SPOT OPERATING, LLC**

By: ______________________________
Name: Mark Boonnark
Title: CEO

**BUYER:**

**PET PROS, LLC**

By: ______________________________
Name: Michael Seitz
Title: CEO

**NPM FRANCHISING, LLC**

By: ______________________________
Name: Michael Seitz
Title: CEO

**IN WITNESS WHEREOF**, the parties have duly executed this Asset Purchase Agreement as of the date first above written.

**SELLER:**

**HEALTHY SPOT OPERATING, LLC**

By: ______________________________
Name: Mark Boonnark
Title:

**BUYER:**

**PET PROS, LLC**

DocuSigned by:
By: Michael Seitz
E93AE27BEC4C444...
Name: Michael Seitz
Title: CEO

**NPM FRANCHISING, LLC**

DocuSigned by:
By: Michael Seitz
E93AE27BEC4C444...
Name: Michael Seitz
Title: CEO

## SCHEDULE A

**Purchased Stores**

1. Carmel at 26200 Carmel Rancho Blvd, Carmel-By-The-Sea, CA 93923
2. Costa Mesa at 1880 Newport Blvd, Costa Mesa, CA 92627
3. Long Beach at 6433 Pacific Coast Hwy Unit A-5, Long Beach, CA 90803
4. Manhattan Beach at 204 S Sepulveda Blvd, Manhattan Beach, CA 90266
5. Marina Del Rey at 4718 Lincoln Blvd, Marina Del Rey, CA 90292
6. North Berkeley at 1510 Walnut St, Berkeley, CA 94709
7. Pasadena at 614 E Colorado Blvd, Pasadena, CA 91101
8. Playa Vista at 12746 Jefferson Blvd #2130, Playa Vista, CA 90094
9. Rockridge at 3206 College Ave, Berkeley, CA 94705
10. Santa Monica at 1110 Wilshire Blvd, Santa Monica, CA 90401
11. Studio City at 12205 Ventura Blvd, Studio City, CA 91604
12. Silverlake at 2550 Glendale Blvd, Los Angeles, CA 90039
13. West Hollywood at 8525 Santa Monica Blvd, West Hollywood, CA 90069
14. Torrance Warehouse w/sublease at 1831 West 208th Street, Torrance, CA 90501

## SCHEDULE B

## Store Leases

1. **Carmel Lease:**

Lease entitled Carmel Rancho Shopping Center II dated August 13, 2012, by and between Katherine L. Bucquet, Trustee of the George W. Beeman and Ruby R. Beeman Trusts (the "***Original Landlord***"), and Lewis E. Adams and M. Sarah Adams (the "***Original Tenant***"), together with that certain Addendum to Lease dated August 13, 2012, which were assigned by the Original Tenant to Healthy Spot B001 LLC, pursuant to that certain Assignment and Assumption of Lease and Consent of Lessor dated August 1, 2022, by and between Radbert Chin and Diana Chin (the "***Landlord***"), as successor-in-interest to the Original Landlord, and Healthy Spot B001 LLC, and then assigned by Healthy Spot B001 LLC to Healthy Spot Operating, LLC, pursuant to that certain Lease Assignment, Assumption, Amendment and Consent Agreement dated May 9, 2023, by and between Healthy Spot B001 LLC, Healthy Spot Operating, LLC, and the Landlord.

2. **Costa Mesa Lease:**

Retail Lease dated October 21, 2013, by and between American Commercial Equities Three, LLC (the "***Landlord***") and Healthy Spot Delta, LLC (the "***Original Tenant***"), together with that certain Guaranty of Lease dated October 21, 2013, made by Healthy Spot, LLC for the benefit of the Landlord, as amended by that certain First Amendment to Lease and Rent Relief Agreement dated April 26, 2022, by and between the parties thereto. The Retail Lease was assigned by the Original Tenant to Healthy Spot Gamma, LLC effective as of March 7, 2019, and assigned to Healthy Spot Operating, LLC pursuant to that certain Lease Assignment and Assumption Agreement dated April 23, 2023, by and between the Landlord, Healthy Spot Gamma, LLC, and Healthy Spot Operating, LLC.

3. **Long Beach Lease:**

Long Beach Marketplace Shopping Center Lease dated September 25, 2013, by and between Pacific Castle Newport I, LLC, Pacific Castle Investments I, LLC, and Pacific Castle Long Beach, L.P. (collectively, the "***Original Landlord***"), and Health Spot Epsilon LLC (the "***Original Tenant***"), together with that certain Guaranty of Lease made by Healthy Spot LLC for the benefit of the Original Landlord, as amended by those certain (i) First Amendment to Lease dated January 4, 2016, by and between the Original Landlord and Original Tenant, (ii) Second Amendment to Shopping Center Lease dated April 1, 2022, by and between MAMO LBMP Investors I LLC, as successor-in-interest to the Original Landlord (the "***Landlord***") and Healthy Spot LLC, as successor-in-interest to the Original Tenant, and (iii) Third Amendment to Shopping Center Lease dated January 31, 2024, by and between the Landlord and Healthy Spot Operating, LLC, as successor-in-interest to Healthy Spot LLC, together with a Guaranty of Shopping Center Lease dated January 31, 2024, made by Healthy Spot Holdings, LLC for the benefit of the Landlord, replacing Healthy Spot LLC with Healthy Spot Holdings, LLC a the guarantor.

4. **Marina Del Rey Lease:**

Standard Lease Agreement dated November 4, 2011, by and between MSQ, LLC (the "***Landlord***") and Healthy Spot Gamma, LLC (the "***Original Tenant***"), together with those certain Guaranty of Lease dated November 4, 2011, made by Andrew Tae Jin Kim and Mark Boonmark for the benefit of MSQ, LLC and Guaranty of Lease dated November 4, 2011, made by Healthy Spot, LLC for the benefit of MSQ, LLC, as amended by those certain (i) First Amendment of Lease dated May 18, 2012, (ii) Second Amendment of Lease dated September 2020, and (iii) Third Amendment of Lease dated August 1, 2022, each by and between the Landlord and the Original Tenant, and that certain Consent to Assignment, Assumption and Amendment of Lease Agreement dated May 26, 2023, pursuant to which the Standard Lease Agreement, as amended, was assigned by the Original Tenant to Healthy Spot Operating, LLC.

5. **North Berkeley Lease:**

Retail Lease dated July 1, 2019, by and between Walnut Square Center, LP, as Landlord, and Holistic Hound, LLC, as Tenant (the "***Original Tenant***"), together with those certain Assignment and Assumption of Lease Agreement dated October 3, 2019, by and between the Original Tenant and Healthy Spot B001, LLC, and Landlord Consent dated October 4, 2019 by and between Landlord, the Original Tenant, and Healthy Spot B001, LLC, and that certain Assignment and Assumption of Lease Agreement dated March 15, 2023, by and between the Healthy Spot B001, LLC and Healthy Spot Operating, LLC.

6. **Pasadena Lease:**

Healthy Spot Commercial Lease dated September 5, 2018, by and between 614 E COL Properties LLC (the "***Landlord***") and Healthy Spot Delta LLC (the "***Original Tenant***"), together with that certain Guaranty dated September 5, 2018, made by Healthy Spot, LLC for the benefit of the Landlord, which were assigned to Healthy Spot Delta LLC pursuant to a notice to the Landlord dated as of February 27, 2019, and assigned Healthy Spot Operating, LLC pursuant to that certain Assignment and Assumption of Lease Agreement dated March 15, 2023.

7. **Playa Vista Lease:**

Lease dated December 13, 2017, by and between Runway Owner, LLC (the "***Landlord***") and Healthy Spot 013 LLC (the "***Original Tenant***"), together with that certain Lease Guaranty dated December 13, 2017, made by Healthy Spot LLC for the benefit of the Landlord, as amended by those certain (i) First Amendment to Lease dated October 17, 2019, by and between Landlord and Healthy Spot Gamma, LLC, as successor-in-interest to the Original Tenant, (ii) Second Amendment to Lease dated September 15, 2020, by and between Landlord and Healthy Spot Gamma, LLC, and (iii) Third Amendment to Lease dated October 5, 2021, by and between Landlord and Healthy Spot Gamma, LLC, and that certain Assignment and Assumption of Lease Agreement dated March 20, 2023, by and

between Healthy Spot Gamma, LLC and Healthy Spot Operating, LLC.

**8. Rockridge Lease:**

Standard Industrial/Commercial Multi-Tenant Lease-Net dated January 18, 2019, by and between The William B. Drury and Kelly Drury Trust (the "***Landlord***") and Healthy Spot Alpha LLC (the "***Original Tenant***"), together with that certain Addendum to the Lease dated January 18, 2019, by and between the Landlord and the Original Tenant, and that certain Assignment and Assumption of Lease Agreement dated March 15, 2023, by and between the Original Tenant and Healthy Spot Operating, LLC.

**9. Santa Monica Lease:**

Shopping Center Lease Agreement between Florence A. Koenig, Trustee of The Koenig Family Revocable Living Trust, dated 1/25/89, as "Landlord" (the "***Original Landlord***") and Healthy Spot Alpha LLC, as "Tenant" (the "***Original Tenant***"), dated February 19, 2008, together with that certain Guaranty of Lease dated February 19, 2008, made by Andrew T. Kim and Mark Boonnark for the benefit of the Original Landlord, as amended by those certain (i) First Amendment to Shopping Center Lease Agreement dated March 1, 2013, by and between Carolyn E. Koenig and U.S. Bank, N.A., Co-Trustees, and Any Successor Trustees of the Survivor's Trust Created Under the Koenig Family Revocable Living Trust Date January 25, 1989, 40% Interest and Carolyn E. Koenig and U.S. Bank, N.A. Co-Trustees, and Any Successor Trustees of the Bypass Trust Created Under the Koenig Family Revocable Living Trust Date January 25, 1989, 40% Interest, as successor-in-interest to the Original Landlord (the "***Successor Landlord***") and Tenant, (ii) Second Amendment to Shopping Center Lease Agreement dated November 25, 2014, by and between the Successor Landlord and Tenant, and (iii) Third Amendment to Shopping Center Lease Agreement dated August 3, 2020, by and between Koenig Family Properties, LLC, as successor-in-interest to the Successor Landlord, and the Original Tenant, and that certain Assignment and Assumption of Lease Agreement dated [March 15], 2023, by and between the Original Tenant and Healthy Spot Operating, LLC.

**10. Studio City Lease:**

Lease Agreement between Allen C. Dennis, as Trustee of The Dennis Family Trust, as Landlord (the "***Original Landlord***"), and Healthy Spot ETA LLC, as Tenant (the "***Original Tenant***"), dated May 30, 2014, together with that certain Parking Lot Sub-License Agreement dated May 23, 2017, by and between Bruce Dennis and David Dennis, as Trustees of the Allen C. Dennis Revocable Living Trust under trust agreement dated May 14, 2015 and the Original Tenant, as amended by that certain First Amendment to Lease Agreement dated June 7, 2024, by and between Allen C. Dennis LLC, as successor-in-interest to the Original Landlord, and Healthy Spot Operating, LLC, as successor-in-interest to the Original Tenant.

**11. Silverlake Lease:**

Lease dated December 9, 2016, by and between Silver Ridge Plaza (the "***Landlord***") and Healthy Spot 011 LLC (the "***Original Tenant***"), together with that certain Guaranty dated December 16, 2026, made by Healthy Spot, LLC for the benefit of the Landlord, and that certain Assignment and Assumption of Lease Agreement dated March 15, 2023, by and between the Original Tenant and Healthy Spot Operating, LLC.

**12. West Hollywood Lease:**

AIR Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease-Net dated August 21, 2009, by and between Monte Overstreet (the "***Landlord***") and Healthy Spot Beta, LLC (the "***Original Tenant***"), together with that certain Addendum to Standard Industrial/Commercial Single-Tenant Lease-Net, as amended by those certain (i) Amendment No. 1 dated December 30, 2014, (ii) Amendment No. 2 dated February 4, 2020, and (iii) Amendment No. 3 dated June 23, 2020, each by and between Landlord and the Original Tenant, and that certain Assignment and Assumption of Lease Agreement dated March 15, 2023, by and between the Original Tenant and Healthy Spot Operating, LLC.

**13. Torrance Warehouse:**

Standard Industrial/Commercial Single-Tenant Lease-Net dated July 15, 2021, by and between Michael J. Quagletti Trust (the "***Landlord***") and Healthy Spot, LLC (the "***Original Tenant***"), together with that certain Addendum to Standard Industrial/Commercial Single-Tenant Lease-Net dated July 12, 2021, that certain Assignment and Assumption of Lease Agreement dated March 15, 2023, by and between the Original Tenant and Healthy Spot Operating, LLC, and that certain Sublease dated November 5, 2024, by and between Healthy Spot Operating, LLC, as successor-in-interest to the Original Tenant, and Broadata Communications, Inc.

# SCHEDULE C

## Vendor Contracts

| Contracts | Cure Amount |
| --- | --- |
| Master Services Agreement for MyTime Point of Sale and Business Management System dated February 18, 2022, by and between Melian Lab Inc. dba MyTime and Healthy Spot LLC, prorated for Purchased Stores. | $0 |
| Agreements with Shopify, including the Master Subscription Agreement, the then-current Shopify Plus Agreement, and that certain 2024 Rate Lock Amendment dated April 16, 2024, by and between Shopify Inc. and Healthy Spot, LLC. | $0 |
| Agreement dated August 22, 2024, by and between Celigo, Inc. and Healthy Spot, together with those certain terms and conditions of the Celigo Terms of Service (available at https://www.celigo.com/terms-of-service/). | $0 |
| Ordering Document dated February 26, 2025, by and between Oracle America, Inc. and Healthy Spot LLC, for that certain Oracle Cloud Crowdtwist Services Agreement v062223. | $0 |
| National Rental Agreement dated April 1, 2021, together with that certain Customer Agreement Addendum dated October 5, 2022, by and between CINTAS Corporation No.2 and Healthy Spot LLC. | $0 |
| Box Service Order dated August 19, 2024, by and between Box, Inc. and Healthy Spot LLC, together with that certain Box Service Agreement. | $0 |
| Master Services Agreement dated April 14, 2016, by and between RetailNext, Inc. and Healthy Spot LLC, together with those Terms and Conditions attached thereto and those certain Renewal Quote Terms dated August 29, 2024. | $0 |
| On-Line Services Agreement dated November 17, 2024, by and between Information & Computing Services, Inc., and Healthy Spot, together with those certain ICS On-Line Services Agreement Terms and Conditions attached thereto. | $0 |
| Instacart Services Agreement dated as of September 2016, by and between Maplebear, Inc., doing business as Instacart, and Healthy Spot, LLC, together with those certain (i) Instacart Full Service Addendum dated as of September 2016, (ii) Shared End User | $0 |

| | |
|---|---|
| Data Addendum dated October 7, 2016, and (iii) Instacart Delivery Only Addendum dated October 7, 2016. | |
| Quote dated August 14, 2024, by and between Review Trackers, Inc. and Heathy Spot Operating, LLC, which is subject to that certain Master Service Agreement as published on Review Trackers' website, prorated for Purchased Stores. | $0 |
| Agreement with monday.com, including those certain Terms of Use of monday.com. | $0 |
| Agreement with Figma, including those certain Software Services Agreement and Terms of Services published on Figma's website. | $0 |
| Membership Agreement dated May 29, 2025 by and between Industrious LA Hughes District LLC and Healthy Spot, together with those certain Industrious Terms and Conditions. | $0 |
| Vehicle Lease Agreement dated May 31, 2023, by and between Healthy Spot Operating, LLC and Isuzu Finance of America, Inc. | $0 |
| **TOTAL** | **$0** |

# SCHEDULE D

## Purchased Assets

None.

# SCHEDULE E

## Excluded Assets

None.

# SCHEDULE F

## Assumed Payable

| Name | Description | Store/Area | Structured |
|---|---|---|---|
| Raw Connection Carmel | Purchase Note to Prior Owne | Carmel | $ 159,500.00 |
| 942 New co | Product Vendor | All Stores | $ 722,368.82 |
| 1330 Ziw ipeak | Product Vendor | All Stores | $ 140,668.66 |
| 189056 Clearmind Technology, Inc. | IT Support | All Stores | $ 78,819.86 |
| 190473 Cintas Corporation | Grooming Tow el Service | All Stores | $ 64,350.87 |
| 1208 Primal Pet Foods | Product Vendor | All Stores | $ 62,520.48 |
| 26 Pet Food Experts | Product Vendor | All Stores | $ 52,077.23 |
| 1211 Pure Dog Food | Product Vendor | All Stores | $ 34,917.60 |
| 603 Maplebear Inc* | Instacart Vendor | All Stores | $ 34,249.63 |
| 1214 Raw Advantage Processing | Private Label Freeze Dried | All Stores | $ 29,246.00 |
| 251885 Mor Air Inc | HVAC & Freezer Maintenan | SoCal | $ 26,875.95 |
| 251498 Odecloud Inc. | System Integration Develope | All Stores | $ 24,595.31 |
| 18 The Honest Kitchen | Product Vendor | All Stores | $ 21,438.99 |
| 976 Artvark Pet Products | Product Vendor | All Stores | $ 19,771.10 |
| 252003 Pacific Western Container | Warehouse Storage Containe | Warehouse | $ 18,455.68 |
| 1271 The Foggy Dog | Product Vendor | All Stores | $ 17,541.00 |
| 251905 Digital Marketing Consulting Group | Digital Marketing Company | All Stores | $ 11,867.11 |
| 190437 Celigo, Inc. | System Integrator | All Stores | $ 11,375.00 |
| 384 Prime Graphix Inc. | Marketing Material Print Vend | All Stores | $ 10,228.02 |
| 251671 Phillips Pet Food Supplies | Product Vendor | All Stores | $ 10,059.27 |
| 251579 Oracle America, Inc. (Crow dtw ist | Loyalty Program | All Stores | $ 10,000.05 |
| 251996 Lambw olf Collective | Product Vendor | All Stores | $ 9,353.25 |
| 190059 Michael Arizola | Website Developer | All Stores | $ 8,735.61 |
| 4 Jax & Bones | Product Vendor | All Stores | $ 8,507.00 |
| 189806 Fortis LLP | Chapter 11 HS Attorneys | All Stores | $ 7,910.00 |
| 190155 Red Security Group LLC | Locksmith | All Stores | $ 7,049.35 |
| 190591 Umland LLC | Private Label Cheese Puff | All Stores | $ 6,193.75 |
| 1479 Evermore Pet Food, Inc | Product Vendor | All Stores | $ 5,554.00 |
| 1161 Yosemite Protein Products Inc. | Private Label Bone Broth | All Stores | $ 4,216.00 |
| 190537 Diggs, Inc | Product Vendor | All Stores | $ 4,150.30 |
| 251888 Doordash G&C LLC | Doodash Vendor | All Stores | $ 4,034.75 |

| | | | | |
|---|---|---|---|---|
| 251969 Firstlight Foods USA Inc. | Product Vendor | All Stores | $ | 3,891.20 |
| 189999 Prime Refrigeration Systems, Inc* | Freezer Repair Service | SoCal | $ | 3,741.56 |
| 251679 Groomers Friend LLC | Grooming Equip Repair Servi | All Stores | $ | 3,092.76 |
| 251667 Roadogs & Rescue | Rescue | All Stores | $ | 3,005.78 |
| 251860 BNG Miracle Pet LLC | Product Vendor | All Stores | $ | 2,883.78 |
| 251877 Paw s of L.A. Rescue | Rescue | SoCal | $ | 2,738.53 |
| 190240 Sage Law Partners | Lease Counsel (assignments | All Stores | $ | 2,679.95 |
| 251831 Margarita R.D Cleaning | Cleaning Service | Carmel | $ | 2,400.00 |
| 251530 Los Angeles LGBT Center | Rescue | All Stores | $ | 2,320.64 |
| 1184 Petipet | Product Vendor | All Stores | $ | 2,292.32 |
| 251972 I Stand With My Pack | Rescue | All Stores | $ | 2,046.29 |
| 251896 Peace of Mind Dog Rescue | Rescue | All Stores | $ | 2,021.49 |
| 251992 A Purposeful Rescue | Rescue | All Stores | $ | 1,920.59 |
| 368 Forte Animal Rescue | Rescue | All Stores | $ | 1,583.00 |
| 189506 The Rescue Train | Rescue | All Stores | $ | 1,524.35 |
| 1448 Karma Cat Inc | Product Vendor | All Stores | $ | 1,400.88 |
| 251856 Dandylion | Product Vendor | All Stores | $ | 1,355.12 |
| 251447 Berkeley Humane | Rescue | Berkeley | $ | 1,202.39 |
| 189989 Bel Air Internet, LLC | Internet Service | Warehouse | $ | 1,180.00 |
| 190667 RetailNext* | Store Traffic Counter | All Stores | $ | 1,083.35 |
| 251974 Independent Pet Supply | Product Vendor | All Stores | $ | 1,010.57 |
| 1141 Natural Dog Company | Product Vendor | All Stores | $ | 919.72 |
| 189613 American City Pest & Termite | Pest Control | SoCal | $ | 801.50 |
| 251657 Project Hive | Product Vendor | All Stores | $ | 788.40 |
| 251965 NorCal Sled Dog Rescue | Rescue | Berkeley | $ | 648.40 |
| 251455 Muttville Senior Dog Rescue | Rescue | All Stores | $ | 283.43 |
| 251485 Rocket Dog Rescue | Rescue | All Stores | $ | 189.55 |
| 1165 Pan Pacific | Paper Bags | All Stores | $ | 3,628.00 |
| Snif - Snax | Private Label Manufacturer | All Stores | $ | 87,105.00 |
| Halshan Premium Food | Raw Food | Carmel | $ | 8,275.00 |
| Feed This, Inc | North Berkeley Only Food | Berkeley | $ | 331.22 |
| Adored Beast | Product Vendor | All Stores | $ | 812.75 |
| | | | | |
| | | | | |
| **Totals** | | | **$** | **1,775,788.16** |

# SCHEDULE G

## Lease Cures

| **Store Lease** | **Amount of Lease Cure** |
|---|---|
| Carmel Lease | $1,375.51 |
| Costa Mesa Lease | $0.00 |
| Long Beach Lease | $1,967.15 |
| Marina Del Rey Lease | $0.00 |
| North Berkeley Lease | $7,342.07 |
| Pasadena Lease | $7,863.49 |
| Playa Vista Lease | $3,390.28 |
| Rockridge Lease | $1,103.11 |
| Santa Monica Lease | $3,084.00 |
| Studio City Lease | $0.00 |
| Silverlake Lease | $1,524.00 |
| West Hollywood Lease | $2,204.53 |
| Torrance Warehouse Lease | $0.00 |
| **TOTAL** | $29,854.14 |

## SCHEDULE H

**Allocation of Consideration**

| Description | Value |
|---|---|
| Cash | $ 950,000.00 |
| Assumed Payables | $ 1,775,788.16 |
| Assumed Lease Amortization | $ 497,511.64 |
| Assumed PTO | $ 215,514.00 |
| Credit Bid | $ 2,876,344.20 |
| ***Total*** | ***$ 6,315,158.00*** |

## SCHEDULE I

**Closing Stores**

1. Beverly Grove at 8126 Beverly Blvd, Los Angeles, CA 90048
2. Mission Bay at 1200 4th St Suite F, San Francisco, CA 94158
3. Culver City at 8809 Washington Blvd Suite 126, Culver City, CA 90232
4. Downtown Los Angeles at 1000 S Grand Ave A, Los Angeles, CA 90015
5. Century City at 10250 Santa Monica Blvd Suite 2580, Los Angeles, CA 90067
6. Topanga at 6320 CA-27 #1635, Woodland Hills, CA 91367

# EXHIBIT "B"

DANIEL H. REISS (SBN 150573)
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dhr@lnbyg.com

Attorneys for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>HEALTHY SPOT OPERATING, LLC,<br><br>Debtor and Debtor in Possession. | Case No.: 2:24-bk-20065-DS<br><br>Chapter 11 Case<br><br>**ORDER (1) AUTHORIZING SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (2) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES AND CONTRACTS**<br><br>Date: July 29, 2025<br>Time: 1:00 p.m.<br>Place: Courtroom 1639<br>255 East Temple Street<br>Los Angeles, CA 90012 |

Upon the *Motion for Order: (1) Authorizing Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (2) Authorizing Assumption and Assignment of Certain Leases and Contracts* (the "Motion") (Dkt. No.__),[1] filed by Healthy Spot Operating, LLC ("Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11

---

[1] Capitalized terms used but not otherwise defined herein shall have the respective meaning ascribed to such terms in the Motion or Asset Purchase Agreement, as applicable. In the event a definition of any capitalized term is inconsistent between the Motion and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

bankruptcy case (the "Chapter 11 Case"), for the entry of an order (this "Order"): (1) authorizing the sale of certain Purchased Assets (as defined in the Asset Purchase Agreement) free and clear of all liens, claims, encumbrances, and interests; (2) authorizing the assumption of assignment of certain unexpired leases and executory contracts; and (3) granting related relief, all as further described in the Motion; and upon consideration of the record of this Chapter 11 Case; and this Court having found that (i) this Court has jurisdiction over the Debtor, its estate, property of its estate and to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334, (ii) this Court may enter a final order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C § 157(b)(2)(A), (iv) venue of this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409, and (v) no further or other notice of the Motion is required under the circumstances; and this Court having reviewed the Motion and having heard the statements in support of the relief requested in the Motion at a hearing before this Court; and having determined that the legal and factual bases set forth in the Motion and the record of this Chapter 11 Case establish just cause for the relief granted in this Order; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED AND ORDERED that:**

1. The relief requested in the Motion is granted as set forth herein.

2. All objections to the Motion or relief provided herein that have not been withdrawn, waived, or settled are hereby overruled and denied on the merits.

3. The *Asset Purchase Agreement*, attached hereto as **Exhibit A** (the "APA"), and all of its terms and conditions are hereby approved. The failure to specifically include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the APA be authorized and approved in its entirety.

4. Pursuant to Bankruptcy Code sections 105(a), 363, and 365, the Debtor is authorized to consummate the transactions provided for in the APA effective immediately upon entry of this Order.

5. The Debtor is authorized to execute and deliver, and empowered to perform under, consummate and implement, the APA and all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be necessary or appropriate for the purposes of assigning, transferring, granting, conveying and conferring to the Buyer of the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.

6. Based on the filed and scheduled claims and the record in this Chapter 11 Case, the Court finds and concludes that the ACH/TVT Claims are the first priority and only liens or claims secured by and encumbrances on the Purchased Assets, and that there are no junior or other valid liens, claims, encumbrances or interests on the Purchased Assets, under Section 506 (a) and (d) of the Bankruptcy Code or otherwise, as of the effective date of the sale. Absent a timely-filed proof of claim evidencing a valid lien, claim, encumbrance, or interest on the Purchased Assets, all other persons or entities shall, as of the effective date of the sale, be deemed to have waived and released such lien, claim, encumbrance, or interest on the Purchased Assets, without regard to whether such holder has executed or filed any applicable release.

7. Pursuant to Bankruptcy Code section 363(f), the sale of the Purchased Assets is, without need for any action by any party, free and clear of all liens, claims, encumbrances and interests, with such liens, claims, encumbrances. Except as set forth herein with respect to the Assumed Leases, all persons or entities who may assert to hold a lien, claim, encumbrance or interest of any kind or nature whatsoever in, to or against the Purchased Assets or the operation of the Purchased Assets are hereby and forever barred, estopped, and permanently enjoined from asserting against the Buyer or any of its successors, assigns or property (including, without limitation, the Purchased Assets) any lien, claim, encumbrance or interest existing, accrued or arising prior to the Closing.

8. This Order shall be good and sufficient evidence of the transfer of title in the Purchased Assets to Buyer, though Debtor is authorized to execute and deliver to Buyer any and all transfer documents contemplated by or consistent with the APA, and the sale consummated pursuant to this Order and the APA shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets sold pursuant to this Order, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state and federal, state and local officials, and each of such persons and entities is hereby authorized to accept this Order as good and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the sale contemplated hereby. A certified copy of this Order may be: (a) filed with the appropriate clerk or similar official, (b) recorded with the applicable recorder of deeds or similar official, and/or (c) filed or recorded with any other governmental agency to evidence the cancellation of any and all liens, claims, encumbrances and interests with respect to the Purchased Assets.

9. This Order and the APA shall be binding and enforceable in all respects upon (a) the Debtor and all successors and assigns of the Debtor, (b) all creditors or interest holders, in each case, whether known or unknown, of the Debtor, (c) the Buyer and its successors and permitted assigns, (d) all holders of liens, claims, interests, or encumbrances in or against any of the Assumed Leases, Assumed Contracts, or Purchased Assets, (e) all counterparties to the Assumed Leases, Assumed Contracts, and Assumed Liabilities, and (f) any subsequent trustee appointed in the Chapter 11 Case or upon conversion of such case to chapter 7 of the Bankruptcy Code.

10. The APA and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtor and Buyer, in good faith, without collusion, and from arm's length bargaining positions. Buyer is a "good faith" purchaser within the meaning of

section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Debtor or Buyer have engaged in any conduct that would cause or permit the APA to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. The APA was not entered into for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtor. Neither the Debtor or Buyer is entering into the APA or proposing to consummate the sale, fraudulently, or for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia. Further, Buyer is not an "insider" of the Debtor.

11. Buyer shall be responsible for the satisfaction of any and all Assumed Liabilities set forth in the APA. Except as provided in the APA or this Order, after the Closing of the sale, the Debtor and its estate shall have no further liability or monetary obligations with respect to any of the Assumed Liabilities, including those arising under the Assumed Leases (listed on Schedule G of the APA) or Assumed Contracts (listed on Schedule C of the APA), and all holders of such claims are forever prohibited, barred, and estopped from asserting any claims under any Assumed Liabilities including those arising under the Assumed Leases or Assumed Contracts against the Debtor, its successors or assigns, and its estate.

12. The Debtor is hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume and assign the Assumed Leases and Assumed Contracts to Buyer free and clear of any and all liens, claims, encumbrances, or other interests, and to execute and deliver to Buyer such documents or other instruments as may be reasonably necessary to assign and transfer the Assumed Leases and Assumed Contracts to Buyer, all as provided in the APA. Upon the assumption and assignment to Buyer of any Assumed Lease or Assumed Contract at Closing in accordance with this Order, Buyer shall succeed to the entirety of the Debtor's rights and obligations in respect of each Assumed Lease and Assumed Contract so assumed and assigned at Closing. Except as otherwise provided in this Order or the APA, upon payment of the applicable cure amount set forth in Schedules C and G to the APA, which are

hereby approved, to the extent set forth in section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to such Assumed Lease.

13. All non-Debtor counterparties (with notice of the sale) to each Assumed Lease shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, section 365(e)(2)(A)(ii) of the Bankruptcy Code, or otherwise, and Buyer shall enjoy all of the rights and benefits under each such Assumed Lease as of the applicable effective date of assumption and assignment without the necessity of obtaining such person's written consent to the assumption or assignment of such Assumed Lease unless the Court orders otherwise. Any non-Debtor counterparty to an Assumed Lease that is a shopping center lease that has not objected to the assignment thereof is deemed to consent to such assignment pursuant to section 365(c) of the Bankruptcy Code unless the Court orders otherwise.

14. With respect to any Assumed Contract or Assumed Lease that is assumed and assigned to Buyer at Closing, Buyer shall pay to the applicable non-Debtor counterparty the cure amount for each Assumed Contract (a "Contract Cure") and the Lease Cure amounts set forth in Schedules C and G to the APA. The payment of the Contract Cures and Lease Cures shall be deemed to be in full satisfaction of and cure all monetary defaults (as that concept is contemplated by section 365 of the Bankruptcy Code) under the Assumed Contracts and Assumed Leases and other executory contracts necessary to effectuate the assumption by the Debtor and the assignment to Buyer of such Assumed Contracts and Assumed Leases pursuant to section 365 of the Bankruptcy Code, and, upon payment in accordance with the preceding sentence, such Assumed Leases shall be deemed to be in full force and effect, free of default for such purposes. To the extent a non-Debtor counterparty to an Assumed Contract or Assumed Lease failed to timely object to any proposed Contract Cure Lease Cure listed on Schedules C and G to the APA, the Contract Cures and the Lease Cures listed therein have been and shall be deemed to be finally determined and any such non-Debtor counterparty shall be prohibited, barred, and estopped from challenging, objecting to, or denying the validity and finality of the Contract Cure and Lease Cure amounts in Schedules C and G at any time. Each non-Debtor

counterparty to an Assumed Contract and Assumed Lease is forever prohibited, barred, and estopped from asserting against the Debtor or Buyer, their affiliates, successors or assigns, or the property of any of them, any monetary default existing as of the date of the hearing on this Motion if such default was not raised or asserted in a timely-filed objection.

15. In connection with the assumption and assignment of the Assumed Leases and Assumed Contracts pursuant to section 365 of the Bankruptcy Code, upon payment of the Lease Cures and Buyer's assumption of the obligations under the Assumed Leases and Assumed Contracts as set forth herein, Buyer shall be deemed to have taken all actions reasonably required under section 365 to provide "adequate assurance of future performance" to the applicable non-Debtor counterparties as of the Closing.

16. Pursuant to section 365(f)(3) of the Bankruptcy Code, no rent accelerations, assignment fees, increases or any other fees may be charged to the Buyer or to the Debtor as a result of the assumption and assignment of the Assumed Leases pursuant to this Order.

17. Notwithstanding anything to the contrary in the APA or this Order, for the avoidance of doubt and as part of the Assumed Liabilities under the APA, as of the entry of this Order, Buyer has assumed all liabilities and obligations under the Assumed Leases and Assumed Contracts that arise or are owed on or after the Closing Date, including, without limitation, accrued and unbilled common area maintenance, insurance, taxes, or similar charges contained in such Assumed Lease or Assumed Contract that will come due on or after the effective date of assumption and assignment of such Assumed Lease or Assumed Contract, as applicable, regardless of when such charges accrued.

18. No bulk sales law, bulk transfer law, or similar law of any state or other jurisdiction shall apply in any way to the sale authorized by this Order. The Debtor and Buyer waive, and hereby shall be deemed to have waived, any requirement of compliance with, and any claims related to noncompliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

19. In connection with the Purchased Assets, Buyer shall continue the Debtor's existing policy concerning the transfer of personally identifiable information upon Closing, as may be modified in accordance with the terms of such policy and/or applicable law.

20. Except as expressly provided for in this Order or the APA, Buyer shall not have any liability of the Debtor or other obligations of the Debtor to any third party arising under or in relation to any of the Assumed Leases, Assumed Contracts, or Purchased Assets.

21. No brokers for Buyer were involved in the consummation of the sale, and no brokers' commissions are due by the Debtor to any person in connection with the sale.

22. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall be effective and enforceable immediately upon entry, and the fourteen (14)-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the sale, and the Debtor and Buyer intend to close the sale as soon as practicable.

23. The transfer of the Purchased Assets and the assignment of the Assumed Leases and Assumed Contracts to Buyer pursuant to the terms of this Order shall be irrevocably binding on the Debtor and all other creditors and parties-in-interest.

24. This Court retains exclusive jurisdiction and power to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order, the APA, and any and all ancillary documents and matters in relation thereto.

###

# EXHIBIT "C"

**Healthy Spot**
**Interested Parties**

| 2024-2025 Interested Parties | | | | |
|---|---|---|---|---|
| **Centinela Pet and Feed** | Strategic | Chris Nakagawa | ckn001@centinelafeed.com | |
| **Bowie Barker** | Strategic | Jeff Platt | jplatt@thenowmassage.com | 9242 Beverly BlvdBeverly Hills, CA 90210 |
| **Charger Investment Partners** | Investor | Kimberly Polalck | klp@chargerinv.com | 880 Apollo St, El Segundo, CA 90245 |
| **CityDog** | Strategic | Phillip Kasdorf | phillipkasdorf@citydogclub.com | |
| **Corbel Capital Parnters** | Investor | Michael Jones | Michael@corbelcap.com | 11777 San Vicente Blvd., Suite 777 LA CA 90049 |
| **FRG (Franchise Resource Group) – owns Pet supplies Plus** | Strategic | Andrew Kaminsky | Akaminsky@franchisegrp.com | |
| **Hollywood Feed** | Strategic | Shawn McGee | shawn@hoolywoodfeed.com | |
| **Jumana Capital** | Investor | Tanner Moran | tmoran@jumanacapital.com | 1717 St. James Pl. Suite 335 Houston TX 77056 |
| **Karp Reilly** | Investor | Billy Logan | billy@karpreilly.com | 102 Greenwich Ave Greenwich, CT 06830 |
| **Lago** | Investor | Kevin Park | kevin.park@lagoinnovation.com | 10 S. Wacker Dr., Ste 3540 Chicago, IL 60606 |
| **Lars Gjoerup** | Investor | Lars Gjoerup | lars@gjoerup.hk | |
| **Modern Animal** | Strategic | Steven Eidelmen | steven@modernanimal.com | |
| **Mudbay** | Strategic | Al Puntillo | Al.Puntillo@mudbay.com | |
| **Petco** | Strategic | Arvind Prabhakar | Arvind.prabhakar@petco.com | |
| **Rainier / Pet Food Express** | Strategic | Henry Anderson | handerson@rainierpartners.com | 1111 3rd Avenue, Suite 3030 Seattle, WA 98101 |
| **Rainier / Pet Food Express** | Strategic | Henry Anderson | handerson@rainierpartners.com | 1111 3rd Avenue, Suite 3030 Seattle, WA 98101 |
| **Seidler** | Investor | Ton Denot | tom@sepfunds.com | 4640 Admiralty Way, Suite 1200 Marina Del Rey, CA 90292 |
| **Serene Investment Management** | Investor | Adam Phillips | adam@sereneim.com | 2625 Alcatraz Ave., Suite 513 Berkeley, CA 94705 |
| **Skyline** | Investor | Kevin Tom | kevin@skylineinv.com | 1901 Avenue of the Stars, Suite 395 Los Angeles, CA 90067 |
| **St Cloud** | Investor | Matt Smith | msmith@stcloudcapital.com | 10866 Wilshire Boulevard, Suite 1450 Los Angeles, CA 90024 |
| **TerraMar Capital** | Investor | Hirak Bali | hbali@terramarcapital.com | |
| **The Dog Bakery (Rocky Kanaka)** | Strategic | Rocky Kanaha | rocky@rockykanaka.com | |
| **Trivest – owns PRHG (Pet Resort Hospitality Group)** | Strategic | Eyal Cohen | eyal@petresorts.love | |
| **VMG Partners** | Investor | Aarti Kapoor | kapoor@vmgpartners.com | 821 Broadway FL6 New York New York 10003-4702 |

# EXHIBIT "D"

# Central District of California
# Claims Register

2:24-bk-20065-DS Healthy Spot Operating LLC

**Judge:** Deborah J. Saltzman **Chapter:** 11
**Office:** Los Angeles **Last Date to file claims:**
**Trustee:** **Last Date to file (Govt):**

*Creditor:* (42255854) History
Ziwi USA, Inc
10985 Cody Street
Suite 110
Overland Park, KS 66210

**Claim No: 1**
*Original Filed Date*: 12/11/2024
*Original Entered Date*: 12/11/2024
*Last Amendment Filed*: 01/28/2025
*Last Amendment Entered*: 01/28/2025

*Status:*
*Filed by:* AT
*Entered by:* Elizabeth S Lynch
*Modified:*

Amount claimed: $228424.76

*History:*
Details 1-1 12/11/2024 Claim #1 filed by Ziwi USA, Inc, Amount claimed: $228424.76 (AUTP)
Details 1-2 01/28/2025 Amended Claim #1 filed by Ziwi USA, Inc, Amount claimed: $228424.76 (Lynch, Elizabeth)

*Description:*
*Remarks:*

*Creditor:* (42268277)
Steven M Carlson
2918 Denby Ave
Unit A
Los Angeles, CA 90039

**Claim No: 2**
*Original Filed Date*: 12/18/2024
*Original Entered Date*: 12/18/2024

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $5029.00
Priority claimed: $2460.00

*History:*
Details 2-1 12/18/2024 Claim #2 filed by Steven M Carlson, Amount claimed: $5029.00 (AUTP)

*Description:*
*Remarks:*

*Creditor:* (42272341)
Michael Arizola
101 RAINBOW DR
#7187
Livingston, TX 77399

**Claim No: 3**
*Original Filed Date*: 12/23/2024
*Original Entered Date*: 12/23/2024
*Last Amendment Filed*: 12/23/2024
*Last Amendment Entered*: 12/23/2024

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:* 12/23/2024

Amount claimed: $12786.27

*History:*
Details 3-1 12/23/2024 Claim #3 filed by Michael Arizola, Amount claimed: $12786.27 (AUTP)
Details 3-2 12/23/2024 Amended Claim #3 filed by Michael Arizola, Amount claimed: $12786.27 (AUTP)

*Description:*
*Remarks:* (3-1) Account Number (last 4 digits):4586
(3-2) Account Number (last 4 digits):4586

*Creditor:* (42289033)
Digital Marketing Consulting Group

**Claim No: 4**
*Original Filed Date*: 01/08/2025

*Status:*
*Filed by:* CR

57 Chandler Street
Unit A
Boston, MA 02116
*Original Entered Date*: 01/08/2025
*Entered by:* AUTP
*Modified:*

Amount claimed: $11867.11

*History:*
Details 4-1 01/08/2025 Claim #4 filed by Digital Marketing Consulting Group, Amount claimed: $11867.11 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42291758)
Mor Air, Inc.
11551 Saticoy Street
North Hollywood, CA 91605
**Claim No: 5**
*Original Filed Date*: 01/10/2025
*Original Entered Date*: 01/10/2025
*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $34456.00

*History:*
Details 5-1 01/10/2025 Claim #5 filed by Mor Air, Inc., Amount claimed: $34456.00 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42293609)
Shopify Capital Inc
100 Shockoe Slip
2nd Floor
Richmond, VA 23219-0000
**Claim No: 6**
*Original Filed Date*: 01/13/2025
*Original Entered Date*: 01/13/2025
*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $357759.75
Secured claimed: $157959.75

*History:*
Details 6-1 01/13/2025 Claim #6 filed by Shopify Capital Inc, Amount claimed: $357759.75 (AUTP)

*Description:*

*Remarks:* (6-1) Account Number (last 4 digits):5684

*Creditor:* (42314775)
Pet Food Experts, LLC
175 Main Street
Pawtucket, RI 02860-4127
**Claim No: 7**
*Original Filed Date*: 01/29/2025
*Original Entered Date*: 01/29/2025
*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $79407.73

*History:*
Details 7-1 01/29/2025 Claim #7 filed by Pet Food Experts, LLC, Amount claimed: $79407.73 (AUTP)

*Description:*

*Remarks:* (7-1) Account Number (last 4 digits):3485

*Creditor:* (42315656)
Diggs, Inc.
733 Third Ave
15th Floor
**Claim No: 8**
*Original Filed Date*: 01/29/2025
*Original Entered Date*: 01/29/2025
*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

*History:*
Details 8-1 01/29/2025 Claim #8 filed by Diggs, Inc., Amount claimed: $6154.15 (AUTP)

*Description:*

*Remarks:*

New York, NY 10017

Amount claimed: $6154.15

*History:*

Details 8-1 01/29/2025 Claim #8 filed by Diggs, Inc., Amount claimed: $6154.15 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42255751)
ACH Capital West, LLC
8791 South Redwood Road Suite 200
West Jordan, UT 84088

**Claim No: 9**
*Original Filed Date*: 02/02/2025
*Original Entered Date*: 02/02/2025

*Status:*
*Filed by:* AT
*Entered by:* Sweeney Kelly
*Modified:*

Amount claimed: $629689.99

Secured claimed: $629689.99

*History:*

Details 9-1 02/02/2025 Claim #9 filed by ACH Capital West, LLC, Amount claimed: $629689.99 (Kelly, Sweeney)

*Description:*

*Remarks:*

*Creditor:* (42255751)
ACH Capital West, LLC
8791 South Redwood Road Suite 200
West Jordan, UT 84088

**Claim No: 10**
*Original Filed Date*: 02/02/2025
*Original Entered Date*: 02/02/2025

*Status:*
*Filed by:* AT
*Entered by:* Sweeney Kelly
*Modified:*

Amount claimed: $651846.94

Secured claimed: $651846.94

*History:*

Details 10-1 02/02/2025 Claim #10 filed by ACH Capital West, LLC, Amount claimed: $651846.94 (Kelly, Sweeney)

*Description:*

*Remarks:*

*Creditor:* (42323537)
Instafunding LLC aka TVT SPVL
c/o Sweeney & Kelble APC
515 S. Flower St., 18th Floor
Los Angeles, CA 90071

**Claim No: 11**
*Original Filed Date*: 02/02/2025
*Original Entered Date*: 02/02/2025

*Status:*
*Filed by:* AT
*Entered by:* Sweeney Kelly
*Modified:*

Amount claimed: $994045.42

Secured claimed: $994045.42

*History:*

Details 11-1 02/02/2025 Claim #11 filed by Instafunding LLC aka TVT SPVL, Amount claimed: $994045.42 (Kelly, Sweeney)

*Description:*

*Remarks:*

*Creditor:* (42323537)

**Claim No: 12**

*Status:*

*History:*

Details 12-1 02/02/2025 Claim #12 filed by Instafunding LLC aka TVT SPVL, Amount claimed: $810624.99 (Kelly, Sweeney)

*Description:*

*Remarks:*

Instafunding LLC aka TVT SPVL
c/o Sweeney & Kelble APC
515 S. Flower St., 18th Floor
Los Angeles, CA 90071

*Original Filed Date*: 02/02/2025
*Original Entered Date*: 02/02/2025

*Filed by:* AT
*Entered by:* Sweeney Kelly
*Modified:*

Amount claimed: $810624.99
Secured claimed: $810624.99

*History:*
Details 12-1 02/02/2025 Claim #12 filed by Instafunding LLC aka TVT SPVL, Amount claimed: $810624.99 (Kelly, Sweeney)

*Description:*
*Remarks:*

*Creditor:* (42323977)
Franchise Tax Board
Bankruptcy Section MS A340
PO BOX 2952
Sacramento CA 95812-2952

**Claim No: 13**
*Original Filed Date*: 02/03/2025
*Original Entered Date*: 02/03/2025

*Status:*
*Filed by:* CR
*Entered by:* Cathy Saechao
*Modified:*

Amount claimed: $913.15
Priority claimed: $841.15

*History:*
Details 13-1 02/03/2025 Claim #13 filed by Franchise Tax Board, Amount claimed: $913.15 (Saechao, Cathy)

*Description:* (13-1) claim filed
*Remarks:*

*Creditor:* (42324537)
PG&E
PO BOX 8329
C/O BANKRUPTCY
STOCKTON, CA 95208

**Claim No: 14**
*Original Filed Date*: 02/03/2025
*Original Entered Date*: 02/03/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $12721.56

*History:*
Details 14-1 02/03/2025 Claim #14 filed by PG&E, Amount claimed: $12721.56 (AUTP)

*Description:*
*Remarks:* (14-1) Account Number (last 4 digits):6711

*Creditor:* (42326437)
William B Drury
PO Box 2248
Mill Valley CA 94942

**Claim No: 15**
*Original Filed Date*: 01/31/2025
*Original Entered Date*: 02/04/2025

*Status:*
*Filed by:* CR
*Entered by:* CS
*Modified:*

Amount claimed: $27000.00

*History:*
Details 15-1 01/31/2025 Claim #15 filed by William B Drury, Amount claimed: $27000.00 (CS)

*Description:*
*Remarks:*

*Creditor:* (42255848)
**Claim No: 16**
*Status:*

*History:*
Details 16-1 02/06/2025 Claim #16 filed by Umland LLC, Amount claimed: $6193.75 (CS)

*Description:*
*Remarks:*

Umland LLC
2213 County Road 355 North
Carlock, IL 61725

*Original Filed Date*: 02/06/2025
*Original Entered Date*: 02/10/2025

*Filed by:* CR
*Entered by:* CS
*Modified:*

Amount claimed: $6193.75

*History:*

Details 16-1 02/06/2025 Claim #16 filed by Umland LLC, Amount claimed: $6193.75 (CS)

*Description:*

*Remarks:*

*Creditor:* (42335020)
The Honest Kitchen, Inc.
1785 Hancock Street
Suite 100
San Diego, CA 92110

**Claim No: 17**
*Original Filed Date*: 02/12/2025
*Original Entered Date*: 02/12/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $21155.20

*History:*

Details 17-1 02/12/2025 Claim #17 filed by The Honest Kitchen, Inc., Amount claimed: $21155.20 (AUTP)

*Description:*

*Remarks:* (17-1) Account Number (last 4 digits):0755

*Creditor:* (42336188)
American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern PA 19355-0701

**Claim No: 18**
*Original Filed Date*: 02/13/2025
*Original Entered Date*: 02/13/2025

*Status:*
*Filed by:* CR
*Entered by:* Greg Deegan
*Modified:*

Amount claimed: $243174.59

*History:*

Details 18-1 02/13/2025 Claim #18 filed by American Express National Bank, Amount claimed: $243174.59 (Deegan, Greg)

*Description:*

*Remarks:*

*Creditor:* (42338655)
American Express National Bank, AENB
c/o Zwicker and Associates, P.C.
Attorneys/Agents for Creditor
P.O. Box 9043
Andover, MA 01810-1041

**Claim No: 19**
*Original Filed Date*: 02/17/2025
*Original Entered Date*: 02/17/2025

*Status:*
*Filed by:* CR
*Entered by:* Jonathan Arias
*Modified:*

Amount claimed: $231666.66

*History:*

Details 19-1 02/17/2025 Claim #19 filed by American Express National Bank, AENB, Amount claimed: $231666.66 (Arias, Jonathan)

*Description:* (19-1) Line of Credit 0502

*Remarks:*

*Creditor:* (42338970)

**Claim No: 20**

*Status:*

*History:*

Details 20-1 02/17/2025 Claim #20 filed by RetailNext, Inc., Amount claimed: $7435.89 (Schlecter, Daren)

*Description:* (20-1) Pre-Petition Services Rendered

*Remarks:*

RetailNext, Inc.
c/o Amy Lund
307 Orchard City Cr #100
Campbell, CA 95008

*Original Filed Date*: 02/17/2025
*Original Entered Date*: 02/17/2025

*Filed by:* CR
*Entered by:* Daren M Schlecter
*Modified:*

Amount claimed: $7435.89

*History:*
Details 20-1 02/17/2025 Claim #20 filed by RetailNext, Inc., Amount claimed: $7435.89 (Schlecter, Daren)

*Description:* (20-1) Pre-Petition Services Rendered
*Remarks:*

*Creditor:* (42338970)
RetailNext, Inc.
c/o Amy Lund
307 Orchard City Cr #100
Campbell, CA 95008

**Claim No: 21**
*Original Filed Date*: 02/17/2025
*Original Entered Date*: 02/17/2025

*Status:*
*Filed by:* CR
*Entered by:* Daren M Schlecter
*Modified:*

Amount claimed: $3037.50
Priority claimed: $3037.50

*History:*
Details 21-1 02/17/2025 Claim #21 filed by RetailNext, Inc., Amount claimed: $3037.50 (Schlecter, Daren)

*Description:* (21-1) Post-Petition Admin Claim
*Remarks:*

*Creditor:* (42255827)
Pure Dog Food
5741 Buckingham Pkwy. Unit D
Culver City, CA 90230

**Claim No: 22**
*Original Filed Date*: 02/19/2025
*Original Entered Date*: 02/19/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $38899.20

*History:*
Details 22-1 02/19/2025 Claim #22 filed by Pure Dog Food, Amount claimed: $38899.20 (AUTP)

*Description:*
*Remarks:*

*Creditor:* (42345658)
U.S. Bank National Association
Bankruptcy Department
PO Box 108
Saint Louis MO 63166-0108

**Claim No: 23**
*Original Filed Date*: 02/24/2025
*Original Entered Date*: 02/24/2025

*Status:*
*Filed by:* CR
*Entered by:* Tiffany Tuggle
*Modified:*

Amount claimed: $55439.08

*History:*
Details 23-1 02/24/2025 Claim #23 filed by U.S. Bank National Association, Amount claimed: $55439.08 (Tuggle, Tiffany)

*Description:* (23-1) credit card 8831
*Remarks:*

*Creditor:* (42348611)

**Claim No: 24**

*Status:*

*History:*
Details 24-1 02/24/2025 Claim #24 filed by Employment Development Department, Amount claimed: $1677.20 (Puertas-Samara, Amelia)

*Description:* (24-1) Claim Filed
*Remarks:* (24-1) Remarks Added

Employment Development Department
Bankruptcy Group MIC 92E, PO BOX 826880
Sacramento, CA 95814

*Original Filed Date*: 02/24/2025
*Original Entered Date*: 02/24/2025

*Filed by:* CR
*Entered by:* Amelia Puertas-Samara
*Modified:*

Amount claimed: $1677.20
Secured claimed: $0.00
Priority claimed: $1235.64

*History:*

Details 24-1 02/24/2025 Claim #24 filed by Employment Development Department, Amount claimed: $1677.20 (Puertas-Samara, Amelia)

*Description:* (24-1) Claim Filed
*Remarks:* (24-1) Remarks Added

*Creditor:* (42255836)
Sarah DeRemer
508 N Normandie ave
#3
Los Angeles, CA 90004

**Claim No: 25**
*Original Filed Date*: 02/24/2025
*Original Entered Date*: 02/24/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $8185.43

*History:*

Details 25-1 02/24/2025 Claim #25 filed by Sarah DeRemer, Amount claimed: $8185.43 (AUTP)

*Description:*
*Remarks:*

*Creditor:* (42351040)
INTERNAL REVENUE SERVICE
PO BOX 7346
PHILA PA 19101-7346

**Claim No: 26**
*Original Filed Date*: 02/26/2025
*Original Entered Date*: 02/26/2025

*Status:*
*Filed by:* CR
*Entered by:* Timothy C Schakow
*Modified:*

Amount claimed: $55168.51
Secured claimed: $0.00
Priority claimed: $43682.46

*History:*

Details 26-1 02/26/2025 Claim #26 filed by INTERNAL REVENUE SERVICE, Amount claimed: $55168.51 (Schakow, Timothy)

*Description:*
*Remarks:*

*Creditor:* (42255762)
Century City Mall, LLC
7950 Collection Center DR.
Chicago, IL 60693

**Claim No: 27**
*Original Filed Date*: 03/04/2025
*Original Entered Date*: 03/04/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $91891.72

*History:*

Details 27-1 03/04/2025 Claim #27 filed by Century City Mall, LLC, Amount claimed: $91891.72 (AUTP)

*Description:*
*Remarks:*

*Creditor:* (42363409)
West Valley Owner LLC
c/o Barclay Damon, LLP

**Claim No: 28**
*Original Filed Date*: 03/04/2025
*Original Entered Date*: 03/04/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP

545 Long Wharf Drive, 9th Floor
ATTN: Niclas A. Ferland
New Haven, CT 06511

*Modified:*

Amount claimed: $215011.56

*History:*

Details 28-1 03/04/2025 Claim #28 filed by West Valley Owner LLC, Amount claimed: $215011.56 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42364856)
One Thousand Grand Avenue Holdings, LLC
Thomas F. Murphy, Esq.
5335 Wisconsin Avenue, NW
Suite 600
Washington, DC 20015

**Claim No: 29**
*Original Filed Date*: 03/05/2025
*Original Entered Date*: 03/05/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $74209.58

*History:*

Details 29-1 03/05/2025 Claim #29 filed by One Thousand Grand Avenue Holdings, LLC, Amount claimed: $74209.58 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42255837)
Sepulveda Blvd. Properties, LLC
225 S Sepulveda Blvd
ATTN: Holly Miyagawa
Manhattan Beach, CA 90266

**Claim No: 30**
*Original Filed Date*: 03/06/2025
*Original Entered Date*: 03/06/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $151884.04

*History:*

Details 30-1 03/06/2025 Claim #30 filed by Sepulveda Blvd. Properties, LLC, Amount claimed: $151884.04 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42367382)
California Dept. of Tax and Fee Administration
Collection Support Bureau, MIC: 29
PO Box 942879
Sacramento, CA 94279-0029

**Claim No: 31**
*Original Filed Date*: 03/06/2025
*Original Entered Date*: 03/06/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $2963.56
Priority claimed: $2963.56

*History:*

Details 31-1 03/06/2025 Claim #31 filed by California Dept. of Tax and Fee Administration, Amount claimed: $2963.56 (AUTP)

*Description:*

*Remarks:* (31-1) Account Number (last 4 digits):6711

*Creditor:* (42370602)
Raw Advantage Processing, LLC

**Claim No: 32**
*Original Filed Date*: 03/09/2025

*Status:*
*Filed by:* CR

c/o David D. Farrell, THOMPSON COBURN LLP
One US Bank Plaza, Suite 2700
505 N. Seventh Street
Saint Louis, MO 63101

*Original Entered Date*: 03/09/2025

*Entered by:* AUTP
*Modified:*

Amount claimed: $29246.00

*History:*

Details 32-1 03/09/2025 Claim #32 filed by Raw Advantage Processing, LLC, Amount claimed: $29246.00 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42255747)
8126 Beverly Properties, LLC
2834 W Imperial Highway
Inglewood, CA 90303

**Claim No: 33**
*Original Filed Date*: 03/11/2025
*Original Entered Date*: 03/11/2025
*Last Amendment Filed*: 05/23/2025
*Last Amendment Entered*: 05/23/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:* 05/23/2025

Amount claimed: $690000.00

*History:*

Details 33-1 03/11/2025 Claim #33 filed by 8126 Beverly Properties, LLC, Amount claimed: $330000.00 (AUTP)

Details 33-2 05/23/2025 Amended Claim #33 filed by 8126 Beverly Properties, LLC, Amount claimed: $690000.00 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42255746)
614 E COL Properties LLC
2834 West Imperial Highway
Inglewood, CA 90303

**Claim No: 34**
*Original Filed Date*: 03/11/2025
*Original Entered Date*: 03/11/2025
*Last Amendment Filed*: 05/23/2025
*Last Amendment Entered*: 05/23/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:* 05/23/2025

Amount claimed: $149203.13

*History:*

Details 34-1 03/11/2025 Claim #34 filed by 614 E COL Properties LLC, Amount claimed: $133056.00 (AUTP)

Details 34-2 05/23/2025 Amended Claim #34 filed by 614 E COL Properties LLC, Amount claimed: $149203.13 (AUTP)

Details 34-3 05/23/2025 Amended Claim #34 filed by 614 E COL Properties LLC, Amount claimed: $149203.13 (AUTP)

*Description:*

*Remarks:*

*Creditor:* (42374735)
Ivy Station Residential LLC
Shartsis Friese LLP, Attn: Ivo Keller
425 Market St, 11th Fl
San Francisco, CA 94105

**Claim No: 35**
*Original Filed Date*: 03/11/2025
*Original Entered Date*: 03/12/2025

*Status:*
*Filed by:* CR
*Entered by:* BT
*Modified:*

Amount claimed: $282810.90

*History:*

Details 35-1 03/11/2025 Claim #35 filed by Ivy Station Residential LLC, Amount claimed: $282810.90 (BT)

*Description:* (35-1) Real PropertyLease

*Remarks:*

*Creditor:* (42374812)

**Claim No: 36**

*Status:*

Oracle Credit Corp. & Oracle America, Inc.
SII to NetSuite, Inc. & CrowdTwist
c/o Shawn M. Christianson, Esq.
Buchalter PC
425 Market St., Suite 2900
San Francisco, CA 94105

*Original Filed Date*: 03/12/2025
*Original Entered Date*: 03/12/2025

*Filed by:* AT
*Entered by:* Shawn M Christianson
*Modified:*

Amount claimed: $174675.63

*History:*
Details 36-1 03/12/2025 Claim #36 filed by Oracle Credit Corp. & Oracle America, Inc., Amount claimed: $174675.63 (Christianson, Shawn)

*Description:*
*Remarks:*

*Creditor:* (42376744)
GKT Village at Topanga, L.L.C.
c/o Manning Gross + Massenburg LLP
Attn: David Primack
125 High Street, Oliver Street Tower, 6th Floor
Boston, MA 02110

**Claim No: 37**
*Original Filed Date*: 03/13/2025
*Original Entered Date*: 03/13/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $97119.28

*History:*
Details 37-1 03/13/2025 Claim #37 filed by GKT Village at Topanga, L.L.C., Amount claimed: $97119.28 (AUTP)

*Description:*
*Remarks:*

*Creditor:* (42255763) History
Cintas Corporation No. 2
c/o Steve Malkiewicz, Bankruptcy Counsel
6800 Cintas Blvd
Mason, OH 45040

**Claim No: 38**
*Original Filed Date*: 03/13/2025
*Original Entered Date*: 03/13/2025

*Status:*
*Filed by:* CR
*Entered by:* Stephen Malkiewicz
*Modified:*

Amount claimed: $115735.29

*History:*
Details 38-1 03/13/2025 Claim #38 filed by Cintas Corporation No. 2, Amount claimed: $115735.29 (Malkiewicz, Stephen)

*Description:*
*Remarks:*

*Creditor:* (42255800) History
Mamo LBMP Investors I LLC
c/o Kutak Rock LLP
Attn: Christopher G. Varallo
510 W. Riverside Ave., #800
Spokane, WA 99201

**Claim No: 39**
*Original Filed Date*: 03/14/2025
*Original Entered Date*: 03/14/2025

*Status:*
*Filed by:* CR
*Entered by:* Brian J Wagner
*Modified:*

Amount claimed: $120434.55

*History:*
Details 39-1 03/14/2025 Claim #39 filed by Mamo LBMP Investors I LLC, Amount claimed: $120434.55 (Wagner, Brian)

*Description:* (39-1) Shopping Center Lease, and Amendments thereto
*Remarks:*

*Creditor:* (42379615)
Andrew Kim
Law Office of Frank Ruggier
15545 Devonshire St., Ste. 110
Mission Hills, CA 91345

**Claim No: 40**
*Original Filed Date*: 03/14/2025
*Original Entered Date*: 03/14/2025

*Status:*
*Filed by:* CR
*Entered by:* Frank X Ruggier
*Modified:*

Amount claimed: $243174.59

*History:*
Details 40-1 03/14/2025 Claim #40 filed by Andrew Kim, Amount claimed: $243174.59 (Ruggier, Frank)

*Description:* (40-1) personal gurantee and indemnification claim
*Remarks:*

*Creditor:* (42255772)
ECS Janitorial Services, Inc.
901 East 65th Street
Inglewood, CA 90302

**Claim No: 41**
*Original Filed Date*: 03/14/2025
*Original Entered Date*: 03/14/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $72918.00

*History:*
Details 41-1 03/14/2025 Claim #41 filed by ECS Janitorial Services, Inc., Amount claimed: $72918.00 (AUTP)

*Description:*
*Remarks:*

*Creditor:* (42384866)
SFPUC Water, Power & Sewer
525 Golden Gate Ave, 7th FL
San Francisco, CA 94102

**Claim No: 42**
*Original Filed Date*: 03/18/2025
*Original Entered Date*: 03/18/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $984.51

*History:*
Details 42-1 03/18/2025 Claim #42 filed by SFPUC Water, Power & Sewer, Amount claimed: $984.51 (AUTP)

*Description:*
*Remarks:* (42-1) Account Number (last 4 digits):9031

*Creditor:* (42442959)
Essex Portfolio, L.P.
1100 PARK PLACE, SUITE 200
SAN MATEO, CA 94002

**Claim No: 43**
*Original Filed Date*: 04/24/2025
*Original Entered Date*: 04/24/2025

*Status:*
*Filed by:* CR
*Entered by:* Jamie Altman Buggy
*Modified:*

Amount claimed: $449560.21

*History:*
Details 43-1 04/24/2025 Claim #43 filed by Essex Portfolio, L.P., Amount claimed: $449560.21 (Buggy, Jamie)

*Description:*
*Remarks:*

*Creditor:* (42491509)
Employment Development Department
Bankruptcy Group MIC 92E, PO BOX

**Claim No: 44**
*Original Filed Date*: 05/27/2025
*Original Entered Date*: 05/27/2025

*Status:*
*Filed by:* CR
*Entered by:* Amelia Puertas-Samara

*History:*
Details 44-1 05/27/2025 Claim #44 filed by Employment Development Department, Amount claimed: $3616.38 (Puertas-Samara, Amelia)

*Description:* (44-1) Claim Filed
*Remarks:* (44-1) Remarks Added

826880
Sacramento, CA 95814

*Modified:*

Amount claimed: $3616.38
Priority claimed: $0.00

*History:*
Details 44-1 05/27/2025 Claim #44 filed by Employment Development Department, Amount claimed: $3616.38 (Puertas-Samara, Amelia)

*Description:* (44-1) Claim Filed
*Remarks:* (44-1) Remarks Added

*Creditor:* (42508221)
Fisher & Phillips LLP
1200 Abernathy Road, Suite 950
Atlanta, GA 30328

**Claim No: 45**
*Original Filed Date*: 06/04/2025
*Original Entered Date*: 06/04/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

Amount claimed: $3859.75

*History:*
Details 45-1 06/04/2025 Claim #45 filed by Fisher & Phillips LLP, Amount claimed: $3859.75 (AUTP)

*Description:*
*Remarks:* (45-1) Account Number (last 4 digits):3241

*Creditor:* (42520226)
Capstone Law APC
1875 Century Park East
Suite 1000
Los Angeles, CA 90067

**Claim No: 46**
*Original Filed Date*: 06/12/2025
*Original Entered Date*: 06/12/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

*No amounts claimed*

*History:*
Details 46-1 06/12/2025 Claim #46 filed by Capstone Law APC, Amount claimed: (AUTP)

*Description:*
*Remarks:* (46-1) Filer Comment: Litigation is ongoing

*Creditor:* (42520249)
Rosa Medina
1875 Century Park East
Suite 1000
Los Angeles, CA 90067

**Claim No: 47**
*Original Filed Date*: 06/12/2025
*Original Entered Date*: 06/12/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP
*Modified:*

*No amounts claimed*

*History:*
Details 47-1 06/12/2025 Claim #47 filed by Rosa Medina, Amount claimed: (AUTP)

*Description:*
*Remarks:* (47-1) Filer Comment: Pending ongoing litigation

*Creditor:* (42520253)
Rosa Medina, a PAGA representative
1875 Century Park East

**Claim No: 48**
*Original Filed Date*: 06/12/2025
*Original Entered Date*: 06/12/2025

*Status:*
*Filed by:* CR
*Entered by:* AUTP

*History:*
Details 48-1 06/12/2025 Claim #48 filed by Rosa Medina, a PAGA representative, Amount claimed: $38600000.00 (AUTP)

*Description:*
*Remarks:*

Suite 1000
Los Angeles, CA 90067

*Modified:*

Amount claimed: $38600000.00

*History:*

Details 48-1 06/12/2025 Claim #48 filed by Rosa Medina, a PAGA representative, Amount claimed: $38600000.00 (AUTP)

*Description:*

*Remarks:*

## Claims Register Summary

**Case Name:** Healthy Spot Operating LLC
**Case Number:** 2:24-bk-20065-DS
**Chapter:** 11
**Date Filed:** 12/10/2024
**Total Number Of Claims:** 48

| | |
|---|---|
| **Total Amount Claimed*** | $46104058.51 |
| **Total Amount Allowed*** | |

*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| **Secured** | $3244167.09 | |
| **Priority** | $54220.31 | |
| **Administrative** | | |



| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/09/2025 15:37:34 | | | |
| **PACER Login:** | ctp4pacer | **Client Code:** | |
| **Description:** | Claims Register | **Search Criteria:** | 2:24-bk-20065-DS Filed or Entered From: 6/18/2000 Filed or Entered To: 12/31/2025 |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled **DEBTOR'S MOTION FOR ORDER: (1) AUTHORIZING SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (2) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES; AND (3) RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MARK BOONNARK** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 10, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Jonathan Arias bknotices@zwickerpc.com
- Jamie Altman Buggy jbuggy@harvestllp.com, jkeatingwolk@harvestllp.com,atenreiro@harvestllp.com
- Shawn M Christianson cmcintire@buchalter.com, schristianson@buchalter.com
- Ivo Keller ikeller@sflaw.com, calendar@sflaw.com
- Sweeney Kelly kelly@ksgklaw.com
- Elizabeth S Lynch blynch@chinnery.com
- Noreen A Madoyan Noreen.Madoyan@usdoj.gov
- Stephen Malkiewicz stephen.malkiewicz@cintas.com
- Jean Pierre Nogues jpn@msk.com
- Dean G Rallis drallis@hahnlawyers.com, jevans@hahnlawyers.com;drallis@ecf.courtdrive.com;jevans@ecf.courtdrive.com;crogers@hahnlawyers.com;acastillo@hahnlawyers.com
- Abe G Salen asalen@wzllp.com, kmartin@wzllp.com,ddouglas@wzllp.com,akaderbarek@wzllp.com
- Daren M Schlecter daren@schlecterlaw.com, assistant@schlecterlaw.com
- Gary A Starre gastarre@gmail.com, mmoonniiee@gmail.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

**2. SERVED BY UNITED STATES MAIL**: On **July 10, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 10, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 10, 2025 | D. Woo | /s/ D. Woo |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

614 E. Col Properties
2834 W. Imperial Hwy
Inglewood, CA 90303

8126 Beverly Properties LLC
Arash Danialifar
2834 W. Imperial Hwy
Inglewood, CA 90303

8525 Santa Monica Blvd LLC
710 N. Oakhurst Drive
Beverly Hills, CA 90210

Allen C. Dennis Trustee
5500 Rhodes Avenue
Valley Village, CA 91607

American Commercial Equities Three
22917 Pacific Coast Hwy., St 300
Malibu, CA 90265

Century City Mall LLC - Westfield
2049 Century Park East, 41st Floor
Los Angeles, CA 90067

East of June LLC
8900 Melrose Ave Suite 201
West Hollywood, CA 90069

Essex Portfolio L.P.
1100 Park Place Suite 200
San Mateo, CA 94403

Industrious LS Hughes District LLC
6600 Center Drive 10th Floor
Los Angeles, CA 90045

Ivy Station Residential LLC
11777 San Vicente Blvd Suite 900
Los Angeles, CA 90049

KB Properties
PO Box 2248
Mill Valley, CA 94942

Koenig Family Properties LLC
P.O Box 8482
Santa Cruz, CA 95061

Mamo LBMP Investors I LLC
PO Box 209427
Austin, TX 78720

Michael Quagletti Trust
2300 Garfield Avenue
Los Angeles, CA 90064

MSQ LLC
13160 Mindanao Way
Marina del Rey, CA 90292

1000 Grand Avenue Holdings, LLC.
Hanover Grand LLC
450 West Olympic
Los Angeles, CA 90015

Radbert and Diana Chin
P.O. Box 9440
Fresno, CA 93792

Runway Owners LLC
12775 W Millenium, Suite 165
Playa Vista, CA 90094

Sepulveda Blvd Prop. LLC - Skechers
225 S Sepulveda Blvd
Manhattan Beach, CA 90266

Silver Ridge Plaza
2760 E. Spring St, Suite 200
Long Beach, CA 90806

Walnut Square Center LP
468 Green St.
San Francisco, CA 94133

West Valley Owner LLC
2049 Century Park East, 41st Floor
Los Angeles, CA 90067

KB Properties
116 Longfellow Rd.
Mill Valley, CA 94941

Koenig Family Properties LLC
113 Shelter Lagoon Dr.
Santa Cruz, CA 95060

Mamo LBMP Investors I LLC
1823 E. 17th St., Suite 120
Santa Ana, CA 92705

Radbert and Diana Chin
1398 W. Herdon Ave., #105
Fresno, CA 93710

Mytime
947 Linda Flora Drive
Los Angeles, CA 90049

Shopify
151 O'Connor St., Ground Floor
Ottawa, Ontario K2P 2L8

Celigo
3 Lagoon Drive, Suite 130
Redwood City, CA 94065

Crowdtwist
7700 Technology Way
Denver, CO 802377

Cintas
6800 Cintas Blvd.
Mason, Ohio 45040

Clearmind Technology
3303 Wilshire Blvd.,Suite 1225
Los Angeles, CA 90010

Box
900 Jefferson Ave
Redwood City, CA 94063

RetailNext
307 Orchard City Drive,Suite 100
Campbell, CA 95008

RFSmart
3563 Phillips Highway, Suite F-601
Jacksonville, FL 32207

Instacart (Maplebear)
50 Beale St., #600
San Francisco, CA 94105

Reviewtrackers
1 N State St., Suite 600
Chicago, IL 60602

Figma
760 Market St, Fl 10
San Francisco, CA 94102

Industrious
6060 Center Drive
Los Angeles, CA 90045

Izuzu Finance
2500 Westchester Ave, Suite 312
Purchase, NY 10577

Healthy Spot Operating LLC
File #10424
Secured

ACH Capital West, LLC
8791 South Redwood Road Suite 200
West Jordan, UT 84088

TVT SPVL.com
2999 NE 191st St, Suite 500
Miami, Florida 33180

Insta Funding LLC
2999 NE 191st St, Suite 500
Miami, Florida 33180

Valerga LLP
ATTN: Brody Valerga
395 S. Main Street #201
Alpine, UT 84004