DANIEL H. REISS (SBN 150573)
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dhr@lnbyg.com

Attorneys for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>HEALTHY SPOT OPERATING, LLC,<br><br>Debtor and Debtor in Possession. | Case No.: 2:24-bk-20065-DS<br><br>Chapter 11 Case<br><br>**(1) MOTION FOR ORDER APPROVING STIPULATION BY AND AMONG THE DEBTOR, ACH CAPITAL WEST, LLC, INSTAFUNDING LLC, PET PROS, LLC, AND NPM FRANCHISING, LLC REGARDING CLAIM ALLOWANCE AND CREDIT BIDDING;**<br><br>**(2) COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF (A) MOTION; AND (B) CONCURRENTLY FILED APPLICATION FOR ORDER SHORTENING NOTICE;**<br><br>**(3) DECLARATION OF MARK BOONNARK IN SUPPORT THEREOF**<br><br>Date: TBD<br>Time: TBD<br>Place: Courtroom 1639<br>255 East Temple Street<br>Los Angeles, CA 90012 |

**TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:**

Healthy Spot Operating, LLC ("Debtor"), debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case, hereby moves (the "Motion") this Court pursuant to section 105(a) of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9019-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California ("LBR"), for an order in substantially the form annexed hereto as **Exhibit B**, approving the *Stipulation By and Among the Debtor, ACH Capital West, LLC, Instafunding LLC, Pet Pros, LLC, and NPM Franchising, LLC Regarding Claim Treatment* (the "Stipulation"), a copy of which is attached hereto as **Exhibit A**.

Debtor has concurrently filed an application for order shortening time to set a hearing on this Motion ("Shortened Time Application") pursuant to Local Bankruptcy Rule 9075-1. The annexed Memorandum of Points and Authorities and Declaration of Mark Boonnark are submitted in support of both the Motion and the Shortened Time Application.

The Motion and Shortened Time Application is based upon the annexed Memorandum of Points and Authorities, the Declaration of Mark Boonnark annexed hereto, the evidence provided herewith, the Stipulation, Debtor's *Motion For Order: (1) Authorizing Sale Of Certain Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests; (2) Authorizing Assumption And Assignment Of Certain Leases; And (3) Related Relief* filed on July 10, 2025 [Dkt. No. 171] which is incorporated hereat, along with the supporting Declaration of Mark Boonnark annexed thereto, the record in this case, such other and further evidence and argument as may be presented to the Court at or before a hearing on this Motion.

WHEREFORE, Debtor hereby moves the Court for an order:

1. Granting the Motion in its entirety;

2. Approving the Stipulation in all respects;

3. Waiving any stay of the effectiveness of the order under the Bankruptcy Code and Bankruptcy Rules; and

4. Granting such related and further relief as deemed appropriate by the Court.

Dated: July 14, 2025

HEALTHY SPOT OPERATING, LLC

By: ___*/s/ Daniel H. Reiss*___
DANIEL H. REISS
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
Attorneys for Chapter 11 Debtor and Debtor in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

By the annexed Motion, Healthy Spot Operating, LLC ("Debtor") seeks entry of an order approving the Stipulation annexed hereto as **Exhibit A** by and among the Debtor, ACH Capital West, LLC ("ACH"), Instafunding LLC a/k/a TVT SPVL ("TVT"), Pet Pros, LLC ("Pet Pros"), and NPM Franchising, LLC ("NPM," and together with Pet Pros, the "Buyer," and Buyer collectively with Debtor, ACH and TVT, the "Parties"). A proposed form of order approving this Motion is attached hereto as **Exhibit B**. The Stipulation is a necessary prerequisite to the proposed sale of substantially all of Debtor's assets to Buyer (the "Sale"), as explained below. By the Stipulation, Buyer is established as the holder of allowed secured claims in the aggregate amount of $3,086,209.34 and, therefore, has the right to credit bid such claim as part of the purchase price of the estate's assets being purchased by Buyer. Therefore, approval of the Stipulation is of the utmost importance to Debtor and its estate to realize the substantial benefits of the proposed sale.

By the concurrently filed "Application for Order Setting Hearing on Shortened Notice" (the "Shortened Notice Application"), Debtor is requesting that the Motion be heard on shortened time due to the crucial importance of the Stipulation to the Sale. As discussed herein, good cause exists for granting the Shortened Notice Application. Without approval of the Stipulation, the Sale cannot proceed; and without the Sale – as will be explained below - Debtor will likely cease operating as a going concern, resulting in irreparable harm to Debtor's bankruptcy estate and its creditors. Further, Debtor's *Motion For Order: (1) Authorizing Sale Of Certain Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests; (2) Authorizing Assumption And Assignment Of Certain Leases; And (3) Related Relief* (the "Sale Motion") filed on July 10, 2025 [Dkt. No. 171], which is incorporated hereat, provides further basis of granting this Motion on an expedited basis.

## II. JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. STATEMENT OF FACTS

### A. Background.

On December 10, 2024, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. Debtor is a comprehensive pet care retail business which, as of the Petition Date, had a network of 20 retail stores in premier locations across Southern and Northern California, as well as a growing e-commerce channel. Debtor's focus is on fostering healthy pet lifestyles. Each of Debtor's stores provides a suite of best-in-class services, including pet grooming, daycare, nutrition consulting, dental cleaning and dog training classes, aiming to cater to the complete spectrum of client needs in pet care. Debtor specializes in a curated offering of pet care products, including an extensive selection of wholesome and organic food options, environmentally-friendly toys, treats, training aids, grooming supplies, and its private label offering, Mind Body Bowl. Debtor has established itself as a benchmark brand for pet services.

Along with the retail locations, Debtor also developed a growing direct-to-consumer ecommerce and wholesale business with its private label brand Mind Body Bowl, which speaks to the same holistic approach to pet health and care embodied in the stores. Mind Body Bowl is currently on shelf in 400+ grocery stores including Erewhon, Gelsons, and Bristol Farms. This serves to further monetize the brand as well as extend the brand reach geographically and demographically. Gross annual sales are approximately $40 million, and Debtor has approximately 300 employees.

The Debtor continues to operate and manage its business and affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Debtor's post-petition efforts have been aimed at stabilizing the company's operations and continued its

efforts to remain a going concern despite the challenges of this chapter 11 bankruptcy, unexpected events such as the recent Los Angeles fires, and competitive business environment. Since the Petition Date, Debtor implemented various strategies to increase sales and improve operating efficiencies. Unfortunately, despite Debtor's best efforts, Debtor is now experiencing significant negative operating cash flows and its ability to remain a going concern is highly unlikely. As set forth in the *Revised Cash Collateral Budget* filed with this Court on April 28, 2025 [Dkt. No. 136], it was anticipated that Debtor would have a *negative* cash balance of approximately $379,000 for the week of June 30, 2025.

Based on the ongoing negative cash flows of Debtor, Debtor will not realistically be able to continue as a going concern. Due to Debtor's negative cash flows, Debtor will be shortly unable to continue as a going concern, nor pay essential operating expenses such as payroll, employee benefits, rent, insurance or utilities. As a result, Debtor is seeking the relief requested herein on a highly expedited basis. Further, Debtor's assets are encumbered by the asserted secured claims of TVT and ACH, whose filed secured proofs of claim exceed $3.0 million.[1] Debtor is fairly certain, therefore, absent a sale of its assets on a going concern basis, that there will be no value available for any creditors in this case, other than possibly for those holding secured claims. Therefore, Debtor has determined that a sale of its operating assets as a going concern will maximize the value of the bankruptcy estate and is the best interests of creditors and other parties in interest.

**B. Proposed Sale of Assets and Substantial Benefit to the Estate.**

On or about July 10, 2025, Debtor entered into that certain Asset Purchase Agreement with Buyer, subject to higher or better offers ("Stalking Horse Purchase Agreement"). A true copy of the Stalking Horse Purchase Agreement is annexed to the Sale Motion filed on July 10, 2025 [Dkt. No. 171] as **Exhibit A**.

---

[1] On February 2, 2025, ACH filed Claim Nos. 9 and 10 against Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10). Also on February 2, 2025, TVT filed Claim Nos. 11 and 12 against Debtor, asserting secured claims in the amounts of $994,045.42 (Claim No. 11) and $810,624.99 (Claim No. 12).

The terms of the Stalking Horse Purchase Agreement can be summarized as follows:

1. Stalking Horse Purchaser shall acquire the Assets (as that term is defined in the Stalking Horse Purchase Agreement), free and clear of all liens, claims, encumbrances and other interests (except as provided in the Stalking Horse Purchase Agreement);

2. Debtor shall assume and assign certain executory contracts and unexpired leases (the "Assigned Contracts") to the Stalking Horse Purchaser as set forth on Schedules B, C and G of the Stalking Horse Purchase;

3. The purchase price for the Assets and assignment of the Assigned Contracts (the "Purchase Price") is set forth on Schedule H to the Stalking Horse Purchase Agreement is $6,315,158.00, and shall consist of:

i. payment of cash consideration to Debtor in the sum of $950,000;

ii. assumption of the Assumed Liabilities (as defined in the Stalking Horse Purchase Agreement);

iii. a credit bid of the amount of the Stalking Horse Purchaser's secured claims of $2,876,344.20, assuming the Stipulation is approved by this Motion; and

iv. all amounts paid in connection with the assumption and assignment of the Assigned Contracts.

A list of the Assigned Contracts and the amounts to be paid in order to cure arrearages under Bankruptcy Code Section 365(b) is set forth in Schedules B, C and G to the Stalking Horse Purchase Agreement (collectively, the "Schedule of Assigned Contracts").

The Sale to Buyer under the terms of the Stalking Horse Purchase Agreement provides substantial economic benefit to the estate that would not exist without the Sale, and is in the overwhelming best interests of the Debtor's bankruptcy estate. First, because Debtor's assets will be sold as a going concern which benefits customers, the business community and employees. Debtor anticipates that the jobs of over 220 employees will be preserved as many of Debtor's retail locations will remain in business. Secondly, as set forth on Schedule H of the Stalking

Horse Purchase Agreement, the Stalking Horse Purchaser is assuming pre-petition and post-petition trade debt ($1,775,788.16), accrued employee PTO ($215,514.00), and paying lease cure amounts ($497,511.64) in the aggregate of amount of $2,488,813.80 as part of its purchase price. Due to these substantial benefits to the estate, Debtor's employees and the community currently served by Debtor's business, Debtor believes that the proposed sale is an excellent achievement for this chapter 11 case and should be approved. None of these benefits would be available outside of the Sale.

As mentioned above, Debtor has already filed the Sale Motion to approve the Stalking Horse Purchase Agreement and filed a motion seeking approval of certain bidding and sale procedures (the "Bid Procedures Motion"), which is set for hearing on July 17, 2025. Due to the substantial benefits of the Sale to the estate, Debtor's employees and the community currently served by Debtor's business, Debtor believes that the proposed sale is an excellent achievement for this chapter 11 case, and should be approved.

Debtor concedes that the proposed timeframe for the proposed sale is rather compressed. However, due to the precipitous decline in Debtor's business performance, Debtor cannot – and the Stalking Horse Purchaser is not willing to – extend the sale process longer than is proposed herein. As described in the Sale Motion, Debtor's business and operations have been constantly and aggressively marketed for multiple years, including post-petition, and Debtor has no expectation that another purchaser will bid on the Assets, nor provide the substantial economic benefit that the Stalking Horse Purchase Agreement provides. Further, Debtor strongly believes that it does not have the luxury to engage in an expensive and lengthy marketing effort, nor does Debtor believe that additional marketing time and resources would yield a better result than is presented by the Stalking Horse Bid. In fact, any further delay may cancel the Sale and cause irreparable harm to the estate.

**C. The Proposed Stipulation and Allowance of Claims and Rights to Credit Bid are a Condition Precedent to the Purchase of the Assets by the Stalking Horse Bidder.**

On January 23, 2025, the Debtor filed, among other things, its Schedules of Assets and Liabilities [Docket No. 62] (the "Schedules"). On its Schedule D, the Debtor scheduled ACH Capital West, LLC as holding an unliquidated and disputed secured claim in the amount of $1,231,902.55. *See* Schedule D, #2.1. Also on Schedule D, the Debtor scheduled "TVT SPVL.com"[2] as holding an unliquidated and disputed secured claim in the amount of $1,700,868.52. *See* Schedule D, #2.3.

On February 2, 2025, ACH filed Claim Nos. 9 and 10 (the "ACH Claims") against the Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10) on account of "Sept 2024 Receivables Purchase Agr." The ACH Claims assert certain "recorded UCC-1" filings as the basis for the perfection of its purported security interests and attached certain UCC Financing Statements (the "ACH UCC-1s") filed with the California Secretary of State. The ACH UCC-1s identify, among other entities, the Debtor as a debtor to the ACH obligations, pledging "[a]ll current assets of the Debtor as of the enforcement date of [the ACH UCC-1s], including but not limited to cash, accounts receivable, other receivables, equipment, inventory, along with all trade fixtures belonging to the Debtor; all inclusive of after acquired property."

Also on February 2, 2025, TVT filed Claim Nos. 11 and 12 (the "TVT Claims," and together with the ACH Claims, the "ACH/TVT Claims") against the Debtor, asserting secured claims in the amounts of $994,045.42 (Claim No. 11) and $810,624.99 (Claim No. 12) on account of "June 2024 Contract Receivables Purchase Agr." The TVT Claims assert certain "recorded UCC-1" filings as the basis for the perfection of its purported security interests and attached certain UCC Financing Statements (the "TVT UCC-1s") filed with the Delaware Secretary of State and California Secretary of State. The TVT UCC-1s identify, among other

[2] The Debtor also listed "Insta Funding LLC" (the formal legal name of TVT) and Valerga LLP, TVT's state court counsel, as a notice only parties.

entities, the Debtor as a debtor to the TVT obligations, pledging "[a]ll personal property of every kind and nature, wherever located, and now owned or hereafter acquired, including without limitation, all accounts, contract rights, rights to the payment of money, insurance claims and proceeds, chattel paper, electronic chattel paper, documents, instruments, securities and other investment property, deposit accounts, supporting obligations of every nature, and general intangibles, including without limitation, customer lists, and all books and records related thereto, and all recorded data of any kind and nature, regardless of the medium of recording; together with, to the extent not listed above as to the original collateral, all substitutions and replacements for and products of any of the foregoing property, and together with proceeds of any and all of the foregoing property."

As a condition to proceeding with the purchase of the Assets, and as set forth in the Stalking Horse Purchase Agreement, Buyer requires that: (i) the ACH/TVT Claims be allowed in the amounts set forth herein below; (ii) Buyer acquires the ACH/TVT Claims; and (iii) and that Buyer be authorized to credit bid the allowed amount of the ACH/TVT Claims under Section 363(k) of the Bankruptcy Code as part of the purchase price for the Assets.

ACH and TVT desire to monetize the ACH/TVT Claims and to sell and transfer such claims to Buyer. Following arm's-length negotiations, the Parties have reached an agreement regarding the treatment of the ACH/TVT Claims. Moreover, the record in this case establishes that there are no other secured claims scheduled by Debtor,[3] nor has any party other than ACH or TVT filed proofs of claim asserting a lien in the Assets of Debtor.[4] Therefore, by way of the approval of the Stipulation, the Buyer shall hold first priority secured claims in the aggregate amount of $3,086,209.34 and will have the right to credit bid such claims in connection with the sale.

---

[3] The Court is requested to take judicial notice of Debtor's Bankruptcy Schedule D (Dkt. No. 62, pgs. 16 - 17). As stated above, all of the parties on Schedule D relate to the ACH/TVT Claims.

[4] A true copy of the claims register in this case is annexed to the Sale Motion as **Exhibit D**.

In full resolution of the ACH/TVT Claims asserted against the Debtor, and as a condition precedent to the transactions contemplated by the Stalking Horse Purchase Agreement, the Parties to the Stipulation have negotiated the various terms of the Stipulation, subject to Court approval, to maximize the value of the estate for the benefit of creditors. The terms and agreements made by and among the Debtor, ACH, TVT, and Buyer are set out fully in the Stipulation, and are incorporated herein by this reference.

**D. Additional Facts Supporting a Hearing on the Stipulation on Shortened Time.**

As stated above, Debtor acknowledges that the Court approvals required for the Sale must take place within a short time frame. Nonetheless, and despite the short time frame within which Debtor seeks approval of the Sale, Debtor has filed the Bid Procedures Motion to allow for competitive bidding and, if appropriate, an auction among competing bids, which is set for hearing on July 17, 2025. As part of those bid procedures, Debtor is proposing a competitive bid deadline of July 20, 2025. Absent approval of the Stipulation, it will not be possible to conduct a sales process because an important condition precedent to the Stalking Horse Purchase Agreement will not be satisfied. Further, absent approval of the Stipulation and the Buyer's ability to credit bid under Section 363(k), the actual amount of the proposed purchase price under the Stalking Horse Purchase Agreement will not be known, which would make a competitive bidding process and auction impossible.

Moreover, without approval of the Stipulation well before a hearing on a Sale, Debtor and the Buyer will remain in limbo, unable to move forward with a full commitment to the sales process and preparing for a quick and efficient close of the Sale, absent approval of the Stipulation on an expedited basis. For these reasons, Debtor is requesting that a hearing be set on this Motion on shortened time to ensure that Court authority is obtained to consummate the sale as soon as possible.

**IV. APPLICABLE AUTHORITY FOR APPROVAL OF THE STIPULATION**

The authority granted a trustee or debtor in possession to compromise a controversy or agree to a settlement is set forth in Bankruptcy Rule 9019(a), which provides in pertinent part

that "[o]n motion by the [debtor in possession] and after hearing on notice to creditors . . ., the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Bankruptcy Rule 9019(a) affords the Bankruptcy Court "great latitude in approving compromise agreements" proposed by a debtor and may approve a proposed compromise so long as it is fair and equitable. *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1987). "A court generally gives deference to a trustee's business judgment in deciding whether to settle a matter," and the debtor-in-possession's duty is to persuade the court that the settlement is "fair and equitable." *In re Mark Technologies Corp.*, 2018 WL 669112, *18 (B.A.P. 9th Cir. Feb. 1, 2018).

"The purpose of a compromise agreement is to allow the [debtor in possession] and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1380–81 (9th Cir. 1986), *cert. denied sub nom.*, *Martin v. Robinson*, 479 U.S. 854 (1986). Indeed, "settlement is particularly valuable in bankruptcy;" it can facilitate "significant creativity in the negotiation and crafting of complex, multiparty settlements resolving what might otherwise be intractable disputes in nonbankruptcy contests." *Foster v. First Interstate Bank (In re Shoot the Moon, LLC)*, Nos. 2:15-bk-60979-WLH11, 2:21-ap-02005-WLH, 2022 Bankr. LEXIS 117, at *10–11 (Bankr. D. Mont. Jan. 18, 2022) (footnotes omitted). Accordingly, in approving a settlement agreement, the court need not conduct an exhaustive investigation of the claims sought to be compromised. *United States v. Alaska National Bank (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the Court find that the settlement was negotiated in good faith and is reasonable, fair, and equitable. *A & C Props.*, 784 F.2d at 1381.

The Debtor believes that the ACH/TVT Claims transfer and allowance arrangement embodied in the Stipulation is reasonable, fair, equitable, and in the best interest of its estate and stakeholders. The terms of the Stipulation provide for a reasonable and final resolution of the ACH/TVT Claims among the Debtor, ACH and TVT, allowing the claimants to efficiently monetize their claims, while providing a valuable credit bid for the Buyer to serve as the Stalking

Horse Purchaser in the auction and sale. Moreover, the terms of the Stipulation are the product of substantial, arms'-length negotiations after fulsome analyses of the ACH and TVT proofs of claim and investigation of other information.

The Debtor believes the expense, delay, and costs associated with claims objections would necessarily reduce any net recovery available to the Debtor's estate. Further, Buyer will not pursue a purchase of the assets absent an approval of the Stipulation. Moreover, as set forth above, the proposed sale provides substantial economic benefit to Debtor's estate and other constituents which would not be available absent the proposed sale.

For the foregoing reasons, the Debtor believes that the terms of the Stipulation will maximize value for the Debtor's stakeholders, avoid unnecessary risk, delay, uncertainty and litigation costs, and most importantly, will allow the Sale to move forward. Therefore, approval of the Stipulation is in the best interest of the Debtor's estate and stakeholders. Under these circumstances, the Debtor believes that the terms of the Stipulation are appropriate, fair, equitable, and should be approved by this Court.

## V. GOOD CAUSE EXISTS FOR THE COURT TO GRANT THE SHORTENED TIME APPLICATION DUE TO THE SHORT TIME FRAME OF THE PROPOSED SALE AND SALE PROCEDURES.

Debtor respectfully submits that the Court should Court grant the Shortened Time Application for good cause shown under Local Bankruptcy Rule 9075-1(b)(1). As set forth herein, approval of the Stipulation is a necessary condition to the Sale, which is in the overwhelming best interests of this estate. Debtor anticipates that its motion to approve the Sale will be heard on July 29, 2025 on the Court's 1:00 p.m. calendar. Additionally, Debtor be requesting the Court's approval of sales procedures on an expedited basis, providing for the possibility of a competitive bidding and auction process. Debtor anticipates requesting this Court to set a deadline of July 20, 2025 for any competing bid. As such, it will be necessary for the Stipulation to be approved no later than that bid deadline.

Absent approval of the Stipulation, it will not be possible to conduct a sales process because an important condition precedent to the Stalking Horse Purchase Agreement will not be satisfied. Further, absent approval of the Stipulation and the Buyer's ability to credit bid under Section 363(k), the actual amount of the proposed purchase price under the Stalking Horse Purchase Agreement will not be known, which would make a competitive bidding process and auction impossible.

Moreover, without approval of the Stipulation well before a hearing on a Sale, Debtor and the Buyer will remain in limbo, unable to move forward with a full commitment to the sales process and preparing for a quick and efficient close of the Sale, absent approval of the Stipulation on an expedited basis.

On the other hand, Debtor could not have filed the Shortened Time Application until the parties executed the Stalking Horse Purchase Agreement and the Stipulation, the latter of which was executed on July 14, 2025. Therefore, Debtor's request for a hearing on the Motion on shortened time is reasonable and done in good faith.

## VI. CONCLUSION

WHEREFORE, for all of the foregoing reasons, and such additional reasons as may be advanced at or prior to the hearing regarding this Motion, the Debtor respectfully requests the entry of an order of the Court approving the Stipulation, granting such other and further relief as the Court may deem just and proper under the circumstances.

Dated: July 14, 2025

HEALTHY SPOT OPERATING, LLC

By: *___/s/ Daniel H. Reiss___________*

DANIEL H. REISS
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
Attorneys for Chapter 11 Debtor and Debtor in Possession

**DECLARATION OF MARK BOONARK**

I, Mark Boonnark, hereby declare as follows:

1. I serve as the chief executive officer of Healthy Spot Operating, LLC, the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"). I have personal knowledge of the facts set forth herein, and, if called as a witness, I would testify competently with respect thereto.

2. I have reviewed and am familiar with and am knowledgeable about the books and records of Debtor, which books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded. I make this declaration in support of the annexed Motion. Unless otherwise indicated, the capitalized terms herein shall have the same meaning herein as in the Motion.

3. On December 10, 2024, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. Debtor is a comprehensive pet care retail business which, as of the Petition Date, had a network of 20 retail stores in premier locations across Southern and Northern California, as well as a growing e-commerce channel. Debtor's focus is on fostering healthy pet lifestyles. Each of Debtor's stores provides a suite of best-in-class services, including pet grooming, daycare, nutrition consulting, dental cleaning and dog training classes, aiming to cater to the complete spectrum of client needs in pet care. Debtor specializes in a curated offering of pet care products, including an extensive selection of wholesome and organic food options, environmentally-friendly toys, treats, training aids, grooming supplies, and its private label offering, Mind Body Bowl. Debtor has established itself as a benchmark brand for pet services and retail, and is able to command industry leading average purchase per customer, basket size, margins, and customer loyalty by leveraging the synergy of daily need services and consumables like grooming and pet food.

4. Along with the retail locations, Debtor has also developed a growing direct-to-consumer ecommerce and wholesale business with its private label brand Mind Body Bowl,

which speaks to the same holistic approach to pet health and care embodied in the stores. Mind Body Bowl is currently on shelf in 400+ grocery stores including Erewhon, Gelsons, and Bristol Farms. This serves to further monetize the brand as well as extend the brand reach geographically and demographically. Gross annual sales are approximately $40 million, and Debtor has approximately 300 employees.

5. The Debtor continues to operate and manage its business and affairs as a debtor-in-possession pursuant. Debtor's post-petition efforts have been aimed at stabilizing the company's operations and remain as a going concern despite the challenges of this chapter 11 bankruptcy, unexpected events such as the recent Los Angeles fires, and competitive business environment. Since the Petition Date, Debtor implemented various strategies to increase sales and improve operating efficiencies. Unfortunately, despite Debtor's best efforts, Debtor is now experiencing significant negative operating cash flows and its ability to remain a going concern is highly unlikely. As set forth in the *Revised Cash Collateral Budget* filed with this Court on April 28, 2025 [Dkt. No. 136], it was anticipated that Debtor would have a *negative* cash balance of approximately $379,000 for the week of June 30, 2025.

6. Based on the ongoing negative cash flows of Debtor, Debtor will not realistically be able to continue as a going concern. Further, Debtor's assets are encumbered by the asserted secured claims of TVT SPVL.com and ACH Capital West, LLC (described further below), whose filed secured proofs of claim exceed $3.0 million.[5] Debtor is fairly certain, therefore, absent a sale of its assets on a going concern basis, that there will be no value available for any creditors in this case, other than possibly for those holding secured claims. Therefore, Debtor has determined that a sale of its operating assets as a going concern will maximize the value of the bankruptcy estate and is the best interests of creditors and other parties in interest.

7. On or about July 10, 2025, Debtor entered into that certain Asset Purchase

---

[5] On February 2, 2025, ACH filed Claim Nos. 9 and 10 against Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10). Also on February 2, 2025, TVT filed Claim Nos. 11 and 12 against Debtor, asserting secured claims in the amounts of $994,045.42 (Claim No. 11) and $810,624.99 (Claim No. 12).

Agreement with Buyer, subject to higher or better offers ("Stalking Horse Purchase Agreement"). On July l0, 2025, Debtor filed a motion with this Court to approval the Stalking Horse Purchase Agreement. A true copy of the Stalking Horse Purchase Agreement is annexed to my Declaration filed in support of the Sale Motion as **Exhibit A**.

8. The Sale to under the terms of the Stalking Horse Purchase Agreement provides substantial economic benefit to the estate that would not exist without the Sale, and is in the overwhelming best interests of the Debtor's bankruptcy estate. First, because Debtor's assets will be sold as a going concern which benefits customers, the business community and employees. Debtor anticipates that the jobs of over 220 employees will be preserved as many of Debtor's retail locations will remain in business. Secondly, as set forth on Schedule H of the Stalking Horse Purchase Agreement, the Stalking Horse Purchaser is assuming pre-petition and post-petition trade debt ($1,775,788.16), accrued employee PTO ($215,514.00), and paying lease cure amounts ($497,511.64) in the aggregate of amount of $2,488,813.80 as part of its purchase price. Due to these substantial benefits to the estate, Debtor's employees and the community currently served by Debtor's business, Debtor believes that the proposed sale is an excellent achievement for this chapter 11 case and should be approved.

9. Due to the substantial benefits of the Sale to the estate, Debtor's employees and the community currently served by Debtor's business, Debtor believes that the proposed Sale is an excellent achievement for this chapter 11 case, and should be approved.

10. The Sale Motion is scheduled to be heard on July 29, 2025. Debtor concedes that the proposed timeframe for the proposed sale is rather compressed. Due to the precipitous decline in Debtor's business performance, Debtor cannot – and the Stalking Horse Purchaser is not willing to – extend the sale process longer than is proposed herein. As stated in the Sale Motion, Debtor's business and operations have been constantly and aggressively marketed for multiple years, including post-petition, and Debtor has no expectation that another purchaser will bid on the Assets, nor provide the substantial economic benefit that the

Stalking Horse Purchase Agreement provides.

11. Further, Debtor strongly believes that it does not have the luxury to engage in an expensive and lengthy marketing effort, nor does Debtor believe that additional marketing time and resources would yield a better result than is presented by the Stalking Horse Bid. In fact, any further delay may cause irreparable harm to the estate. Due to Debtor's negative cash flows, Debtor will be shortly unable to continue as a going concern, nor pay essential operating expenses such as payroll, employee benefits, rent, insurance or utilities. As a result, Debtor is seeking the relief requested herein on a highly expedited basis. For these reasons, Debtor is requesting that a hearing be set on the annexed Motion on shortened time to ensure that Court authority is obtained to consummate the sale as soon as possible.

12. On January 23, 2025, the Debtor filed, among other things, its Schedules of Assets and Liabilities. On its Schedule D, the Debtor scheduled ACH Capital West, LLC as holding an unliquidated and disputed secured claim in the amount of $1,231,902.55. Also on Schedule D, the Debtor scheduled "TVT SPVL.com" as holding an unliquidated and disputed secured claim in the amount of $1,700,868.52.

13. Based on the record in this bankruptcy case, I am informed that on February 2, 2025, ACH filed Claim Nos. 9 and 10 against the Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10) on account of "Sept 2024 Receivables Purchase Agr." I am also informed that on February 2, 2025, TVT filed Claim Nos. 11 and 12 against the Debtor, asserting secured claims in the amounts of $994,045.42 (Claim No. 11) and $810,624.99 (Claim No. 12) on account of "June 2024 Contract Receivables Purchase Agr."

14. As a necessary condition to proceeding with the Sale, and as set forth in the Stalking Horse Purchase Agreement, Buyer requires that: (i) the ACH/TVT Claims be allowed in certain agreed amounts; (ii) Buyer acquires the ACH/TVT Claims; and (iii) and Buyer be authorized to credit bid the allowed amount of the ACH/TVT Claims under Section 363(k) of the Bankruptcy Code as part of the purchase price for the Assets.

15. In order to fulfill these conditions, and in full resolution of the ACH/TVT Claims asserted against the Debtor, the Debtor, the Buyer, ACH and TVT have entered into a stipulation annexed hereto as **Exhibit A** (the "Stipulation"). The parties to the Stipulation negotiated the various terms of the Stipulation at arms'-length. Due to the clear benefits of the propose Sale, and because entry into the Stipulation and its approval by this Court is a condition precedent to moving forward with the Sale I believe it is in the overwhelming best interests of Debtor's bankruptcy estate for the Court to approve the Stipulation.

16. I believe that the ACH/TVT Claims transfer and allowance arrangement embodied in the Stipulation is reasonable, fair, equitable, and in the best interest of its estate and stakeholders. The terms of the Stipulation provide for a reasonable and final resolution of the ACH/TVT Claims among the Debtor, ACH and TVT, allowing the claimants to efficiently monetize their claims, while providing a valuable credit bid for the Buyer to serve as the Stalking Horse Purchaser in the auction and sale.

17. I believe the expense, delay, uncertainty, and costs associated with claims objections would necessarily reduce any net recovery available to the Debtor's estate. Further, and more importantly, Buyer will not pursue a purchase of the assets absent an approval of the Stipulation. Moreover, as set forth above, the proposed sale provides substantial economic benefit to Debtor's estate and other constituents which would not be available absent the proposed sale.

18. I am not aware of any other party other than ACH and TVT that asserts a lien in the assets of Debtor. I am informed that the record in this case also establishes that there are no other secured claims against Debtor, as there are no other secured parties scheduled by Debtor,[6] nor has any party other than ACH or TVT filed proofs of claim asserting a lien in the assets of Debtor.[7]

---

[6] The Court is requested to take judicial notice of Debtor's Bankruptcy Schedule D (Dkt. No. 62, pgs. 16 - 17). As stated above, all of the parties on Schedule D relate to the ACH/TVT Claims.

[7] A true copy of the claims register in this case is annexed to my Declaration in support of the Sale Motion as **Exhibit D**.

19. For the foregoing reasons, I believe that the terms of the Stipulation will maximize value for the Debtor's stakeholders as it will allow the Sale to proceed, and will avoid unnecessary risk, delay, and litigation costs, and are, ultimately, in the best interest of the Debtor's estate and stakeholders. Under these circumstances, I believe that the terms of the Stipulation are appropriate, fair, equitable, and should be approved by this Court.

20. In addition to the Sale Motion, Debtor has filed a motion to approve of sales procedures on an expedited basis, providing for the possibility of competitive bidding and auction process. The sales procedures motion is currently set for hearing on July 17, 2025. The Debtor has requested that this Court set a deadline of July 20, 2025 for third parties interested in purchasing the Debtor's assets to submit a competing bid.

21. Absent approval of the Stipulation, I do not think it will be possible to conduct a sales process because approval of the Stipulation is a condition precedent to the Stalking Horse Purchase Agreement. Further, absent approval of the Stipulation, Buyer's ability to credit bid, the actual amount of the proposed purchase price under the Stalking Horse Purchase Agreement will not be known, making a competitive bidding process and auction impossible.

22. Further, without approval of the Stipulation well before a hearing on a Sale, Debtor and the Buyer will remain in limbo, unable to move forward with a full commitment to the sales process and preparing for a quick and efficient close of the Sale. Therefore, approval of the Stipulation on an expedited basis is essential to move forward with the Sale.

23. Debtor could not have filed the Shortened Time Application until the parties executed the Stalking Horse Purchase Agreement and the Stipulation. The Stipulation was finally signed on July 14, 2025. Therefore, Debtor's request for the Court to set a hearing on the Motion on shortened notice is reasonable and done in good faith.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of July, 2025 in Los Angeles, California.

MARK BOONNARK

# EXHIBIT "A"

DANIEL H. REISS (SBN 150573)
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dhr@lnbyg.com

Attorneys for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>HEALTHY SPOT OPERATING, LLC,<br><br>Debtor and Debtor in Possession. | Case No.: 2:24-bk-20065-DS<br><br>Chapter 11 Case<br><br>**STIPULATION BY AND AMONG THE DEBTOR, ACH CAPITAL WEST, LLC, INSTAFUNDING LLC, PET PROS, LLC, AND NPM FRANCHISING, LLC REGARDING CLAIM TREATMENT** |

Healthy Spot Operating, LLC ("Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Chapter 11 Case"), ACH Capital West, LLC ("ACH"), Instafunding LLC aka TVT SPVL ("TVT"), Pet Pros, LLC ("Pet Pros"), and NPM Franchising, LLC ("NPM," and together with Pet Pros, the "Buyer," and Buyer collectively with Debtor, ACH and TVT, the "Parties"), by and through their undersigned counsel, hereby enter into this stipulation ("Stipulation"), pursuant to which the Parties stipulate and agree as follows:

**RECITALS**

A. On December 10, 2024, the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

B. On February 2, 2025, ACH filed Claim Nos. 9 and 10 (the "ACH Claims") against the Debtor, asserting secured claims in the amounts of $629,689.99 (Claim No. 9) and $651,846.94 (Claim No. 10) on account of "Sept 2024 Receivables Purchase Agr."

C. The ACH Claims assert certain "recorded UCC-1" filings as the basis for the perfection of its purported security interests and attached certain UCC Financing Statements (the "ACH UCC-1s") filed with the Delaware Secretary of State and the California Secretary of State. The ACH UCC-1s identify, among other entities, the Debtor as a debtor to the ACH obligations, pledging "[a]ll current assets of the Debtor as of the enforcement date of [the ACH UCC-1s], including but not limited to cash, accounts receivable, other receivables, equipment, inventory, along with all trade fixtures belonging to the Debtor; all inclusive of after acquired property."

D. Also on February 2, 2025, TVT filed Claim Nos. 11 and 12 (the "TVT Claims," and together with the ACH Claims, the "ACH/TVT Claims") against the Debtor, asserting secured claims in the amounts of $994,045.42 (Claim No. 11) and $810,624.99 (Claim No. 12) on account of "June 2024 Contract Receivables Purchase Agr."

E. The TVT Claims assert certain "recorded UCC-1" filings as the basis for the perfection of its purported security interests and attached certain UCC Financing Statements (the "TVT UCC-1s") filed with the California Secretary of State. The TVT UCC-1s identify, among other entities, the Debtor as a debtor to the TVT obligations, pledging "[a]ll personal property of every kind and nature, wherever located, and now owned or hereafter acquired, including without limitation, all accounts, contract rights, rights to the payment of money, insurance claims and proceeds, chattel paper, electronic chattel paper, documents, instruments, securities and other investment property, deposit accounts, supporting obligations of every nature, and general intangibles, including without limitation, customer lists, and all books and records related thereto, and all recorded data of any kind and nature, regardless of the medium of recording; together with, to the extent not listed above as to the original collateral, all substitutions and replacements for and products of any of the foregoing property, and together with proceeds of any and all of the foregoing property." TVT asserts that, pursuant to a merchant cash advance

agreement, it purchased accounts receivable from Debtor, and therefore claims an ownership interest in such purchased receivables.

F. As set forth in its *Initial Chapter 11 Case Status Report* [Docket No. 42] (the "Status Report"), the Debtor asserts various defects and deficiencies as to the validity and perfection of the ACH and TVT purported security interests underlying the ACH/TVT Claims, including that the Debtor disputes the validity of the confession of judgment filed by TVT in Utah state court.

G. Conversely, ACH and TVT dispute the Debtor's allegations raised in the Status Report, and assert that the ACH/TVT Claims, respectively, are valid, properly perfected, and enforceable against the Debtor.

H. The Parties hereto agree that there are no other liens claimed by any other creditor of the Debtor, and that, to the extent the ACH/TVT Claims are valid and enforceable, the liens secured such claims are first-priority blanket liens against the Debtor's assets.

I Pet Pros, a Washington limited liability company, and NPM, a Washington limited liability company, together are interested in acquiring certain Assets of the Debtor, free and clear of liens, claims, encumbrances and interests, and intends to enter into an *Asset Purchase Agreement* (the "APA") with Debtor for that purpose. Debtor has filed or will soon file a motion with the Bankruptcy Court to approve the APA (the "Sale Motion"), as well as a motion seeking approval of certain bidding and sale procedures (the "Bid Procedures Motion"). As a condition to proceeding with the purchase of the Assets, and as set forth in the APA, Buyer requires that: (i) the ACH/TVT Claims be allowed in the amounts set forth herein below; (ii) Buyer acquires the ACH/TVT Claims; and (iii) and that Buyer be authorized to credit bid the allowed amount of the ACH/TVT Claims under Section 363(k) of the Bankruptcy Code as part of the purchase price for the Assets.

J. ACH and TVT desire to monetize the ACH/TVT Claims and to sell and transfer such claims to Buyer.

K. Following arm's-length negotiations, the Parties have reached an agreement regarding the treatment of the ACH/TVT Claims.

**NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED,** by and among the Parties, as follows:

1. Effective Date. This Stipulation shall become effective upon the entry of an order of the Bankruptcy Court approving this Stipulation (the "Effective Date").

2. The ACH/TVT Allowed Claims. Upon the Effective Date of this Stipulation, the ACH Claims shall be allowed, for the purpose of Buyer submitting a credit bid in the Auction and Sale, in the total amount of $1,281,538.93 (the "ACH Allowed Claims"). Also upon the Effective Date of this Stipulation, the TVT Claims shall be allowed, for the purpose of Buyer submitting a credit bid in the Auction and Sale, in the total amount of $1,804,670.41 (the "TVT Allowed Claims"). Accordingly, the ACH/TVT Claims shall be allowed as first-priority secured claims secured by a blanket lien on Debtor's assets, as good and valid consideration for the purpose of Buyer submitting a credit bid in the Auction and Sale, under Section 363(k) of the Bankruptcy Code, in the aggregate amount of $3,086,209.34 (the "ACH/TVT Allowed Claims"). The allowance of the ACH/TVT Claims are subject to: (i) the acquisition of the ACH/TVT Claims by Buyer, and (ii) Debtor and Buyer entering into a binding asset purchase agreement, subject to Bankruptcy Court approval, in which the TVT/ACH Allowed Claims shall be credit bid as part of the purchase price. Absent the foregoing conditions, Debtor reserves all rights with respect to objecting to the ACH/TVT Claims.

3. Transfer of ACH/TVT Allowed Claims. Upon an order of the Bankruptcy Court approving this Stipulation and the allowance of the ACH/TVT Allowed Claims for the purpose of Buyer submitting a credit bid in the Auction and Sale, under Section 363(k) of the Bankruptcy Code, ACH and TVT each agree to promptly transfer their respective ACH/TVT Allowed Claims to Buyer within three (3) business days upon receipt of such consideration that has been agreed upon in writing. ACH and/or TVT shall have no further claims (administrative, secured, unsecured, or otherwise) against the Debtor.

4. Reservation of Rights. Should Buyer not be determined to be the Successful Bidder in the Auction, Buyer reserves all rights in and to the ACH/TVT Claims, including any and all asserted security interests in collateral of the Debtor and any rights to payment in connection therewith, in the Chapter 11 Case, or under the Bankruptcy Code.

5. Jurisdiction. The Bankruptcy Court shall retain exclusive jurisdiction and power to interpret and enforce the terms and conditions of this Stipulation.

*[Signature page follows]*

**IT IS SO STIPULATED.**

DATED: July 14, 2025

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK LLP

*/s/ Daniel H. Reiss*
DANIEL H. REISS
*Attorneys for Healthy Spot Operating, LLC*

DATED: July 14, 2025

BRONSTER LLP

*/s/ J. Logan Rappaport*
J. LOGAN RAPPAPORT
*Attorneys for ACH Capital West, LLC and Instafunding LLC aka TVT SPVL*

DATED: July 14, 2025

BUSH KORNFELD LLP

*/s/ Richard B. Keeton*
RICHARD B. KEETON
*Attorneys for Pet Pros, LLC and NPM Franchising, LLC*

# EXHIBIT "B"

DANIEL H. REISS (SBN 150573)
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dhr@lnbyg.com

Attorneys for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>HEALTHY SPOT OPERATING, LLC,<br><br>Debtor and Debtor in Possession. | Case No.: 2:24-bk-20065-DS<br><br>Chapter 11 Case<br><br>**ORDER APPROVING STIPULATION BY AND AMONG THE DEBTOR, ACH CAPITAL WEST, LLC, INSTAFUNDING LLC, PET PROS, LLC, AND NPM FRANCHISING, LLC REGARDING CLAIM TREATMENT**<br><br>Date:<br>Time:<br>Place: Courtroom 1639<br>255 East Temple Street<br>Los Angeles, CA 90012 |

Upon the *Motion for Order Approving Stipulation By and Among the Debtor, ACH Capital West, LLC, Instafunding LLC, Pet Pros, LLC, and NPM Franchising, LLC Regarding Claim Treatment* (the "Motion"),[1] filed by Healthy Spot Operating, LLC ("Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Chapter 11 Case"), for the entry of an order (this "Order") approving the Stipulation (as defined and set forth in the Motion), **Exhibit A** hereto, and granting related relief; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found this matter

[1] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the statements of counsel, the declaration of Mark Boonnark submitted in support of the Motion, and any objections raised; and it appearing that the relief requested in the Motion is reasonable and in the best interests of the Debtor's bankruptcy estate, its creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1. The Motion is granted as set forth herein.

2. All formal and informal objections, if any, to the relief requested in the Motion that have not been withdrawn, waived, or settled are overruled on the merits.

3. The Stipulation and the terms therein are approved and are incorporated herein.

4. Notwithstanding anything in the Bankruptcy Code or the Bankruptcy Rules to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5. The Debtor is authorized and empowered to take such steps and do such other things as may be necessary or appropriate to implement and effectuate the relief granted in this Order.

6. This Court retains exclusive jurisdiction and power to hear and determine all matters arising from or related to the implementation and interpretation of this Order.

###

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled **1) MOTION FOR ORDER APPROVING STIPULATION BY AND AMONG THE DEBTOR, ACH CAPITAL WEST, LLC, INSTAFUNDING LLC, PET PROS, LLC, AND NPM FRANCHISING, LLC REGARDING CLAIM ALLOWANCE AND CREDIT BIDDING; (2) COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF (A) MOTION; AND (B) CONCURRENTLY FILED APPLICATION FOR ORDER SHORTENING NOTICE; (3) DECLARATION OF MARK BOONNARK IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 14, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Jonathan Arias bknotices@zwickerpc.com
- Jamie Altman Buggy jbuggy@harvestllp.com, jkeatingwolk@harvestllp.com,atenreiro@harvestllp.com
- Shawn M Christianson cmcintire@buchalter.com, schristianson@buchalter.com
- Ivo Keller ikeller@sflaw.com, calendar@sflaw.com
- Sweeney Kelly kelly@ksgklaw.com
- Elizabeth S Lynch blynch@chinnery.com
- Noreen A Madoyan Noreen.Madoyan@usdoj.gov
- Stephen Malkiewicz stephen.malkiewicz@cintas.com
- Jean Pierre Nogues jpn@msk.com
- Dean G Rallis drallis@hahnlawyers.com, jevans@hahnlawyers.com;drallis@ecf.courtdrive.com;jevans@ecf.courtdrive.com;crogers@hahnlawyers.com;acastillo@hahnlawyers.com
- Abe G Salen asalen@wzllp.com, kmartin@wzllp.com,ddouglas@wzllp.com,akaderbarek@wzllp.com
- Daren M Schlecter daren@schlecterlaw.com, assistant@schlecterlaw.com
- Gary A Starre gastarre@gmail.com, mmoonniiee@gmail.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

**2. SERVED BY UNITED STATES MAIL**: On **July 14, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 14, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| July 14, 2025 | D. Woo | */s/ D. Woo* |
| *Date* | *Type Name* | *Signature* |